# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| EVERGREEN SOLAR, INC.,[1] | ) | |
| | ) | Case No. 11-**12590**   (___) |
| Debtor. | ) | |
| | ) | |

## DECLARATION OF MICHAEL EL-HILLOW, CHIEF EXECUTIVE OFFICER OF THE DEBTOR, IN SUPPORT OF FIRST DAY PLEADINGS

Michael El-Hillow, under penalty of perjury, hereby states:

1.      I am the President and Chief Executive Officer of Evergreen Solar, Inc. ("Evergreen" or the "Debtor"), which has its corporate headquarters at 138 Bartlett Street, Marlborough, Massachusetts.  I have been employed in this capacity since September 2010 and had previously served as Chief Operations Officer from September 2009 to September 2010 and Chief Financial Officer from January 2007 to September 2009.  I previously served as Chairman of the Board of Directors (the "Board") of the Debtor from September 2005 to December 2006. I rejoined the Board in September 2010, and served on the Board prior thereto from August 2004 until December 2006.  Accordingly, I am familiar with Debtor's day-to-day operations, books and records, businesses, and financial affairs.

2.      On August 15, 2011 (the "Petition Date"), the Debtor commenced a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court").

---

[1] The last four digits of the Debtor's federal tax identification number is 2254.

3.     In order to enable the Debtor to operate effectively and minimize any disruption caused by the commencement of this chapter 11 case, the Debtor has requested certain relief in "first day" motions and applications filed with the Court (collectively, the "First Day Pleadings"). As described herein, the First Day Pleadings seek, among other things, to ensure the continuation of the Debtor's cash management system and other business operations without interruption, preserve vendor and customer relations, maintain employee confidence and morale, and establish certain other administrative procedures to promote a seamless transition into chapter 11. I am familiar with the contents of each First Day Pleading (including the exhibits and other attachments to such motions) and believe the relief sought in each First Day Pleading: (i) is necessary to enable the Debtor to operate in chapter 11 with minimal disruption or loss of productivity or value; (ii) is critical to the Debtor's effort to maximize the value of its estate for the benefit of all stakeholders; and (iii) best serves the Debtor's estate and the interest of the Debtor's creditors.

4.     I submit this Declaration (the "Declaration") to assist the Court and other parties in interest in understanding the circumstances that compelled the commencement of this chapter 11 case and in support of the First Day Pleadings. I have reviewed the factual support set forth in each of the First Day Pleadings and attest to the accuracy thereof. Except as otherwise indicated, all facts set forth herein are based on my personal knowledge, my discussions with other members of the Debtor's senior management, my review of relevant documents, or my opinion based upon experience, knowledge, and information concerning the Debtor's operations and financial affairs. If called upon to testify, I would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of the Debtor.

2

5.    This Declaration is intended to provide a summary overview of the Debtor's business and this chapter 11 case. Sections I through V of this Declaration provide an overview of the Debtor's business, organizational structure, capital structure, events and circumstances giving rise to this chapter 11 case, and information regarding this chapter 11 case. Section VI summarizes the relief requested and the relevant facts in support of each of the First Day Pleadings.

## I. OVERVIEW OF THE DEBTOR'S BUSINESS OPERATIONS

### A.    Bankruptcy

6.    The Debtor commenced this case by filing a voluntary petition on the Petition Date. The Debtor has continued in the possession of its property and has continued to operate and manage its business as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request has been made for the appointment of a trustee or an examiner in this case, and no official committee(s) have yet been appointed by the United States Trustee for the District of Delaware.

### B.    Description of Evergreen Solar, Inc.'s Business (past, present and future)

7.    Evergreen Solar, Inc. was incorporated in Delaware in August 1994. Evergreen has historically developed and manufactured multi-crystalline silicon wafers (known as String Ribbon ™ wafers) utilizing its proprietary wafer manufacturing technology. Those String Ribbon wafers are then converted into photovoltaic solar cells, which are used to produce Evergreen-branded solar panels (also referred to as solar modules). Evergreen's technology involves a unique process of producing multi-crystalline silicon wafers by growing thin strips of silicon that are then cut into wafers using lasers, substantially reducing the amount of silicon and other processing costs required to produce a wafer as compared to conventional wafer manufacturing methods.

A/74481821.1

8.      Evergreen's revenues, historically, have been derived from the sale of solar panels. Evergreen traditionally sold its products using distributors, systems integrators and other resellers who often added value through system design by incorporating Evergreen's solar panels with electronics, mounting structures and wiring systems.

9.      Evergreen commenced product sales in April 1997. Evergreen's sales have primarily been to customers in Europe, as European countries (particularly Germany) have historically provided subsidies to consumers for using solar technology.

10.     To meet the increasing competition from much better capitalized China-based companies, on July 30, 2009, Evergreen finalized agreements with Jiawei Solarchina Co., Ltd. and Hubei Science & Technology Investment Co., Ltd. ("HSTIC"), an investment fund sponsored by the government of Hubei, China to expand Evergreen's manufacturing operations in China. In connection with their collaboration, HSTIC invested the Chinese RMB equivalent of $33 million in Evergreen Solar (China) Co., Ltd. ("Evergreen Wuhan") in exchange for 66% of Evergreen Wuhan's equity, and Evergreen invested approximately $17 million in cash and equipment in exchange for the remaining 34% of Evergreen Wuhan's equity. As part of HSTIC's investment, Evergreen agreed to purchase HSTIC's shares no later than July 2014 for an amount equal to HSTIC's aggregate investment of approximately $33 million plus interest of 7.5% compounded annually (the "Purchase Obligation").

11.     Evergreen is currently engaged in discussions with HSTIC regarding the Purchase Obligation and the continued operation of its Wuhan Facility (as defined below), in light of Evergreen's recent change in strategic focus (as discussed below).

12.     Historically, Evergreen produced non-standard size rectangular wafers (industry standard sized wafers are 156 mm square; Evergreen wafers were historically rectangular) that

4

were then processed into Evergreen-branded solar panels primarily in Evergreen's facilities, first in Marlborough, Massachusetts, and then recently in Devens, Massachusetts (the "Devens Facility"). Construction of the Devens Facility began in 2007 and production of wafers and assembly of solar panels began there in mid-2008, at which time the much smaller Marlborough facility was gradually closed. About 5% of the approximately $450 million cost of the Devens Facility was financed by (i) job-related grants from certain agencies of the Commonwealth of Massachusetts, including Massachusetts Development Finance Agency ("Mass Dev"), (ii) a favorable ground lease for the facility in Devens from Mass Dev and (iii) a Tax Increment Financing Agreement ("TIF") with Mass Dev, which Mass Dev alleges constituted an abatement from the property tax assessment otherwise payable in the Devens municipality.

13.     During 2010, in an effort to reduce panel costs and meet competition from Chinese companies, Evergreen also began production at its new Evergreen Wuhan wafer facility in Wuhan, China (the "Wuhan Facility"). In addition, Evergreen operates a plant in Midland, Michigan (the "Midland Facility") which is in the early stages of producing the filament that is critical to Evergreen's technology. Filament has historically been purchased by Evergreen from an independent small company based in Lowell, Massachusetts.

14.     As discussed in greater detail in Section IV below, due to market conditions, Evergreen closed the Devens Facility in early 2011, and intends to suspend operations at its Midland Facility in the near future.

15.     Evergreen made substantial progress in the second half of 2010 and into 2011 towards development of technology for the production of an industry standard size wafer ("Wide Wafer Technology"), which can be supplied to the world's leading solar cell and panel manufacturers. The Debtor plans to focus its operations solely on completing the development

5

of the Wide Wafer Technology, which then may be used to manufacture wafers to be sold to other cell or panel manufacturers or licensed to other cell or panel manufacturers. Evergreen expects that its Wide Wafer Technology will permit the manufacturing of wafers at substantially lower cost than wafers manufactured by alternative methodologies and therefore expects significant demand for its Wide Wafer Technology.

## C.    Employees

16.    As of the Petition Date, Evergreen has approximately 133 full-time employees in the United States, including approximately 64 who are engaged in research and development and approximately 69 engaged in administration, information technology, sales and operations. Of the 133 employees, approximately 50 employees will remain with the Company for a few months to assist with the bankruptcy process and operational transition. In addition, one of Evergreen's non-debtor subsidiaries, Hubei Evergreen Solar Co., Ltd, employs 25 full-time employees, who are all engaged in research and development and another subsidiary, Evergreen Solar GmbH, employs five full-time employees in Germany who serve in the sales area. The sales area and its employees will either be closed (and the employees terminated) or transferred to Evergreen Wuhan's operations within the next few months.

17.    Evergreen employees are not covered by collective bargaining agreements.

## D.    Properties

18.    The Devens Facility consists of approximately 450,000 square feet of manufacturing and office space, which Evergreen owns, located on approximately 23 acres of land leased in Devens, Massachusetts from Mass Dev for an annual base rent of one dollar. Evergreen has an option to purchase this property on or before November 20, 2012 for a purchase price of $2.7 million or thereafter for the remainder of the initial 30-year term of the lease for the greater of $4.27 million or the fair market value of the property.

6

19.     In addition, Evergreen owns and occupies approximately 31,000 square feet of manufacturing and office space in Midland, Michigan for its Midland Facility.

20.     Evergreen also leases approximately 51,000 square feet of research and development and office space in Marlborough, Massachusetts, its non-debtor subsidiary Evergreen Solar GmbH leases approximately 4,000 square feet of office space in Berlin, Germany and its non-debtor subsidiary Hubei Evergreen Solar Co., Ltd leases approximately 4,400 square feet of factory and office space in Wuhan, China.

**E.      Intellectual Property**

21.     Evergreen owns significant intellectual property rights that underlie its proprietary technologies, in particular the manufacturing methods, product technology and other assets used with respect to the its Wafer Technology (the "Wide Wafer Assets").

22.     Evergreen has 26 U.S. patents, six Japanese patents, five Indian patents, and four European patents that are enforceable in one or more European jurisdictions. These patents begin to expire in 2016 and will all expire by 2028.

23.     In addition, Evergreen has 20 pending U.S. patent applications and 76 pending foreign patent applications related to its business.

## II. ORGANIZATIONAL STRUCTURE

24.     Evergreen is a Delaware corporation. Evergreen holds direct or indirect ownership interests in the following nondebtor subsidiaries:

(a)     100% of the membership interest in Evergreen Solar, GmbH;

(b)     100% of the common stock of Evergreen Solar Securities Corp.;

(c)     100% of the interest in Evergreen Solar (HK) China Limited, which in turn owns 100% of the equity interest in Hubei Evergreen Solar Co., Ltd.; and

A/74481821.1

      (d)     34% of the equity interest of Evergreen Wuhan (with the remaining 66% held by HSTIC).

For convenience of reference, an organization chart is annexed as Exhibit "A" hereto.

     25.     Prior to February 2011, Evergreen was also the sole member of ESLR1, LLC ("ESLR1"), a Delaware limited liability company. In connection with an exchange offer with respect to the 13% Secured Notes and 4% Notes (each as defined below), ESLR1 was merged with and into Evergreen.

## III. EVERGREEN'S CAPITAL STRUCTURE

### A.    Senior Unsecured Convertible 4% Notes

     26.     Pursuant to that certain Indenture dated as of July 2, 2008 and First Supplemental Indenture dated as of July 2, 2008 (together, the "2013 Notes Indenture"), on July 2, 2008 and July 8, 2008, Evergreen issued $373.75 million in aggregate principal amount of senior convertible notes due July 15, 2013 bearing interest at the rate of 4% per year, payable semi-annually in arrears on January 15 and July 15 of each year (the "2013 Notes") in a registered public offering. The 2013 Notes are unsecured. U.S. Bank National Association ("U.S. Bank") is the trustee under the 2013 Notes Indenture. Currently, approximately $203.8 million aggregate principal amount of 2013 Notes remain outstanding.

### B.    Senior Convertible 13% Secured Notes

     27.     Pursuant to that certain Indenture dated as of April 26, 2010 (the "13% Notes Indenture"), on April 26, 2010, Evergreen issued $165 million in aggregate principal amount of convertible senior secured notes due April 15, 2015 bearing interest at a rate of 13% per year, payable semi-annually, in arrears on April 15 and October 15 of each year (the "13% Secured Notes") through a private placement effected in accordance with Rule 144A of the Securities Act of 1933 (as amended). Evergreen's obligations under the 13% Secured Notes were guaranteed

8

by ESLR1. U.S. Bank is the indenture and collateral trustee under the 13% Notes Indenture (the "13% Notes Trustee ").

28.     Prepetition, Evergreen used approximately $82.4 million of the net proceeds for the issuance of the 13% Secured Notes to purchase approximately $124.5 million aggregate principal amount of the 2013 Notes, with the remainder of the net proceeds used for general corporate purposes, working capital and capital expenditures for further expansion in China.

29.     To secure the obligations owing in respect of the 13% Secured Notes, pursuant to the Pledge and Security Agreement and the Collateral Trust Agreement, each dated as of April 26, 2010, and related documents, Evergreen granted to the 13% Notes Trustee , a first-priority lien on substantially all of the assets owned by Evergreen, subject to certain exceptions. Currently, $165 million in aggregate principal amount of 13% Secured Notes remains outstanding, plus accrued and unpaid interest.

**C.     New 4% Notes**

30.     In early 2011, Evergreen commenced a registered exchange offer (the "Exchange Offer") to exchange: (a) an aggregate principal amount of up to $100 million of new 4.0% Convertible Subordinated Additional Cash Notes due 2020 (the "2020 Notes," and together with the 2013 Notes, the "4% Notes") for an aggregate principal amount of up to $200 million of existing 2013 Notes; and (b) an aggregate principal amount of up to $165 million of new 7.5% Convertible Senior Secured Notes due 2011 for an aggregate principal amount of up to $165 million of existing 13% Secured Notes.

31.     Holders of approximately $45.4 million aggregate principal amount of 2013 Notes tendered their existing 2013 Notes for exchange pursuant to the terms of the Exchange Offer.

9

32.     An aggregate principal amount of approximately $203.8 million in aggregate principal amount of 2013 Notes remained outstanding following consummation of the Exchange Offer, and approximately $22.7 million principal amount of 2020 Notes were issued pursuant to that certain Indenture dated as of February 17, 2011 and that certain First Supplemental Indenture dated as of February 17, 2011 (together, the "2020 Notes Indenture") to holders whose 2013 Notes were accepted for exchange. U.S. Bank is also the trustee under the 2020 Notes Indenture. A portion of the 2020 Notes were converted to equity and approximately $4.5 million in aggregate principal amount remains outstanding.

33.     Less than $50 million aggregate principal amount of the 13% Secured Notes were tendered as part of the Exchange Offer. Because the minimum tender and consent conditions with respect to the 13% Secured Notes were not met, Evergreen did not accept any 13% Secured Notes for exchange.

34.     On July 15, 2011, Evergreen announced, pursuant to a Current Report on Form 8-K filed with the Securities and Exchange Commission on such date, that the Board had determined that in light of its current liquidity and capital resources, it would not make the interest payments due to the holders of the 4% Notes on July 15, 2011.

**D.     Capped Call and Stock Lending Agreements**

35.     In connection with the issuance of the 2013 Notes, Evergreen entered into a capped call transaction with respect to its common stock with Lehman Brothers OTC Derivatives Inc. ("LOTC"), an affiliate of Lehman Brothers Inc., the lead underwriter for the 2013 Notes issuance. The purpose of the capped call transaction was to reduce the dilution that would otherwise occur as a result of new common stock issuance upon conversion of the 2013 Notes. Evergreen agreed to pay a total premium of approximately $68.1 million for the capped call, of which $39.5 million was paid contemporaneously with the closing of the 2013 Notes issuance

10

and the remaining $28.6 million was required to be paid in nine equal semi-annual installments beginning January 15, 2009.

36.    In addition, in connection with the issuance of the 2013 Notes, Evergreen entered into a common stock lending agreement with Lehman Brothers International (Europe), an affiliate of LOTC ("LBIE"), pursuant to which Evergreen loaned 5,142,757 shares of its common stock valued at approximately $290 million at the time of the transaction to LBIE.

37.    On September 15, 2008, Lehman Brothers Holdings, Inc., the parent of the lead underwriter for the 2013 Notes, filed for bankruptcy under chapter 11 of the Bankruptcy Code, and on October 3, 2008, LOTC filed for bankruptcy under chapter 11 of the Bankruptcy Code. In addition, LBIE was placed into administration in the United Kingdom shortly thereafter. Each of the bankruptcy and administration filings constituted an event of default under the capped call transaction. As a result of the defaults, LOTC is not expected to perform its obligations if such obligations were to be triggered, and Evergreen's obligations under the agreement have been suspended. Also, the bankruptcy and administration filings contractually required LBIE to return to Evergreen the shares loaned under a common stock lending agreement. Despite demands made by Evergreen for the immediate return of all outstanding borrowed shares, however, the shares were not returned.

E.    **Letters of Credit**

38.    As of the Petition Date, Evergreen has approximately $1.25 million of outstanding letters of credit, most of which are required to secure several equipment leases and Evergreen's corporate credit card program. Evergreen has segregated cash to collateralize these outstanding letters of credit.

A/74481821.1

**F.     Equity**

39.     Evergreen's common stock is currently traded on The NASDAQ Capital Market, although, as discussed below, it is currently not in compliance with applicable NASDAQ listing requirements.

40.     On July 5, 2011, Evergreen received a deficiency letter from NASDAQ Capital Market stating that, based on the closing bid price of Evergreen's common stock for the 30 consecutive business days preceding such date, Evergreen no longer met the minimum $1.00 per share requirement for continued listing on The NASDAQ Capital Market under Marketplace Rule 5450(a)(1).  On the same date, Evergreen received a second deficiency letter from NASDAQ stating that the Debtor is no longer in compliance with the minimum market value requirement for continued listing on the NASDAQ Capital Market (a minimum market value of $35 million is required).

**G.     Recent Financial Information**

41.     As of the Quarterly Report filed on Form 10-Q on May 12, 2011 (for the quarterly period ending April 2, 2011), the consolidated financial statements for Evergreen reflected approximately $35.3 million of revenue for the first quarter of 2011, a total operating loss of $46.2 million, total current assets of approximately $191.3 million, total current liabilities of approximately $59.5 million, cash and cash equivalents of $38.5 million, total long term liabilities of $396.0 million and stockholders equity of negative $81.5 million.

## IV.  EVENTS LEADING TO THE CHAPTER 11 CASE

**A.     International Competition and Manufacturing Costs**

42.     The solar power market is intensely competitive and rapidly evolving.  In particular, solar manufacturers in China continue to receive considerable government and financial support and, together with China's low manufacturing costs, have become price leaders

12

within the industry. Prices for solar panels fell precipitously throughout 2010 and into 2011. The reasons for this decline were several, including massive overcapacity of production, combined with severe cutbacks in available financing for solar power projects and reductions of state-sponsored subsidies world-wide for solar installation, principally in Europe, and the failure of the U.S. to adopt significant "clean energy" policies. While overall demand for solar panels may increase in the future, the Debtor expects that significant capacity expansions in low cost manufacturing regions combined with potential adverse changes in government subsidies in several markets in Europe will result in continuing pressure on solar panel selling prices throughout the remainder of 2011 and into 2012 and beyond.

43.     Although the Debtor was able to significantly reduce production costs at the Devens Facility, the Debtor's production costs remained much higher than those of its competitors in China. As industry selling prices continued their rapid declines in 2010 and into 2011, panel manufacturing in the Devens Facility, either fully or partially, was no longer economically feasible.

44.     In January 2011, the Debtor announced its intention to shut down operations at the Devens Facility to better position the Debtor to pursue its strategy to become one of the lowest cost producers of industry standard size wafers. The shut down process has largely been completed, and the Debtor has been actively marketing the Devens Facility to potential buyers since early in 2011.

45.     As a result of the closure of the Devens Facility and continued price declines, total product revenue for 2011 has substantially decreased, and beyond the first quarter of 2011, revenue has only been generated from product produced at the Wuhan Facility and the sale of remaining inventory that had been produced at the Devens Facility.

A/74481821.1

46.     Because the Debtor will no longer be expanding its panel manufacturing, the Debtor's focus moving forward will be on developing and leveraging out its Wide Wafer Assets. The Debtor believes that upon successful implementation of the Wide Wafer Technology, it (or any potential purchaser of the Wide Wafer Assets) can be the lowest-cost producer and market leader for solar wafers or other derivative products.

**B.     Examination of Strategic Alternatives; Proposed Restructuring**

47.     The Debtor routinely assesses strategic opportunities as part of its evaluation of its business and the industry in which it operates and reviews various alternatives intended to strengthen its business. The Debtor also regularly assesses its capital structure and short- and long-term liquidity requirements.

48.     The Debtor has a substantial amount of debt that will or could mature in 2013. The 2013 Notes mature on July 15, 2013. In addition, each holder of 13% Secured Notes may require Evergreen to repurchase such notes on April 15, 2013, two years ahead of the stated maturity, unless prior to such date Evergreen has reduced the outstanding aggregate principal amount of the 2013 Notes to no more than $50 million.

49.     This potential "put" of the 13% Secured Notes and the scheduled maturity date of the 2013 Notes has the combined effect of putting Evergreen in the position that all of Evergreen's long term debt could become payable in by mid 2013. Evergreen recognized that it was unlikely to be able to generate sufficient cash to repay the 13% Secured Notes and the 2013 Notes in 2013, and the debt overhang would likely prevent Evergreen from raising additional capital. In fact, Evergreen was not able to raise additional capital, despite reaching out to numerous investment banks, private equity firms and current holders of its debt, over the last twelve months.

14

50.     Consequently, Evergreen intensified its efforts to pursue restructuring alternatives from the middle of 2010 and in July 2010, Evergreen engaged Lazard Ltd. ("Lazard") as its investment advisor with the goal of having Lazard develop a detailed plan to address the 2013 Notes and the 13% Secured Notes.

51.     On November 29, 2010, Evergreen's board of directors approved a comprehensive recapitalization plan to align its capital structure with its current business model and to better position Evergreen for future growth.  The goal of the recapitalization plan was to: (i) substantially reduce Evergreen's outstanding indebtedness and annual interest expense; (ii) exchange a substantial portion of Evergreen's existing convertible debt for new debt with longer maturities and lower conversion prices; (iii) create a capital structure that could provide greater incentive to convertible debt holders to convert their notes into shares of common stock, which would further accomplish Evergreen's goal of substantially reducing outstanding debt; and (iv) enhance Evergreen's flexibility to manage its business by eliminating certain restrictive covenants and the security interests contained in existing debt instruments.

52.     Following the completion of the Exchange Offer in February 2011, Evergreen determined that, in light of insufficient participation in the Exchange Offer, Evergreen needed to explore other ways to restructure its debt.

53.     During February and March 2011, Evergreen's management had discussions with various holders of the 4% Notes (the "4% Noteholders") and the 13% Secured Notes (the "13% Secured Noteholders") with respect to the Exchange Offer, the reasons the Exchange Offer was unsuccessful, and possible next steps in a restructuring of Evergreen's capital structure.  In early March 2011, Evergreen began to investigate the feasibility of executing a transaction, or series of transactions, designed to enhance its liquidity and reduce its debt, including a refinancing of its

15

existing debt facilities, entering into new debt facilities and capital raising transactions. Evergreen considered a variety of restructuring alternatives, including the potential restructuring of the 4% Notes and 13% Secured Notes. In addition, Evergreen's management met with a large 4% Note holder to discuss in general the failed Exchange Offer, the reasons for the failure, Evergreen's need for liquidity and a possible restructuring of the 4% Notes.

54.     Through April 2011, Evergreen continued evaluating its cash position, strategic and financial restructuring alternatives, need for additional financing, financing options (including the refinancing of the 4% Notes and 13% Secured Notes) and strategic alternatives to address Evergreen's capital structure and business plan. Throughout April 2011, Evergreen continued discussions with the large 4% Note holder, its counsel and financial advisor, with the goal of formulating a plan to restructure the 4% Notes. However, after several weeks of intense discussions, it became apparent that the parties could not move forward with a restructuring plan focused on just restructuring the 4% Notes. Since then, Evergreen has had conversations with additional holders of the 4% Notes and the message has been the same--a 4% focused restructuring was not feasible.

55.     As a consequence, Evergreen changed its focus and began to discuss a possible transaction to restructure the 13% Secured Notes. Evergreen commenced discussions with certain 13% Noteholders, which collectively hold in excess of 70% of the outstanding principal amount of 13% Secured Notes, (the "Supporting Noteholders") and their counsel and financial advisor. Beginning in May 2011, Evergreen has engaged in intense negotiations with the Supporting Noteholders to reach an agreement with respect to restructuring Evergreen's capital structure and organization.

16

56.     As a result of these negotiations, Evergreen and the Supporting Noteholders have reached an agreement in principle regarding a proposed restructuring through a chapter 11 bankruptcy process that will give Evergreen the best chance to maximize value for stakeholders, while also developing the Wide Wafer Technology for sale to a potential purchaser.

## V.  THE CHAPTER 11 CASE

57.     As described below, through the First Day Pleadings, the Debtor seeks to ensure the continuation of its business operations without interruption.  The Debtor is also seeking authorization to obtain from the 13% Secured Noteholders authorization to use cash collateral, which would provide the Debtor with the necessary liquidity to finance the chapter 11 case.

58.     On August 15, 2011, the Debtor and the Supporting Noteholders agreed to a proposed restructuring through a chapter 11 bankruptcy process (the "Proposed Restructuring"), as set forth in that certain Restructuring Support Agreement dated August 15, 2011 (the "Restructuring Support Agreement"), which is attached hereto as Exhibit B.  The proposed restructuring, if successful, would involve the marketing and sale of substantially all of the assets of the Debtor, while allowing for the development of the Wide Wafer Technology through such sales.

59.     Notably, the Debtor and the Supporting Noteholders have agreed to a mechanism by which the Supporting Noteholders have agreed to effect a stalking horse credit bid through Newco as acquisition vehicle for the Purchased Assets.  The Supporting Noteholders will direct the 13% Notes Trustee to credit bid the secured obligations on behalf of all holders of the 13% Secured Notes, for the assets of the Debtor, including, without limitation, the Wide Wafer Technology, while at the same time permitting cash to be used to hire the Debtor's employees to develop and implement the Wide Wafer Technology.  This will enable jobs to be saved, while allowing for the potential of the Wide Wafer Technology to be realized.  The proposed procedure

A/74481821.1

would be through a sale pursuant to Section 363 of the Bankruptcy Code, in which the assets will

be thoroughly marketed by the Debtor and any sale or sales will be subject to higher and better

offers and approval by the Bankruptcy Court. A motion has been filed on the Petition Date

which seeks the approval of the procedures to effectuate this sales process.

60. Specifically, the Proposed Restructuring contemplates, among other things,

(a) immediately implementing an operational restructuring, including suspending operations at the Midland Facility, eliminating cash requirements from the United States to support Evergreen Wuhan, and scaling back all selling, general and administrative expenses, which changes would result in a corresponding reduction to the number of employees necessary to support the Debtor's business;

(b) immediately undertaking a process to market the sale of the Debtor's assets;

(c) effectuating a sale of Debtor's assets pursuant to section 363 of the Bankruptcy Code, in connection with which the holders of 13% Secured Notes will direct the 13% Notes Trustee to credit bid the secured obligations on behalf of all holders of the 13% Secured Notes; and

(d) operating during the chapter 11 case through a consensual use of cash collateral pursuant to a budget, acceptable to the Requisite Supporting Noteholders, in order to achieve a successful restructuring.

## VI. SUMMARY OF FIRST DAY PLEADINGS[2]

61. As discussed above, concurrently with the filing of its chapter 11 petition, the

Debtor filed various First Day Pleadings, which it believes are necessary to enable them to

operate with minimal disruption and loss of productivity. Through the First Day Pleadings, the

Debtor seeks authorization to, among other things, use cash collateral; maintain its cash

management system, pay its current and former employees' wages and severance and continue

---

[2] Unless otherwise defined, terms defined herein have the meaning ascribed to them in the respective First Day Pleading described.

all employee benefits in the ordinary course of business; pay certain prepetition taxes, and to continue paying its utility obligations.

62. As set forth in more detail below, in such instances, I believe the relief sought is necessary to avoid immediate and irreparable harm to the Debtor.

**A.  Retention of Claims Agent**

i.  *Summary of Relief Requested*

63. The Debtor seeks entry of a an order authorizing the Debtor to (i) employ and retain Epiq Bankruptcy Solutions, LLC ("Epiq") as noticing, claims and balloting agent, and as applicable, the Clerk to, among other things: (i) serve as the Court's notice agent to mail certain notices to the estate, creditors, and parties-in-interest, (ii) provide computerized claims, claims objections, and balloting database services, and (iii) provide expertise, consultation, and assistance with claim and ballot processing and with other administrative information related to the Debtor's bankruptcy case (the "Claims Agent Motion").

ii.  *Basis for Relief Requested*

64. The proposed terms of Epiq's employment are set forth in the engagement agreement between the Debtor and Epiq (the "Engagement Letter"), a copy of which is attached to the Claims Agent Motion as Exhibit B.

65. The creditor matrix in the Debtor's case includes approximately 2600 parties to whom certain notices must be sent. Such a large number of parties in interest will undoubtedly impose heavy administrative and other burdens on the Court and the Office of the Clerk of the Court. The Debtor will also need assistance in managing and addressing the myriad of administrative issues that will likely arise in this case. In addition, in connection with any plan of reorganization proposed by the Debtor, the Debtor has determined that they will require the services of Epiq to act as solicitation agent with respect to the mailing of a disclosure statement,

19

the plan and related ballots, and maintaining and tallying ballots in connection with the voting on such plan. To relieve and assist with these burdens, the Debtor requests the appointment of Epiq as claims, balloting, noticing and administrative agent in this chapter 11 case.

66.     Epiq is one of the leading chapter 11 administrators with expertise in noticing, claims processing, claims reconciliation, and distribution and ballot tabulation. Epiq has acted as claims and noticing agent in numerous bankruptcy cases and is well qualified to provide the Debtor with experienced services as claims, noticing, balloting, and administrative agent in connection with this chapter 11 case.

67.     By appointing Epiq as the Claims and Noticing Agent in this Chapter 11 case, creditors of the Debtor's estate will benefit from Epiq's significant experience in acting as a Claims and Noticing Agent in other cases and the efficient and cost-effective methods that Epiq has developed in its many years of operation.

**B.      Postpetition Use of Cash Collateral**

     *i.      Summary of Relief Requested*

68.     By motion filed contemporaneously herewith (the "Cash Collateral Motion"), the Debtor seeks entry of an order, on an interim basis (the "Interim Cash Collateral Order"), (i) authorizing the Debtor's use of cash collateral (as defined in section 363(a) of the Bankruptcy Code, "Cash Collateral"); (ii) providing adequate protection to the Debtor's prepetition secured noteholders for any diminution in value of their respective interests in the Cash Collateral or other prepetition collateral; (iii) vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Interim Order; (iv) to make an initial payment and to distribute cash upon consummation of the sale and (v) scheduling a final hearing (the "Final Hearing") to consider the

relief requested herein and the entry of a Final Order (as defined in the Cash Collateral Motion) and approving the form of notice with respect to the Final Hearing.

*ii. Risk of Irreparable Harm and Need for Immediate Relief*

69.     The Debtor requires use of Cash Collateral to pay operating expenses, including payroll, in addition to funding deposits and providing adequate assurance with respect to utilities. Currently, the Debtor lacks sufficient unencumbered funds with which to operate its business on an ongoing basis. The limited cash on hand, collections on accounts receivables and the proceeds from the sales of inventory are the Debtor's only source of funds with which to pay operating expenses and are subject to the liens of the Prepetition Secured Parties (as defined in the Cash Collateral Motion).

70.     The Debtor's ability to use Cash Collateral to pay budgeted operating expenses during the pendency of its chapter 11 case is essential to the Debtor's business, including for the maintenance of its business relationships, meeting payroll, and the sale of its assets through an orderly sale process in order to maximize the return on such assets. As the Debtor has no unencumbered funds, the Debtor requires use of such Cash Collateral to fund the day-to-day expenses of its operations, its efforts to conduct the sale process, and to meet the costs and expenses of this chapter 11 case.

71.     Unless the Court authorizes use of Cash Collateral, the Debtor will be unable to pay for services and expenses necessary to preserve and maximize the value of its assets, and will need to immediately cease operations and terminate the employment of hundreds of employees. The Debtor believes that any such a result would lead to a substantially lower return on the value of the Debtor's assets. Thus, authorization to use Cash Collateral, pending the Final Hearing, is in the best interests of the Debtor's estate and creditors. Without the authorization to

21

use Cash Collateral, I believe the Debtor will suffer permanent and irreparable harm to the value of the enterprise.

## C.    Employee Wages and Benefits Motion

### i.    Relief Requested

72.    The Debtor has filed its Motion for an Order: (a) authorizing, but not requiring the Debtor to, subject to compliance with the Interim Cash Collateral Order, (i) pay and/or honor prepetition wages, commissions, salaries, and other compensation, (ii) maintain employee medical and other benefits, (iii) pay reimbursable employee expenses and (iv) satisfy certain severance obligations; and (b) authorizing banks and other financial institutions to receive, process, honor, and pay all checks presented for payment and electronic payment requests relating to the foregoing in order to maintain and continue to honor its practices, programs, and policies for its Employees as they were in effect as of the Petition Date, and as such may be modified, amended, or supplemented from time to time in the ordinary course (the "Wages and Benefits Motion").

### ii.    Basis for Relief Requested

73.    The Debtor currently employs 133 full-time employees in hourly, salaried, supervisory, management, sales, administrative, and operational positions to perform the functions necessary to effectively and efficiently operate the Debtor's business (collectively, the "Employees"). As of the Petition Date, the Debtor employed approximately 69 salaried and 64 hourly Employees.

74.    The Debtor seeks entry of an order approving the Wages and Benefits Motion in order to minimize the personal hardships that the Employees may suffer if their prepetition employment-related obligations are not paid or honored, to maintain Employee morale during this critical time, and to minimize disruptions to the Debtor's ongoing business operations

22

75. Benefits covered by the Wages and Benefits Motion (as described in greater detail therein) include, among other things, medical plan contributions, employee life insurance programs, an employee assistance program, workers' compensation insurance premiums, and a severance program (the "Severance Program"). Consistent with Bankruptcy Code priorities and applicable law, the Debtor seeks generally to satisfy prepetition claims of employees only up to the $11,725 cap under section 507(a)(4) that would be entitled to priority over unsecured creditors in any event. In addition, to the extent that beneficiaries of the Severance Program includes insiders (as that terms is defined by section 101(34) of the Bankruptcy Code), the Debtor is not seeking immediate approval of the Severance Program with respect to such insiders, but rather proposes to have that aspect of the Wages and Benefits Motion considered upon appropriate notice and opportunity for objection, at a later hearing.

## D. Tax Motion

### i. Relief Requested

76. The Debtor requests that this Court enter a final order authorizing, but not directing, the Debtor to remit and pay certain prepetition corporate franchise, property, and certain other governmental taxes that the Debtor deems necessary in its sole discretion, subject to compliance with the Interim Cash Collateral Order, as and when they become due in the ordinary course of the Debtor's business, and (ii) authorizing financial institutions to receive, process, honor and pay all checks issued and electronic payment requests made relating to the foregoing (the "Tax Motion").

### ii. Basis for Relief

77. I believe that the payment of taxes is critical to the Debtor's continued and uninterrupted operations. Among other things, failure to pay outstanding amounts could, in some instances, jeopardize the Debtor's ability to do business in certain states, cause the Taxing

23

Authorities to file liens on the Debtor's property, and/or result in excessive interest and penalties. In addition, it is my understanding that non-payment of certain outstanding taxes and assessments may result in personal liability for the Debtor's directors or officers and could trigger unwarranted governmental action in the form of increased audits, all of which would be very disruptive to the Debtor's operations. Furthermore, it is my understanding that certain taxes, such as sales taxes and use taxes, are only being held by the Debtor in trust for the benefit of the taxing authorities and, thus, are not property of the Debtor's estate.

78.     Finally, based on my knowledge and conversations with the Debtor's counsel, it is my understanding that certain of the Debtor's taxes are entitled to priority status under the Bankruptcy Code and, therefore, must be paid in full before any general unsecured obligations may be satisfied. Accordingly, I believe that the relief requested in the tax motion is necessary to avoid immediate and irreparable harm that would result from the failure to authorize the Debtor to pay its taxes and assessments.

**E.     Shippers and Warehousemen Motion**

   *i.   Relief Requested*

79.     The Debtor seeks entry of an order authorizing but not directing, the Debtor, subject to compliance with the Interim Cash Collateral Order, to pay, subject to compliance with the Interim Cash Collateral Order, prepetition obligations owed to common carriers for ground transportation, air freight, ocean freight, and similar charges and freight forwarding charges (which freight forwarding charges may include in the amount payable to the freight forwarder for charges for customs duties and dock facilities)(collectively, the "Shippers") incurred by the Debtor, including those that give rise (or legitimately may give rise) to any statutory or common-law possessory liens on account of unpaid charges owing from the Debtor to such Shippers (collectively, "Shipping Obligations"), as further described in this Motion. The Debtor also

24

seeks authority to pay, in the exercise of their business judgment, warehousing and port facility charges (the "Warehousing Obligations") to any third party Warehousemen as further described in the Motion. The Debtor proposes to pay such claims, when, in the Debtor's sole discretion, the Shippers' and Warehousemen's exercise of contractual or statutory self-help remedies would unduly disrupt the Debtor's businesses. The Debtor requests the authority, but not the direction, to pay up to $10,000 on account of such claims.

*ii. Basis for Relief Requested*

80.      In connection with its Wide Wafer business, as described above, the Debtor uses certain Shippers with respect to: (a) the shipment of finished high temperature filament from the Midland Filament Plant to the Marlboro Research Facility; (b) the full-pallet shipments of completed Standard Sized Wafers from the Marlboro Research Facility to the Wuhan Wafer Plant; and (c) de minimis shipment of spare parts, remaining inventory or raw materials from the closed Devens Facility to the cell and panel manufacturing plant of Jiawei Solarchina Co., Ltd.

81.      It is my concern that certain Shippers may refuse to deliver goods to their final destination, or hold the Debtor's goods hostage in their warehousing facilities, if not paid prepetition amounts owed to them and, in some instances, may assert a lien on the goods in their possession. If the Debtor's distribution network and storage system is interrupted – even for a short period of time – the impact on the business would be devastating and the Debtor would be immediately and irreparably harmed.

82.      Because the Debtor's research and development efforts to develop the Wide Wafer Technology depend on the constant manufacture of Standard Size Wafers to be tested at the Wuhan Wafer Plant , even minor disruptions to the Debtor's manufacture and delivery of the wafers could be disastrous for the going concern value of the Debtor's business.

25

83.     Accordingly the Debtor seek to prevent the breakdown of the manufacture of the Standard Size Wafers by requesting authority to pay certain prepetition claims relating to the Shippers and Warehousemen (directly or through the Logistics Coordinator, which payments shall include the Logistics Coordinator's fee) that the Debtor determines are necessary or appropriate to (a) obtain release of critical or valuable merchandise that may be subject to liens, (b) maintain a reliable, efficient and smooth distribution system, and (c) induce critical Shippers and Warehousemen to continue to carry merchandise and make timely delivery.  Notably, the Debtor only seek authority, not direction, to make such payments.

**F.      Utilities Motion**

*i.   Relief Requested*

84.     The Debtor seeks entry of an order (a) prohibiting the Utility Providers (defined below) from altering, refusing or discontinuing service; (b) deeming the Utility Providers adequately assured of future performance; and (c) establishing procedures for determining additional adequate assurance of future payment (the "Utility Motion").  The Debtor seeks approval of certain procedures, as more fully explained in the Utility Motion, which will require that the Debtor provide a deposit, subjected to compliance with the Interim Cash Collateral Order,  in an amount equal 50% of the Debtor's estimated cost of its monthly utility consumption for each Utility into escrow into a newly created, segregated, interest-bearing account (the "Utility Deposit Account") within twenty days after the Petition Date.  I believe that this deposit, together with the Debtor's demonstrated ability to pay for future utility services in the ordinary course of business, provides more than adequate assurance of payment.

*ii.  Basis for Relief*

85.     The Debtor cannot continue to operate without continued Utility Services.  If any of the Utility Providers alter, refuse or discontinue service, even for a brief period, the Debtor's

business operations would be severely disrupted. In contrast, the Utility Providers will not be prejudiced by the continuation of their services and will be paid all postpetition utility charges. It is therefore critical that Utility Services continue uninterrupted.

86.     Uninterrupted utility services are essential the ongoing operations of the Debtor and the overall success of this chapter 11 case. The Debtor is dependent on electricity, gas, water, sewer, telecommunications, and related services (the "Utility Services"). Should any utility provider refuse or discontinue service, even for a brief period, the operations of the Debtor could be severely disrupted, and such disruption would jeopardize the Debtor's ability to manage its reorganization efforts. Accordingly, it is essential that that utility services continue uninterrupted during the chapter 11 case.

87.     I believe that the relief requested in the Utility Motion is in the best interests of the Debtor's estate, its creditors, and all other parties in interest, and will enable the Debtor to continue to operate its business in chapter 11 without disruption. Accordingly, on behalf of the Debtor, I respectfully submit that the Utility Motion should be approved.


*[The reminder of this page is intentionally blank. Signature Page to Follow.]*

A/74481821.1

The foregoing is true and correct to the best of my knowledge, information, and belief.

By: _Michael El-Hillow_____

Name:  Michael El-Hillow
Title:   Chief Executive Officer

Dated:  August ___, 2011