# Exhibit B

## Restructuring Support Agreement

# RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT (the "Agreement"), dated as of August 15, 2011, is entered into by and between Evergreen Solar, Inc. (the "Company") and the noteholders identified on the signature pages hereof and such other noteholders who may become bound by this Agreement (each a "Supporting Noteholder" and collectively, the "Supporting Noteholders"). The Supporting Noteholders and the Company are referred to herein individually as a "Party" and collectively referred to as the "Parties."

## W H E R E A S :

A.     Prior to the date hereof, representatives of the Company and the Supporting Noteholders have engaged in good faith negotiations with the objective of reaching an agreement with regard to the financial restructuring of the indebtedness and other obligations of the Company, including the potential asset sales, actions and transactions contemplated by this Agreement (the "Restructuring") pursuant to the terms and conditions as set forth in this Agreement and as described in the term sheet attached hereto as Exhibit A (the "Term Sheet"). The Term Sheet and the other Exhibits hereto are expressly incorporated by reference in this Agreement and made a part hereof.

B.     The Term Sheet contemplates that the Restructuring will be effected through one or more sales of the Company's assets pursuant to section 363 of the Bankruptcy Code (the "Asset Sale") in connection with a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").  As part of the Restructuring, the Supporting Noteholders have agreed that they will act as a "stalking horse" bidder for substantially all assets of the Company.

C.     The Supporting Noteholders own in excess of 70% of the principal amount of the Company's outstanding 13% Convertible Senior Secured Notes due 2015 (the "Secured Notes").

D.     This Agreement sets forth the agreement between the Parties concerning their commitment, subject to the terms and conditions hereof, to implement the Restructuring.

E.     By executing this Agreement, the Parties do not desire or intend to derogate from or diminish the solicitation requirements of federal or state securities laws or the Bankruptcy Code.

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

1.     Definitions. The following terms shall have the following definitions:

"Asset Sale" has the meaning set forth in paragraph B of the recitals.

"Act" means the Securities Act of 1933, 15 U.S.C. §§ 77a-77aa, as now in effect or hereinafter amended, or any similar federal, state or local law.

"Additional Notes" has the meaning set forth in Section 28.

"Agreement" has the meaning set forth in the preamble.

"Affiliate" means, with respect to any Person, any other Person which directly or indirectly controls, or is under common control with, or is controlled by, such Person. As used in this definition, "control" (including, with its correlative meanings, "controlled by" and "under common control with") shall mean, with respect to any Person, the possession, directly or indirectly, of power to direct or cause the direction of management or policies (whether through ownership of securities or partnership or other ownership interests, by contract or otherwise) of such Person.

"Approved Budget" has the meaning set forth in the Cash Collateral Order.

"Bankruptcy Case" means the voluntary case commenced by the Company under chapter 11 of the Bankruptcy Code in the District of Delaware.

"Bankruptcy Code" has the meaning set forth in paragraph B of the recitals.

"Bankruptcy Court" has the meaning set forth in paragraph B of the recitals.

"Bidding Procedures" means the procedures reasonably acceptable to the Requisite Supporting Noteholders to govern the auction, which proposed procedures are attached as Exhibit F-1.

"Business Day" means any day other than Saturday, Sunday and any day that is a legal holiday or a day on which banking institutions in New York, New York are authorized by law or other governmental action to close.

"Cash Collateral Order" has the meaning set forth in Section 2.

"Cash Management Motion" means the motion for entry of an order approving the Debtor's cash management system.

"Company" has the meaning set forth in the preamble.

"Company Termination Event" has the meaning set forth in Section 8.

"Contract" means any written agreement, commitment, contract, mortgage, indenture, lease, license, understanding, arrangement, instrument, note, guaranty, indemnity, representation, warranty, deed, assignment, power of attorney, certificate, purchase order, work order, insurance policy, benefit plan, commitment, covenant, assurance or undertaking of any nature.

"Core Assets" has the meaning set forth in Exhibit A to the Noteholder APA.

"Devens Assets" has the meaning set forth in Exhibit A to the Noteholder APA.

"Effective Date" means the date on which a plan of liquidation is consummated.

A/74486196.2

"Final Order" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, as entered on the docket of such court, the operation or effect of which has not been stayed, reversed, vacated, modified or amended, and as to which order or judgment (or any revision, modification, or amendment thereof) the time to appeal, petition for certiorari, or seek review or rehearing has expired and as to which no appeal, petition for certiorari, or petition for review or rehearing was filed or, if filed, remains pending; provided, however, that the possibility that a motion may be filed pursuant to Rules 9023 or 9024 of the Bankruptcy Rules or Rules 59 or 60(b) of the Federal Rules of Civil Procedure shall not mean that an order or judgment is not a Final Order.

"First Day Motions" has the meaning set forth in Section 2.

"Indenture Trustee" means U.S. Bank National Association (i) as Trustee for the Secured Notes pursuant to that certain Indenture, dated as of April 26, 2010, by and among Evergreen Solar, Inc., the Guarantors and U.S. Bank National Association; (ii) as Collateral Agent for the Secured Notes pursuant to that certain Pledge and Security Agreement, dated as of April 26, 2010, by and among Evergreen Solar, Inc., the Guarantors and U.S. Bank National Association; and (iii) as Trustee and Collateral Agent for the Secured Notes pursuant to that certain Collateral Trust Agreement, dated as of April 26, 2010, by and among Evergreen Solar, Inc., the Guarantors and U.S. Bank National Association.

"LBIE Assets" has the meaning set forth in Exhibit A to the Noteholder APA.

"NDA" collectively means all individual confidentiality agreements dated prior to the date hereof, between the Parties, as amended to date and as such may be amended from time to time after the date hereof.

"Non-Core Assets" has the meaning set forth in Exhibit A to the Noteholder APA.

"Noteholder APA" has the meaning set forth in Section 2.

"Noteholder NewCo" means the entity formed by the Supporting Noteholders to acquire assets from the Company pursuant to the Noteholder APA.

"Parties" has the meaning set forth in the preamble.

"Person" means an individual, a partnership, a joint venture, a limited liability company, a corporation, a trust, an unincorporated organization, a group or any legal entity or association.

"Petition Date" means the date on which the Company commences the Bankruptcy Case.

"Pre-Arranged Plan" means the plan of reorganization of the Company consistent with the terms set forth in Exhibit B hereto, with any changes to be reasonably acceptable to the Requisite Supporting Noteholders, provided, however, that in the event the holders of the Secured Note Claims are not satisfied in full (including, but not limited to, post-petition interest at the contract rate), the Pre-Arranged Plan will not permit any payment to holders of general unsecured claims in excess of $200,000 without the consent of the Requisite Supporting Noteholders.

A/74486196.2

"Requisite Supporting Noteholders" means Supporting Noteholders holding a majority in aggregate principal amount of the Secured Notes held collectively by the Supporting Noteholders.

"Requisite Supporting Noteholder Termination Event" has the meaning set forth in Section 7.

"Restructuring" has the meaning set forth in paragraph A of the recitals.

"Retained Assets" has the meaning set forth in the Noteholder APA.

"Sale Assets" means the Core Assets, the LBIE Claim, the Devens Assets and the Non-Core Assets.

"Sale Motion" means the Company's motion, in form and substance reasonably acceptable to the Requisite Supporting Noteholders for entry of an order which, among other things (a) approves the Bidding Procedures, (b) approves the form and manner of the sale notice and bidding procedures notice, (c) schedules a date for the Bankruptcy Court to consider approval of the sale, (d) approves procedures for the assumption and, if necessary, assignment of executory contracts and unexpired leases, (e) approves the expense reimbursement, (f) approves the Noteholder APA as the stalking horse bid, and (g) approves the direct application of all net sale proceeds to the Secured Note Claims.

"Secured Note Claims" means all outstanding obligations to and claims of the holders of the Secured Notes arising under the indenture dated April 26, 2010 among the Indenture Trustee, the Company and the guarantors party thereto from time to time.

"Supporting Noteholders" has the meaning set forth in the preamble.

"Termination Date" has the meaning set forth in Section 7.

"Term Sheet" has the meaning set for in Paragraph A of the recitals.

"Wafer Budget" has the meaning set forth in Exhibit A to the Noteholder APA.

"Wafer Business" has the meaning set forth in Exhibit A to the Noteholder APA.

"Wages Order" has the meaning set forth in Section 2.

2.     Restructuring Transactions. In order to effect the Restructuring, the Supporting Noteholders and the Company will use their respective commercially reasonable efforts to effect the following transactions on the timeline set forth below.

(a)     Transition Budget and Related Expenditures.

(i)     As of August 15, 2011, the Company will implement organizational changes enabling it to achieve operating costs at the level contemplated in the budget attached hereto as Exhibit C (the "Transition

Budget"), and until the Petition Date, will operate pursuant to the Transition Budget with only such modifications, if any, as are acceptable to the Requisite Supporting Noteholders in their sole discretion.

(ii)     During the Bankruptcy Case, the Company will operate in accordance with the Cash Collateral Order and the Approved Budget (as defined in the Cash Collateral Order) with only such modifications to the Approved Budget, if any, as are acceptable to the Requisite Supporting Noteholders in their sole discretion provided, however, the sale process may be extended by the Company without the consent of the Supporting Noteholders past November 15, 2011 (but in no event past November 30, 2011, except such period may be extended until December 31, 2011 solely to the extent required for the purchaser to obtain necessary regulatory approvals), in which case the Approved Budget will be increased by an amount to fund the Company's operating activities during such period and the Wafer Budget shall be decreased by an equal amount, all as set forth in the Term Sheet.

(b)     Bankruptcy Filing.

In order to implement the Restructuring, the Company shall commence the Bankruptcy Case in the Bankruptcy Court, on or before August 15, 2011. Concurrent with the filing of the petition, the Company shall file the Sale Motion, including the Bidding Procedures, and the motion seeking interim and final approval of the Cash Collateral Order.

(c)     First Day Orders.

The Company will seek approval from the Bankruptcy Court of first day motions in the forms set forth on Exhibit D (the "First Day Motions"), which forms shall be reasonably acceptable to the Requisite Supporting Noteholders. The Supporting Noteholders agree to support the approval by the Bankruptcy Court of the First Day Motions and related orders with only such modifications, if any, as are reasonably acceptable to the Requisite Supporting Noteholders.

(d)     Cash Collateral Order.

The Company will file a motion on the Petition Date seeking approval of a cash collateral order in the form of Exhibit E hereto (the "Cash Collateral Order") on an interim basis and thereafter on a final basis, including authorization for an immediate paydown of the Secured Note Claims in the amount of $12.5 million and a direct paydown of the Secured Note Claims from net sales proceeds of the Sale Assets, to the extent and as set forth in the Term Sheet and the Cash Collateral Order, provided that such initial and future paydowns will be subject to the approval of the Bankruptcy Court. The Supporting Noteholders agree to support the approval by the Bankruptcy Court of the Cash Collateral Order with only such modifications, if any, as are reasonably acceptable to the Requisite Supporting Noteholders other than any modifications to the Approved Budget which must be in form and substance acceptable to the Requisite Supporting Noteholders in their sole discretion.

(e)     Auction Process.

In order to sell the Sale Assets, on the Petition Date, the Company will file the Sale Motion seeking entry of an order approving the (i) the Bidding Procedures attached hereto as <u>Exhibit F-1</u> and (ii) the Asset Purchase Agreement for all of the Sale Assets attached hereto as <u>Exhibit F-2</u> (the "<u>Noteholder APA</u>").

The Supporting Noteholders agree to support the approval by the Bankruptcy Court of the Sale Motion, only with such modifications, if any, as are reasonably acceptable to the Requisite Supporting Noteholders.

(f)     <u>Employee Claims</u>.

The Company promptly will seek approval of an order approving the payment of existing and prospective employee claims in the form of <u>Exhibit G</u> hereto (the "<u>Wages Order</u>"). The Supporting Noteholders agree to support the approval by the Bankruptcy Court of the Wages Order, with only such modifications, if any, as are reasonably acceptable to the Requisite Supporting Noteholders.

(g)     <u>Key Employee Incentive Plan</u>.

The Company promptly will seek approval of an order approving a Key Employee Incentive Program in the form of <u>Exhibit H</u> hereto (the "<u>KEIP Order</u>"). The Supporting Noteholders agree to support the approval by the Bankruptcy Court of the KEIP Order, with only such modifications, if any, as are reasonably acceptable to the Requisite Supporting Noteholders.

(h)     <u>Wafer Business</u>.

If Noteholder NewCo acquires the Core Assets, the Supporting Noteholders will use commercially reasonable efforts to cause Noteholder NewCo to adopt the governance provisions on the terms set forth on <u>Exhibit K</u> hereto.

(i)     <u>Pre-Arranged Plan</u>.

Promptly after (or with the consent of the Requisite Supporting Noteholders, not to be unreasonably withheld, before) the Sale Assets (other than the Retained Assets) have been sold, the Company will file the Pre-Arranged Plan with the Bankruptcy Court providing for (i) the distribution of any assets remaining in the estate and (ii) winding up of the Company, and having the terms outlined in <u>Exhibit B</u>, with such other terms as are reasonably acceptable to the Requisite Supporting Noteholders. The Supporting Noteholders agree to support the Pre-Arranged Plan. For the avoidance of doubt, in the event that the Secured Note Claims are not satisfied in full (including, but not limited to, post-petition interest at the contract rate), the Pre-Arranged Plan will not permit any payment to holders of general unsecured claims in excess of $200,000.

3.     <u>Commitments and Representations of the Supporting Noteholders</u>.

(a)     Subject to the terms and conditions hereof, until the earlier of the Effective Date or the termination of this Agreement, each Supporting Noteholder shall:

(i)    support and use its commercially reasonable efforts to complete the Restructuring pursuant to the Term Sheet and as embodied in this Agreement, including, without limitation, instructing the Indenture Trustee and any other agents and representatives accordingly;

(ii)    not, in any material respect, (w) object to, delay, impede or take any other action to interfere with the acceptance or implementation of the Restructuring or (x) seek, solicit, propose, negotiate, file, support, participate in or vote its Secured Notes for any alternative exchange offer, restructuring, workout or plan of reorganization or liquidation for the Company; (y) object to confirmation of the Pre-Arranged Plan or object to or otherwise commence any proceeding to oppose, alter, delay or impede or take any other action, directly or indirectly, to interfere with entry of any order approving all or any part of the Restructuring or the Pre-Arranged Plan, or (z) commence or participate in any involuntary bankruptcy proceeding against the Company; and

(iii)    use commercially reasonable efforts to cause the Noteholder NewCo to enter into the Noteholder APA and, subject to the terms and conditions therein, consummate the Asset Sale.

(b)    Each Supporting Noteholder represents and warrants to the Company, severally as to itself only, that:

(i)    it is an "accredited investor" (as defined in Rule 501(a) of Regulation D promulgated under the Act) and/or it is a "qualified institutional buyer" (as defined in Rule 144A under the Act);

(ii)    it has reviewed, or has had the opportunity to review, with the assistance of professional and/or legal advisors of its choosing, sufficient information necessary for such Supporting Noteholder to decide to participate in the Restructuring; and

(iii)    as of the date hereof, the Supporting Noteholder is the beneficial owner of the principal amount of the Secured Notes, or is the nominee, investment manager or advisor for beneficial holders of the Secured Notes, in an amount not less than the amount indicated on Exhibit J to this Agreement.

(c)    Each Supporting Noteholder shall not be responsible in any way for the performance of the obligations of any other Supporting Noteholder.

Notwithstanding the foregoing, nothing in this Agreement shall be construed to prohibit the Supporting Noteholders from appearing as a party-in-interest in any matter in the Bankruptcy Case so long as such appearance and the positions advocated in connection therewith are not materially inconsistent with this Agreement and the Restructuring and are not for the purpose of hindering, delaying or preventing the consummation of the Restructuring.

4.    Commitments of the Company.  Subject to the terms and conditions hereof, until the earlier of the Effective Date and the termination of this Agreement, the Company shall:

(a)     support and use its commercially reasonable efforts to complete the Restructuring pursuant to the Term Sheet and as embodied in this Agreement,

(b)     take any and all reasonably necessary and appropriate actions in furtherance of the Restructuring, and

(c)     not take any action that is inconsistent with, or is intended or is likely to interfere with the consummation of, the Restructuring pursuant to the Term Sheet and as embodied in this Agreement.

5.     <u>Conditions to the Obligation of the Supporting Noteholders</u>. Except as may be waived by the Requisite Supporting Noteholders, in their reasonable discretion, the obligation of the Supporting Noteholders to consummate the transactions set forth in this Agreement as provided herein is subject to the following conditions:

(a)     All of the representations and warranties made by the Company in this Agreement shall have been true and correct in all material respects as of the date hereof, except to the extent any such representation or warranty by its terms is as of a specific date, in which case such representation and warranty shall have been true and correct in all material respects as of such applicable date, except for changes permitted or contemplated by this Agreement.

(b)     The Company shall have, or shall have caused to be, satisfied or complied with and performed in all material respects all terms, covenants, and conditions of this Agreement to be complied with or performed by the Company on the applicable date.

(c)     No Requisite Supporting Noteholder Termination Event shall have occurred or shall exist, that has not been waived by the Requisite Supporting Noteholders.

6.     <u>Conditions to the Obligations of the Company</u>. Except as may be waived by the Company, the obligations of the Company to consummate the transactions set forth in this Agreement as provided herein is subject to the following conditions:

(a)     All of the representations and warranties made by the Supporting Noteholders in this Agreement shall have been true and correct in all material respects as of the date hereof (or at the time of any transfer of the Secured Notes permitted hereby), and shall remain true and correct in all material respects with the same force and effect as if such representations and warranties had been made at and as of the applicable date except as otherwise permitted or contemplated by this Agreement; <u>provided</u>, <u>however</u>, that if the representations and warranties are not true as to one or more Supporting Noteholders, the Company's obligations to the remaining Supporting Noteholders shall otherwise remain in full force and effect with respect to such Supporting Noteholders unless the aggregate amount of Secured Notes held by the remaining Supporting Noteholders is less than 51% of the aggregate principal amount of Secured Notes outstanding.

(b)     The Supporting Noteholders shall have, or shall have caused to be, satisfied or complied with and performed in all material respects all terms, covenants, and conditions of this Agreement to be complied with or performed by the Supporting Noteholders on or before the Effective Date.

8

(c)     No Company Termination Event shall have occurred or shall exist, that has not been waived by the Company.

7.     <u>Supporting Noteholders Termination</u>. This Agreement may be terminated at the option of the Requisite Supporting Noteholders upon the occurrence of any of the following events (each a "<u>Requisite Supporting Noteholder Termination Event</u>"):

(a)     If the Company fails to meet any of the following milestones, which milestones may be amended with the consent of the Requisite Supporting Noteholders, which consent shall not be unreasonably withheld, other than with respect to (x) below which may only be extended with the consent of the Requisite Supporting Noteholders in their sole discretion:

(i)     On or prior to August 15, 2011, the Company shall have commenced the Bankruptcy Case;

(ii)     On or prior to August 15, 2011 and concurrently with the filing of the chapter 11 petition, the Company shall have filed the Sale Motion, Cash Management Motion and the motion to approve the Cash Collateral Order;

(iii)     On or prior to August 15, 2011 and concurrently with the filing of the chapter 11 petition, the Company shall have filed a Cleansing Document (as defined in the NDAs), which shall be on Form 8-K, setting forth all material non-public information provided under any NDA to a Supporting Noteholder;

(iv)     On or prior to August 18, 2011, the Company shall obtain entry of the Cash Collateral Order on an interim basis, in form and substance reasonably acceptable to the Requisite Supporting Noteholders; <u>provided</u>, <u>however</u>, that the Approved Budget shall be acceptable to the Requisite Supporting Noteholders in their sole discretion;

(v)     On or prior to August 18, 2011, the Company shall obtain entry of an order granting the relief requested in the Cash Management Motion, in form and substance reasonably acceptable to the Requisite Supporting Noteholders;

(vi)     On or prior to September 9, 2011, the Company shall obtain entry of an order approving the relief requested in the Sale Motion (other than the Asset Sale in (ix) below), including fixing a bid deadline no later than October 26, 2011 or such other date as is reasonably acceptable to the Requisite Supporting Noteholders, which order shall be reasonably acceptable to the Requisite Supporting Noteholders;

(vii)     On or prior to September 9, 2011, the Company shall obtain entry of the Cash Collateral Order on a final basis, in form and substance reasonably acceptable to the Requisite Supporting Noteholders; <u>provided</u>, <u>however</u>, that the Approved Budget shall be acceptable to the Requisite Supporting Noteholders in their sole discretion;

(viii)     On or prior to November 1, 2011, the Company shall have concluded the Auction;

(ix)     On or prior to November 9, 2011, the Company shall obtain entry of an order approving the Asset Sale(s);

(x)     On or prior to November 30, 2011 (or, if the time to close is extended by the Company past November 30, 2011 solely to obtain regulatory approvals, December 31, 2011), the Company shall consummate the Asset Sale, including, subject to Bankruptcy Court approval, a paydown of Secured Note Claims with the net proceeds of the Asset Sale;[1]

(b)     Any court of competent jurisdiction or other competent governmental or regulatory authority shall have issued a Final Order making illegal or otherwise materially restricting, preventing, or prohibiting the Restructuring in a way that cannot be reasonably remedied by the Company or the Supporting Noteholders;

(c)     The occurrence of a material breach of this Agreement by the Company, provided, however, the Requisite Supporting Noteholders shall provide the Company with notice of such breach and provide the Company with five (5) Business Days to cure such breach (only if such breach is susceptible to cure).  For the avoidance of doubt, a Termination Event under the Cash Collateral Order shall not be susceptible to cure;

(d)     The Bankruptcy Case is converted to a case under chapter 7 or the Bankruptcy Case is dismissed by order of the Bankruptcy Court;

(e)     The appointment of a trustee, receiver or examiner with expanded powers in the Bankruptcy Case, unless such appointment is made with the prior written consent of the Requisite Supporting Noteholders, which consent shall not be unreasonably withheld;

(f)     The Company files or otherwise seeks, or the Court grants, an amendment, modification, or withdrawal of the Cash Collateral Order (but not the Approved Budget) without the prior written consent of the Requisite Supporting Noteholders, which consent shall not be unreasonably withheld;

(g)     The Company files or otherwise seeks, or the Court grants, an amendment, modification, or withdrawal of the Approved Budget without the prior written consent of the Requisite Supporting Noteholders in their sole discretion;

(h)     The Company files or otherwise seeks, or the Court approves any plan, disclosure statement or any documents related to the foregoing inconsistent with the Pre-Arranged Plan, including motions, notices, exhibits, supplements, appendices and orders without the prior written consent of the Requisite Supporting Noteholders, which consent shall not be unreasonably withheld;

(i)     The Company files or otherwise seeks, or the Court approves any application seeking authority to sell any material assets (other than inventory in the ordinary course of business) other than through the Asset Sale described herein, without the prior written

_____

[1] This parties agree that this does not constitute consent by the Requisite Supporting Noteholders to extend the sale process beyond November 15, 2011.

consent of the Requisite Supporting Noteholders, which consent shall not be unreasonably withheld;

(j)     The entry of an order by any court of competent jurisdiction invalidating, disallowing, subordinating, or limiting, in any respect, as applicable, the extent, enforceability, priority, or validity of the liens or claims with respect to the Secured Notes (each, a "Limitation Order"), only if such Limitation Order invalidates, disallows, subordinates, or limits, in any respect as applicable, the enforceability, priority, extent or validity of the liens or claims with respect to the Secured Notes by an amount exceeding $1 million;

(k)     The Company fails to pay the fees and expenses incurred by the legal and financial advisors to the Supporting Noteholders or the Indenture Trustee as they become due and owing under the respective engagement letters, the Indenture, and this Agreement, as applicable; or

(l)     The date of a Termination Event under the Cash Collateral Order (as defined therein) other than a Termination Event arising under the following clauses of Section 5(a) of the Cash Collateral Order: (i), (ii), (viii) or (ix) or any other clause within Section 5(a) in which the Requisite Supporting Noteholders agree in writing to waive such a Termination Event thereunder.

The date on which this Agreement is terminated in accordance with the foregoing provisions or upon a Company Termination Event (as defined below) shall be referred to as the "Termination Date". Notwithstanding the foregoing, the Requisite Supporting Noteholders may waive any of the foregoing in a writing delivered to the Company.

8.     Company Termination Events. The Company may terminate this Agreement by providing written notice thereof to the other Parties, upon the occurrence of any of the following events (each, a "Company Termination Event"):

(a)     Any court of competent jurisdiction or other competent governmental or regulatory authority shall have issued a Final Order making illegal or otherwise materially restricting, preventing, or prohibiting the Restructuring in a way that cannot be reasonably remedied by the Company or the Supporting Noteholders;

(b)     The material breach by any Supporting Noteholder of any of the representations, warranties or covenants set forth in this Agreement that remains uncured for a period of five (5) Business Days after the receipt by such Supporting Noteholder of notice of such breach, provided, however, the foregoing shall constitute a Company Termination Event only with respect to the breaching Supporting Noteholder and this Agreement shall otherwise remain in full force and effect with respect to all other Supporting Noteholders and the Company unless the aggregate amount of Secured Notes held by the non-breaching Supporting Noteholders is less than 51% of the aggregate principal amount of Secured Notes outstanding, in which case this Agreement shall automatically terminate without any further notice or action and such termination may not be waived by the Company or any other Party;

(c)     The Bankruptcy Case is converted to a case under chapter 7 or the Bankruptcy Case is dismissed by order of the Bankruptcy Court; or

(d)     The board of directors of the Company determines, based upon the written advice of the Company's outside counsel, that proceeding with the Restructuring would be inconsistent with the exercise of the board of directors' fiduciary duties; provided, however, that, as of the date of this Agreement, the Company hereby represents that nothing in this Agreement conflicts with the fiduciary obligations of the directors and officers of the Company.  In addition, notwithstanding anything to the contrary set forth in this Agreement, the Company shall at all times and in all respects after the Petition Date act in accordance with applicable law to exercise fiduciary duties as a debtor in possession in the Chapter 11 Case.  Nothing in this Agreement imposes any liability, and there shall be no liability, for actions taken, or not taken, in order to discharge fiduciary obligations described in this Section 8(d).

9.     Effect of Termination.  Upon termination of this Agreement in accordance with the terms hereof, this Agreement shall be of no further force and effect and each Party shall be released from its commitments, undertakings and agreements under or related to this Agreement and shall have the rights and remedies that it would have had it not entered into this Agreement, and shall be entitled to take all actions that it would have been entitled to take had it not entered into this Agreement; provided, however, that any claim for breach of this Agreement that occurs prior to termination shall survive such termination and all rights and remedies with respect to such claims shall not be prejudiced in any way.  Upon any termination of this Agreement (i) the Company and the Supporting Noteholders agree that such termination shall also terminate the Company's right to use cash collateral under the Cash Collateral Order and (ii) any and all Secured Notes or consents tendered by the Supporting Noteholders and votes submitted by the Supporting Noteholders, if any, prior to such termination shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring or otherwise.  In addition, upon any termination, any accrued fees of the Supporting Noteholders' Professionals will become immediately due and payable.

10.     Restructuring Expenses.  The Company shall pay all fees and expenses of (i) the Supporting Noteholders (including without limitation, the fees and expenses of Akin Gump Strauss Hauer & Feld, LLP; Duff & Phelps Securities, LLC; and Morris, Nichols, Arsht & Tunnell, LLP) and (ii) the Indenture Trustee (including without limitation, the fees and Expenses of Maslon, Edelman Borman & Brand, LLP and such Delaware counsel as the Indenture Trustee may select) incurred in connection with the Restructuring.  On the Petition Date, the Company shall seek authority to pay the fees and expenses of the Supporting Noteholders and the Indenture Trustee pursuant to the Cash Collateral Order.

11.     Indemnification.  The Company will indemnify and hold harmless the Supporting Noteholders and the Indenture Trustee and each of these party's respective members, and affiliates and the officers, directors, employees, representatives, successors, permitted assigns, attorneys, advisors, partners, members, owners and agents of any of the foregoing (the "Indemnitees") from and against any claims, demands, judgments, actions or causes of action, liabilities, obligations, damages, losses, deficiencies, assessments, costs, fines, penalties, interest and expenditures (including the fees and out-of-pocket expenses of counsel) suffered or incurred by any Indemnitee arising out of, based upon, attributable to or resulting from any legal proceedings brought or initiated by a third party relating to or arising out of the negotiation of, entry into, or performance under this Agreement or the transactions contemplated therein, in

12

each case, except to the extent of the gross negligence or willful misconduct of an Indemnitee (as finally determined by a court of competent jurisdiction).

12.     Transfer of Secured Notes. Prior to the earlier of (i) the Effective Date and (ii) the termination of this Agreement in accordance with its terms, no Supporting Noteholder will, directly or indirectly, sell, contract to sell, give, assign, hypothecate, pledge, encumber, grant a security interest in, offer, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, or otherwise transfer or dispose of, any economic, voting or other rights in or to, by operation of law or otherwise (collectively, "Transfer"), all or any portion of its Secured Notes, and no such Transfer will be effective, unless: (i) such Transfer consists of a simultaneous Transfer by such Supporting Noteholder of Secured Notes, and its rights and obligations under this Agreement, (ii) the transferee furnishes to the other Parties to this Agreement a joinder in the form attached hereto as Exhibit I within three (3) Business Days of execution of an agreement or trade confirmation in respect of such transfer, (iii) such Supporting Noteholder effecting such Transfer notifies counsel to the Company and counsel to the Supporting Noteholders in writing of such Transfer within three (3) Business Days of the execution of an agreement or trade confirmation in respect of such Transfer and (iv) such transferring Supporting Noteholder shall be reasonably satisfied prior to such Transfer that registration under the Act, and the applicable securities laws of any other jurisdiction is not required in connection with or as a result of the transaction resulting in such Transfer.  In addition to the foregoing Transfer, the following Transfers shall be permitted:

(a)     any Transfer by any Supporting Noteholder to an Affiliate of such Supporting Noteholder or one or more affiliated funds or affiliated entity or entities with a common investment advisor (in each case, other than portfolio companies) provided that the transferee furnishes to the Company a joinder, in the form annexed hereto as Exhibit I, pursuant to which such transferee agrees to be bound by all of the terms and conditions of this Agreement and the Term Sheet;

(b)     any Transfer by any Supporting Noteholder to another Supporting Noteholder, provided that the transferee shall be deemed to be bound by the terms and conditions of the Agreement with respect to the transferred Secured Notes to the same extent that the Supporting Noteholder is bound; and

(c)     any other Transfer that is approved in writing in advance of such Transfer by the Company.

Any Transfer by a Supporting Noteholder that does not comply with the procedures set forth in this Section 12 shall be deemed void *ab initio*.

13.     Ownership of Claims.  Each Supporting Noteholder represents and warrants, severally as to itself and not as to any other Supporting Noteholder, that:

(a)     as of the date of this Agreement, it is the beneficial owner of the principal amount of the Secured Notes, or is the nominee, investment manager or advisor for beneficial holders of the Secured Notes, as indicated on Exhibit J to this Agreement;

(b)     other than pursuant to this Agreement, such Secured Notes are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal or other limitation on disposition or encumbrances of any kind (except for any such lien or security interest in favor of a bank or broker dealer at which the Supporting Noteholder maintains an account over property of the Supporting Noteholder in such account generally and which is released concurrently with the transfer of such property), that would adversely affect in any way such Supporting Noteholder's performance of its obligations contained in this Agreement at the time such obligations are required to be performed; and

(c)     it is not aware of any event that, due to any fiduciary or similar duty to any other person, would prevent it from taking any action required of it under this Agreement.

14.     Cooperation.  The Company shall cooperate in good faith with the Supporting Noteholders in providing reasonable notice and copies of material pleadings, applications, or other documents it intends to file with the Bankruptcy Court to counsel for the Supporting Noteholders.

15.     Access.  The Company will afford the Supporting Noteholders and its attorneys, consultants, financial advisors, accountants and other authorized representatives reasonable access, upon reasonable notice during normal business hours, and at other reasonable times, to all properties, books, contracts, commitments, records, management personnel, lenders and advisors of the Company

16.     Tax Matters.  The Company will consult with the Supporting Noteholders on tax issues and matters of structure related to the Asset Sale in order to optimize the tax consequences to the Company, the Supporting Noteholders and Noteholder NewCo and all tax related decisions related to the Asset Sale to Noteholder NewCo shall be acceptable to the Requisite Supporting Noteholders in their reasonable discretion.

17.     Agreement Effective Date. This Agreement will become effective when signed by the Company and Supporting Noteholders owning more than sixty-six and two-thirds (66 2/3%) percent of the aggregate outstanding principal amount of the Secured Notes.

18.     Representations.

(a)     Power and Authority. Each Party represents to each other Party that, as of the date of this Agreement, such Party is duly organized, validly existing, and in good standing under the laws of the jurisdiction of its organization, and has all requisite corporate, partnership, or limited liability company power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement.

(b)     Enforceability. Each Party represents to each other Party that this Agreement, is a legal, valid and binding obligation of such Party, enforceable against it in accordance with the terms hereof, except as such enforcement may be limited by applicable laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

(c)　　No Consent or Approval. Each Party represents to each other Party that no consent or approval is required to be obtained from any other individual or entity in order for such Party to carry out the provisions hereof, except (i) as otherwise provided in this Agreement and (ii) approvals by the Bankruptcy Court.

(d)　　Authorization. Each Party represents to each other Party that the execution and delivery of this Agreement and the performance of the obligations hereunder have been duly authorized by such Party.

(e)　　Governmental Consents. Each Party represents to each other Party that the execution, delivery and performance of this Agreement by such Party does not and shall not require any registration or filing with consent or approval of, or notice to, or other action to, with or by, any federal, state or other governmental authority or regulatory body, except for any registrations or filings required by the Act or the Bankruptcy Code.

(f)　　No Conflicts. Each Party represents to each other Party that the execution, delivery and performance of this Agreement does not and shall not: (i) violate any provision of law, rule or regulations applicable to such Party or any of its subsidiaries or affiliates; or (ii) violate the certificate of incorporation, bylaws or other organizational documents such Party or of any of its subsidiaries or affiliates.

19.　　No Solicitation. Notwithstanding any other provision of this Agreement, nothing in this Agreement is intended to be or constitute, and nothing in this Agreement shall be deemed to be or constitute, a solicitation of vote for any plan of reorganization or a sale or a solicitation of an offer to purchase new common stock or any other security of the Company.

20.　　Entire Agreement.

(a)　　Except as set forth in Section (b) below, this Agreement together with the NDA constitutes the entire agreement of the Parties with respect to the subject matter of this Agreement, and supersedes all other prior negotiations, agreements and understandings, whether written or oral, among the Parties with respect to the subject matter of this Agreement.  In the event of any inconsistency between this Agreement and the NDA, the terms of this Agreement will control.

(b)　　The Term Sheet is incorporated by reference herein and is made part of this Agreement as if fully set forth herein. The general terms and conditions of the Restructuring are as set forth in the Term Sheet; provided, however, that the Term Sheet is supplemented by the terms and conditions of this Agreement. In the event of any inconsistencies between the terms of the Agreement and the Term Sheet, this Agreement will govern; in the event of any inconsistencies between the terms of this Agreement, and the Noteholder APA, the Noteholder APA will govern.

21.　　Interpretation of Agreement. This Agreement is the product of negotiation by and between the Parties. Any Party enforcing or interpreting this Agreement shall interpret it in a neutral manner. There shall be no presumption concerning whether to interpret this Agreement for or against any Party by reason of that Party having drafted this Agreement, or any portion thereof, or caused it or any portion thereof to be drafted.

22.     Waiver. If the transactions contemplated herein are or are not consummated, or following the occurrence of the Termination Date, if applicable, nothing shall be construed herein as a waiver by any Party of any or all of such Party's rights and the Parties expressly reserve any and all of their respective rights.

23.     Counterparts. This Agreement may be executed in one or more counterparts, each of which, when so executed, shall constitute the same instrument and the counterparts may be delivered by facsimile transmission or by electronic mail in portable document format (.pdf).

24.     Amendments. Except as otherwise provided herein, this Agreement may not be modified, amended or supplemented without prior written consent of the Company and the Requisite Supporting Noteholders.

25.     Headings. The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof.

26.     No Public Announcement. Except as may be required by law or in connection with the Chapter 11 Case and upon 24 hours advance notice of such public announcement or disclosure, each Party agrees that it shall not make any public announcement or disclosure regarding this Agreement or the transactions contemplated herein without the prior written consent of the other Parties hereto, which shall not be unreasonably withheld.  Except as may be required by law or regulation and upon 24 hours advance notice of such public announcement or disclosure, the Company shall not (a) use the name of any Supporting Noteholder or any fund managed by a Supporting Noteholder in any press release, announcement, public filings or communications with any news media without such Supporting Noteholder's prior written consent, which consent shall be in its sole discretion, or (b) disclose to any Person other than legal and financial advisors to the Company the principal amount or percentage of Secured Notes held by any Supporting Noteholder.

27.     Independence of Supporting Noteholders.  Each Supporting Noteholder is acting independent of the other Supporting Noteholders and shall not be responsible in any way for the performance of the obligations of any other Supporting Noteholder.

28.     Additional Notes. If, after the date hereof, any Supporting Noteholder acquires beneficial or record ownership of any additional Secured Notes for itself or any account or fund managed by such Supporting Noteholder (any such Secured Notes, "Additional Notes"), such Supporting Noteholder shall promptly notify the Company of such acquisition and the provisions of this Agreement shall be applicable to such Additional Notes as if such Additional Notes had been Secured Notes owned by such Supporting Noteholder as of the date hereof. The provisions of the immediately preceding sentence shall be effective with respect to Additional Notes without action by any person or entity immediately upon the acquisition by such Supporting Noteholder of beneficial or record ownership of such Additional Notes.

29.     Governing Law. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to such state's choice of law provisions which would require the application of the law of any other jurisdiction. By its execution and delivery of this Agreement, each of the Parties irrevocably and unconditionally

agrees for itself that any legal action, suit or proceeding against it with respect to any matter arising under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, may be brought in the United States District Court for the Southern District of New York (or, if the Bankruptcy Case has been commenced, in the Bankruptcy Court), and by execution and delivery of this Agreement, each of the Parties irrevocably accepts and submits itself to the jurisdiction of such courts, generally and unconditionally, with respect to any such action, suit or proceeding; provided, however, that the Bankruptcy Case shall be filed in Bankruptcy Court and shall be subject to the Bankruptcy Code.

30.　　Notices. All notices, requests and other communications hereunder must be in writing and will be deemed to have been duly given only if delivered personally or by facsimile transmission or mailed (first class postage prepaid) to the parties at the following addresses or facsimile numbers:

If to the Company:

> Evergreen Solar, Inc.
> 138 Bartlett Street
> Marlboro, MA  01752
> Attention:  Christian Ehrbar, General Counsel

with a copy (which shall not constitute notice) to:

> Bingham McCutchen LLP
> 399 Park Avenue
> New York, New York 10022
> Facsimile:　　(212) 705-7868
> Attention:　　Ronald J. Silverman, Esq.

If to a Supporting Noteholder, at the email address (with return receipt) set forth on the signature pages below with a copy (which shall not constitute notice) to:

> Akin Gump Strauss Hauer & Feld LLP
> One Bryant Park
> New York, NY 10036
> Facsimile:　　(212) 872-1002
> Attention:　　Michael S. Stamer, Esq.
> Email:　　　　mstamer@akingump.com

31.　　No Third-Party Beneficiaries. The terms and provisions of this Agreement are intended solely for the benefit of the Parties hereto and their respective affiliates, subsidiaries, successors and permitted assigns, and it is not the intention of the Parties to confer third-party beneficiary rights upon any other Person or entity that is not affiliated with or related to the Parties.

A/74486196.2

32.     Further Assurances. Each Party agrees to execute any and all documents and to do and perform any and all acts and things reasonably necessary or proper to effectuate or further evidence the terms and provisions of this Agreement and agrees to negotiate in good faith the documents necessary to implement the transactions contemplated by the Restructuring.

33.     Releases.   Upon consummation of the Restructuring, the Parties will execute mutual releases as are customary for releases provided at the conclusion of chapter 11 proceedings.  The Parties also agree to support inclusion of releases in the Pre-Arranged Plan.

**[Signature Pages Follow]**

A/74486196.2

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

**EVERGREEN SOLAR, INC.**

By: _Michael El-Hillow_

Michael El-Hillow
President and Chief Executive Officer

**ARISTEIA MASTER, L.P.**
By: Aristeia Capital, L.L.C.,
    its Investment Manager

By: /s/ _____
    Name: William R. Techar
    Title: Member of the Investment
           Manager

By: /s/ _____
    Name: Andrew B. David
    Title: General Counsel of the
           Investment Manager

Address: c/o Aristeia Capital, LLC
         136 Madison Ave, 3rd Floor
         New York, NY 10016

Fax: (212) 842-8901
Email:
andrew.david@aristeiacapital.com
with a copy to:
techar@aristeiacapital.com

DTC Participant: JP Morgan Clearing Corp.

**BRIGADE LEVERAGED CAPITAL
STRUCTURES FUND LTD.**

By: /s/

Name: Carney Hawks
Title: Partner of the Investment
Manager

Address:
c/o Brigade Capital Management, LLC
399 Park Avenue, 16th Floor
New York, NY 10022

Fax: (212) 754-9701
Email: ch@brigadecapital.com

DTC Participant: Goldman Sachs, & Co.

**DBX CONVERTIBLE ARBITRAGE 14 FUND**
By: Lazard Asset Management, LLC in its
capacity as agent and not in its
individual corporate capacity

By: /s/ _____

Name: Sean Reynolds

Title: Managing Director

Address:
c/o Lazard Asset Management LLC
30 Rockefeller Plaza
New York, NY 10112-6300
Attn: Nathan Paul, General Counsel

Fax: (212) 332-1703
Email: nathan.paul@lazard.com

DTC Participant: Deutsche Bank

**HFR CA LAZARD RATHMORE MASTER TRUST**
By: Lazard Asset Management, LLC in its
    capacity as agent and not in its
    individual corporate capacity

By:   /s/
    Name: Sean Reynolds
    Title: Managing Director

Address:
c/o Lazard Asset Management LLC
30 Rockefeller Plaza
New York, NY 10112-6300
Attn: Nathan Paul, General Counsel

Fax: (212) 332-1703
Email: nathan.paul@lazard.com


DTC Participant: Deutsche Bank
              UBS

**HIGHMARK LIMITED**
By: Lazard Asset Management, LLC in its
    capacity as agent and not in its
    individual corporate capacity

By:  /s/ _____
     Name: Sean Reynolds
     Title: Managing Director

     Address:
     c/o Lazard Asset Management LLC
     30 Rockefeller Plaza
     New York, NY 10112-6300
     Attn: Nathan Paul, General Counsel

     Fax: (212) 332-1703
     Email: nathan.paul@lazard.com


     DTC Participant: CSFB

**MAP 99 SEGREGATED PORTFOLIO**
By: Lazard Asset Management, LLC in its
    capacity as agent and not in its
    individual corporate capacity

By: /s/ ⟨signature⟩
    Name: _SEAN REYNOLDS_
    Title: _MANAGING DIRECTOR_

Address:
c/o Lazard Asset Management LLC
30 Rockefeller Plaza
New York, NY 10112-6300
Attn: Nathan Paul, General Counsel

Fax: (212) 332-1703
Email: nathan.paul@lazard.com


DTC Participant: Deutsche Bank
                UBS

**LAZARD RATHMORE MASTER FUND, LP**
By: Lazard Asset Management, LLC in its
    capacity as agent and not in its
    individual corporate capacity

By: /s/ _____
    Name: Sean Reynolds
    Title: Managing Director

Address:
c/o Lazard Asset Management LLC
30 Rockefeller Plaza
New York, NY 10112-6300
Attn: Nathan Paul, General Counsel

Fax: (212) 332-1703
Email: nathan.paul@lazard.com


DTC Participant: Deutsche Bank
                 UBS

**LYXOR LAZARD RATHMORE FUND LIMITED**
By: Lazard Asset Management, LLC in its
    capacity as agent and not in its
    individual corporate capacity

By:  /s/
    Name:  SEAN REYNOLDS
    Title:  MANAGING DIRECTOR

Address:
c/o Lazard Asset Management LLC
30 Rockefeller Plaza
New York, NY 10112-6300
Attn: Nathan Paul, General Counsel

Fax: (212) 332-1703
Email: nathan.paul@lazard.com


DTC Participant: Deutsche Bank
                UBS

**LMA SPC, a Cayman Islands segregated portfolio (SPC), solely on behalf of the MAP 89 Segregated Portfolio**

By: Pine River Capital Management L.P.,
    Its Investment Manager

By: /s/ *Jeff Stolt*
    Name: Jeff Stolt
    Title: Chief Financial Officer

Address:
    601 Carlson Parkway, Suite 330
    Minnetonka, MN 55305

Fax: (612) 238-3301
Email: legal@pinerivercapital.com


DTC Participant: Goldman Sachs Prime
    Brokerage

**NISSWA CONVERTIBLES MASTER FUND LTD.**
By: Pine River Capital Management L.P., Its Investment Manager

By: /s/ *Jeff Stolt*
Name: Jeff Stolt
Title: Chief Financial Officer

Address:
601 Carlson Parkway, Suite 330
Minnetonka, MN 55305

Fax: (612) 238-3301
Email: legal@pinerivercapital.com

DTC Participant: Goldman Sachs Prime Brokerage

**PINE RIVER MASTER FUND LTD.**
**(fka Nisswa Master Fund Ltd.)**
By: Pine River Capital Management L.P.,
    Its Investment Manager

By: /s/ *Jeff Stolt*
       Name: Jeff Stolt
       Title: Chief Financial Officer

       Address:
          601 Carlson Parkway, Suite 330
          Minnetonka, MN 55305

       Fax: (612) 238-3301
       Email: legal@pinerivercapital.com


DTC Participant: Goldman Sachs Prime
                Brokerage

**PINES EDGE VALUE INVESTORS LTD.**

By: Pine River Capital Management L.P.,
    Its Investment Manager

By: /s/ *Jeff Stolt*
    Name: Jeff Stolt
    Title: Chief Financial Officer

Address:
    601 Carlson Parkway, Suite 330
    Minnetonka, MN 55305

Fax: (612) 238-3301
Email: legal@pinerivercapital.com

DTC Participant: Goldman Sachs Prime
    Brokerage

**HFR RVA COMBINED MASTER TRUST**
By: WHITEBOX ADVISORS, LLC
    its Investment Advisor

By:  /s/ _____
     Name: Mark Strefling
     Title:  CLO

     Address: 3033 Excelsior Blvd,
              Suite 300
              Minneapolis, MN 55416
              Attn:  Jake Mercer

     Fax: (612) 253-6149
     Email: jmercer@whiteboxadvisors.com


     DTC Participant:  BNP Paribas

**IAM MINI-FUND 14 LIMITED**
By: WHITEBOX ADVISORS, LLC
    its Investment Advisor

By: /s/ _____

    Name: Mark Strefling
    Title:  CLO

    Address: 3033 Excelsior Blvd,
             Suite 300
             Minneapolis, MN 55416
             Attn:  Jake Mercer

    Fax: (612) 253-6149
    Email: jmercer@whiteboxadvisors.com


DTC Participant: JP Morgan
                   BNP Paribas

**PANDORA SELECT PARTNERS, LP**
By: PANDORA SELECT ADVISORS, LLC
    its General Partner
By: WHITEBOX ADVISORS, LLC
    its Managing Member

By: /s/
    Name: Mark Strefling
    Title: CLO

    Address: 3033 Excelsior Blvd,
            Suite 300
            Minneapolis, MN 55416
            Attn: Jake Mercer

    Fax: (612) 253-6149
    Email: jmercer@whiteboxadvisors.com

DTC Participant: Deutsche Bank

**WHITEBOX CONCENTRATED
CONVERTIBLE ARBITRAGE PARTNERS,
LP**
By: WHITEBOX CONCENTRATED
    CONVERTIBLE ARBITRAGE ADVISORS,
    LLC
    its General Partner
By: WHITEBOX ADVISORS, LLC
    its Managing Member

By:   /s/
      Name: Mark Strefling
      Title: CLO

      Address: 3033 Excelsior Blvd,
            Suite 300
            Minneapolis, MN 55416
            Attn: Jake Mercer

      Fax: (612) 253-6149
      Email: jmercer@whiteboxadvisors.com


    DTC Participant:  JP Morgan
                      BNP Paribas

**WHITEBOX MULTI-STRATEGY**
**PARTNERS, LP**
By: WHITEBOX MULTI-STRATEGY
    ADVISORS, LLC
    its General Partner
By: WHITEBOX ADVISORS, LLC
    its Managing Member

By:   /s/
      Name: Mark Strefling
      Title: CLO

      Address: 3033 Excelsior Blvd,
             Suite 300
             Minneapolis, MN 55416
             Attn: Jake Mercer

      Fax: (612) 253-6149
      Email: jmercer@whiteboxadvisors.com


DTC Participant: JP Morgan
                 BNP Paribas

**WHITEBOX CREDIT ARBITRAGE
PARTNERS, LP**
By: WHITEBOX CREDIT ARBITRAGE
    ADVISORS, LLC
    its General Partner
By: WHITEBOX ADVISORS, LLC
    its Managing Member

By: /s/
    Name: Mark Strefling
    Title: CLO

    Address: 3033 Excelsior Blvd,
         Suite 300
         Minneapolis, MN 55416
         Attn: Jake Mercer

    Fax: (612) 253-6149
    Email: jmercer@whiteboxadvisors.com


DTC Participant: BNP Paribas

**DBX CONVERTIBLE ARBITRAGE 13 FUND** Waterstone Capital Management, L.P.

By: /s/

Name: Jeff Erb
Jeffrey C. Erb
General Counsel

Title: General Counsel & CCO

Address:
c/o Waterstone Capital Management, LP
2 Carlson Parkway, Suite 260
Plymouth, MN 55447

Fax: (952) 697-4130
Email: cparks@wscm.net

DTC Participant: Deutsche Bank

**IAM MINI-FUND 21 LIMITED** Waterstone Capital Management, L.P.

By: /s/

Name: Jeff Erb

Title: General Counsel & CCO

Jeffrey C. Erb
General Counsel

Address:

c/o Waterstone Capital Management, LP

2 Carlson Parkway, Suite 260
Plymouth, MN 55447

Fax: (952) 697-4130
Email: cparks@wscm.net

DTC Participant: Deutsche Bank

*[Signature Page to Restructuring Support Agreement]*

**WATERSTONE MARKET NEUTRAL
MASTER FUND LTD.**

By: _/s/_ _____
Waterstone Capital Management, L.P.
Name: Jeff Erb
Title:  General Counsel & CCO

Jeffrey C. Erb
General Counsel

Address:
c/o Waterstone Capital Management,
LP
2 Carlson Parkway, Suite 260
Plymouth, MN 55447

Fax: (952) 697-4130
Email: cparks@wscm.net


DTC Participant: BNP Paribas

**WATERSTONE MARKET NEUTRAL MAC 51 LTD.**

By: /s/      Waterstone Capital Management, L.P.

Name: Jeff Erb

Title: General Counsel & CCO

Address:

c/o Waterstone Capital Management, LP

2 Carlson Parkway, Suite 260

Plymouth, MN 55447

Fax: (952) 697-4130

Email: cparks@wscm.net

DTC Participant: Deutsche Bank

**WATERSTONE MF FUND, LTD**
Waterstone Capital Management, L.P.

By: /s/
Name: Jeff Erb
Title: General Counsel & CCO
Jeffrey C. Erb
Address: General Counsel
c/o Waterstone Capital Management,
LP
2 Carlson Parkway, Suite 260
Plymouth, MN 55447

Fax: (952) 697-4130
Email: cparks@wscm.net

DTC Participant: BNP Paribas

**NOMURA WATERSTONE MARKET
NEUTRAL FUND**

Waterstone Capital Management, L.P.

By: /s/

Name: Jeff Erb
Title: General Counsel & CCO

Jeffrey C. Erb
Address: General Counsel
c/o Waterstone Capital Management,
LP
2 Carlson Parkway, Suite 260
Plymouth, MN 55447

Fax: (952) 697-4130
Email: cparks@wscm.net


DTC Participant: Deutsche Bank

**PRIME CAPITAL MASTER SPC – GOT WAT MAC SEGREGATED PORTFOLIO**

Waterstone Capital Management, L.P.

By: /s/

Name: Jeff Erb

Title: General Counsel & CCO

Jeffrey C. Erb
General Counsel

Address: c/o Waterstone Capital Management, LP

2 Carlson Parkway, Suite 260
Plymouth, MN 55447

Fax: (952) 697-4130
Email: cparks@wscm.net

DTC Participant: Deutsche Bank

**WILFRID GLOBAL OPPORTUNITY FUND, L.P.**
By: WILFRID HOLDINGS LLC
    a Delaware limited liability company,
    its general partner

By: /s/ *[signature]*
    Name: Nicholas W. Walsh CFA
    Title: Managing Member

    Address: 100 William St. Suite 1850
            New York, NY 10038

    Fax: (212) 675-3626
    Email: yukelsonm@wilfridaubrey.com
        with a copy to:
        walshn@wilfridaubrey.com


DTC Participant: Pershing LLC

**TENOR OPPORTUNITY MASTER FUND, LTD**

By: /s/
Name: Daniel H. Kochav
Title: Director

Address:
c/o Tenor Capital Management
Company
1180 Avenue of the Americas,
Suite 1940
New York, NY 10036

Fax: (212) 918-5301
Email: dkochav@tenorcapital.com

DTC Participant: Goldman Sachs

**PARSOON OPPORTUNITY FUND, LTD**

By: /s/
Name: Daniel H. Kochav
Title: Director

Address:
c/o Tenor Capital Management
Company
1180 Avenue of the Americas,
 Suite 1940
New York, NY 10036

Fax: (212) 918-5301
Email: dkochav@tenorcapital.com


DTC Participant: Goldman Sachs

**ARIA OPPORTUNITY FUND, LTD**

By: /s/
Name: Daniel H. Kochav
Title: Director

Address:
c/o Tenor Capital Management
Company
1180 Avenue of the Americas,
 Suite 1940
New York, NY 10036

Fax: (212) 918-5301
Email: dkochav@tenorcapital.com


DTC Participant: Goldman Sachs

**Exhibit A:  Term Sheet**

**EVERGREEN SOLAR, INC.**
**RESTRUCTURING PROPOSAL**

The following is an outline of a proposed restructuring (the "Proposal") in respect of Evergreen Solar, Inc. (the "Company"). This Proposal does not contain all of the terms, conditions, and other provisions of the transactions contemplated hereby. This Proposal is subject to the execution of definitive documents acceptable to the Company and certain unaffiliated holders (the "Supporting Noteholders") of the Company's 13% Convertible Senior Secured Notes due 2015 ("13% Notes"), in each case in its sole discretion. This Proposal does not constitute an offer of securities and is not an offer or solicitation for any chapter 11 plan.

I.      Certain Defined Terms

As used in this Proposal:

"Core Assets" means all assets (other than the Non-Core Assets) necessary for the development and pursuit of the Company's business plan based on the Wafer Business, including the building and assets in Midland, MI, and including $12.884 million of cash, as such amount may be adjusted upward or downward as provided in Schedule B, but excluding certain assets usable in the Company's business plan based on the Wafer Business that the Supporting Noteholders and the Company agree should constitute Non-Core Assets.

"Devens Assets" means the manufacturing facility and equipment located in Devens Massachusetts, the lease agreement between the Company and the Massachusetts Development Finance Agency dated November 20, 2007, as amended, and other assets associated with the operation of the facility, including vendor lists, agreements with vendors, operations documentation, and a license to operate the Company's non-ISSR wafer manufacturing equipment, but excluding (x) accounts receivable and inventory and any assets constituting part of the Wafer Business and (y) certain other assets located at the facility that the Supporting Noteholders and the Company agree should constitute Non-Core Assets.

"LBIE Claim" means the Company's claims against Lehman Brothers International Europe ("LBIE") and Lehman Brothers Holdings Inc. ("LBHI") arising out of the share lending agreement entered into by the Company with LBIE and the related guarantee of LBIE's obligations provided by LBHI.

"Non-Core Assets" means all cash (other than (i) the $12.884 million included in the Core Assets (as such amount may be adjusted upward or downward as provided in Schedule B), (ii) the $10.7 million (subject to increase with respect to winddown costs as described below) (the "Advisor/Winddown Reserve") reserved for (a) Company advisor fees and (b) costs of winding up the Bankruptcy Case, (iii) an amount equal to the Budget (as defined herein), (iv) $50,000 reserved for advisors to the official committee of unsecured creditors ("UCC"), if any, (v) fees for the advisors to the Supporting Noteholders and Indenture Trustee, (vi) cash otherwise permitted to be used by the Cash Collateral Order and (vii) cash otherwise agreed by the Supporting Noteholders to be used hereunder, pursuant to the Stalking Horse Bid Asset Purchase Agreement (including expenses to be satisfied by the Company thereunder), or otherwise (all of the foregoing, the "Reserved Cash")), account receivables, causes of action (including avoidance actions[1]), existing inventory and all other assets of the Company that are not (or are excluded from) Core Assets, the Devens Assets or the LBIE Claim.

---

[1] Avoidance actions would not be sold to a third party purchaser (i.e., a party other than the holders of 13% Notes) unless the Company and the Supporting Noteholders agree otherwise.

"Sale Assets" means the Core Assets, the LBIE Claim, the Devens Assets and the Non-Core Assets.[2]

"Wafer Business" means the Company's proposed business based on industry standard sized String Ribbon wafers for the photovoltaic solar industry. The Company's goal is to complete the commercialization of the technology for the Wafer Business, with a view to enabling a commercialization plan (which may be in one or more forms such as licensing or manufacturing) that better positions the business enterprise for significant new financings or sales.

Proposal

- On or before August 12, 2011, the Company informed all employees who will be terminated as part of this restructuring. From August 15 forward, certain employees critical to the transaction will be paid from the transition budget and be separated from the Company as their transition roles wind down and allowing the Company to meet the budgetary levels outlined in the June 2011 Investor Presentation provided to the Supporting Noteholders (the "June 2011 Presentation").

- The Company shall continue or immediately undertake a process to market the Sale Assets (the "Sale Process"). The Sale Process will permit parties to bid on all of the Sale Assets as a group or separately on any of the following group of assets (the "Asset Groups"): (i) the Devens Assets; (ii) the LBIE Claim; (iii) the Core Assets and (iv) the Non-Core Assets (provided that separate bidding on individual assets that comprise Non-Core Assets may be permitted with the consent of the Supporting Noteholders, such consent not to be unreasonably withheld). The Sale Process shall be completed in a bankruptcy case (the "Bankruptcy Case") filed under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the District of Delaware on terms and conditions reasonably acceptable to the Supporting Noteholders.

- The Sale Process shall be effectuated either through or subsequent to one or more auctions pursuant to Section 363 of the Bankruptcy Code, in which holders of 13% Notes provide a "credit-bid" pursuant to Section 363(k) of the Bankruptcy Code for the Sale Assets (the "Stalking Horse Bid").[3] The Stalking Horse Bid will (i) contain a release price of $30 million[4] in cash or, if the Supporting Noteholders consent in its sole discretion, in other consideration for the sale of the Core Assets such that the holders of the 13% Notes consent to the sale of the Core Assets to a third party in an amount above the release price and (ii) otherwise allow the holders of 13% Notes to allocate, in their discretion, the Stalking Horse Bid among the Asset Groups if one or more bids are received on any of the individual Asset Groups. None of the Sale Assets, other than existing inventory sold in the ordinary course of business, shall be sold or disposed of outside of the Sale Process without the consent of the Supporting Noteholders. Subject to Bankruptcy Court approval, all proceeds from the Sale Assets (net of costs and other amounts required to be paid in connection with sales including without limitation, cure costs, taxes, broker fees, required payments to third parties under the sales agreements and other transaction costs), whether pursuant to the Sale Process, the Stalking Horse Bid or otherwise, will go directly to pay down

---

[2] For clarity, regarding any postpetition asset, a credit bid may apply to the extent that there is a lien on such asset in favor of the 13% Notes.

[3] The Stalking Horse Bid will provide that the purchaser has the option to include or exclude assets from the sale, including, but not limited to, the stock of each of the foreign subsidiaries of the Company and contracts related to the Company's operations in China, provided that the Advisor/Windown Reserve will be increased by an agreed upon estimate of additional windown costs related to any such excluded assets, provided, further, that such additional costs that remain after deducting such costs from the proceeds of dispositions of excluded assets shall not exceed $7.5 million in the aggregate (i.e., in addition to the value of any excluded assets).

[4] The Supporting Noteholders may reduce this amount in its sole discretion.

the claims of the holders of 13% Notes until such holders are paid in full in cash (including, but not limited to, post-petition interest at the contract rate), to the extent that after such paydown the Company will retain sufficient cash to cover Reserved Cash.

- During the Sale Process, the Company will operate pursuant to a budget (the "Budget"), which Budget is outlined on Schedule A hereto. The Sale Process is anticipated to be conducted over a period of approximately three months. The Company will also be permitted to use Reserved Cash for the contemplated purposes, including, without limitation, up to $10.7 million to cover any (a) Company advisor fees and (b) costs of winding up the Bankruptcy Case (exclusive of Severance/PTO Benefits Payments otherwise addressed herein), including a plan of reorganization to the extent the Company so chooses, and, subject to approval of the Bankruptcy Court, an amount not to exceed $50,000 for the fees of the UCC (if any). If the Company decides to pursue confirmation of a plan of reorganization, the Supporting Noteholders agree to support such a plan solely on the terms and conditions set forth in the Restructuring Support Agreement (as defined below), including that such plan not require payments in excess of amounts specified in the Restructuring Support Agreement (including payments of no more than $200,000 to holders of general unsecured claims, unless the holders of the 13% Notes are paid in full).

- The Supporting Noteholders will support the Company's restructuring with consent to cash collateral and/or accounts receivable usage, pursuant to the Budget and agreed upon protections. The cash collateral order will provide (i) that all proceeds of the Sale Process (net of costs and other amounts required to be paid in connection with sales including, without limitation, cure costs, taxes, broker fees, required payments to third parties under the sales agreements and other transaction costs) will go directly to pay down the claims of the holders of 13% Notes until such holders are paid in full in cash (including, but not limited to, post-petition interest at the contract rate), to the extent that after such paydown the Company will retain sufficient cash to cover Reserved Cash and (ii) subject to the approval by the Bankruptcy Court (and subject to any requirements of the Bankruptcy Court), $12.5 million of cash will immediately be used to pay down the claims of the holders of 13% Notes. If the Bankruptcy Court does not permit all or a portion of the net sale proceeds to be immediately paid to the holders of 13% Notes, then such proceeds shall be held in a segregated account by the Company subject to the first priority perfected liens of the holders of 13% Notes pending further order of the Bankruptcy Court. The Supporting Noteholders will also support court approval of a management incentive plan that provides for an amount equal to 5% of gross cash sale proceeds from a third party (i.e. not pursuant to the Stalking Horse Bid or an acquisition vehicle in which management has an equity interest of more than 20% or management has committed to invest more than $1 million) for the Core Assets; provided, however, the amount provided in the management incentive plan shall not be less than $1 million.[5]

- If the Stalking Horse Bid is the highest and best bid for either all of the Sale Assets or a subset of the Sale Assets that includes the Core Assets and the sale is consummated:

  o the company ("NewCo") that purchases the assets pursuant the Stalking Horse Bid would, subject to agreed corporate governance provisions, support development of the Wafer Business with working capital as outlined on Schedule B hereto, and pursuant to mechanisms to be described in the Asset Purchase Agreement and would offer to hire existing employees, with the same salary or wages, comparable severance and other

---

[5] If the Bankruptcy Court does not approve the management incentive plan, the parties will negotiate in good faith to obtain court approval of a revised management incentive plan on similar economic terms.

benefits comparable in the aggregate ("<u>Comparable Terms</u>"), sufficient to support the development of the Wafer Business; and

- o The board of directors of NewCo will establish a management incentive plan as soon as practicable after consummation of the sale to provide designated members of senior management of NewCo with stock, options and/or other instruments representing, in the aggregate, up to 10% of the equity value of NewCo relating to the Core Assets, and Newco will offer short term transition contracts for certain members of existing management who are required for a transition period on terms to be agreed upon between such members of management and the Supporting Noteholders prior to filing the Bankruptcy Case, with any such costs reducing the budget set forth on Schedule B on a dollar for dollar basis. The transition contracts for the current general counsel and chief financial officer will (i) require such consultants to be available on a full time basis and (ii) contain non-compete clauses for the duration of the transition contracts.

- The Company and the Supporting Noteholders shall set forth their agreements and undertakings contemplated by this Proposal in a restructuring support agreement to be executed prior to the filing of the Bankruptcy Case which shall include, among other things, milestones to achieve the restructuring and agreement to provide mutual releases upon consummation of the Sale Process (the "<u>Restructuring Support Agreement</u>").

- On or before August 15, 2011, the Company shall have commenced the Bankruptcy Case in the District of Delaware.

## Schedule A – Budget (in $000s)

| | |
|---|---|
| Operating Activities | $5,841 |
| Other Transition Charges | 2,120 |
| Severance/PTO/Benefits Payments | 2,200[6] |
| **Total Budget** | **$10,161** |

Note: Budget items are defined as presented in the June 2011 Presentation. The Severance/PTO/Benefits Payments are based on a defined list of personnel that the Company expects it will terminate prior to the end of the Sale Process. When the employment of all of these people has terminated, if the Company's total commitments for Severance/PTO/Benefits Payments for these people are less than the $2.2 million budgeted, the difference between the budgeted amount and the actual amount spent will be added to the Operating Activities budgeted amount on Schedule B. For purposes of clarity, employees that are offered employment with NewCo or the third party purchaser of the Core Assets on Comparable Terms and who do not accept these employment terms will not be entitled to severance from the estate and (ii) any employee who accepts an offer of employment from NewCo or a third party purchaser (whether or not on Comparable Terms) would not be entitled to severance from the estate.

The Budget contemplates a sales process commencing August 15, 2011 and consummating on or prior to November 15, 2011. To the extent that such period is extended with the consent of the Supporting Noteholders, which consent shall be in its sole discretion, this Budget shall be increased and extended in an amount to be reasonably agreed and shall not reduce amounts on Schedule B. In addition, to the extent that the Sale Process is extended by the Company without the consent of the Supporting Noteholders past November 15, 2011, the timetable for the Sale Process will be extended, but not past November 30, 2011 except such period may be extended until December 31, 2011 solely to the extent required for the purchaser to obtain necessary regulatory approvals. In the event of such an extension without the consent of the Supporting Noteholders, the budget set forth above for Operating Activities will be increased by an amount to fund the Company's operating activities during such period, and such amount shall be deducted on a dollar for dollar basis from the Operating Activities budget set forth on Schedule B and the amount of cash to be transferred to NewCo or third parties as part of the sale of the Core Assets.

---

[6] This represents all Severance/PTO/Benefits payments required through the completion of the Sales Process, based on the employees the Company intends to terminate prior to the end of the Sale Process. If the Company decides to terminate additional employees prior to the end of the Sale Process, these employees would be entitled to severance to be paid out of the additional $1.9 million reserved for potential additional severance and the Budget will be increased by this amount. If every employee is terminated as a result of the Sale Process (for example, Newco or the third party purchaser of the Core Assets does not offer comparable employment terms to any current employee of the Company), the Company would pay a total of an additional $1.9 million in additional severance and the Budget will be increased by this amount.

## Schedule B – Wafer Business Working Capital (in $000s)

| | |
|---|---|
| Operating Activities | $9,884 |
| Capex for Wide Wafer Development | 3,000 |
| **Total** | **$12,884** |

Note:  Budget items are defined as presented in the June 2011 Presentation.  The budget for Operating Activities will be increased by an amount equal to (i) 25% of the sum of the following items in excess of $4.5 million (as included in Working Capital and Other in the June 2011 Presentation) collected post-petition: (a) Accounts Receivable, (b) Inventory, and (c) Sovello royalty payments, plus (ii) the $2.2 million budgeted for Severance/PTO/Benefits payments on Schedule A for those people expected to be terminated prior to the end of the Sale Process minus the amount of actual Severance/PTO/Benefits payments actually paid to those persons; provided, however, that the budget will be increased by the amounts referred to in clause (i) above only to the extent that the Company receives at least $4 million in proceeds of avoidance (including turnover) actions in the Bankruptcy Case and such proceeds are subject to the liens of the 13% Notes.

**Exhibit B: Plan Term Sheet**

A/74486196.2

## Evergreen Solar, Inc. Plan Term Sheet

The following is a summary (the "<u>Plan Term Sheet</u>") of certain material terms of a proposed plan of reorganization (the "<u>Plan</u>") of Evergreen Solar, Inc. (the "<u>Company</u>" or the "<u>Debtor</u>") under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>").  This Term Sheet does not contain all the terms other provisions of the Plan, which terms and provisions shall not be inconsistent with this Plan Term Sheet and shall be reasonably acceptable to the holders of 13% secured notes (the "<u>Supporting Noteholders</u>") that are a party to the Restructuring Support Agreement dated August [14], 2011 (the "<u>RSA</u>").  Nothing in this Plan Term Sheet is intended to be or constitute, and nothing in this Plan Term Sheet shall be deemed to be or constitute, a solicitation of vote for any plan of reorganization or a sale or a solicitation of an offer to purchase any security of the Company.

<div align="center">PART I – INTRODUCTION</div>

| | |
|---|---|
| <u>Issuer</u>: | The Company |
| <u>Description of Outstanding Debt</u>: | The Company has the following convertible notes and other debt for borrowed money outstanding: |

- $165,000,000 aggregate principal amount of 13% Convertible Senior Secured Notes due 2015 ("<u>13% Notes</u>");

- $203,809,000 aggregate principal amount of 4% Senior Convertible Notes due 2013 ("<u>Old 4% Notes</u>"); and

- $12,596,000 aggregate principal amount of 4% Convertible Subordinated Additional Cash Notes due 2020 ("<u>New 4% Notes</u>").  The Old 4% Notes and New 4% Notes are collectively referred to as the "<u>4% Notes</u>" and together with the 13% Notes, the "<u>Notes</u>".

## PART II – PRE-ARRANGED BANKRUPTCY PLAN OF REORGANIZATION

| | |
|---|---|
| <u>Plan of Reorganization</u>: | A "pre-arranged" bankruptcy of the Debtor under Chapter 11 of the Bankruptcy Code to be filed with the U.S. Bankruptcy Court for the District of Delaware to implement the terms of the restructuring stated in this Term Sheet through the Plan.  The Debtor shall be liquidated pursuant to the terms of the Plan. |
| <u>Treatment of Administrative Expense Claims</u> | To the extent holders of 13% Notes are satisfied in full in cash or sufficient amounts are provided for in the RSA, Allowed Administrative Claims shall be paid in full in cash (a) on the date on which the Plan is consummated (the "<u>Effective Date</u>"), (b) the date such Claim is Allowed, (c) in the ordinary course, or (d) upon such other terms as the Debtor and the holder of such claim may agree. |
| <u>Treatment of Priority Tax Claims</u> | To the extent holders of 13% Notes are satisfied in full in cash or sufficient amounts are provided for in the RSA, holders of Allowed Priority Tax Claims shall be paid either (i) in full in Cash or (ii) over a period ending not later than five (5) years after the Petition Date. |
| <u>Class 1: Other Priority Claims</u> | Class 1 claims will be unimpaired.<br><br>To the extent holders of 13% Notes are satisfied in full in cash or sufficient amounts are provided for in the RSA, holders of Class 1 Claimants shall be paid in full in cash (a) on the Effective Date, (b) the date such Claim is Allowed, (c) in the ordinary course, or (d) upon such other terms as the Debtor and the holder of such claim may agree. |
| <u>Class 2: 13% Secured Notes</u> | Allowed Class 2 Claims: an amount no less than $165,000,000 plus accrued interest (at the contract rate in all instances).<br><br>Until all Allowed Class 2 Claims are satisfied in full, holders of Allowed Class 2 Claims shall receive a pro-rata share of (i) any assets which constitute collateral securing the 13% Notes, including on account of liens granted in the Cash Collateral Order, (ii) all proceeds of the sale of the collateral securing the 13% Notes, including on account of liens granted in the Cash Collateral Order and (iii) any and all assets of the Company to the extent necessary to satisfy any superiority administrative claim provided for in the |

2

Cash Collateral Order, less amounts specified in the RSA and utilized for the specific purpose set forth therein (the "Secured Creditor Recovery").

| | |
|---|---|
| Class 3 Claims:  Other Secured Claims | Class 3 claims will be unimpaired. |

Holders of Class 3 Claimants shall receive either (i) payment in full in cash to the extent of such holder's secured claim consistent with section 506 of the Bankruptcy Code or (ii) delivery of the collateral securing such holder's secured claim.

| | |
|---|---|
| Class 4:  General Unsecured Claims: | General Unsecured Claims:  Includes the 4% Notes and all general unsecured claims (including any deficiency claim with respect to Class 2). |

Holders of Allowed Class 4 Claims will receive a pro rata share of any assets available after satisfaction in full of any and all administrative, priority, Class 2 and Class 3 claims, provided, however, if no such assets are available, holders of Class 2 Claims will provide $200,000 out of their Secured Creditor Recovery for the sole and exclusive benefit of, and ultimate distribution to Holders of Allowed Class 4 Claims.

| | |
|---|---|
| Class 5: Existing Equity in Company: | On the Effective Date, shares of existing common stock will be cancelled and holders of shares of existing common stock will receive nothing. |
| Solicitation: | Class 2 and Class 4 will be solicited via a Disclosure Statement approved by the Bankruptcy Court. |
| Mutual Releases: | The Plan will include a release (i) by the Debtor of each Supporting Noteholder and the Indenture Trustee (each, a "Debtor Releasee"), (ii) of the Debtor by the Indenture Trustee and each Supporting Noteholder (a "Creditor Releasee"), and in all cases, their respective attorneys, professionals, current and former officers, current and former directors, partners, employees and agents, from all claims, causes of action and liability up to the Effective Date of the Plan directly or indirectly relating to the Company, the Chapter 11 Case, the Notes, the restructuring of the Notes and the negotiation of the Chapter 11 Case, the Plan, the Restructuring Support |

3

|                          | Agreement and related documents, except for gross negligence or willful misconduct. |
|--------------------------|--------------------------------------------------------------------------------------|
| <u>Satisfaction of Claims</u> | The Plan will include a provision which states that the rights afforded in the Plan and the treatment of all Claims and Interests therein shall be in exchange for and in complete satisfaction and release of all Claims and Interests of any nature whatsoever against the Debtor, its estate, assets, properties, or interests in property. On the Effective Date, all Claims against and Interests in the Debtor shall be deemed satisfied in full. |
| <u>Injunction</u> | The Plan and Confirmation Order will include a permanent injunction which enjoins all entities from, and restrains them against, commencing or continuing in any court any suit, action or other proceeding, or otherwise asserting any claim or interest, seeking to hold the Debtor, the Reorganized or Liquidating Debtor, any Debtor Releasee and Noteholder Newco from any claim, obligation, right, interest, debt or liability that has been discharged, treated or released pursuant to the Plan. |
| <u>Cancellation of Securities</u> | All Notes and Equity shall be deemed cancelled as of the Effective Date of the Plan. |
| <u>Exculpatory Clause</u> | Customary exculpation provisions associated with conduct of Debtor Releasees and Creditor Releasees related to the Plan and the Bankruptcy proceeding. |
| <u>Means of Implementation</u> | Any cash available after payment in full of 13% Notes or, if no such cash is available, the cash specified in the RSA. |
| <u>Wind-Down</u> | On and after the Effective Date, the holders of 13% Notes or, if the 13% Notes have been satisfied in full, the creditors' committee, shall select a plan administrator to perform all activities associated with winding-down of the Debtor's estate, consistent with the amounts specified in the RSA for such purpose, including, without limitation: |

- Resolve any objections to allowance or priority of Claims, Administrative Expenses or Interests;

- Manage, recover, sell and convert the property of the estate to cash, and distribute the net proceeds consistent with the terms of the Plan;

- Wind-up the affairs of the Debtor and its

subsidiaries to the extent necessary;

- Employ, retain and compensate, and discharge and dismiss, without further order of the Bankruptcy Court, professionals as the Debtor (or plan representative, if any) may deem necessary or desirable to assist in fulfilling the purposes of the Plan;

- Commence or prosecute in the name of the Debtor, any lawsuit or other legal or equitable action (except to the extent released pursuant to the Plan), including, without limitation, filing objections to or estimation of Claims;

- Settle or compromise, pursuant to the standards of Bankruptcy Rule 9019, any disputes or controversies in favor of, or against, the Debtor;

- Incur and pay all expenses associated with the Plan, subject to the winddown budget set forth in the RSA, including without limitation, reasonable rent for office space and storage, office supplies, travel and expense reimbursement, insurance and other obligations;

- Prepare and file tax returns, to the extent required by law;

- Seek entry of a final decree at the appropriate time; and

- Take such other action as the plan administrator may determine to be necessary or desirable to carry out the purpose of the Plan.

A/74486214.1

**<u>Exhibit C: Transition Budget</u>**

A/74486196.2

EXHIBIT C

Transition Budget (in $000s)

| Operating Activities | $5,841 |
|---|---|
| Other Transition Charges | 2,120 |
| Severance/PTO/Benefits Payments | 2,200[1] |
| **Total Budget** | **$10,161** |

Note:  Budget items are defined as presented in the June 2011 Presentation.  The Severance/PTO/Benefits Payments are based on a defined list of personnel that the Company expects it will terminate prior to Closing.   When the employment of all of these people has terminated, if the Company's total commitments for Severance/PTO/Benefits Payments for these people are less than the $2.2 million budgeted, the difference between the budgeted amount and the actual amount spent will be added to the Operating Activities included in the Wafer Budget.  For purposes of clarity, employees that are offered employment with Purchaser or the third party purchaser of the Core Assets on Comparable Terms (as defined in the Support Agreement) and who do not accept these employment terms will not be entitled to severance from the estate and (ii) any employee who accepts an offer of employment from Purchaser or a third party purchaser (whether or not on Comparable Terms) would not be entitled to severance from the estate.

This Transition Budget contemplates a sales process commencing August 15, 2011 and consummating on or prior to November 15, 2011.  To the extent that such period is extended with the consent of the Supporting Noteholders, which consent shall be in their sole discretion, this Transition Budget shall be increased and extended in an amount to be reasonably agreed and shall not reduce amounts for the Wafer Budget.  In addition, to the extent that the Closing has not occurred (without the consent of the Supporting Noteholders) prior to November 15, 2011, the term of the Transition Budget will be extended, but not past November 30, 2011 except such term may be extended until December 31, 2011 solely to the extent required for the purchaser to obtain necessary regulatory approvals.  In the event of such an extension without the consent of the Supporting Noteholders, the budget set forth above for Operating Activities will be increased by an amount to fund Seller's operating activities during such period, and such amount shall be deducted on a dollar for dollar basis from the Operating Activities of the Wafer Budget set forth on Exhibit A-1 and the amount of cash to be transferred to Purchaser or third parties as part of the sale of the Core Assets.

---

[1] This represents all Severance/PTO/Benefits payments required through Closing, based on the employees Seller intends to terminate prior to Closing.  If Seller decides to terminate additional employees prior to Closing, these employees would be entitled to severance to be paid out of the additional $1.9 million reserved for potential additional severance and the Transition Budget will be increased by this amount.  If every employee is terminated as a result of the Transactions (for example,  Purchaser or the third party purchaser of the Core Assets does not offer comparable employment terms to any current employee of Seller), Seller would pay a total of an additional $1.9 million in additional severance and the Transition Budget will be increased by this amount.

**Exhibit D:  First Day Motions**

A/74486196.2

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| EVERGREEN SOLAR, INC.,[1] | ) | Case No. 11-_____ (___) |
| | ) | |
| Debtor. | ) | |

**MOTION OF DEBTOR FOR ORDER UNDER 11 U.S.C. §§ 105, 363, 1107 AND 1108 AUTHORIZING (I) MAINTENANCE OF EXISTING BANK ACCOUNTS, (II) CONTINUED USE OF EXISTING BUSINESS FORMS, (III) CONTINUED USE OF EXISTING CASH MANAGEMENT SYSTEM, (IV) CONTINUED PERFORMANCE OF INTERCOMPANY TRANSACTIONS AND PROVIDING ADMINISTRATIVE PRIORITY STATUS TO POSTPETITION INTERCOMPANY CLAIMS AND (V) LIMITED WAIVER OF SECTION 345(b) DEPOSIT AND INVESTMENT REQUIREMENTS**

The above-captioned debtor and debtor in possession (the "Debtor") hereby moves the Court for entry of an order under 11 U.S.C. §§ 105, 345, 363, 364(c)(1), 1107 and 1108, authorizing the (i) maintenance of existing bank accounts, (ii) continued use of existing business forms, (iii) continued use of existing cash management system for the Debtor, (iv) the continued performance of intercompany transactions and provision of administrative priority to postpetition intercompany claims, and (v) limited waiver of 11 U.S.C. § 345(b) deposit and investment guidelines (this "Motion"). In support of the Motion, the Debtor respectfully represents as follows:

---

[1] The last four digits of the Debtor's federal tax identification number are 2254. The Debtor's mailing address is 138 Bartlett Street, Marlboro, MA 01752.

**Error! Unknown document property name.**

## Jurisdiction

1.      This Court has jurisdiction over the Motion under 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), (M), and (O).  Venue of this proceeding and the Motion is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are sections 105(a), 345(b), 363, 1107 and 1108 of title 11 of the United States Code (the "Bankruptcy Code").

## Background

3.      On the date hereof (the "Petition Date"), the Debtor commenced this case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtor has continued in the possession of its property and has continued to operate and manage its business as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner or committee has been appointed in the Debtor's chapter 11 case.

4.      The Debtor has historically developed and manufactured multi-crystalline silicon wafers (known as String Ribbon ™ wafers) utilizing its proprietary wafer manufacturing technology. Those String Ribbon wafers are then converted into photovoltaic solarcells, which are used to produce Evergreen-branded solar panels or solar modules. Evergreen's technology involves a unique process of producing multi-crystalline silicon wafers by growing thin strips of silicon that are then cut into wafers using lasers, substantially reducing the amount of silicon and other processing costs required to produce a wafer as compared to conventional wafer manufacturing methods.

5.　　　More recently, the Debtor has focused its efforts on developing technology for the production of an industry standard size wafer ("Wide Wafer Technology"), which can be supplied to the world's leading solar cell and panel manufacturers. The Debtor plans to focus its operations solely on completing the development of the Wide Wafer Technology, which then may be used to manufacture wafers to be sold to other cell or panel manufacturers or licensed to other cell or panel manufacturers. Evergreen expects that its Wide Wafer Technology will permit the manufacturing of wafers at substantially lower cost than wafers manufactured by alternative methodologies and therefore expects significant demand for its Wide Wafer Technology.

6.　　　The factual background relating to the Debtor's commencement of this chapter 11 case is set forth in detail in the *Declaration of Michael El-Hillow, Chief Executive Officer of the Debtor, in Support of First Day Pleadings* (the "El-Hillow Declaration") filed contemporaneously with this Motion and incorporated herein by reference.

7.　　　Evergreen holds direct or indirect ownership interests in the following nondebtor subsidiaries: 100% of the membership interest in Evergreen Solar, GmbH; 100% of the common stock of Evergreen Solar Securities Corp.; 100% of the interest in Evergreen Solar (HK) China Limited (which in turn owns 100% of the interest in Hubei Evergreen Solar Co., Ltd), ;and 34% of the equity interest of Evergreen Solar (China) Co., Ltd. ("Evergreen Wuhan") (with the remaining 66% held by Hubei Science & Technology Investment Co., Ltd. ("HSTIC")., a third party)).

8.	Evergreen Solar, GmbH is a German entity which serves the Debtor's sales function, currently employing 5 people who are engaged in selling inventory on behalf of the Debtor. Hubei Evergreen Solar Co., Ltd, which is located in China, serves the Debtor's research and development function, currently employing 25 people who are all engaged in research and development on behalf of the Debtor. Evergreen Solar (HK) China Limited does not have any operations, other than serving as the parent of Hubei Evergreen Solar Co., Ltd. Evergreen Wuhan is the Debtor's joint venture with HSTIC, which is further described in the El-Hillow Declaration.

## Relief Requested

9.	By this Motion, the Debtor seeks authorization to (1) maintain its existing bank accounts, (2) continue to use its existing business forms, (3) continue to use its existing cash management system, (4) continue to perform intercompany transactions between the Debtor and its non-debtor affiliates and provide administrative priority to post-petition intercompany claims of such non-debtor affiliates, and (5) to obtain a limited waiver of Bankruptcy Code § 345(b) requirements. Accordingly, the Debtor respectfully requests the entry of an order pursuant to sections 105, 363, 1107 and 1108 of the Bankruptcy Code granting such authority.

## The Cash Management System

10.	The Debtor's cash management system (the "Cash Management System") facilitates the timely and efficient collection, management and disbursement of funds used in the Debtor's business. Because of the nature of the Debtor's business and the disruption to the

business that would result if it was forced to close these accounts, it is critical that the existing Cash Management System remain in place.

11.    The Cash Management System consists of an operating account (the "Operating Account") maintained at Silicon Valley Bank ("SVB") that is interconnected to a series of other accounts.  A diagram showing the role of each account in the Cash Management System is attached hereto as Exhibit A.  A description of each account appears in Exhibit B, attached hereto (collectively, the "Bank Accounts").  The funds in the Bank Accounts constitute the Cash Collateral (as defined in the Cash Collateral Order) of the Secured Parties (as defined in the Cash Collateral Order) and they are subject to the restrictions in the Cash Collateral Order.

12.    Collection Accounts.  The Debtor derives substantially all of its revenues from the sale of its products to its customers.  Revenues derived from the Debtor's operations are deposited either manually or by wire transfer into one of the Debtor's collections accounts.  The Debtor proposes to continue using the Collection Accounts after the Petition Date.

a.    European Collection Account.  Revenues from the Debtor's European customers are generally deposited in a collection account, via wire transfer, with Anglo Irish Bank.  The Euros received are generally transferred each day to the Debtor's Multi-Currency Account at Silicon Valley Bank.  At any point in time, funds may be maintained in the European Collection Account at Anglo Irish Bank in order to pay vendor invoices denominated in Euros or to fund any operating expenses of the Debtor's European operations.  The Debtor proposes to continue using the European Collection Accounts after the Petition Date.

b.    US Collections.  Revenues from the Debtor's U.S. customers are either wired directly to the Debtor's Operating Account or are deposited in the U.S. collections lockbox account at Silicon Valley Bank and swept daily to the operating account.  The Debtor proposes to continue using the U.S. collection lockboxes and the Operating Account after the Petition Date.

13.    Multi-Currency Accounts.  The Debtor also maintains the following multi-currency accounts to facilitate the convenient use of funds.  The Debtor proposes to continue using the Multi-Currency Accounts after the Petition Date.

a.    SVB Multi-Currency Account.  The Debtor utilizes this account to both receive payments into and make disbursements from a Silicon Valley Bank account in foreign currency.  The use of this account reduces the cost of currency exchange when dealing with foreign customers and the foreign non-Debtor affiliates.

b.    Bank of America Multi-Currency Account.  The Debtor established this deposit account at Bank of America to establish a Euro-denominated operating account for collections and disbursements.  As with the SVB Multi-Currency Account, the use of this account reduces the cost of currency exchange when dealing with foreign customers and the foreign non-Debtor affiliates.  This account has had minimal activity since inception.

14.    Disbursements.  The Debtor makes all U.S. dollar denominated operational disbursements from their Operating Account, and no separate U.S. dollar operational disbursement accounts exist in the Cash Management System.

15.     <u>Investment Accounts</u>.  The Debtor maintains two investment accounts one at each of Silicon Valley Bank and Bank of America (collectively, the "Investment Accounts").  The Debtor transfers excess cash as necessary to maximize the return on its cash-on-hand.  The Debtor also utilizes the Investment Accounts as a source of funds to pay its operating expenses.  Transfers between the Operating Account and the Investments Accounts are generally done at the end of each day.  The Debtor proposes to continue using the Investment Accounts after the Petition Date.

## The Intercompany Transactions

16.     The non-Debtor affiliates each have bank accounts separate from the Cash Management System.  Prior to the Petition Date, the Debtor and certain non-Debtor affiliates provided a number of services to, and engaged in intercompany transactions with, each other in the ordinary course of their respective businesses (collectively, the "Intercompany Transactions").  The Intercompany Transactions include[2], but are not limited to:

- <u>Purchase and Shipment of Materials</u>:  The Debtor obtains and ships certain materials to certain non-Debtor affiliates to facilitate research and development of the Debtor's products.

- <u>Marketing and Sale of Finished Products</u>:  Marketing and sale of finished products to or on behalf of the Debtor.  A portion of the Company's products are sold through the German Non-Debtor Affiliate, Evergreen Solar GmbH, which acts as a sales office, for which it receives a reimbursement of expenses on a cost plus arrangement.  All payments received on account of such sales are received directly by the Debtor.

- <u>Payment of Expenses</u>:  Expenses paid by the Debtor on behalf of its non-Debtor affiliates (for example, treasury services, human

---

[2] As noted in the El-Hillow Declaration, the Debtor has ceased all transfers of cash to support Evergreen Wuhan. For the avoidance of doubt, no monies shall be distributed to Evergreen Wuhan.

resources and payroll services, freight, insurance, imported and domestic purchased materials, and various other types of operating expenses). As of the Petition Date and going forward, this applies primarily to Hubei Evergreen Solar Co., Ltd (which, as described above, serves the research and development function for the Debtor's benefit) and Evergreen Solar GmbH (which, as described above, serves a sales function by which the Debtor is selling its remaining inventory).

- <u>Information Services Systems</u>  The Debtor provides a number of information services systems to the non-Debtor affiliates including information technology, financial and purchasing systems. As of the Petition Date and going forward, this applies only to Hubei Evergreen Solar Co., Ltd (which, as described above, serves the research and development function for the Debtor's benefit) and Evergreen Solar GmbH (which, as described above, serves a sales function by which the Debtor is selling its remaining inventory), although the Debtor does continue to share certain information services systems with Evergreen Wuhan, at no material incremental cost to the Debtor.

- <u>Cash Management System</u>:  Transfers of excess cash via the Cash Management System.

Discrete transfers to intercompany accounts are made in furtherance of the Intercompany Transactions. The Intercompany Transactions are recorded by each entity as an intercompany obligation and ultimately satisfied between the entities.

## <u>The Court Should Authorize the Debtor to Maintain Existing Bank Accounts</u>

17.      The United States Trustee for the District of Delaware has established certain operating guidelines for debtors in possession. One such provision requires a chapter 11 debtor in possession to open new bank accounts and close all existing accounts. The United States Trustee Guidelines also require that the new bank accounts only be opened in certain financial institutions designated as authorized depositories by the United States Trustee. This requirement, designed to provide a clear line of demarcation between prepetition and postpetition

claims and payments, helps to protect against the inadvertent payment of prepetition claims by preventing banks from honoring checks drawn before the Petition Date.

18.     The Debtor seeks a waiver of the United States Trustee's requirement that the Bank Accounts be closed and new postpetition bank accounts be opened at depositories authorized by the United States Trustee.  If strictly enforced in this case, the United States Trustee's requirement would cause disruption in the Debtor's activities and would impair the Debtor's ability to operate its business for the benefit of its estate and parties in interest during this chapter 11 case.

19.     Maintenance of the Bank Accounts will greatly facilitate the Debtor's operations in chapter 11.  The Debtor's customers make regular payments to the existing collections accounts by check or electronic transfers, and closing these accounts, establishing new accounts in their place and instructing customers of the changes will substantially disrupt and delay the Debtor's receipt of payments from its customers.  To avoid disruptions and delays in the Debtor's receipt of payments and the Debtor's payment of debts incurred postpetition, the Debtor should be permitted to continue to maintain the existing Bank Accounts and, if necessary, to open new accounts or close unnecessary existing accounts.

20.     To guard against improper transfers resulting from the postpetition honoring of prepetition checks, courts have ordered banks, with limited court-approved exceptions, not to honor any checks drawn on a Debtor's accounts before the Petition Date. Subject to a prohibition against honoring prepetition checks or offsets without specific authorization from this Court, the Debtor requests that the Bank Accounts be deemed debtor-in-

possession accounts and that the Debtor be authorized to maintain and continue the use of these accounts in the same manner and with the same account numbers, styles and document forms as those employed during the prepetition period.

21.     If the relief requested herein is granted, the Debtor will not pay, and each of its banks where the Bank Accounts are maintained will be instructed not to pay, any debts incurred before the Petition Date other than as specifically authorized by this Court.

## The Court Should Authorize the Debtor to Continue its Existing Cash Management System, as Modified by this Motion

22.     The Debtor seeks authority to continue to use its Cash Management System, as such system may be modified pursuant to the requirements of any Court-approved debtor in possession financing facility and/or Cash Collateral usage, and related order of this Court.

23.     The Debtor's Cash Management System constitutes a customary and essential business practice and was created and implemented by the management of the Debtor in the exercise of their business judgment.  The Cash Management System is similar to those commonly employed by corporate enterprises comparable to the Debtor in size and complexity. The widespread use of this type of Cash Management System, moreover, is attributable to the numerous benefits it provides, including the ability to (a) control and monitor corporate funds, (b) reduce idle cash balances, (c) ensure cash availability and (d) reduce administrative expenses by facilitating the movement of funds and the development of timely and accurate balance and presentment information.  In addition, preserving a "business as usual" atmosphere and avoiding

the unnecessary distractions that would inevitably be associated with a substantial disruption of the Cash Management System, will facilitate and enhance the Debtor's efforts to maximize the value of its assets for the benefit of its stakeholders. For similar reasons, the Debtor should be authorized to continue to fund its business and operations by payments made from the Operating Account. The relief requested is consistent with the relief provided to debtors in a number of other cases pending in this district.

### The Court Should Grant the Debtor Authority
### To Use Checks to the Limited Extent Requested Below

24. To minimize expense to its estate, the Debtor also requests authority to continue using any pre-printed business forms and check stock without reference to its "debtor in possession" status until the existing pre-printed stock has been exhausted, provided that the Debtor shall add the "debtor in possession" designation to any new checks ordered after the depletion of the existing stock. Because the vast majority of the Debtor's checks and business forms are electronically printed, the Debtor believes that it can add the "debtor in possession" label to its computer generated checks and forms within a short period of time and with minimal expense.

### Payment of Outstanding Routine Prepetition Expenses
### Relating to the Operation of the Cash Management System

25. In the ordinary course of the operation and maintenance of the Cash Management System, the Debtor incurs routine bank charges and fees relating to the administration of the Cash Management System. The Debtor seeks authority, in its sole discretion, to pay any such routine prepetition banking fees.

**The Debtor Should Be Allowed to Continue the Intercompany Transactions,
Preserve Intercompany Setoff Rights and Grant Postpetition Intercompany Transactions
Administrative Priority Status**

26. The Intercompany Transactions allow the Debtor, among other things, to meet the needs of its customers and suppliers efficiently and in a cost-effective manner, through centralization of key administrative functions. Moreover, in many cases, due to the cross-border nature of the Debtor's business and operations, the Intercompany Transactions help the Debtors to function in a tax-efficient manner. Accordingly, the Debtor believes that the continuation of the Intercompany Transactions, only with respect to Hubei Evergreen Solar Co., Ltd. and Evergreen Solar GmbH and expressly subject to the Cash Collateral Order and the associated budget, is beneficial to its estate, its creditors and other parties in interest and should therefore be authorized by the Court.[3]

27. The Debtor also seeks authorization to preserve and exercise intercompany setoff rights. Section 553(a) of the Bankruptcy Code provides that:

> Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case . . . .

11 U.S.C. § 553(a). A creditor need only establish two elements before a setoff may be asserted: mutuality and timing. *Official Comm. of Unsecured Creditors v. Mfrs. & Traders Trust Co. (In re The Bennett Funding Group, Inc.*), 212 B.R. 206, 212 (2d Cir. B.A.P. 1997); *see also In re*

---

[3] The Debtor engaged in Intercompany Transactions on a regular basis prior to the Petition Date. Such transactions are common for enterprises such as the Debtor's. The Debtor believes that these transactions are in the ordinary course within the meaning of section 363(c)(1) of the Bankruptcy Code and, thus, do not require this Court's approval. Nevertheless, out of an abundance of caution, the Debtor is seeking express authority to engage in such transactions. For the avoidance of doubt, no monies shall be distributed to Evergreen Wuhan.

*Verco Industries*, 704 F.2d 1134, 1139 (9th Cir. 1983); *In re Lundell Farms*, 86 B.R. 582, 584

(Bankr. W.D. Wis. 1988).  Although courts have not uniformly defined the elements of

mutuality, most courts require the following elements:  that the debts be (i) owed between the

same parties and (ii) in the same right or capacity.  *See* 5 *Collier on Bankruptcy* ¶ 553.03[3][a] at

553-28-29 (15th rev. ed. 2004) (citing *Davidovich v. Welton* (*In re Davidovich*), 901 F.2d 1533,

1537 (10th Cir. 1990); *Lubman v. Sovran Bank, N.A.* (*In re A & B Homes, Ltd.*), 98 B.R. 243,

248 (Bankr. E.D. Va. 1989); *see also Cohen v. Savs. Bldg. & Loan Co. (In re Bevill, Bresler &*

*Schulman Asset Mgmt. Corp.)*, 896 F.2d 54, 57 (3d Cir. 1990) (explaining that the right of setoff

depends on the existence of mutual debts and claims between the creditor and debtor).  Timing

requires that both claims arose prepetition.  *See Cooper Jarrett, Inc. v. Cent. Transp., Inc.*, 726

F.2d 93, 96 (3d Cir. 1984) (noting that a creditor may not [setoff] its prepetition claims against a

debt owed to a debtor which came into existence after filing the bankruptcy petition); *see also In*

*re Sentinel Prods.Corp.*, 192 B.R. 41, 45 (S.D.N.Y. 1996) ("Section 553(a) of the bankruptcy

code preserves a creditor's right to set off . . .  between the debtor and creditor as long as both

debts arose before the commencement of the [bankruptcy] case"); *In re Westchester Structures*,

181 B.R. at 739 (same);  Arnold M. Quittner, *Setoff and Recoupment*, 715 PLI/Comm 633, 661

(1995) (same).[4]  As a result, "a creditor may not set off a pre-petition claim against a post-

petition debt it owes the debtor, and likewise it may not set off a post-petition claim that it has

---

[4]     In addition, courts have allowed parties to offset claims postpetition in the same manner as a prepetition setoff,
as long as the mutuality requirements are met.  *See, e.g., United States v. Gordon Sel-Way, Inc.* (*In re Gordon
Sel-Way, Inc.*), 239 B.R 741, 751 (E.D. Mich. 1999), aff'd, 270 F.3d 280 (6th Cir. 2001); *In re Mohawk Indus.,
Inc.*, 82 B.R. 174,179 (Bankr. D. Mass. 1987).

against a pre-petition debt it owes to a debtor." *In re Metco Mining and Minerals, Inc.*, 171 B.R. 210 (Bankr. W.D. Pa. 1994); *see also In re Westchester Structures*, 181 B.R. at 739.

28.     The Cash Management System and other processes allow the Debtor to track all obligations owing between related entities and thereby ensure that all setoffs of Intercompany Transactions will meet both the mutuality and timing requirements of section 553 of the Bankruptcy Code.  The Debtor respectfully requests, therefore, that the Debtor and the non-Debtor affiliates expressly be authorized to set off prepetition obligations arising on account of Intercompany Transactions between the Debtor and any Non-Debtor Affiliate.  The Debtor also respectfully requests that the Debtor and the non-Debtor affiliates be expressly authorized to set off postpetition obligations arising on account of Intercompany Transactions between a Debtor and a Non-Debtor Affiliate.

29.     If the Court authorizes the continuation of Intercompany Transactions, at any given time there may be balances due and owing from one Debtor to the non-Debtor affiliates representing extensions of intercompany credit.  To ensure that the Debtor will not, at the expense of its creditors, fund the operations of another entity, the Debtor will continue to maintain records of such transfers, including records of all current intercompany accounts receivable and payable.  Additionally, the Debtor respectfully requests that, pursuant to section 507(a)(i) of the Bankruptcy Code, all Intercompany Transactions arising after the Petition Date be accorded administrative priority status, provided, however, that all such transactions shall be subject to the Cash Collateral Order.  For the avoidance of doubt, the Debtor is not seeking authority by this Motion to satisfy prepetition claims arising out of Intercompany

Transactions by offsetting such prepetition Intercompany Transactions against postpetition Intercompany Transactions.

## **The Court Should Grant a Limited § 345(b) Waiver on an Interim Basis**

30.     The Debtor seeks an interim waiver of section 345(b) of the Bankruptcy Code subject to final approval.  The waiver would permit the Debtor to maintain its Bank Accounts without posting a bond or other security, as would otherwise be required under section 345(b) whenever the funds on deposit exceed the amount permitted under section 345(b), while the Debtor takes steps to comply with the requirements of the Bankruptcy Code.  The Debtor believes that, other than the Anglo Irish Bank accounts, its Bank Accounts are (a) covered by FDIC insurance and contain amounts which are within the limits of such insurance, and/or (b) with financial institutions which have standing collateralization agreements with the office of the United States Trustee (the "OUST").  With regard to the Anglo Irish Bank accounts, the Debtor will work with Anglo Irish Bank to either (a) put acceptable collateralization agreements in place subject to the reasonable consent of the OUST and Supporting Noteholders or, (b) if that is not practicable, will move the funds in these accounts to a new or existing bank account that satisfies the requirements of the Bankruptcy Code within sixty (60) days of the Petition Date subject to the Debtor's right to seek additional time, after consulting with the Supporting Noteholders.  As noted above, the Bank Accounts may, at certain times, contain cash in excess of the FDIC insurance limits.

## **Authority for the Requested Relief**

A.     The Continued Use of the Debtor's Cash Management System is Essential to the
       Debtor's Operations, and Approval to Maintain the Status Quo is
       Routinely Granted Under the Bankruptcy Code Sections 363 and 105

        31.     Bankruptcy courts routinely grant chapter 11 debtors authority to continue

utilizing existing cash management systems, and treat requests for such authority as a relatively

"simple matter."  *In re Baldwin-United Corp.*, 79 B.R.  321, 327 (Bankr. S.D.  Ohio 1987).  This

is particularly true where, as here, the chapter 11 case involves affiliated entities with complex

financial affairs.  In *In re Charter Co.*, 778 F.2d 617 (11th Cir. 1985), for example, the

bankruptcy court entered an order authorizing the debtor and forty-three (43) of its subsidiaries

"to continue to consolidate the management of its cash as has been usual and customary in the

past, and to transfer monies from affiliated entity to entity, including operating entities that are

not debtors."  *Id.* at 620.  The Eleventh Circuit Court of Appeals then affirmed a subsequent

district court decision denying a creditor's motion for leave to appeal the bankruptcy court's cash

management order, holding that authorizing the debtor to utilize its prepetition "routine cash

management system" was "entirely consistent" with applicable provisions of the Bankruptcy

Code.  *Id.* at 621.

        32.     Likewise, in another context, the bankruptcy court in the *Columbia Gas*

chapter 11 case explained that a centralized cash management system "allows efficient utilization

of cash resources and recognizes the impracticabilities of maintaining separate cash accounts for

the many different purposes that require cash."  *In re Columbia Gas Sys., Inc.*, 136 B.R. 930, 934

(Bankr. D. Del. 1993), *aff'd in part* and *rev'd in part*, 997 F.2d 1039 (3d Cir. 1993), *cert. denied

sub nom Official Comm. of Unsecured Creditors v. Columbia Gas Transmission Corp.*, 114 S.

Ct. 1050 (1994). The Third Circuit agreed, emphasizing that a requirement to maintain all accounts separately "would be a huge administrative burden and economically inefficient." *Columbia Gas*, 997 F.2d at 1061. *See also In re Southmark Corp.*, 49 F.3d 111, 114 (5th Cir. 1995) (cash management system allows debtor "to administer more efficiently and effectively its financial operations and assets"); *In re UNR Indus., Inc.*, 46 B.R. 25, 27 (Bankr. N.D. Ill. 1984).

33. Section 363(c)(1) of the Bankruptcy Code authorizes the debtor in possession to "use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c)(1). The purpose of section 363(c)(1) of the Bankruptcy Code is to provide a debtor in possession with the flexibility to engage in the ordinary transactions required to operate its business without undue oversight by creditors or the court. *Medical Malpractice Ins. Ass'n. v. Hirsch (In re Lavigne)*, 114 F.3d 379, 384 (2nd Cir. 1997). Included within the purview of section 363(c) is a debtor's ability to continue the "routine transactions" necessitated by a debtor's cash management system. *Amdura Nat'l Distrib. Co. v. Amdura Corp. (In re Amdura Corp.)*, 75 F.3d 1447, 1453 (10th Cir. 1996). Accordingly, the Debtor seeks authority under section 363(c)(1) of the Bankruptcy Code to continue the collection and disbursement of cash pursuant to its Cash Management System as described above.

34. Additionally the Court may exercise its equitable powers to grant the relief requested herein. Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary to carry out the provisions of this title." 11 U.S.C. § 105(a). Continuing the Debtor's Cash Management System without interruption is vital to the

success of this chapter 11 case. The Cash Management System is an efficient mechanism whereby the Debtor is able to transfer its revenues toward the payment of its obligations.

35. In other cases in this District, this Court has granted relief similar to that requested in this Motion. *See, e.g.*, *In re Point Blank Systems, Inc., et al.,* Case No. 10-11255 (PJW) (Bankr. D. Del. April 14, 2010); *In re Latham International, Inc., et al.*, Case No. 09-14490 (SS) (Bankr. D. Del. December 23, 2009), *In re Champion Enterprises, Inc., et al.*, Case No. 09-14019 (KJC) (Bankr. D. Del November 20, 2009), *In re Filene's Basement, Inc., et al.*, Case No. 09-11525 (MFW) (Bankr. D. Del. May 5, 2009); *In re Monaco Coach Corporation, et al.*, Case No. 09-10750 (KJC) (Bankr. D. Del. March 10, 2009); *In re eToys Direct 1, LLC, et al.*, Case No. 08-13412 (BLS) (Bankr. D. Del. Dec. 30, 2008); *In re NetEffect, Inc.,* Case No. 08-12008 (KJC) (Bankr. D. Del. Aug. 28, 2008).

**B.     An Interim Waiver of Section 345(b) to Allow the Debtor to
Continue to Use its Cash Management System Without the Need for Posting
a Bond or Providing Other Security is Appropriate in This Case**

36. The Debtor seeks an interim waiver of the requirements of Bankruptcy Code section 345, subject to final approval by this Court. Bankruptcy Code section 345(a) authorizes deposits or investments of money "as will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment." Section 345(b) provides:

> Except with respect to a deposit or investment that is insured or guaranteed by the United States or by a department, agency, or instrumentality of the United States or backed by the full faith and credit of the United States, the trustee shall require from an entity with which such money is deposited or invested --
>
> (1)     a bond –

A.    in favor of the United States;

B.    secured by the undertaking of a corporate
      surety approved by the United States trustee
      for the district in which the case is pending;
      and

C.    conditioned on --

      i)     a proper accounting of all money so deposited or
             invested and for any return on such money;

      ii)    prompt repayment of such money and return; and

      iii)   faithful performance of duties as a depository; or

(2)    the deposit of securities of the kind specified in section 9303 of
title 31 unless the court for cause orders otherwise.

    37.    The Court's ability to excuse strict performance of the deposit and

investment requirements of section 345(b) "for cause" arises from the 1994 amendments to the

Bankruptcy Code.  The legislative history of that amendment provides:

> Section 345 of the Code governs investments of funds of
> bankruptcy estates.  The purposes (sic) is to make sure that funds
> of a bankrupt that are obliged to creditors are invested prudently
> and safely with the eventual goal of being able to satisfy all claims
> against the bankruptcy estate.  Under current law, all investments
> are required to be FDIC insured, collateralized or bonded.  While
> this requirement is wise in the case of smaller Debtor with limited
> funds that cannot afford a risky investment to be lost, it can work
> to needlessly handcuff larger, more sophisticated Debtors.  This
> section would amend the Code to allow the courts to approve
> investments other than those permitted by section 345(b) for just
> cause, thereby overruling In re Columbia Gas Systems, Inc., 33
> F.3d 294 (3d Cir. 1994).

*In re Service Merchandise Company, Inc.,* 240 B.R. 894, 896 (Bankr. M.D. Tenn. 1999) (quoting

H.R. Rep. 103-834, 103rd Cong., 2nd Sess. 224 (Oct. 4, 1994); 140 Cong. Rec. H10767 (Oct. 4,

1994)).

38.     In determining whether the "for cause" standard has been met, the Court

should consider a "totality of the circumstances," utilizing the following factors:

a.      The sophistication of the debtor's business;

b.      The size of the debtor's business operations;

c.      The amount of the investments involved;

d.      The bank ratings (Moody's and Standard and Poor) of the financial

institutions where the debtor in possession funds are held;

e.      The complexity of the case;

f.      The safeguards in place within the debtor's own business of

insuring the safety of the funds;

g.      The debtor's ability to reorganize in the face of a failure of one or

more of the financial institutions;

h.      The benefit to the debtor;

i.      The harm, if any, to the estate; and

j.      The reasonableness of the debtor's request for relief from section

345(b) requirements in light of the overall circumstances of the case.

*Id.*

39.     The Debtor will, at certain times, have funds accumulated in its Bank

Accounts that exceed the limits provided in section 345, and therefore necessitate a waiver of

section 345(b).  Unless the requirements of Bankruptcy Code section 345(b) are waived, the

Debtor's business will be prejudiced for the reasons discussed above.  Moreover, as described

above, the relief requested herein is expected to be only for a short period of time in order to allow the Debtor to either obtain the necessary collateralization agreement from its Banks or move their accounts to a bank on the OUST-approved depository list. The Debtor submits that its funds will not be sufficiently at risk during this short period to necessitate strict adherence to the requirements of section 345(b) of the Bankruptcy Code.

40. In other chapter 11 cases, courts have liberally construed the requirement of section 345(b) that a debtor in possession obtain a bond from any entity with which its money is deposited or invested. In those instances, courts, including many within this district, have waived the requirements of section 345(b) and replaced them with alternative procedures. *See e.g., In re Point Blank Systems, Inc., et al.,* Case No. 10-11255 (PJW) (Bankr. D. Del. April 14, 2010); *In re Latham International, Inc., et al.*, Case No. 09-14490 (SS) (Bankr. D. Del. December 22, 2009), *In re Champion Enterprises, Inc., et al.*, Case No. 09-14019 (KJC) (Bankr. D. Del November 20, 2009), *In re Filene's Basement, Inc., et al.*, Case No. 09-11525 (MFW) (Bankr. D. Del. May 5, 2009); *In re Monaco Coach Corporation, et al.*, Case No. 09-10750 (KJC) (Bankr. D. Del. March 10, 2009); *In re eToys Direct 1, LLC, et al.*, Case No. 08-13412(BLS) (Bankr. D. Del. Dec. 30, 2008); *In re Global Motorsport Group, et al.* Case No. 08-10192 (KJC) (Bankr. D. Del. Feb. 1, 2008); *In re Aegis Mortgage Corp.,* Case No 07-11119 (BLS) (Bankr. D. Del. Aug. 16, 2007).

41. For the foregoing reasons, it is critical that the Debtor continues to utilize its existing Cash Management System without disruption in order to effectuate the proposed sale. Accordingly, it is appropriate and entirely consistent with applicable provisions of the

Bankruptcy Code and case law for the Court to approve the Debtor's centralized Cash Management System in its current form, and grant a waiver of the requirements of section 345(b) of the Bankruptcy Code, on an interim basis, pending a final hearing.

## Notice

42.     Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known: (i) the Office of the United States Trustee, (ii) the Indenture Trustee and (iii) the Supporting Noteholders.  As the Motion is seeking "first day" relief, within two business days after the hearing on the Motion, the Debtor will serve copies of the Motion and any order entered respecting the Motion as required by Del. Bankr. LR 9013-1(m).  The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

## No Prior Request

43.     No prior motion for the relief requested herein has been made to this or any other Court.

WHEREFORE, the Debtor respectfully requests that the Court enter an Order, substantially in the form attached hereto: (i) authorizing the Debtor to maintain the Bank Accounts, subject to the Debtor's ability, in its discretion, to close any unnecessary Bank Accounts throughout this chapter 11 case; (ii) authorizing the Debtor to continue to use its existing checks without reference to the debtor in possession status, to the extent provided herein; (iii) authorizing the Debtor to continue to employ its existing Cash Management System; (iv) granting a limited waiver of the investment and deposit guidelines set forth in Bankruptcy

Code Section 345(b) on an interim basis pending a final hearing; and (v) granting such other and

further relief as the Court deems appropriate.

Dated:  August ___, 2011

PACHULSKI STANG ZIEHL & JONES LLP

_____
Laura Davis Jones (Bar No. 2436)
Timothy P. Cairns (Bar No. 4228)
Peter J. Keane (Bar No. 5503)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile:  (302) 652-4400
E-mail:  ljones@pszjlaw.com
            tcairns@pszjlaw.com
            pkeane@pszjlaw.com

-and-

BINGHAM MCCUTCHEN LLP
Ronald J. Silverman, Esquire
Scott K. Seamon, Esquire
399 Park Avenue
New York, NY  10022-4689
Telephone: (212) 705-7868
Facsimile:  (212) 508-1407
E-mail:  ronald.silverman@bingham.com
            scott.seamon@bingham.com

[Proposed] Counsel to Debtor and
Debtor in Possession

60149-0011DOCS_DE:139900.2



**Exhibit A**
**Cash Management System**
**Bank Accounts and Cash Flow**

Customer Payments (EUR)

Anglo Irish Bank ZBA/Collection Account (Euro) 9600

Anglo Irish Bank Collection Account (USD) 6031

Silicon Valley Bank Collection Account 0057

Customer Payments (US)

Bank of America Multi Currency Account (EUR) 008

Bank of America Investment Account 2065

Silicon Valley Bank Operating Account 9832

Silicon Valley Bank Investment Account 017

Silicon Valley Bank Multi Currency Account 2706

Evergreen Solar GmbH Intercompany Transfers

Evergreen Solar (HK) China Limited Intercompany Transfers

Evergreen Solar (China) Co. Ltd. Intercompany Transfers

Hubei Evergreen Solar Co., Ltd. Intercompany Transfers

Accounts Payable

Payroll Disbursements

Operating Expenses

**Exhibit B**

**Evergreen Solar, Inc. Bank Accounts**

| Location | Bank Name | Bank Account Type | Bank Account Number |
|----------|-----------|-------------------|---------------------|
| US | Silicon Valley Bank | Operating Account | XXXXXX9832 |
| US | Silicon Valley Bank | Multi Currency Account | XXXXXX2706 |
| US | Silicon Valley Bank | ZBA/Collections Account | XXXXXX0057 |
| US | SVB Asset Management | Investment Account | XXXXX017 |
| IRL | Anglo Irish Bank | Collections/Pymt Account (EUR) | XXXX9600 |
| IRL | Anglo Irish Bank | Collections Account (USD) | XXXX6031 |
| US | Bank of America | Investment Account | XXXXXX2065 |
| US | Bank of America | Deposit Account | XXXXX008 |

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| EVERGREEN SOLAR, INC.,[5] | ) | Case No. 11-_____ (___) |
| | ) | |
| Debtor. | ) | |

## ORDER AUTHORIZING (I) MAINTENANCE OF EXISTING BANK ACCOUNTS, (II) CONTINUED USE OF EXISTING CASH MANAGEMENT SYSTEM, AND (III) WAIVER OF SECTION 345(b) DEPOSIT AND INVESTMENT REQUIREMENTS

Upon consideration of the motion (the "Motion")[6] filed by the debtor and debtor in possession (the "Debtor") in the above-captioned chapter 11 case, seeking entry of an Order under sections 105, 363, 1107 and 1108 of title 11 of the United States Code (the "Bankruptcy Code") (i) authorizing the Debtor to maintain existing bank accounts, (ii) authorizing the Debtor to continue use of existing Cash Management System, and (iii) granting a limited waiver of section 345(b) deposit and investment requirements; and it appearing that the relief requested is in the best interests of the Debtor's estate, its creditors and other parties in interest; and it appearing that this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (M) and (O); and due and adequate notice of the Motion having been given under the circumstances; and after due deliberation and cause appearing therefor; it is hereby

ORDERED that the Motion is granted as provided herein; and it is further

---

[5] The last four digits of the Debtor's federal tax identification number are 2254. The Debtor's mailing address is 138 Bartlett Street, Marlboro, MA 01752.
[6] Unless otherwise noted, capitalized terms used herein shall have the meanings ascribed to them in the Motion.

ORDERED that all payments made in accordance with this Order shall be subject to the Cash Collateral Order; and it is further

ORDERED that the Debtor is authorized, but not directed, in the reasonable exercise of its business judgment, (i) to designate, maintain and continue to use, with the same account numbers, all of the bank accounts in existence on the Petition Date identified on Exhibit B to the Motion (the "Bank Accounts"); (ii) to use, in their present form, checks and other documents related to the Bank Accounts and (iii) to treat the Bank Accounts for all purposes as accounts of the Debtor as debtor in possession; and it is further

ORDERED that the bank at which any Bank Account is maintained (the "Bank") is hereby authorized to continue to service and administer such Bank Account as an account of the Debtor as a debtor in possession without interruption and in the usual and ordinary course of business, and to receive, process, honor and pay any and all checks and drafts drawn on the Bank Account after the Petition Date by the holders or makers thereof, as the case may be; *provided, however*, that any check that has been drawn or issued by the Debtor before the Petition Date may be honored by any bank only if specifically authorized by order of this Court; and it is further

ORDERED that (i) certain existing arrangements between the Debtor and the Banks with respect to the Bank Accounts and with respect to the transfers to and from the Bank Accounts shall continue to govern the postpetition cash management relationship between the Debtor and each of the Banks; (ii) the Debtor and each of the Banks may, without further order of this Court, agree to and implement changes to the cash management system and

procedures in the ordinary course of business, including, without limitation, the opening and closing of bank accounts, with notice to the United States Trustee and counsel to any official committee appointed in this case; and (iii) in the course of providing cash management services to the Debtor, each Bank is authorized, without further Order of this Court, to continue to deduct from the appropriate accounts of the Debtor, the Bank's customary fees and expenses associated with the nature of the deposit and cash management services rendered to the Debtor; and is further

ORDERED that each Bank that maintains a disbursement account of the Debtor shall implement reasonable handling procedures designed to effectuate the terms of this Order, and no Bank that implements such handling procedures and then honors a prepetition check or other item drawn on any account that is the subject of this Order either (i) at the direction of the Debtor to honor such prepetition check or item, (ii) in good faith belief that the Court has authorized such prepetition check or item to be honored, or (iii) as a result of an innocent mistake made despite implementation of such handling procedures, shall be deemed in violation of this Order; and it is further

ORDERED that the Debtor may continue to fund its business and operations through the Bank Accounts, subject to the Cash Collateral Order and its associated budget; and it is further

ORDERED that the Debtor shall maintain detailed records reflecting all transfers of funds under the terms and conditions provided for by the existing agreements with

the institutions participating in the Debtor's Cash Management System in connection with the ongoing utilization of its Cash Management System; and it is further

ORDERED that nothing contained herein shall prevent the Debtor from opening any new bank accounts or closing any existing bank accounts as it may deem necessary and appropriate, with notice to the United States Trustee, the Debtor's prepetition and postpetition lenders, and to any official committee appointed in these cases; *provided, however,* that any new account shall be with a bank that is insured by the Federal Deposit Insurance Corporation and organized under the laws of the United States or any state therein, and subject to the restrictions in the Cash Collateral Order; and it is further

ORDERED that the Debtor is authorized to continue to use and issue checks without alteration and without the designation "debtor in possession" imprinted upon them *provided, however,* that upon exhaustion of its current check supply the Debtor shall designate "debtor in possession" on any new checks obtained postpetition; and it is further

ORDERED that the Debtor is authorized to continue utilizing its Cash Management System to manage its cash, in a manner consistent with its prepetition practice and subject to the Cash Collateral Order and its associated budget; provided, however, that with respect to Intercompany Transactions, the Debtor is only authorize to continue Intercompany Transactions with Hubei Evergreen Solar Co., Ltd. and Evergreen Solar GmbH[7]; and it is further

ORDERED that, pursuant to section 507(a)(i) of the Bankruptcy Code, the Debtor is authorized to continue to consummate Intercompany Transactions with Hubei

---

[7] For the avoidance of doubt, no monies shall be distributed to Evergreen Wuhan.

Evergreen Solar Co., Ltd. and Evergreen Solar GmbH in the ordinary course of business and subject to the Cash Collateral Order and its associated budget, and all intercompany claims by and against the Debtor arising from Intercompany Transactions with Hubei Evergreen Solar Co., Ltd. and Evergreen Solar GmbH are accorded administrative priority expenses status; and it is further

ORDERED that, subject to the following paragraph of this Order, the Debtor is (i) authorized, on an interim basis, to deposit funds, in excess of amounts insured by the Federal Depository Insurance Corporation, as requested in the Motion, all in accordance with the Debtor's customary prepetition Cash Management System, in addition to the investments and deposits permitted by Bankruptcy Code § 345 and (ii) granted a 60-day extension of time to comply with the investment and deposit requirements of section 345 of the Bankruptcy Code, which extension is without prejudice to the Debtor's ability to seek a final waiver of those requirements; and it is further

ORDERED, for banks at which the Debtor holds accounts that are party to a Uniform Depository Agreement with the Office of the United States Trustee for the District of Delaware, within fifteen (15) days from the date of entry of this Order the Debtor shall (a) contact each bank, (b) provide the bank with each of the Debtor's employer identification numbers, and (c) identify each of their accounts held at such banks as being held by a debtor in possession; and it is further

ORDERED that the authority and approvals granted by the terms of this Order to the Debtor, including with respect to the opening and closing of bank accounts and

continuation of its Cash Management System, shall be in all respects subject to any requirements imposed on the Debtor under the Cash Collateral Order; and it is further

ORDERED that the Debtor shall cause a copy of this Order to be served on each Bank at which a Bank Account is maintained within five (5) business days of the date hereof; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Order.

Dated: _____, 2011

_____
United States Bankruptcy Judge

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| EVERGREEN SOLAR, INC.,[1] | ) | Case No. 11-_____ (___) |
| | ) | |
| Debtor. | ) | |

**DEBTOR'S MOTION FOR AN ORDER ESTABLISHING
PROCEDURES FOR INTERIM COMPENSATION
PURSUANT TO SECTION 331 OF THE BANKRUPTCY CODE**

The  debtor and debtor in possession in the above captioned chapter 11 case (the

"Debtor"), as and for its motion (the "Motion") for entry of an administrative order (the

"Administrative Order") establishing procedures for monthly compensation and reimbursement

of expenses for professionals retained in this chapter 11 case (each a "Professional"), respectfully

represents as follows:

**<u>Jurisdiction and Venue</u>**

1.      This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and

1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue in

this district is proper under 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for the relief requested herein are sections 105(a),

331 and 363 and 507(a) of title 11 of the United States Code (the "Bankruptcy Code").

---

[1]  The last four digits of the Debtor's federal tax identification number are 2254.  The Debtor's mailing address is
138 Bartlett Street, Marlboro, MA 01752.

## Background

3.      On August ___, 2011 (the "Petition Date"), the Debtor commenced this case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

4.      The Debtor has continued in the possession of its property and has continued to operate and manage its business as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner or committee has been appointed in the Debtor's chapter 11 case.

5.      The Debtor has historically developed and manufactured multi-crystalline silicon wafers (known as String Ribbon ™ wafers) utilizing its proprietary wafer manufacturing technology.  Those String Ribbon wafers are then converted into photovoltaic solarcells, which are used to produce Evergreen-branded solar panels or solar modules.  Evergreen's technology involves a unique process of producing multi-crystalline silicon wafers by growing thin strips of silicon that are then cut into wafers using lasers, substantially reducing the amount of silicon and other processing costs required to produce a wafer as compared to conventional wafer manufacturing methods.

6.      More recently, the Debtor has focused its efforts on developing technology for the production of an industry standard size wafer ("Wide Wafer Technology"), which can be supplied to the world's leading solar cell and panel manufacturers.  The Debtor plans to focus its operations solely on completing the development of the Wide Wafer Technology, which then may be used to manufacture wafers to be sold to other cell or panel manufacturers or licensed to other cell or panel manufacturers.  Evergreen expects that its Wide Wafer Technology will permit the manufacturing of wafers at substantially lower cost than

wafers manufactured by alternative methodologies and therefore expects significant demand for its Wide Wafer Technology.

7.     The factual background regarding the Debtor, including its current and historical business operations and the events precipitating the chapter 11 filing, are set forth in detail in the *Declaration of Michael El-Hillow, Chief Executive Officer of the Debtor, in Support of First Day Pleadings* (the "El-Hillow Declaration") filed concurrently herewith and fully incorporated herein by reference.

## Relief Requested

8.     The Debtor has filed or will file applications to retain the following Professionals: (a) Bingham McCutchen as general bankruptcy counsel; (b) Pachulski Stang Ziehl & Jones LLP as general bankruptcy co-counsel; (c) Zolfo Cooper, LLC as restructuring advisors; (d) UBS Securities, LLC as investment banker; and (e) Hilco Industrial LLC as asset and marketing agent for asset sales.  The Debtor anticipates that it may employ other Professionals in the course of this chapter 11 case.  With the potential involvement of Professionals on behalf of the statutory committee of unsecured creditors, if any, the Professional fee application and review process could be burdensome on the Debtor, the Professionals, and the Court. Implementation of compensation procedures (the "Compensation Procedures") will provide an efficient structure for disbursing compensation to the Professionals and will allow all parties to this case to monitor the monthly accrual of compensation for each Professional.

9.     Except as otherwise provided in an order entered by the Court authorizing the retention of a particular Professional, the Debtor proposes that pursuant to section 331 of the

Bankruptcy Code, the Court permit the Professionals to seek monthly payment of compensation

in accordance with the following Compensation Procedures:

a. On or about the 25th day of each calendar month, beginning with October 2011 each Professional seeking interim compensation shall file an application (the "Monthly Fee Application") with the Court pursuant to section 331 of the Bankruptcy Code, for interim approval and allowance of compensation for services rendered and reimbursement of expenses incurred during the immediately preceding month (the "Compensation Period") and serve a copy of such Monthly Fee Application on: (i) counsel to the Debtor, (a) Bingham McCutchen LLP, 399 Park Avenue, New York, NY 10022 (Attn:: Scott K. Seamon, Esq.) and (b) Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, Wilmington, DE 19801 (Attn: Laura Davis Jones, Esq.); (ii) the Office of the United States Trustee for the District of Delaware, J. Caleb Boggs Federal Building, Room 2207, 844 North King Street, Wilmington, Delaware 19801; and (iii) counsel for any official committee appointed in this case, if any; (iv) Maslon Edelman Borman & Brand, LLP, 3300 Wells Fargo Center, 90 South Seventh Street, Minneapolis, MN 55402-4140, Attn: Clark T. Whitmore, Esq. (clark.whitmore@maslon.com), as counsel to the Indenture Trustee; and (v) counsel to the Supporting Noteholders, Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036, Attn: Michael S. Stamer (collectively, the "Notice Parties"). All Monthly Fee Applications shall comply with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), applicable Third Circuit law, and the Local Rules of this Court.

b. Each Notice Party will have twenty (20) days after service of a Monthly Fee Application to object thereto (the "Objection Deadline"). If no objections are raised prior to the expiration of the Objection Deadline, the fee applicant or the Debtor shall file a certificate of no objection with the Court after which the Debtor shall be authorized to pay each such Professional an amount (the "Actual Interim Payment") equal to the lesser of: (i) 80 percent of the fees and 100 percent of the expenses requested in the Monthly Fee Application (the "Maximum Interim Payment") and (ii) 80 percent of the fees and 100 percent of the expenses not subject to an objection pursuant to subparagraph (c), below. The first such Monthly Fee Application shall cover the period from the Petition Date through September 30, 2011.

c. If any Notice Party objects to a Professional's Monthly Fee Application, it must, on or before the expiration of the Objection

Deadline, file with the Court and serve on the affected Professional and each of the Notice Parties a written objection (the "Objection") so as to be received on or before the Objection Deadline. Any such Objection shall identify with specificity the objectionable fees and/or expenses, including the amount of such objected to fees and/or expenses, and the basis for such objection. Thereafter, the objecting party and the affected Professional may attempt to resolve the Objection on a consensual basis. If the parties are unable to reach a resolution of the Objection within 20 days after service of the Objection, the affected Professional may either: (i) file a response to the Objection with the Court, together with a request for payment of the difference, if any, between the Maximum Interim Payment and the Actual Interim Payment made to the affected Professional (the "Incremental Amount"); or (ii) forego payment of the Incremental Amount until the next interim or final fee application hearing, at which time the Court will consider and dispose of the Objection if requested by the parties.

d.      Beginning with the period ending November 30, 2011, at three-month intervals, each of the Professionals must file with the Court and serve on the Notice Parties a request (an "Interim Fee Application Request") for interim Court approval and allowance, pursuant to Bankruptcy Code section 331, of the compensation and reimbursements of expenses sought in the Monthly Fee Applications filed during such three-month period (the "Interim Fee Period"). The Interim Fee Application Request must identify the Monthly Fee Applications that are the subject of the Request and any other information requested by the Court or required by the local rules. The Interim Fee Application Requests shall be filed with the Court and served on the Notice Parties within 45 days after the end of the Interim Fee Period for which the request seeks allowance of fees and reimbursement of expenses. Each Professional must file its first Interim Fee Application Request on or before January 16, 2012 and the first Interim Fee Application Request should cover the Interim Fee Period from the Petition Date through November 30, 2011.

e.      The Debtor shall request a hearing on the pending Interim Fee Applications at least every six months. The Debtor, however, may request that a hearing be held every three months or at such other intervals as the Court deems appropriate.

f.      The pendency of an objection to payment of compensation or reimbursement of expenses will not disqualify a Professional from the future payment of compensation or reimbursement of expenses, unless the Court orders otherwise.

g.      Neither (i) the payment of or the failure to pay in whole or in part monthly interim compensation and reimbursement of expenses nor, (ii) the filing of or failure to file an objection will bind any party in interest or the Court with respect to the allowance of interim or final applications for compensation and reimbursement of expenses of the Professionals.  All fees and expenses paid to the Professionals pursuant to this order or any other are subject to disgorgement until such expenses are finally allowed by the Court.

h.      All payments made by the Debtor pursuant to these provisions will be in accordance with the Cash Collateral Order and the Budget attached thereto.

10.     The Debtor further requests that (i) only the Notice Parties be entitled to receive the Monthly Fee Applications, the Interim Fee Application Requests and the notice of hearing thereon (the "Hearing Notice") and (ii) all other parties who have filed a notice pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure be entitled to receive only the Hearing Notice.[2]  Such notice should reach the parties most active in this case while eliminating the expense associated with mass duplication and mailing of lengthy fee applications.

11.     The Debtor furthers request that each member of any committee appointed in this case, if any, (once appointed) be permitted to submit statements of expenses (excluding fees and expenses of the committee member's counsel) and supporting documentation to counsel for the committee, who will collect and submit such requests for reimbursement in accordance with the foregoing procedure for monthly and interim compensation and reimbursement of Professionals.

---

[2]  If any party receiving only a Hearing Notice requests a copy of any of the fee applications, the Debtor will furnish that party with the requested copies at the Debtor's expense.

12.     The Debtor will include all payments made to Professionals in accordance with the Compensation Procedures in their monthly operating reports identifying the amount paid to each of the Professionals.

13.     The Compensation Procedures will relieve the burden on the Court imposed by alternative interim compensation procedures that require monthly court orders, while preserving all rights of objection, enabling the parties to closely monitor costs of administration, and permitting the Professionals to maintain a level cash flow.

**Basis for Relief**

14.     Pursuant to Bankruptcy Code section 331, all professionals are entitled to submit applications for interim compensation and reimbursement of expenses every 120 days, or more often, if the Court permits.

15.     Specifically, section 331 of the Bankruptcy Code provides, in relevant part:

> A trustee, an examiner, a debtor's attorney, or any professional person employed under section 327 or 1103 of this title may apply to the Court not more than once every 120 days after an order for relief in a case under this title, or more often if the court permits, for such compensation for services rendered before the date of such an application or reimbursement for expenses incurred before such date as is provided under section 330 of this title.

11 U.S.C. § 331.

16.     Bankruptcy Code section 105(a) provides, in relevant part:

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title . . . shall be construed to preclude the court from, *sua sponte*, taking any action or making any determination necessary or appropriate to

enforce or implement court orders or rules.

11 U.S.C. § 105(a).

       17.     Procedures for compensating and reimbursing court-approved

Professionals have been established in other large chapter 11 cases in this and other districts. *See*

*e.g., In re Nebraska Book Co., Inc.*, Case No. 11-12005 (PJW) (Bankr. D. Del. July 21, 2011); *In*

*re Consolidated Horticulture Group, LLC*, Case No. 10-13308 (CSS) (Bankr. D. Del. Nov. 1,

2010); *In re Point Blank Solutions, Inc.*, Case. No. 10-11255 (PJW) (Bankr. D. Del. May 12,

2010); *In re Monaco Coach Corp.*, Case No. 09-10750 (KJC) (Bankr. D. Del. April 7, 2009); *In*

*re Sharper Image Corp.*, Case No. 08-10322 (KG) (Bankr. D. Del. Feb. 19, 2008); *In re Buffets*

*Holding, Inc.*, Case No. 08-10141 (MFW) (Bankr. D. Del. Jan. 22, 2008). The Compensation

Procedures will reduce the burden imposed on the Court and the U.S. Trustee's office, enable

parties in interest to monitor the Professional's fees and costs in this case more closely, and

diminish undue financial burdens on the Professionals. Accordingly, the Debtor submits that the

Compensation Procedures are in the best interests of its estate, creditors, and other parties-in-

interest.

### Notice

       18.     Notice of this Motion has been given to the following parties or, in lieu

thereof, to their counsel, if known: (i) the Office of the United States Trustee; (ii) the Debtor's

prepetition secured lenders; (iii) Maslon Edelman Borman & Brand, LLP, 3300 Wells Fargo

Center, 90 South Seventh Street, Minneapolis, MN 55402-4140, Attn: Clark T. Whitmore, Esq.

(clark.whitmore@maslon.com), as counsel to the Indenture Trustee; (iv) Akin Gump Strauss

Hauer & Feld LLP, One Bryant Park, New York, New York 10036, Attn: Michael S. Stamer

(mstamer@akingump.com), as counsel to the Supporting Noteholders. Following the first day

hearing in this case, this Motion will be served on (a) creditors holding the twenty largest

unsecured claims against the Debtor, or their legal counsel (if known) and (b) those persons who

have requested notice pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure. The

Debtor submits that, in light of the nature of the relief requested, no other or further notice need

be given.

## **No Prior Request**

19.     No previous motion for the relief sought herein has been made to this or

any other Court.

WHEREFORE, the Debtor respectfully requests that this Court enter an order,

substantially in the form filed herewith, granting the relief requested herein and such other and

further relief as is just and proper under the circumstances.

Dated: August _____, 2011                    PACHULSKI STANG ZIEHL & JONES LLP


_____
Laura Davis Jones (Bar No. 2436)
Timothy P. Cairns (Bar No. 4228)
Peter J. Keane (Bar No. 5503)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile:  (302) 652-4400
E-mail:  ljones@pszjlaw.com
             tcairns@pszjlaw.com
             pkeane@pszjlaw.com

-and-

BINGHAM MCCUTCHEN LLP
Ronald J. Silverman (*pro hac vice* pending)
Scott K. Seamon (*pro hac vice* pending)
399 Park Avenue
New York, NY  10022-4689
Telephone: (212) 705-7868
Facsimile:  (212) 508-1407
E-mail:  ronald.silverman@bingham.com
              scott.seamon@bingham.com

[Proposed] Counsel to Debtor and
Debtor in Possession

24688-001\DOCS_DE:169893.4
A/74486211.1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| EVERGREEN SOLAR, INC.,[1] | ) | Case No. 11-_____ (___) |
| | ) | |
| Debtor. | ) | **Related Docket No. _____** |

## ADMINISTRATIVE ORDER ESTABLISHING PROCEDURES FOR INTERIM COMPENSATION PURSUANT TO SECTION 331 OF THE BANKRUPTCY CODE

Upon consideration of the Debtor's *Motion for an Order Establishing Procedures for Interim Compensation Pursuant to Section 331 of the Bankruptcy Code* (the "Motion"); the Court finding that (i) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; (ii) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); (iii) venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409; (iv) notice of the Motion and the hearing was sufficient under the circumstances; (v) cause exists, within the meaning of section 105(a) and 331 of the Bankruptcy Code to permit the Debtor to establish certain procedures for interim compensation and reimbursement of expenses of Professionals;[2] and (iv) the Court having determined that the legal and factual bases set forth in the Motion and at the hearing establish just cause for the relief granted herein, and it appearing that the relief requested is in the best interests of the Debtor's estate, creditors and other parties in interest; it is hereby:

ORDERED that the Motion is GRANTED; and it is further

---

[1] The last four digits of the Debtor's federal tax identification number are 2254. The Debtor's mailing address is 138 Bartlett Street, Marlboro, MA 01752.

[2] Capitalized terms not otherwise defined herein have the meanings given to them in the Motion.

ORDERED that except as otherwise provided in an order of the Court authorizing the retention of a particular Professional, the Professionals specifically retained pursuant to an order of the Court in this case may seek interim payment of compensation and reimbursement of expenses in accordance with the following Compensation Procedures:

a.  On or about the 25th day of each calendar month, beginning with October 2011 each Professional seeking interim compensation shall file an application (the "Monthly Fee Application") with the Court pursuant to section 331 of the Bankruptcy Code, for interim approval and allowance of compensation for services rendered and reimbursement of expenses incurred during the immediately preceding month (the "Compensation Period") and serve a copy of such Monthly Fee Application on: (i) counsel to the Debtor, (a) Bingham McCutchen LLP, 399 Park Avenue, New York, NY 10022 (Attn:: Scott K. Seamon, Esq.) and (b) Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, Wilmington, DE 19801 (Attn: Laura Davis Jones, Esq.); (ii) the Office of the United States Trustee for the District of Delaware, J. Caleb Boggs Federal Building, Room 2207, 844 North King Street, Wilmington, Delaware 19801; (iii) counsel for any official committee appointed in this case, if any; (iv) Maslon Edelman Borman & Brand, LLP,  3300 Wells Fargo Center, 90 South Seventh Street, Minneapolis, MN 55402-4140, Attn: Clark T. Whitmore, Esq. (clark.whitmore@maslon.com), as counsel to the Indenture Trustee; and (v) counsel to the Supporting Noteholders, Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036, Attn: Michael S. Stamer (collectively, the "Notice Parties"). All Monthly Fee Applications shall comply with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), applicable Third Circuit law, and the Local Rules of this Court.

b.  Each Notice Party will have twenty (20) days after service of a Monthly Fee Application to object thereto (the "Objection Deadline").  If no objections are raised prior to the expiration of the Objection Deadline, the fee applicant or the Debtor shall file a certificate of no objection with the Court after which the Debtor shall be authorized to pay each such Professional an amount (the "Actual Interim Payment") equal to the lesser of (i) 80 percent of the fees and 100 percent of the expenses requested in the Monthly Fee Application (the "Maximum Interim Payment") and (ii) 80 percent of the fees and 100 percent of the expenses not subject to an objection pursuant to subparagraph (c), below, provided, however, that all payments made by the Debtor shall comply with the Cash Collateral Order and Budget attached thereto, including that in no event shall the aggregate payments made to the Debtor's Professionals (as such term is defined in the Cash Collateral Order) exceed the Professional Fee Cap (as such term

is defined in the Cash Collateral Order) and in no event shall the aggregate payments to the Committee Professionals (as such term is defined in the Cash Collateral Order) exceed $50,000. The first such Monthly Fee Application shall cover the period from the Petition Date through September 30, 2011.

c.    If any Notice Party objects to a Professional's Monthly Fee Application, it must, on or before the expiration of the Objection Deadline, file with the Court and serve on the affected Professional and each of the Notice Parties a written objection (the "Objection") so as to be received on or before the Objection Deadline. Any such Objection shall identify with specificity the objectionable fees and/or expenses, including the amount of such objected to fees and/or expenses, and the basis for such objection. Thereafter, the objecting party and the affected Professional may attempt to resolve the Objection on a consensual basis. If the parties are unable to reach a resolution of the Objection within 20 days after service of the Objection, the affected Professional may either: (i) file a response to the Objection with the Court, together with a request for payment of the difference, if any, between the Maximum Interim Payment and the Actual Interim Payment made to the affected Professional (the "Incremental Amount"); or (ii) forego payment of the Incremental Amount until the next interim or final fee application hearing, at which time the Court will consider and dispose of the Objection if requested by the parties.

d.    Beginning with the period ending November 30, 2011, at three-month intervals, each of the Professionals shall file with the Court and serve on the Notice Parties a request (an "Interim Fee Application Request") for interim Court approval and allowance, pursuant to Bankruptcy Code section 331, of the compensation and reimbursements of expenses sought in the Monthly Fee Applications filed during such three-month period (the "Interim Fee Period"). The Interim Fee Application Request must identify the Monthly Fee Applications that are the subject of the Request and any other information requested by the Court or required by the local rules. The Interim Fee Application Requests shall be filed with the Court and served on the Notice Parties within 45 days after the end of the Interim Fee Period for which the request seeks allowance of fees and reimbursement of expenses. Each Professional must file its first Interim Fee Application Request on or before January 16, 2012 and the first Interim Fee Application Request should cover the Interim Fee Period from the Petition Date through November 30, 2011.

e.    The Debtor shall request a hearing on the pending Interim Fee Applications at least every six months. The Debtor, however, may request that a hearing be held every three months or at such other intervals as the Court deems appropriate.

f.      The pendency of an objection to payment of compensation or reimbursement of expenses shall not disqualify a Professional from the future payment of compensation or reimbursement of expenses, unless the Court orders otherwise.

g.      Neither (i) the payment of or the failure to pay in whole or in part monthly interim compensation and reimbursement of expenses nor, (ii) the filing of or failure to file an objection will bind any party in interest or the Court with respect to the allowance of interim or final applications for compensation and reimbursement of expenses of the Professionals.  All fees and expenses paid to the Professionals pursuant to this order or any other are subject to disgorgement until such expenses are finally allowed by the Court.

h.      The Debtor may only make payments pursuant to this Order if such payments are permitted by the Cash Collateral Order and the Budget attached thereto.

ORDERED that each member of any official committee appointed in this case, if any, is permitted to submit statements of expenses (excluding committee member counsel expenses) and supporting documentation to counsel for any such committee, which shall collect and submit the committee members' requests for reimbursement in accordance with the Compensation Procedures; and it is further

ORDERED that notice of the Monthly Fee Applications, the Interim Fee Application Requests, final fee applications and the Hearing Notice (as defined below) shall be provided as follows: (i) the Notice Parties shall be entitled to receive the Monthly Fee Applications, the Interim Fee Application Requests, the final fee applications and the notice of hearing thereon (the "Hearing Notice"); and (ii) the 2002 List shall be entitled to receive only the Hearing Notice.  Notice given in accordance with this paragraph is deemed sufficient and adequate and in full compliance with the applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and the Local Rules of this Court; and it is further

ORDERED that all time periods referenced in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a); and it is further

ORDERED that this Court shall retain jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated: _____, 2011

_____
United States Bankruptcy Judge

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| EVERGREEN SOLAR, INC.,[1] | ) | Case No. 11-_____ (___) |
| | ) | |
| Debtor. | ) | |

### DEBTOR'S MOTION FOR ORDER AUTHORIZING AND APPROVING IMPLEMENTATION OF A KEY EMPLOYEE INCENTIVE PROGRAM PURSUANT TO SECTIONS 105(a), 363(b), 503(b)(1) AND 503(c)(3) OF THE BANKRUPTCY CODE

The debtor and debtor in possession in the above-captioned case (the "Debtor") as and for its motion (this "Motion") for entry of an order under 11 U.S.C. §§ 105, 363(b), 503(b)(1) and 503(c)(3), authorizing and approving the implementation of a Key Employee Incentive Program (the "KEIP"), respectfully represents as follows:

### Jurisdiction

1.      This Court has jurisdiction over the Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), (M), and (O). Venue of this proceeding and the Motion is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are sections 105(a), 363(b), 503(b)(1) and 503(c)(3) of title 11 of the United States Code (the "Bankruptcy Code").

### Background

3.      On the date hereof (the "Petition Date"), the Debtor commenced its case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor has

---

[1]      The last four digits of the Debtor's federal tax identification number are 2254. The Debtor's mailing address is 138 Bartlett Street, Marlboro, MA 01752.

continued in the possession of its property and has continued to operate and manage its business as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner or committee has been appointed in the Debtor's chapter 11 case.

4. The Debtor, incorporated in August 1994, develops, manufactures and markets String Ribbon™ solar panels utilizing proprietary wafer manufacturing technology that substantially reduces the amount of silicon and other processing costs required to produce a wafer when compared to conventional processes. The wafers produced by the Debtor are the primary components of photovoltaic cells which, in turn, are used to produce solar panels.

5. Additional facts relating to the Debtor's commencement of this chapter 11 case is set forth in detail in the *Declaration of Michael El-Hillow in Support of First Day Motions* (the "First Day Declaration") filed contemporaneously herewith.[2]

### The Wide Wafer Assets

6. As set forth in the First Day Declaration, the Debtor historically manufactured for resale its own multi-crystalline silicon wafers, but is now moving away from that model. Instead, the Debtor believes that the likelihood of its business succeeding would be maximized by focusing on the further development of its proprietary Wide Wafer Technology. The Debtor intends to accomplish this by means of section 363 of the Bankruptcy Code, in one of the following two ways, depending upon which one generates a greater return to its estate.

7. First, the Debtor has negotiated with the Supporting Noteholders comprised of certain holders of the 13% Secured Notes to effectively act as the "stalking horse" bidder for various categories of the Debtor's assets. The Indenture Trustee, at the direction of

---

[2] Capitalized terms not otherwise defined herein have the meanings ascribed to them in the First Day Affidavit.

the Supporting Noteholders and through a designee, will credit bid, pursuant to section 363(k) of the Bankruptcy Code, its Secured Obligations on behalf of all holders of the 13% Secured Notes to purchase the Wide Wafer Assets (the "Stalking Horse Bid"). The holders of the 13% Secured Notes will receive all of the equity interests of the designee, Newco, at the Closing in exchange for the credit bid of its Secured Obligations. Among the of assets to be sold are the intellectual property and other assets associated with the Wide Wafer Technology (the "Wide Wafer Assets").

8.     The sale of the Wide Wafer Assets will be subject to a Court-approved auction process.[3] If, at the conclusion of the auction, the Stalking Horse Bid is the highest and best bid for the Wide Wafer Assets, then, subject to Court approval, the Newco will become the owner of the Wide Wafer Assets, and will be managed by members of the Debtor's existing senior management team, given their intimate knowledge of the business. It is also expected that existing rank-and-file employees relevant to the Wide Wafer Assets will join Newco. The reorganized business will then be positioned to move forward with its new business plan and a right-sized balance sheet.

9.     On the other hand, if at the conclusion of the auction, a third party's bid is deemed to be the highest and best bid for the Wide Wafer Assets, then those assets will, subject to Court approval, be sold to that third party bidder. If the third party bidder is a strategic buyer (as is likely), it may well have its own management team in place to develop and manage the Wide Wafer Assets. In that case, certain senior employees whose efforts are most required in

---

[3]     The Supporting Noteholders have agreed that they will stop bidding for the Wide Wafer Assets at the auction for the Wide Wafer Assets if a third party submits an all cash bid of $30 million or greater for the Wide Wafer Assets.

order to facilitate and maximize the benefit of a third-party sale, will have worked themselves out of their jobs.

10.     Given that the ability to maximize creditor recoveries hinges, in large part, upon the consummation of a third party cash sale, the Debtor believes it is essential that key senior employees are properly motivated to ensure that they will direct maximum efforts toward enhancing estate value, without the overhang or appearance of any extrinsic, parochial considerations.  Consequently, the Debtor, at the direction of its non-executive directors, with the assistance of its outside financial professionals, and after consultation with the Supporting Noteholders, seeks approval of a narrowly-tailored KEIP that will tie incentive bonuses for participants directly to the consideration received from the sale of the Wide Wafer Assets.

### Description of the KEIP

11.     Personnel eligible for the KEIP consist of seven of the Debtor's senior employees, including several executives (collectively, the "KEIP Participants") whose active involvement in the sale process is necessary if a third-party buyer is to be found at a price that exceeds the Stalking Horse Bid and maximizes estate value.  The KEIP Participants collectively provide a broad range of essential services, including managerial, financial, legal, technological, and R&D, all of which have the potential, in varying degrees, to influence the outcome of the sale process.  The KEIP Participants must remain employed in order to receive any award.

12.     The KEIP, which is directly tied to the success of the Wide Wafer Assets sale process, provides for aggregate KEIP payments equal to 5% of the gross cash proceeds of a third-party sale of the Wide Wafer Assets, subject to a minimum aggregate KEIP of $1 million. Importantly, no KEIP will apply if the Stalking Horse Bid prevails.

4

13.     The aggregate KEIP amount earned, if any, will be distributed to the KEIP

Participants pursuant to an allocation designed to account for each KEIP Participant's relative

ability to contribute to, and affect the outcome of, the sale of the Wide Wafer Assets.  As a

result, the base KEIP awardable to any individual employee is not uniform among all KEIP

Participants, but ranges from $75,000 to $350,000.  A table that identifies each KEIP Participant

by title, along with each such participant's percentage allocation of KEIP and illustrative

individual and aggregate KEIP awards based on particular hypothetical asset sale prices, is

annexed as Exhibit "A" hereto.

### Relief Requested

14.     By this Motion, the Debtor seeks entry of an order under sections 105(a),

363(b)(1)(i), and 503(c)(3) of the Bankruptcy Code: (a) approving the KEIP; (b) authorizing the

Debtor to implement the KEIP; and (c) allowing all payments thereunder as an expense of

administration pursuant to sections 503(b)(1) and 503(c)(3) of the Bankruptcy Code.

### Authority for the Requested Relief

*A.      The KEIP Is Authorized Under 11 U.S.C. § 363(b)*

15.     Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee,

after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business,

property of the estate." 11 U.S.C. § 363(b)(1).  The use, sale, or lease of property of the estate,

other than in the ordinary course of business, is authorized when a "sound business purpose"

justifies such action.  *See, e.g., In re Delaware & Hudson R.R. Co.*, 124 B.R. 169, 176 (D. Del.

1991) (explaining that Third Circuit has adopted "sound business purpose" test to evaluate

motions brought under section 363(b); *see also In re Continental Air Lines*, 780 F.2d 1223, 1226

(5th Cir. 1986); *In re Quality Beverage Co.*, 181 B.R. 887, 895 (Bankr. S.D. Tex. 1995); *In re San Jacinto Glass Indus.*, 93 B.R. 934, 944 (Bankr. S.D. Tex. 1988).

16.     Once a debtor articulates a valid business justification for a particular form of relief, the Court reviews the debtor's request under the "business judgment rule."  The business judgment rule "is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company."  *In re Integrated Resources, Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (*quoting Smith v. Van Gorkom*, 488 A.2d 858, 872 (D. Del. 1985)).[4]

17.     The business judgment rule has vitality in chapter 11 cases and shields a debtor's management from judicial second-guessing.  *See id.; Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (noting that under normal circumstances, courts defer to a trustee's judgment concerning use of property under Bankruptcy Code section 363(b) when there is a legitimate business justification); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (affirming bankruptcy court approval of key employee retention program, stating that "in determining whether to authorize the use, sale or lease of property of the estate under [section 363(b)], courts require the debtors to show that a sound business purpose justifies such actions").

---

[4]     Because the KEIP was independently approved by the Debtor's non-executive board members, the business judgment rule applies, notwithstanding that certain of the KEIP Participants also are the Debtor's executives.  *See In re Network Access Solutions Corp.*, 360 B.R. 67, 77 (Bankr. D. Del. 2005) (dismissing portion of complaint for disgorgement of prepetition bonuses where bonuses were approved by independent board members) *citing Prod. Res. Group, L.L.C. v. NCT Group, Inc.*, 863 A.2d 772, 799 (Del.Ch. 2004). ("Informed decisions regarding employee compensation by independent boards are usually entitled to business judgment rule protection.") This is especially the case here, where the Supporting Noteholders, which are unaffiliated with the Debtor and would stand to lose the most if the KEIP was unnecessary or excessive, have consented to the KEIP and supports the Motion.

6

18.     Courts have specifically found that a debtor's use of reasonable retention bonuses and other incentives to retain employees is a valid exercise of a debtor's business judgment.  *See, e.g., In re Global Home Prods., LLC,* 2007 Bankr. LEXIS 758 at *15 (Bankr. D. Del. March 6, 2007) ("The reasonable use of incentives and performance bonuses are considered the proper exercise of a debtor's business judgment."); *In re Gadzooks, Inc.*, 04-31486, 2005 Bankr. LEXIS 3244 *6 (Bankr. N.D. Tex. July 21, 2005) ("sound business purpose existed justifying the severance payment" under the KERP); *In re America West Airlines, Inc.*, 171 B.R. 674, 678 (Bankr. D. Ariz. 1994) (it is the proper use of a debtor's business judgment to propose bonuses for employees who helped propel the debtor successfully through the bankruptcy process); *In re Interco Inc.*, 128 B.R. 229, 234 (Bankr. E.D. Mo. 1991) ("debtors' business judgment" was controlling in the approval of a "performance/retention program").

19.     Moreover, section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(1).

20.     As discussed above, the Debtor believes that implementing the KEIP will maximize the value of the Wide Wafer Assets.  The KEIP Participants are highly skilled individuals, each of whom is knowledgeable of one or more particular aspects of the operations, management, and business concerns of the Debtor.  The KEIP Participants have been integral in the development of the technology and strategy for the Wide Wafer Assets.  Bidders likely will require significant portions of the KEIP Participants' time to aid the bidders in the diligence on: (1) the market receptivity for the products, including conversations had to-date with prospective customers; (2) the progress in the development of the platform including understanding the Debtor's results on many parameters such as the efficiency of the products versus other

7

commercial alternatives, the cost to produce them and their ability to be integrated into

customers solar cells; and (3) the future cost to build the appropriate plant and equipment to

produce the wide wafer products at sufficient capacity to supply customers.

21.     In contrast to the substantial efforts that will be expended by the KEIP

Participants and the potential benefits of a third party sale, the cost of the KEIP, at a base of $1

million, is relatively small, and is tied directly to sales proceeds generated from the Wide Wafer

Assets.[5]  Additionally, the cost of the KEIP, as a practical matter, likely will be borne primarily

by holders of the 13% Secured Notes, a large majority of whom have consented to the KEIP and

support the Motion.

22.     Moreover, the KEIP will foster creditor confidence in the sale process, by

providing an incentive for the KEIP Participants to pursue, and maximize the success of, a third

party sale even where their individual interests would otherwise favor the Stalking Horse Bid.

B.     *The KEIP Is Permissible Under 11 U.S.C. § 503(c)(3)*

23.     The KEIP is permissible under section 503(c)(3) of the Bankruptcy Code.

Section 503(c)(3) prohibits transfers made "outside the ordinary course of business and not

justified by the facts and circumstances of the case."  Courts that have analyzed the prohibition

on "other transfers" have applied the same standard under that section as they do under section

363(b) of the Bankruptcy Code: namely, whether the decision to use estate property outside of

the ordinary course of business is based on a sound exercise of the debtor's business judgment.

*See In re Dana Corp.*, 358 B.R. 567, 576 (Bankr. S.D.N.Y 2006) (test for compensation program

---

[5]     Because the Debtor has tried to narrowly tailor the KEIP to meet its needs, there is no KEIP
associated with any other of the Debtor's anticipated asset sales (such as the sale of the Debtor's
Devens, Massachusetts facility), because, among other things, the price achievable for the
Debtor's other assets are less dependent upon the future efforts of the KEIP Participants.

8

under section 503(c)(3) is the same as the "business judgment" test); *In re Nobex*, 2006 WL 4063024, at *3 (Bankr. D. Del. 2006) (section 503(c)(3) is essentially reiteration of standard under section 363).

24.     Indeed, Judge Walrath, in the *Nobex* case, stated:

> I read (c)(3) to be the catch-all and the standard under (c)(3) for any transfers or obligations made outside of the ordinary course of business are those that are justified by the facts and circumstances of the case... *I find it quite frankly nothing more than a reiteration of the standard under 363...* under which courts had previously authorized transfers outside of the ordinary course of business and that [are], based on the business judgment of the debtor...."

Transcript of January 12, 2006, hearing at 86-87, *In re Nobex Corp.*, Case No. 05-20050 (MFW) (Bankr. D. Del.) (order approving management incentive plan entered January 20, 2006) (emphasis added).

25.     In *In re American Home Mortgage Holdings*, Judge Sontchi considered the interim approval of an interim retention plan.  In approving that plan, in part on an interim basis, Judge Sontchi stated that:

> I think the Debtors have satisfied certainly the most important criteria in connection with the non-insiders.  *There's a reasonable relationship between the plan and the results to be obtained, the cost of the plan is reasonable, the context of the debtors' assets, liabilities, and the scope of the plan is fair and reasonable*....

Transcript of August 7, 2007, Hearing at 110, *In re American Home Mortgage Holdings, et al.*, Case No. 07-11047 (CSS) (Bankr. D. Del.) (emphasis added).

26.     As set forth above, implementing the KEIP has a sound business purpose: (a) to maximize value for all of the Debtor's stakeholders, and (b) to motivate the KEIP Participants by rewarding them for conducting, facilitating, and/or assisting with a successful sale process.  Moreover, the payments to be made under the KEIP bear a direct relationship to

9

the benefit achieved for the Debtor's estate, bear a reasonable cost in the context of the Debtor's assets and liabilities, and are generally fair and reasonable. Thus, the KEIP is justified by the facts and circumstances of this chapter 11 case and therefore satisfies section 503(c)(3) of the Bankruptcy Code.

C.     *The KEIP Does Not Implicate 11 U.S.C. § 503(c)(1)*

27.     The KEIP, and the payments contemplated thereunder, do not implicate section 503(c)( 1) of the Bankruptcy Code. Section 503(c)(1) contains a number of conditions that can virtually never be satisfied, effectively prohibiting any postpetition payments to an insider of a debtor made "for the purpose of inducing such person to remain with the debtor's business…." See 11 U.S.C. § 503(c)(1); see also Karen Lee Turner & Ronald S. Gellert, *Dana Hits a Roadblock: Why Post-BAPCPA Laws May Impose Stricter KERP Standards*, 3 Andrews Bankr. Litig. Rep. (West) (Nov. 6, 2006) (section 503(c)(1)(A) "nears absurdity" by imposing a requirement that could never be met.)

28.     However, section 503(c)(1) applies only to retention programs, not to incentive programs that may, coincidentally, have a retentive effect. This Court has recognized that section 503(c)(1) necessarily must be interpreted only to prohibit "a transfer made to . . . an insider of the debtor for the *[primary]* purpose of inducing such person to remain with the debtor's business." *In re Nellson Nutraceuticals*, 369 B.R. 787, 802 (Bankr. D. Del. 2007) (emphasis in original). This is because "any payment made to an employee, including regular wages, has at least a partial retentive effect." *In re Borders Group, Inc.* __ B.R. __, 2011 WL 1563633, *8 (Bankr. April 27, 2011) (citing *Nellson Nutraceuticals, id.*).

10

29.    Here, any retentive effect of the KEIP will be incidental to its main purpose of motivating the KEIP Participants to maximize estate value through an effective section 363 sale process.  Accordingly, section 503(c)(1) does not apply.[6]

**Notice**

30.    Notice of this Motion has been given to the following parties, or their counsel, if known:  (i) the Office of the United States Trustee; (ii) the Indenture Trustee; and (iii) the Supporting Noteholders.  Following the first day hearing in this case, this Motion will be served on (a) creditors holding the twenty largest unsecured claims against the Debtor, or their legal counsel (if known) and (b) those persons who have requested notice pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure.  The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be give.

**No Prior Request**

31.    No prior motion for the relief requested herein has been made to this or any other Court.

**Conclusion**

WHEREFORE, the Debtor respectfully requests that the Court: (i) enter an Order, substantially in the form annexed as Exhibit "B" hereto: (a) approving the KEIP; (b) authorizing the Debtor to implement the KEIP; and (c) allowing all payments thereunder as an expense of

---

[6]    Section 503(c)(2) of the Bankruptcy Code, which imposes restrictions on the ability of a debtor to pay severance to insiders, is also not applicable here, because the KEIP is not a severance plan. Among other things, the compensation awarded thereunder is not triggered by, or otherwise dependent upon, the termination of the KEIP Participants' employment.  *See In re Harnischfeger Indus., Inc.,* 270 B.R. 188, 199 (D. Del. 2001) *vacated in part, In re Joy Global, Inc.,* 80 Fed.Appx. 286 (3rd Cir. 2003) ("'Severance pay, by its very definition, means compensation due an employee, upon the severance of his employment status with the employer.'") (citation omitted).

administration pursuant to sections 503(b)(1) and 503(c)(3) of the Bankruptcy Code; and (ii)

grant such other and further relief as may be just.

Dated:  August ___, 2011

<div style="margin-left: 40%;">

PACHULSKI STANG ZIEHL & JONES LLP

_____

Laura Davis Jones (Bar No. 2436)
Joshua M. Fried (CA Bar No. 181541)
Timothy P. Cairns (Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile:  (302) 652-4400
E-mail:   ljones@pszjlaw.com
              jfried@pszjlaw.com
              tcairns@pszjlaw.com

-and-

BINGHAM McCUTCHEN LLP
Ronald J. Silverman, Esq.
Steven Wilamowsky, Esq.
399 Park Avenue
New York, NY  10022-4689
Telephone: (212) 705-7868
Facsimile:  (212) 508-1407
E-mail:   ronald.silverman@bingham.com
              steven.wilamowsky@bingham.com

[Proposed] Counsel to Debtor and
Debtor in Possession

</div>

12

Exhibit "A"

**Evergreen Solar Inc**
**Key Employee Incentive Plan**

| TITLE | % INCENTIVE | Hypothetical Gross Asset Sale Proceeds: | | | | |
|---|---|---|---|---|---|---|
| | | $20 million or Less | $25 million | $30 million | $35 million | $40 million |
| | | Total KEIP: | | | | |
| | | $1,000,000 | $1,250,000 | $1,500,000 | $1,750,000 | $2,000,000 |
| President & CEO | 35.0% | $350,000 | $437,500 | $525,000 | $612,500 | $700,000 |
| CTO | 25.0% | $250,000 | $312,500 | $375,000 | $437,500 | $500,000 |
| President China | 10.0% | $100,000 | $125,000 | $150,000 | $175,000 | $200,000 |
| VP R&D | 7.5% | $75,000 | $93,750 | $112,500 | $131,250 | $150,000 |
| CFO | 7.5% | $75,000 | $93,750 | $112,500 | $131,250 | $150,000 |
| General Counsel | 7.5% | $75,000 | $93,750 | $112,500 | $131,250 | $150,000 |
| Corporate Controller | 7.5% | $75,000 | $93,750 | $112,500 | $131,250 | $150,000 |
| | 100.0% | $1,000,000 | $1,250,000 | $1,500,000 | $1,750,000 | $2,000,000 |

Exhibit "B"

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| EVERGREEN SOLAR, INC.,[1] | ) | Case No. 11-_____ (___) |
| | ) | |
| Debtor. | ) | |

**ORDER AUTHORIZING AND APPROVING IMPLEMENTATION OF A
KEY EMPLOYEE INCENTIVE PROGRAM PURSUANT TO SECTIONS
105(a), 363(b), 503(b)(1) AND 503(c)(3) OF THE BANKRUPTCY CODE**

Upon consideration of the motion (the "Motion")[2] filed by the debtor and debtor

in possession (the "Debtor") in the above-captioned chapter 11 case, seeking entry of an Order

under 11 U.S.C. §§ 105, 363(b), 503(b)(1) and 503(c)(3), authorizing and approving the

implementation of a Key Employee Incentive Program (the "KEIP"); and it appearing that the

relief requested is in the best interests of the Debtor's estate, its creditors and other parties in

interest; and it appearing that this Court has jurisdiction over this matter pursuant to 28 U.S.C.

§§ 157 and 1334; and it appearing that this matter is a core proceeding pursuant to 28 U.S.C.

§ 157(b)(2)(A), (M) and (O); and due and adequate notice of the Motion having been given

under the circumstances; and after due deliberation and cause appearing therefor; it is hereby

ORDERED that the Motion is granted and the KEIP is approved; and it is further

ORDERED that if the Wide Wafer Assets are sold to a party other than the

Stalking Horse Bidder or pursuant to a credit bid, then the KEIP Participants shall, upon the

---

[1] The last four digits of the Debtor's federal tax identification number are 2254. The Debtor's mailing address is 138 Bartlett Street, Marlboro, MA 01752.

[2] Unless otherwise noted, capitalized terms used herein shall have the meanings ascribed to them in the Motion.

2

A/74453719.6

closing of such sale (or sales) be entitled to their respective KEIP allocations, all as set forth in Exhibit "A" to the Motion; and it is further

ORDERED that any KEIP amounts earned pursuant to this Order shall be entitled to administrative expense priority pursuant to sections 503(b)(1) and 503(c)(3) of the Bankruptcy Code; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all matters arising from the interpretation and implementation of this Order.

Dated: _____, 2011

_____
UNITED STATES BANKRUPTCY JUDGE

3

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| EVERGREEN SOLAR, INC.[1] | ) | Case No. _____ (___) |
| | ) | |
| Debtor. | ) | |

**MOTION OF THE DEBTOR PURSUANT TO SECTIONS 105(a), 327, 328
AND 330 OF THE BANKRUPTCY CODE FOR AN ORDER AUTHORIZING THE
DEBTOR TO RETAIN, EMPLOY AND COMPENSATE CERTAIN PROFESSIONALS
<u>UTILIZED BY THE DEBTOR IN THE ORDINARY COURSE OF BUSINESS</u>**

Evergreen Solar, Inc., the above-captioned chapter 11 debtor and debtor in

possession (the "Debtor") moves the Court for entry of an order authorizing the Debtor to

employ and compensate certain professionals utilized in the ordinary course of the Debtor's

business (the "Motion"). In support of this Motion, the Debtor respectfully states as follows:

<u>**Jurisdiction and Venue**</u>

1.      This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and

1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue in

this district is proper under 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief sought herein are sections 105(a), 327,

328 and 330 of title 11 of the United States Code (the "Bankruptcy Code").

---

[1]  The last four digits of the Debtor's federal tax identification number are 2254. The Debtor's mailing address is
138 Bartlett Street, Marlboro, MA 01752.

1

**Background**

3.      On the date hereof (the "Petition Date"), the Debtor commenced this case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

4.      The Debtor has continued in the possession of its property and has continued to operate and manage its business as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner or committee has been appointed in the Debtor's chapter 11 case.

5.      The Debtor has historically developed and manufactured multi-crystalline silicon wafers (known as String Ribbon ™ wafers) utilizing its proprietary wafer manufacturing technology.  Those String Ribbon wafers are then converted into photovoltaic solarcells, which are used to produce Evergreen-branded solar panels or solar modules.  Evergreen's technology involves a unique process of producing multi-crystalline silicon wafers by growing thin strips of silicon that are then cut into wafers using lasers, substantially reducing the amount of silicon and other processing costs required to produce a wafer as compared to conventional wafer manufacturing methods.

6.      More recently, the Debtor has focused its efforts on developing technology for the production of an industry standard size wafer ("Wide Wafer Technology"), which can be supplied to the world's leading solar cell and panel manufacturers.  The Debtor plans to focus its operations solely on completing the development of the Wide Wafer Technology, which then may be used to manufacture wafers to be sold to other cell or panel manufacturers or licensed to other cell or panel manufacturers.  Evergreen expects that its Wide

2

Wafer Technology will permit the manufacturing of wafers at substantially lower cost than wafers manufactured by alternative methodologies and therefore expects significant demand for its Wide Wafer Technology.

7.     The factual background relating to the Debtor's commencement of this chapter 11 case (the "Chapter 11 Case") is set forth in detail in the *Declaration of Michael El-Hillow, Chief Executive Officer of the Debtor, in Support of First Day Pleadings* (the "El-Hillow Declaration") filed contemporaneously with this Motion and incorporated herein by reference.

<div align="center"><b><u>The Debtor's Ordinary Course Professionals</u></b></div>

8.     The Debtor customarily retains the services of various attorneys, accountants, actuaries, consultants, and other professionals to represent it in matters arising in the ordinary course of their businesses, unrelated to this Chapter 11 Case (each an "Ordinary Course Professional" and collectively, the "Ordinary Course Professionals").  A list of the Ordinary Course Professionals utilized or expected to be utilized by the Debtor is attached as <u>Exhibit A</u> hereto.[2]

9.     In contrast, the Debtor has filed, or will file, individual retention applications for any professionals that the Debtor seeks to employ in connection with the conduct of this Chapter 11 Case (the "Chapter 11 Professionals").  The Chapter 11 Professionals will be permitted to be compensated and reimbursed only in accordance with procedures to be approved

---

[2]  As discussed more fully below, the Debtor reserves the right to amend such list in the future in its sole discretion, pursuant to the procedures set forth herein.

24688-001\DOCS_DE:169898.4
A/74486212.1

by this Court, and with the terms of the orders approving each Chapter 11 Professional's employment.

10. The Ordinary Course Professionals will not be involved in the administration of this Chapter 11 Case. Rather, they will provide services in connection with the Debtor's ongoing business operations or services ordinarily provided by in-house counsel to a corporation. As a result, the Debtor does not believe that the Ordinary Course Professionals are "professionals" as that term is used in section 327 of the Bankruptcy Code, whose retention must be approved by this Court.[3] Nevertheless, out of an abundance of caution, the Debtor seeks an order authorizing the retention and payment of all Ordinary Course Professionals during the pendency of this Chapter 11 Case.

11. The Debtor anticipates employing, among others, certain of the Ordinary Course Professionals listed on Exhibit A to perform ongoing services during the pendency of this Chapter 11 Case. In particular, attorneys performing litigation-related services for the Debtor are among the Ordinary Course Professionals listed on Exhibit A. Although litigation will be stayed upon the commencement of the Chapter 11 Case, the Debtor, out of an abundance of caution, seek authority to retain certain of the Ordinary Course Professionals that provide litigation

---

[3] *See, e.g., In re That's Entertainment Mkt'g Group, Inc.,* 168 B.R. 226, 230 (N.D. Cal. 1994) (only the retention of professionals whose duties are central to the administration of the estate require prior court approval under section 327 of the Bankruptcy Code); *In re Madison Mgmt. Group, Inc.,* 137 B.R. 275, 283 (Bankr. N.D. Ill. 1992) (same); *In re Sieling Assocs. Ltd. P'ship,* 128 B.R. 721, 723 (Bankr. E.D. Va. 1991) (same); *In re Johns-Manville Corp.,* 60 B.R. 612, 619 (Bankr. S.D.N.Y. 1989) (only those professionals involved in the actual reorganization effort, rather than debtor's ongoing business, require approval under section 327 of the Bankruptcy Code).

support (as well as other professionals) should circumstances render continued litigation support necessary during the pendency of this Chapter 11 Case.

## Relief Requested

12.      By the Motion, pursuant to sections 105(a), 327, 328 and 330 of the Bankruptcy Code, the Debtor seeks entry of an order by this Court authorizing it, in accordance with the Cash Collateral Order, to (a) retain and employ the Ordinary Course Professionals on an "as needed" basis without the submission of separate, formal retention applications for each Ordinary Course Professional, and (b) establish procedures to compensate the Ordinary Course Professionals under sections 328, 330 and 331 of the Bankruptcy Code for postpetition services rendered and expenses incurred.

## Basis for Relief

13.      The Debtor cannot continue to operate its business as a debtor in possession unless it retains and pays for the services of the Ordinary Course Professionals listed on Exhibit A.  The work of the Ordinary Course Professionals, albeit ordinary course, is directly related to the preservation of the value of the Debtor's estates, even though the amount of fees and expenses incurred by the Ordinary Course Professionals represents only a small fraction of that value.

14.      The operation of the Debtor's business would be severely hindered if the Ordinary Course Professionals were delayed in performing their work on behalf of the Debtor while the Debtor (i) submitted to this Court an application, affidavit and proposed retention order for each Ordinary Course Professional; (ii) waited until such order was approved before such

5

Ordinary Course Professional continued to render services; and (iii) withheld payment of the normal fees and expenses of the Ordinary Course Professionals until they complied with the compensation procedures applicable to Chapter 11 Professionals.

15.     Further, a number of Ordinary Course Professionals are unfamiliar with the fee application procedures employed in bankruptcy cases.  Some Ordinary Course Professionals might be unwilling or unable to assume the administrative and cost burden of such procedures, and may therefore be unwilling to work with the Debtor if these requirements are imposed, forcing the Debtor to incur additional and unnecessary expenses to retain other professionals without such background and expertise and at potentially higher rates.  The uninterrupted services of the Ordinary Course Professionals are vital to the Debtor's continuing operations and its ultimate ability to reorganize.  More importantly, the cost of preparing and prosecuting these retention applications and fee applications would be significant, and such costs would be borne by the Debtor's estate.

16.     Moreover, a requirement that the Ordinary Course Professionals each file retention pleadings and follow the usual fee application process required of the Chapter 11 Professionals would unnecessarily burden the Clerk's office, this Court and the U.S. Trustee's office with unnecessary fee applications while significantly adding to the administrative costs of this case without any corresponding benefit to the Debtor's estates.  This Motion proposes a procedure to alleviate such a burden.

17.     Although some of the Ordinary Course Professionals may hold unsecured claims against the Debtor in respect of prepetition services rendered, the Debtor does not believe

that any of the Ordinary Course Professionals have an interest materially adverse to the Debtor, its estate, its creditors, or other parties in interest, and thus none would be retained who do not meet, if applicable, the special counsel retention requirement of section 327(e) of the Bankruptcy Code.  By this Motion, the Debtor is not requesting authority to pay prepetition amounts owed to Ordinary Course Professionals.

**Proposed Retention Procedure**

18.     The Debtor proposes that they be permitted to continue to employ and retain the Ordinary Course Professionals,  in accordance with the Cash Collateral Order. Pursuant to the requirement imposed by Bankruptcy Rule 2014 and in order to provide the interested parties and this Court with appropriate comfort and assurances, each Ordinary Course Professional will be required to file with this Court, and to serve upon (i) proposed co-counsel for the Debtor (a) Bingham McCutchen LLP, 399 Park Avenue, New York, NY 10022, Attn: Scott K. Seamon, Esq., and (b) Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, P.O. Box 8705, Wilmington, Delaware 19899-8705 (Courier 19801), Attn: Laura Davis Jones, Esq.; (ii) Office of the U.S. Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801; (iii) counsel to any Official Committee of Unsecured Creditors appointed in this case (subsequent to its appointment in this case); (iv) Maslon Edelman Borman & Brand, LLP,  3300 Wells Fargo Center, 90 South Seventh Street, Minneapolis, MN 55402-4140, Attn: Clark T. Whitmore, Esq. (clark.whitmore@maslon.com), as counsel to the Indenture Trustee; and (v) counsel to the Supporting Noteholders, Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036, Attn: Michael S. Stamer

(mstamer@akingump.com) (collectively, the "Notice Parties"), a disclosure affidavit of such proposed professional (the "Affidavit," a form of which is attached as <u>Exhibit B</u> hereto) on the later of: (i) thirty (30) days after entry of an order of this Court granting the Motion; or (ii) prior to the date such Ordinary Course Professional provides any services to the Debtor. Such Affidavit shall set forth the following information: (a) a description of the effort(s) that were taken to search for connections with parties in interest; (b) a description of the proposed scope of services to be provided by the Ordinary Course Professional; (c) the rate(s) proposed to be charged for the services; (d) all information otherwise required to be disclosed pursuant to Federal Rule of Bankruptcy Procedure 2014; and (e) to the extent that the Ordinary Course Professional was not providing services as of the Petition Date, the date on which such services began postpetition. The Debtor will not make any payments to any Ordinary Course Professionals who have failed to file such an Affidavit.

19. The Debtor further requests that the Notice Parties will have ten (10) days from the date of the filing and service of the Affidavit (the "Objection Period") to object to the retention of the Ordinary Course Professional in question. Any such objection must be timely filed with this Court and served upon the Ordinary Course Professional, the Debtor, and the Notice Parties. If an objection is filed and cannot be resolved and/or withdrawn within twenty (20) days after service of such objection, this Court shall adjudicate the matter at a hearing scheduled by the Debtor at a mutually convenient time.[4] If no timely objection is filed and

---

[4] If, after a hearing, the retention of an Ordinary Course Professional is not approved, such professional may still apply to this Court, pursuant to sections 330 and 331 of the Bankruptcy Code, for compensation for all work performed on behalf of the Debtor from the Petition Date through the date of an order denying such retention.

24688-001\DOCS_DE:169898.4

A/74486212.1

received, or if an objection is withdrawn, the Debtor will be authorized to retain the Ordinary Course Professional on a final basis without further order of this Court.

20.     The Debtor requests that it be authorized to employ and retain additional Ordinary Course Professionals not currently listed on <u>Exhibit A</u> hereto, from time to time as necessary, and without the need to file individual retention applications or have a further hearing by filing with this Court, one or more supplements to <u>Exhibit A</u> (a "Supplemental Notice") and serving a copy of the Supplemental Notice upon the Notice Parties.  The Debtor proposes that, as with the Ordinary Course Professionals set forth on <u>Exhibit A</u>, each additional Ordinary Course Professional be required to file and serve upon the Court and the Notice Parties an Affidavit on the later of:  (a) thirty (30) days after the Supplemental Notice is filed; or (b) prior to the date such Ordinary Course Professional provides any services to the Debtor.  The Notice Parties then would be given ten (10) days after service of each required Affidavit to object to the retention of such professional.  Any objection will be handled pursuant to the procedures discussed above.  If no objection is submitted, or the objection is withdrawn, the Debtor will be authorized to retain the professional as an Ordinary Course Professional on a final basis without further order of this Court.

## **Proposed Payment Procedure**

21.     The Debtor seeks authority to pay, to the extent permitted by the Cash Collateral Order, without formal application to and order from this Court, one hundred percent (100%) of the fees and expenses of each Ordinary Course Professional upon submission to, and approval by, the Debtor of an appropriate billing statement setting forth in reasonable detail the

9

nature of the postpetition services rendered and expenses actually incurred; <u>provided</u>, <u>however</u>, that such interim fees and expenses do not exceed the maximum authority under the authorized caps established herein.  Further, the Debtor will not pay any fees and expenses to an Ordinary Course Professional unless (i) the professional has filed its Affidavit, (ii) the Objection Period has expired, (iii) no timely objection is pending, and (iv) such payment is consistent with the Cash Collateral Order.  .  If a timely objection is received, no payment will be made until such objection is (a) resolved and withdrawn, or (b) otherwise approved by the Court.

A.    **<u>Monthly Payment Caps Proposed By The Debtor.</u>**

22.    The Debtor proposes that it be permitted to pay, in accordance with the Cash Collateral Order and without formal application to this Court by any one Ordinary Course Professional, fees and expenses not exceeding a total of $60,000.00 for any one calendar month to any Ordinary Course Professional, unless otherwise authorized by this Court.  The Debtor also proposes that aggregate monthly payments to Ordinary Course Professionals be limited to $199,750.00 unless otherwise authorized by this Court.

23.    If in any given month the fees and expenses for any one Ordinary Course Professional exceeds $60,000.00, such Ordinary Course Professional shall be required to apply for approval by the Court of all such Ordinary Course Professional's fees and expenses for such month under sections 330 and 331 of the Bankruptcy Code; <u>provided</u>, <u>however</u>, that such Ordinary Course Professional shall be entitled to an interim payment of up to $60,000.00 as a credit against the invoices for such month ultimately allowed by the Court.

24688-001\DOCS_DE:169898.4

A/74486212.1

24.     The Debtor proposes to except from such monthly limitations any contingent fee amounts received by Ordinary Course Professionals from recoveries realized on the Debtor's behalf.  In other words, the limitations would apply only to direct disbursements by the Debtor.

25.     As a routine matter prior to the commencement of this case, the Debtor carefully reviewed all billing statements received from the Ordinary Course Professionals to ensure that the fees charged were reasonable and that the expenses incurred were necessary. This type of review will continue postpetition and, coupled with the proposed monthly payment caps, will protect the Debtor's estates against excessive and improper billings.

**B.     The Debtor Proposes To File Periodic Statements Of Payments Made.**

26.     The Debtor further proposes to file a payment summary statement with this Court not more than thirty (30) days after the last day of March, June, September and December of each year this Chapter 11 Case is pending, or such other period as this Court directs, and to serve such statement upon the Notice Parties.  The summary statement will include the following information for each Ordinary Course Professional:  (a) the name of the Ordinary Course Professional; (b) the aggregate amounts paid as compensation for services rendered and reimbursement of expenses incurred by such Ordinary Course Professional during the statement period; and (c) a brief statement of the type of services rendered.

**Authority for the Requested Relief**

27.     Numerous courts, including courts in this district, have routinely granted the same or similar relief to chapter 11 debtors in other chapter 11 cases.  *See, e.g., In re*

11

*Nebraska Book Co., Inc.*, Case No. 11-12005 (PJW) (Bankr. D. Del. July 21, 2011); *In re Local Insight Media Holdings, Inc.*, Case No. 10-13677 (KG) (Bankr. D. Del. Dec. 20, 2010); *In re Point Blank Solutions, Inc.*, Case. No. 10-11255 (PJW) (Bankr. D. Del. May 12, 2010); *In re Latham International, Inc.*, Case No 09-14490 (CSS) (Bankr. D. Del. Jan. 21, 2010); *In re Progressive Molded Products, Inc.*, Case No 08-11253 (KJC) (Bankr. D. Del. June 20, 2008); *In re Charys Holding Co. Inc.*, Case No. 08-10289 (BLS) (Bankr. D. Del. Feb. 14, 2008).

28.     The Debtor and its estate will be well served by authorizing the retention of the Ordinary Course Professionals because of such professionals' past relationship with, and understanding of, the Debtor and its operations.  It is in the best interest of all of the parties and the creditors to avoid any disruption in the professional services rendered by the Ordinary Course Professionals in the day-to-day operations of the Debtor's business.

**<u>Notice</u>**

29.     Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known: (i) the Office of the United States Trustee; (ii) Maslon Edelman Borman & Brand, LLP, 3300 Wells Fargo Center, 90 South Seventh Street, Minneapolis, MN 55402-4140, Attn: Clark T. Whitmore, Esq. (clark.whitmore@maslon.com), as counsel to the Indenture Trustee; and (iii) Akin Gump Strauss Hauer & Feld LLP, Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036, Attn: Michael S. Stamer (mstamer@akingump.com), as counsel to the Supporting Noteholders.  As the Motion is seeking "first day" relief, within forty-eight hours of the entry of an order respecting the Motion, the Debtor will serve copies of the Motion and the order respecting the Motion as required by

12

Rule 9013-1(m) of the Local Bankruptcy Rules.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## **No Prior Request**

30.     No prior request for the relief sought in this Motion has been made to this Court or any other court.

*[Remainder of page intentionally left blank]*

24688-001\DOCS_DE:169898.4

A/74486212.1

WHEREFORE, the Debtor respectfully requests that this Court enter an order, substantially in the form attached hereto, granting the relief requested herein and such other and further relief as this Court deems appropriate.

Dated:  August____, 2011

PACHULSKI STANG ZIEHL & JONES LLP

_____
Laura Davis Jones (Bar No. 2436)
Timothy P. Cairns (Bar No. 4228)
Peter J. Keane (Bar No. 5503)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile:  (302) 652-4400
E-mail:  ljones@pszjlaw.com
           tcairns@pszjlaw.com
           pkeane@pszjlaw.com

-and-

BINGHAM MCCUTCHEN LLP
Ronald J. Silverman (*pro hac vice* pending)
Scott K. Seamon (*pro hac vice* pending)
399 Park Avenue
New York, NY  10022-4689
Telephone: (212) 705-7868
Facsimile:  (212) 508-1407
E-mail:  ronald.silverman@bingham.com
           scott.seamon@bingham.com

[Proposed] Counsel to Debtor and
Debtor in Possession

14

**<u>Exhibit A</u>**

**Professionals Utilized in the Ordinary Course of Business**

## Professionals Utilized in the Ordinary Course of Business

| Name | Professional's Mailing Address | Nature of Services Provided | Estimated Amount Paid Monthly |
|---|---|---|---|
| O'Connor, Carnathan & Mack LLC | 1 Van De Graaff Drive Suite 104 Burlington, MA 01803 | Legal services: State aid, collections, disputes | $20,000 |
| Bello, Black & Welsh LLP | 699 Boylston Street Boston, MA 02116 | Legal services: Employment matters | $5,000 |
| Middleton & Shrull | 50 Mall Road Suite 205 Burlington, MA 01803 | Legal services: U.S. Customs, import/export control | $2,500 |
| Noble & Wickersham LLP | 1280 Massachusetts Ave Cambridge, MA 02138 | Legal services: Real Estate and land use | $5,000 |
| Sunstein Kann Murphy & Timbers LLP | 125 Summer Street Boston, MA 02110 | Legal services: Intellectual property law | $60,000 |
| Quarles & Brady LLP | 33 East Main Street Suite 900 Madison, WI 53703 | Legal services: Immigration law | $2,000 |
| TransAsia Lawyers | Unit 1101 Platinum 233 Tai Cang Rd Shanghai 200020, China | Legal services: PRC advisors, Wuhan (JV) matters (China) | $15,000 |
| Hogan Lovells | 555 Thirteenth Street NW Washington, DC 20004 | Legal services: Global trade matters (China) | $5,000 |

| Name | Professional's Mailing Address | Nature of Services Provided | Estimated Amount Paid Monthly |
|---|---|---|---|
| Taylor Wessing | Eberstsirabe 15-10117<br><br>Berlin, Germany | Legal services:<br><br>Operation of Berlin sales office | $4,000 |
| Honigman Miller Schwartz and Cohn LLP | 38500 Woodward Ave Suite 100<br><br>Bloomfield Hills, MI 48304-5048 | Legal services:<br><br>Michigan counsel, property and tax | $5,000 |
| K&L Gates LLP | 535 Smithfield Street<br><br>Pittsburgh, PA 15222-2312 | Legal services:<br><br>Export control matters (materials and tech) | $15,000 |
| Nexus Professional Law Group | PO Box 667<br><br>Hawthorne, NJ 07507-0667 | Legal services:<br><br>Korean law firm, OCI contractual matters, Sun & Kim litigation | $15,000 |
| Immigration Law Group LLC | 57 Exchange Street, Suite 401<br><br>Portland, Maine 04101 | Legal services:<br><br>Immigration law | $1,250 |
| RR Donnelly | 14100 Lear Blvd Suite 130<br><br>Reno, NV 89506 | Document services:<br><br>SEC reports and solicitation materials | $2,000 |
| Bright Way Accounting & Secretarial Services | Rm 1601-03, 16F Golden Gate Comm Bldg 136-137 Austin Road, Tsim Sha Tsui Kowloon, Hong Kong | Accounting services:<br><br>Hubei services (China) | $1,500 |

2

| Name | Professional's Mailing Address | Nature of Services Provided | Estimated Amount Paid Monthly |
|---|---|---|---|
| Union Alpha Business Services | 10/F Chinatown Tower Connaught Rd Central, Hong Kong | Accounting and advisory services:<br><br>Hubei financial statement preparation (China) | $1,500 |
| PriceWaterhouseCoopers | PO Box 7247-8001<br><br>Philadelphia, PA 19170-8001 | Auditor | $10,000 |
| Ernst & Young | 200 Plaza Drive<br><br>Secaucus, NJ 07094 | Tax advisory services | $10,000 |
| Deloitte & Touche Belgium | Belastingsconsulenten/Conseils Fiscaux Berkenlaan 8b<br>B-1831 Diegem - Belgium | Tax advisory services:<br><br>Local tax advisor, VAT filings | $7,500 |
| Deloitte & Touche Germany | Wirtschaftsprufungsgesellschaft Seemannstrabe 8<br>Postfach 100830 04008 Leipzig  Deutschland | Tax advisory services:<br><br>Local tax advisor, VAT filings | $7,500 |
| CCR LLP | 1400 Computer Drive<br><br>Westborough MA 01581 | Accounting services:<br><br>401(k) audit, SOX audit | $5,000 |
| | | **Total:** | $199,750.00 |

3

**Exhibit B**

**Form of Affidavit of Disinterestedness**

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| EVERGREEN SOLAR, INC.[1] | ) | Case No. _____ (___) |
| | ) | |
| Debtor. | ) | |

## **DISCLOSURE AFFIDAVIT OF ORDINARY COURSE PROFESSIONAL**

| | |
|---|---|
| STATE OF | ) |
| | ) ss: |
| COUNTY OF | ) |

I, _____, hereby declare that the following is true to the best of my

knowledge, information and belief:

I am a _____ of _____ (the "Firm") which maintains offices at

[address].

This Affidavit is submitted in connection with an order of the United States

Bankruptcy Court for the District of Delaware dated _____, 2011, authorizing the above-

captioned debtor and debtor in possession (the "Debtor") to retain certain professionals in the

ordinary course of business during the pendency of the Debtor's chapter 11 case (the "Chapter

11 Case").

---

[1] The last four digits of the Debtor's federal tax identification number are 2254. The Debtor's mailing address is 138 Bartlett Street, Marlboro, MA 01752.

The Firm, through me, and members of the firm, have represented and advised the Debtor as _____ with respect to a broad range of aspects of the Debtor's businesses, including _____, since [insert date].

The Debtor has requested, and the Firm has agreed, to continue to provide services to the Debtor pursuant to section 327 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with respect to such matters. Additionally, the Debtor has requested, and the Firm proposes to render, the following services to the Debtor: [Insert description].

The Firm's current customary [hourly] rates, subject to change from time to time, are $_____. In the normal course of business, the Firm revises its regular [hourly] rates on _____ of each year and requests that, effective _____ of each year, the aforementioned rates be revised to the regular [hourly] rates which will be in effect at that time.

To the best of my knowledge, formed after due inquiry, neither I, the Firm, nor any employee thereof has any connection with the Debtor or currently represents any of its creditors, other parties-in-interest, the Office of the United States Trustee or any person employed by the Office of the United States Trustee with respect to the matters upon which it is to be engaged, and the Firm does not, by reason of any direct or indirect relationship to, connection with, or interest in the Debtor, hold or represent any interest adverse to the Debtor, its estate or any class of creditors or equity interest holders, except [_____].

Thus, I believe that the Firm's representation of such entities in matters entirely unrelated to the Debtor is not adverse to the Debtor's interests, or the interests of its creditors or

24688-001\DOCS_DE:169898.4
A/74486212.1

estates in respect of the matters for which the Firm will be engaged, nor will such services impair the Firm's ability to represent the Debtor in the ordinary course in this Chapter 11 Case.

In addition, although unascertainable at this time after due inquiry, due to the magnitude of the Debtor's potential universe of creditors and the Firm's clients, the Firm may have in the past represented, currently represent, and may in the future represent entities that are claimants of the Debtor in matters entirely unrelated to the Debtor and its estate. The Firm does not and will not represent any such entity in connection with this pending Chapter 11 Case and does not have any relationship with any such entity, attorneys or accountants that would be adverse to the Debtor or its estate.

The Firm's process of ascertaining what, if any, connection it may have with any interest adverse to the Debtor, its estate or any class of creditors or equity interest holders, consists of the following: _____.

In the past year, the Firm has rendered services that have not yet been billed or that have been billed but with respect to which payment has not yet been received. The Firm is currently owed $_____ on account of such prepetition services.

In light of the foregoing, I believe that the Firm does not hold or represent any interest materially adverse to the Debtor, its estate, creditors, or equity interest holders, as identified to the Firm, with respect to the matters in which the firm will be engaged.

Except as set forth herein, no promises have been received by the Firm or any partner, associate or other professional thereof as to compensation in connection with this Chapter 11 Case other than in accordance with the provisions of the Bankruptcy Code, the

24688-001\DOCS_DE:169898.4
A/74486212.1

Federal Rules of Bankruptcy Procedure, the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, and orders of this Court.

The Firm further states that it has not shared, nor agreed to share any compensation received in connection with this Chapter 11 Case with another party or person, other than as permitted by section 504(b) of the Bankruptcy Code and Bankruptcy Rule 2016.

The foregoing constitutes the statement of the Firm pursuant to sections 329 and 504 of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure 2014 and 2016(b).

*I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.*

_____
[NAME]
[ADDRESS]

Sworn to before me
this _____ day of _____, 2011

_____
Notary Public

24688-001\DOCS_DE:169898.4
A/74486212.1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| EVERGREEN SOLAR, INC.[1] | ) | Case No. _____ (___) |
| | ) | |
| Debtor. | ) | **Related Docket No. _____** |

## ORDER PURSUANT TO SECTIONS 105(a), 327, 328 AND 330 OF THE BANKRUPTCY CODE AUTHORIZING THE DEBTOR TO RETAIN, EMPLOY AND COMPENSATE CERTAIN PROFESSIONALS UTILIZED BY THE DEBTOR IN THE ORDINARY COURSE OF BUSINESS

Upon the Motion[2] of the above-captioned debtor and debtor in possession (the "Debtor") for entry of an order pursuant to sections 105(a), 327, 328 and 330 of the Bankruptcy Code, authorizing it to retain, employ, and compensate certain professionals in the ordinary course of business without further order of the Court; the Court having reviewed the Motion; the Court finding that (a) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, (b) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), (c) venue of this Chapter 11 Case in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409, and (d) notice of the Motion was sufficient under the circumstances; the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the relief requested is in the best interests of the Debtor's estate, its creditors and other parties in interest;

---

[1] The last four digits of the Debtor's federal tax identification number are 2254. The Debtor's mailing address is 138 Bartlett Street, Marlboro, MA 01752.

[2] Capitalized terms used herein and not otherwise defined shall have the same meaning as in the Motion.

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is GRANTED.

2.      The Debtor is authorized to retain and employ, effective as of the Petition Date, the Ordinary Course Professionals listed on Exhibit A to the Motion, without the need to file separate, formal retention applications for each Ordinary Course Professional and obtain retention orders for each.

3.      Within five (5) business days after the date of entry of this Order, the Debtor shall serve this Order and the form of Affidavit attached to the Motion as Exhibit B upon each Ordinary Course Professional.

4.      On the later of (a) thirty (30) days after entry of an order by this Court granting the Motion, or (b) prior to the date an Ordinary Course Professional provides any services to the Debtor following the Petition Date, each Ordinary Course Professional shall file with this Court, and serve upon the Notice Parties, a disclosure affidavit of the proposed professional (the "Affidavit") in substantially the form attached to the Motion as Exhibit B, which includes the following information: (a) a description of the effort(s) that were taken to search for connections with parties in interest; (b) a description of the proposed scope of services to be provided by the Ordinary Course Professional; (c) the rate(s) proposed to be charged for the services; (d) all information otherwise required to be disclosed pursuant to Federal Rule of Bankruptcy Procedure 2014; and (e) to the extent that the Ordinary Course Professional was not providing services as of the Petition Date, the date on which such services began postpetition.

24688-001\DOCS_DE:169898.4
A/74486212.1

5.     The Notice Parties shall have ten (10) days after service of each Ordinary Course Professional's Affidavit (the "Objection Period") to object to the retention of such professional.  Any such objections shall be timely served upon the Ordinary Course Professional to whom the objection applies, the Debtor, and the Notice Parties.  If any such objection is filed and cannot be resolved and/or withdrawn within twenty (20) days after service of such objection, this Court shall adjudicate the matter at a hearing scheduled by the Debtor at a mutually convenient time.  If no timely objection is filed and received, or if any objection is withdrawn, the Debtor shall be authorized to retain the Ordinary Course Professional as a final matter without further order of this Court.  Nothing herein shall preclude an Ordinary Course Professional from applying to the Court, pursuant to sections 330 and 331 of the Bankruptcy Code, for compensation for all work performed on behalf of the Debtor from the date an Affidavit is filed until such retention request is denied by the Court or withdrawn by the Debtor.

6.     The Debtor may not make any payments to any Ordinary Course Professionals unless (i) the Ordinary Course Professional has filed the Affidavit, (ii) the Objection Period has expired, (iii) no timely objection is pending, or, if a timely objection is received, (a) the objection is resolved and withdrawn, or (b) such retention is otherwise approved by the Court and (iv) such payment is consistent with the Cash Collateral Order.

7.     The Debtor is authorized, without need for further hearing or order from this Court, to employ and retain Ordinary Course Professionals not currently listed on Exhibit A to the Motion by filing with this Court, and serving on the Notice Parties, a Supplemental Notice

3

listing the name of the professional, together with a brief description of the services to be rendered, and by otherwise complying with the terms of this Order.

8.     The Debtor is authorized to pay, to the extent permitted by the Cash Collateral Order, to each Ordinary Course Professional listed on Exhibit A to the Motion, one hundred percent (100%) of each Ordinary Course Professional's fees and expenses not to exceed $60,000.00 per month, in the manner customarily made by the Debtor; provided, however, that such payments to all Ordinary Course Professionals shall not exceed $199,750.00 in the aggregate for any given month.  Each Ordinary Course Professional must submit reasonably detailed billing statements indicating the nature of the services rendered, calculated in accordance with such professional's standard billing practices (without prejudice to the Debtor's normal right to dispute any such billing statements).

9.     If in any given month the fees and expenses for any one Ordinary Course Professional listed on Exhibit A exceed $60,000.00, such Ordinary Course Professional shall be required to apply for approval by this Court of all such Ordinary Course Professional's fees and expenses for such month; provided, however, that such Ordinary Course Professional shall be entitled to an interim payment of up to $60,000.00 in fees and expenses, consistent with the immediately preceding paragraph, as a credit against the invoices for such month ultimately allowed by this Court.

10.     All payments to any one Ordinary Course Professional shall be subject to 11 U.S.C. §§ 328(c) and 330 of the Bankruptcy Code, which provides generally that the Court may deny allowance of compensation for services and reimbursement of expenses if such

4

professional person is not a disinterested person, or represents or holds an interest adverse to the interest of the estate with respect to the matter on which such professional person is employed or for reasons set forth in section 330.  All payments to an Ordinary Course Professional are further subject to Federal Rules of Bankruptcy Procedures, the Local Rules of Bankruptcy Practice and Procedures of the United States Bankruptcy Court for the District of Delaware, and such procedures as may be approved by order of this Court for professionals involved in the conduct of this case, if amounts requested by such Ordinary Course Professional exceed $60,000.00 in fees and expenses during any one month, provided, however, that the Ordinary Course Professionals shall not be required to submit quarterly or final fee applications for any applications submitted solely because the $60,000.00 limit is exceeded for a single month.

11.     Notwithstanding the foregoing, the monthly caps established above shall apply only to direct disbursements by the Debtor, and shall specifically not apply to any contingent fee amounts received by Ordinary Course Professionals from recoveries realized on behalf of the Debtor.

12.     Within thirty (30) days after the last day of March, June, September and December of each year this Chapter 11 Case is pending, the Debtor shall file with this Court and serve upon the Notice Parties a statement that includes the following information for each Ordinary Course Processional:  (a) the name of the Ordinary Course Professional; (b) the aggregate amounts paid as compensation for services rendered and reimbursement of expenses incurred by such Ordinary Course Professional during the statement period; and (c) a short statement of the type of services rendered by such Ordinary Course Professional.

24688-001\DOCS_DE:169898.4
A/74486212.1

13.     This Court shall retain jurisdiction to hear and determine all matters

arising from or related to the implementation of this Order.


Dated: _____, 2011     _____
                                          United States Bankruptcy Judge

24688-001\DOCS_DE:169898.4

A/74486212.1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| EVERGREEN SOLAR, INC.,[1] | ) | Case No. 11-_____ (___) |
| | ) | |
| Debtor. | ) | |

**MOTION OF THE DEBTOR FOR AN ORDER AUTHORIZING, BUT
NOT DIRECTING, PAYMENT OF CERTAIN PREPETITION SHIPPING
CHARGES, WAREHOUSING CHARGES AND RELATED POSSESSORY LIENS**

The above-captioned Debtor and Debtor in possession (collectively, the "Debtor")

hereby move this Court for entry of an order authorizing but not directing, payment of certain

prepetition shipping charges, warehousing charges, custom charges and other charges related to

possessory liens that may be asserted from the Debtor's shippers, warehouseman and supporting

agents (the "Motion"). In support of this Motion, the Debtor respectfully represent as follows:

**Jurisdiction**

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334

and 157. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of the Debtor's

chapter 11 case and this Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for the relief sought herein are sections 105(a)

and 363 of the Bankruptcy Code and Rules 2002, 6004 and 9014 of the Federal Rules of

Bankruptcy Procedure.

---

[1] The last four digits of the Debtor's federal tax identification number are 2254. The Debtor's mailing address is
138 Bartlett Street, Marlboro, MA 01752.

## **Background**

3.      On the date hereof (the "Petition Date"), the Debtor commenced this case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtor has continued in the possession of its property and has continued to operate and manage its business as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner or committee has been appointed in the Debtor's chapter 11 case.

4.      The Debtor has historically developed and manufactured multi-crystalline silicon wafers (known as String Ribbon ™ wafers) utilizing its proprietary wafer manufacturing technology.  Those String Ribbon wafers are then converted into photovoltaic solarcells, which are used to produce Evergreen-branded solar panels or solar modules.  The Debtor's technology involves a unique process of producing multi-crystalline silicon wafers by growing thin strips of silicon that are then cut into wafers using lasers, substantially reducing the amount of silicon and other processing costs required to produce a wafer as compared to conventional wafer manufacturing methods.

5.      More recently, the Debtor has focused its efforts on developing technology for the production of an industry standard size wafer ("Wide Wafer Technology"), which can be supplied to the world's leading solar cell and panel manufacturers.  The Debtor plans to focus its operations solely on completing the development of the Wide Wafer Technology, which then may be used to manufacture wafers to be sold to other cell or panel manufacturers or licensed to other cell or panel manufacturers.  The Debtor expects that its Wide Wafer Technology will permit the manufacturing of wafers at substantially lower cost than

wafers manufactured by alternative methodologies and therefore expects significant demand for

its Wide Wafer Technology.

6.      The factual background relating to the Debtor's commencement of this

chapter 11 case is set forth in detail in the *Declaration of Michael El-Hillow, Chief Executive*

*Officer of the Debtor, in Support of First Day Pleadings* (the "El-Hillow Declaration") filed

contemporaneously with this Motion and incorporated herein by reference.

### The Debtor's Operations

7.      Historically, Evergreen produced non-standard size rectangular wafers that

were then processed into Evergreen branded solar cells and panels primarily in Evergreen's

facilities in Devens, Massachusetts (the "Devens Facility").  In January 2011, the Debtor

announced its intent to shut down operations at its Devens Facility to better position the

Company to pursue its industry standard size wafer strategy and preserve its liquidity.  The

Debtor completely shut down the Devens Facility in the first quarter of 2011.

8.      Following the closure of the Devens Facility, the Debtor shifted wafer

manufacturing to a facility in Wuhan, China (the "Wuhan Wafer Plant") and partnered with

Jiawei Solarchina Co., Ltd. ("Jiawei") to process the wafers into cells and panels.  Through these

relationships, the Debtor combined its low-cost wafer manufacturing technology with Jiawei's

low-cost cell and panel manufacturing capability to produce a solar panel that will be among the

most cost competitive in the industry.

9.      In anticipation of the closure of the Devens Facility, the Debtor began an

ongoing process to manufacture standard size String Ribbon™ wafers, rather than the non-

standard size wafers that had previously been produced, to increase the marketability of its

wafers as a stand-alone product. The Debtor made substantial progress in the second half of 2010 and into 2011 towards development of technology for the production of an industry standard size wafer, or Wide Wafer Technology, which can be supplied to the world's leading solar cell and panel manufacturers. The Debtor has focused its remaining operations solely on completing the development of the Wide Wafer Technology, which then may be used by the Debtor or one of its affiliates to manufacture wafers (the "Standard Sized Wafers") to be sold to other cell or panel manufacturers or licensed to other cell or panel manufacturers. The Debtor expects that its Wide Wafer Technology will permit the manufacturing of wafers at substantially lower cost than wafers manufactured by alternative methodologies and therefore expects significant demand for its Standard Sized Wafers.

10.     In support of the development of the Wide Wafer Technology, the Debtor currently operates two small-scale manufacturing facilities: the high temperature filament plant in Midland, Michigan (the "Midland Filament Plant") and a small, research and development wafer manufacturing facility at its headquarters in Marlboro, Massachusetts (the "Marlboro Research Facility"). High temperature filament produced by the Midland Filament Plant is sent to the Marlboro Research Facility to support the manufacture of prototype Standard Sized Wafers, which are then sent on to the Debtor's wholly owned subsidiary, Hubei Evergreen Solar Co., Ltd. to be used in the Debtor's Wuhan Wafer Plant for further testing and research. Other than the manufacturing to support the research into the Wide Wafer Technology, the Debtor has no further ongoing manufacturing operations.

## Relief Requested

11.     By this Motion, the Debtor seeks entry of an order authorizing, but not directing, the Debtor, in its business judgment and to the extent permitted in the Cash Collateral Order, to pay prepetition obligations owed to common carriers for ground transportation, air freight, ocean freight, and similar charges and freight forwarding charges (which freight forwarding charges may include in the amount payable to the freight forwarder for charges for customs duties and dock facilities)(collectively, the "Shippers") incurred by the Debtor, including those that give rise (or legitimately may give rise) to any statutory or common-law possessory liens on account of unpaid charges owing from the Debtor to such Shippers (collectively, "Shipping Obligations"), as further described in this Motion.  The Debtor also seeks authority to pay, in the exercise of their business judgment, to the extent permitted in the Cash Collateral Order, warehousing and port facility charges (the "Warehousing Obligations") to any third party Warehousemen as further described in this Motion.  The Debtor proposes to pay such claims, when, in the Debtor's discretion, and to the extent permitted in the Cash Collateral Order, the Shippers' and Warehousemen's exercise of contractual or statutory self-help remedies would unduly disrupt the Debtor's businesses.  The Debtor requests the authority, but not the direction, to pay up to $10,000 on account of such claims, as described further herein.

## The Debtor's Shipping and Warehousing Operations

12.     As discussed in detail above, the Debtors has significantly reduced its operations after the closing of the Devens Facility.  In fact, other than the limited research, development and manufacturing operation in support of the development of the Wide Wafer Technology, the Debtor has no operations which require shipment of finished products or

manufacturing components.  The Debtor's prepetition shipping and warehousing obligations include the following:

        a.       the shipment of finished high temperature filament from the Midland Filament Plant to the Marlboro Research Facility;

        b.       the full-pallet shipments of completed Standard Sized Wafers from the Marlboro Research Facility to the Wuhan Wafer Plant; and

        c.       de minimis shipment of spare parts, remaining inventory or raw materials from the closed Devens Facility to the cell and panel manufacturing plant of Jiawei Solarchina Co., Ltd.

13.      All shipments of inbound supplies to support the limited manufacturing operations are paid for by the suppliers.  Shipments of finished solar panels to the Debtor's end user customers are the obligation of the Debtor's affiliates in China.  All finished products manufactured at the Midland Filament Plant or Marlboro Research Facility are warehoused on-site while awaiting shipment.

14.      The Debtor's businesses therefore has minimal prepetition shipping and warehousing obligations.  DHL ships filament from the Midland Filament Plant to the Marlboro Research Facility and the de minimis spare parts from the Devens Facility to Jiawei.  For delivery of the full-pallet shipments of completed Standard Sized Wafers from the Marlboro Research Facility, the Debtor contracts with Shippers including, without limitation, the railroads, truckers, and short-distance delivery personnel, to ship, transport, store, and deliver merchandise to the U.S. Customs bonded warehouses in New York and Boston.

15.     Because the Debtor stores all finished product at their own facilities, the

Debtor does not contract directly with any third party warehousemen.  However, when

necessary, the Shippers may utilize certain warehousemen (the "Warehousemen") to store

merchandise while in transit.  Such warehousing of merchandise is controlled and paid directly

by the Shippers, with the cost passed along to the Debtor.

16.     For their overseas shipments to the Wuhan Wafer Facility, the Debtor

employs Expeditors International of USA, Inc. ("Expeditors") as third-party logistics coordinator

(the "Logistics Coordinator").  The Logistics Coordinator manages the logistics of the Debtor's

supply and delivery system, including the Shippers by, among other things, auditing the

Shippers' invoices and then billing the Debtor for their services.  Generally, the Debtor pays the

Logistics Coordinator first, and they, in turn, pay the Shippers.  The Logistics Coordinator will

advance funds to the Shippers and then invoice the Debtor.  The Logistics Coordinators exact a

percentage fee from all transport transactions managed for the Debtor.

## Basis for the Relief Requested

17.     Under some non-bankruptcy laws, a Shipper or Warehouseman may have

a lien on the goods in its possession, which secures the charges or expenses incurred in

connection with the transportation or storage of the goods.[2]

18.     The Debtor expect that, as of the Petition Date, certain Shippers,

Warehousemen (when used by the Shippers) and Logistics Coordinators may have outstanding

invoices for merchandise delivered to the Debtor prior to the Petition Date or stored for the

---

[2]  For example, section 7-307 of the Uniform Commercial Code provides, in pertinent part, that a "carrier has a lien on the goods covered by a bill of lading for charges subsequent to the date of its receipt of the goods for storage or transportation, including demurrage and terminal charges, and for expenses necessary for preservation of the goods incident to their transportation or reasonably incurred in their sale pursuant to [law]."  See U.C.C. § 7-307(1) (2003).

Debtor on the Petition Date (collectively, including amounts owed to Logistics Coordinator, the "Shipping and Warehousing Charges").[3]  Shipping charges constitute the majority of these amounts, since the Debtor do not directly warehouse merchandise with third parties.  Some of the Debtor's Shippers also act as Warehousemen, to the extent a particular Shipper warehouses the Debtor's products in their trucks or at their facilities.

19.     Usually, as long as the Logistics Coordinator's invoices remain unpaid, the Shippers and Warehousemen will not be paid for future shipments.  In such an event, the Shippers and Warehousemen likely will argue that they have possessory liens for transportation or storage costs, and may refuse to deliver or release goods in their possession until their claims are satisfied and their liens redeemed.  Because the Debtor's research and development efforts to develop the Wide Wafer Technology depend on the constant manufacture of Standard Size Wafers to be tested at the Wuhan Wafer Plant , even minor disruptions to the Debtor's manufacture and delivery of the wafers could be disastrous for the going concern value of the Debtor's business.

20.     The Debtor anticipates that some Shippers and Warehousemen will demand immediate payment from the Debtor or the Logistics Coordinator.  Even absent a valid lien, a Shipper's or Warehouseman's mere possession (and retention) of the Debtor's merchandise could severely disrupt, and potentially cripple, the Debtor's operations because of the time-sensitive nature of the need to develop the Wide Wafer Technology.

---

[3]  Included within the Shipping and Warehousing Charges are certain amounts owed relating to customs brokers and customs fees.  The Debtor employ a third-party broker to pay such fees, and expect the amounts owed to such broker to be de minimis.

21.     Accordingly, by this Motion, the Debtor seek to prevent the breakdown of the manufacture of the Standard Size Wafers by requesting authority to pay certain prepetition claims relating to the Shippers and Warehousemen (directly or through the Logistics Coordinator, which payments shall include the Logistics Coordinator's fee) that the Debtor determine are necessary or appropriate to (a) obtain release of critical or valuable merchandise that may be subject to liens, (b) maintain a reliable, efficient and smooth distribution system, and (c) induce critical Shippers and Warehousemen to continue to carry merchandise and make timely delivery. Notably, the Debtor only seek authority, not direction, to make such payments.

22.     The Debtor seeks the authority to make payments to the Logistics Coordinator, Shippers and/or Warehousemen, as appropriate and to the extent permitted by the Cash Collateral Order, relating to undisputed prepetition Shipping and Warehousing Charges that it, in its business judgment, (a) determines are necessary or appropriate and (b) believes the benefits to its estates and creditors from making such payments will exceed the costs that its estates would incur by bringing an action to compel the turnover of such goods, and the delays associated with such actions.[4] The Debtor does not expect such payments to exceed $10,000.

23.     The Debtor further requests that all applicable banks and other financial institutions be authorized to receive, process, honor, and pay all checks presented for payment and to honor all electronic payment requests made by the Debtor related to the prepetition obligations described herein, whether such checks were presented or electronic requests were submitted prior to or after the Petition Date. The Debtor further requests that all such banks and

---

[4] The value of the goods in the possession of the Shippers and Warehousemen and the potential injury to the Debtor if the goods are not released is likely to greatly exceed the amount of such Shipping and Warehousing Charges.

financial institutions be authorized to rely on the Debtor's designation of any particular check or electronic payment request as approved pursuant to this Motion.

## **Applicable Authority**

24.     This Court may grant the relief requested herein under section 105(a) of the Bankruptcy Code.  That section grants broad authority to bankruptcy courts to enforce the provisions of the Bankruptcy Code under equitable common law doctrines, providing that:

> The court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to prevent the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

11 U.S.C. § 105(a).  A bankruptcy court's use of its equitable powers under section 105(a) to "authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept."  In re Ionosphere Clubs, Inc., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (citing Miltenberger v. Logansport, C. & S.W.R. Co., 106 U.S. 286 (1882)); accord In re Just for Feet, Inc., 242 B.R. 821, 825 (D. Del. 1999).

25.     The Debtor believes that the relief requested herein will ensure a continued supply of goods that are vital to the Debtor's continued operations and essential to its goals in this chapter 11 case.  Absent the relief requested in the Motion, the Debtor will be required to expend substantial time and resources (i) convincing those parties holding goods that they should not assert a lien on or hold goods in transit, (ii) attempting to persuade Shippers and Warehousers to release goods held and/or not detain future shipments, (iii) locate replacement shippers for those that cease doing business with the Debtor, and (iv) convincing Shippers of the

Debtor's authority and ability to make certain payments. The attendant disruption in the

continuous flow of manufactured Standard Size Wafers delivered to the Wuhan Wafer Plant for

testing likely will result in a delay in efforts to develop the Wide Wafer Technology and the

Debtor's business will rapidly deteriorate and their opportunity to achieve a successful sale in

this case will be seriously jeopardized.

26.     Numerous courts have used their powers under section 105(a) and the

"doctrine of necessity" to authorize payment of a debtor in possession's prepetition obligations

where, as here, such payment is an essential element of the preservation of the debtor-in-

possession's potential for rehabilitation. See, e.g., In re Lehigh & New England Ry. Co., 657

F.2d 570, 581 (3d Cir. 1981) (doctrine of necessity permits "immediate payment of claims of

creditors where those creditors will not supply services or material essential to the conduct of the

business until their pre-reorganization claims shall have been paid."); Ionosphere Clubs, 98 B.R.

at 176. The doctrine of necessity "recognizes the existence of the judicial power to authorize a

debtor … to pay prepetition claims where such payment is essential to the continued operation of

the debtor." Id.

27.     In recognition of these factors, relief similar to that requested herein has

been granted in other large chapter 11 cases in the district and elsewhere. See, e.g., In re ACG

Holdings, Inc., Case No. 08-11467 (CSS) (Bankr. D. Del. July 15, 2008) (authorizing payment of

prepetition shipping and warehousing charges as well as other liens); Progressive Molded Prods.,

Inc., Case No 08-11253 (KJC) (Bankr. D. Del. June 24, 2008); Dura Auto. Sys., Inc., No. 06-

11202 (KJC) (Bankr. D. Del. Nov. 20, 2006); In re Radnor Holdings Corp., Case No. 06-10894

(PJW) (Bank. D. Del. August 23, 2006); In re Werner Holdings Co. (DE), Inc., Case No. 06-

10578 (KJC) (Bank. D. Del. June 13, 2006); In re Global Home Prods., Case No. 06-10340

(KG) (Bankr. D. Del. April 11, 2006); In re J.L. French Auto. Castings, Case No. 06-10119

(MFW) (Bankr. D. Del. February 14, 2006); In re Pliant Corp., Case No. 06-10001 (MFW)

(Bankr. D. Del. January 4, 2006); In re Meridian Auto. Sys. – Composite Operations, Inc., Case

No. 05-11168 (MFW) (Bankr. D. Del. April 27, 2005).

    28.  The goods in transit include the Standard Size Wafers that are essential to

the Debtor's continued operations.  The critical nature of this merchandise amply justifies

granting the relief sought herein.  The Debtor has demonstrated that the prompt payment of the

Shipping Obligations and Warehousing Obligations, as may be necessary or advisable to obtain

delivery of these goods, is crucial to the orderly and efficient operation of the Debtor's business.

Unless the Debtor receives the authority to pay these essential providers, the Debtor's business

likely will suffer irreparable harm.  The Debtor further submits that the total amount to be paid in

satisfaction of the items identified herein, estimated at up to approximately $10,000 (excluding

amounts paid prepetition by checks that have not yet cleared on the Petition Date), is *de minimis*

compared with the importance and necessity of the merchandise in question, the maintenance of

uninterrupted avenues of supply, and the additional losses that may be suffered by the Debtor if

its business and operations are adversely affected by merchandise shortages.

    29.  Finally, pursuant to Bankruptcy Rule 6003(b), "a motion to pay all or part

of a claim that arose before the filing of the petition" shall not be granted by the Court within 20

days of the Petition Date "[e]xcept to the extent that relief is necessary to avoid immediate and

irreparable harm . . . ."  Fed. R. Bankr. P. 6003(b).  For the reasons described herein and as

supported by the El-Hillow Declaration, the Debtor submits that the requirements of Rule 6003

have been met and that the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtor and its estates.

## <u>Notice</u>

30.     Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known: (i) the Office of the United States Trustee, (ii) the Indenture Trustee and (iii) the Supporting Noteholders.  As the Motion is seeking "first day" relief, within two business days after the hearing on the Motion, the Debtor will serve copies of the Motion and any order entered respecting the Motion as required by Del. Bankr. LR 9013-1(m).  The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

## <u>No Prior Request</u>

31.     No prior request for the relief sought herein has been made to this Court or to any other court.

WHEREFORE, the Debtor respectfully request that the Court enter an order granting the Motion, substantially in the form annexed hereto, and grant such other and further relief as is just and proper.

Dated:  August ___, 2011

PACHULSKI STANG ZIEHL & JONES LLP

_____
Laura Davis Jones (Bar No. 2436)
Timothy P. Cairns (Bar No. 4228)
Peter J. Keane (Bar No. 5503)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile:  (302) 652-4400
E-mail:  ljones@pszjlaw.com
             tcairns@pszjlaw.com
             pkeane@pszjlaw.com

-and-

BINGHAM MCCUTCHEN LLP
Ronald J. Silverman, Esquire
Scott K. Seamon, Esquire
399 Park Avenue
New York, NY  10022-4689
Telephone: (212) 705-7868
Facsimile:  (212) 508-1407
E-mail:  ronald.silverman@bingham.com
             scott.seamon@bingham.com

[Proposed] Counsel to Debtor and
Debtor in Possession

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| EVERGREEN SOLAR, INC.,[1] | ) | Case No. 11-_____ (___) |
| | ) | |
| Debtor. | ) | |

**ORDER AUTHORIZING, BUT NOT DIRECTING,
PAYMENT OF CERTAIN PREPETITION SHIPPING CHARGES,
WAREHOUSING CHARGES AND RELATED POSSESSORY LIENS**

Upon the motion (the "Motion") of the captioned Debtor and Debtor in possession herein (the "Debtor"), for entry of an order, authorizing, but not directing, the Debtor to pay certain prepetition shipping charges, warehousing charges and related possessory liens; and the Court having reviewed the Motion, the *Declaration of Michael El-Hillow, Chief Executive Officer of the Debtor, in Support of First Day Pleadings* (the "El-Hillow Declaration"), and all responses to the Motion; and due and proper notice of the Motion having been given under the circumstances; and it appearing that the relief requested is in the best interests of the Debtor, their estates and creditors; and after due deliberation, and good and sufficient cause appearing therefore, it is hereby

ORDERED, that the Motion is granted; and it is further

ORDERED, that the Debtor is authorized, but not directed, to the extent permitted by the Cash Collateral Order, to pay the Shipping and Warehousing Charges owing as of the Petition Date, provided that the amounts paid (excluding amounts paid prepetition that may not

---

[1] The last four digits of the Debtor's federal tax identification number are 2254. The Debtor's mailing address is 138 Bartlett Street, Marlboro, MA 01752.

have cleared on the Petition Date) shall not exceed $10,000 in the aggregate unless otherwise ordered by the Court; and it is further

ORDERED that all banks and other financial institutions on which checks were drawn or electronic payment requests made in payment of the prepetition Shipping and Warehousing Charges approved herein are authorized to receive, process, honor, and pay all such checks and electronic payment requests when presented for payment; provided, however, that sufficient funds are available in the Debtor's bank accounts to cover such payments; and provided, further, that all such banks and financial institutions are authorized to rely on the Debtor's designation of any particular check or electronic payment request as approved by this Order; and it is further

ORDERED, that nothing herein shall be construed as the assumption of any executory contract or unexpired lease by the Debtor; and it is further

ORDERED that the requirements set forth in Bankruptcy Rule 6003(b) are satisfied by the contents of the Motion; and it is further

ORDERED, that nothing herein shall limit the ability of the Debtor to challenge the validity or amount of the claims for payment of any of the parties whose prepetition amounts are sought to be paid by the Motion.

Dated: _____, 2011

_____
The Honorable _____
United States Bankruptcy Judge

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| EVERGREEN SOLAR, INC.[1] | ) | Case No. _____ (___) |
| | ) | |
| Debtor. | ) | |

## MOTION OF THE DEBTOR FOR AN ORDER (I) AUTHORIZING THE DEBTOR TO PAY CERTAIN TAXES IN THE ORDINARY COURSE OF BUSINESS; AND (II) AUTHORIZING BANKS AND FINANCIAL INSTITUTIONS TO HONOR AND PROCESS CHECKS AND TRANSFERS RELATED THERETO

The above-captioned debtor and debtor in possession (the "Debtor") files this

motion (the "Motion") for entry of an order, pursuant to sections 105(a), 363(b), 507(a) and 541

of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), and Rule

6003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (i) authorizing,

but not directing, the Debtor to remit and pay certain prepetition corporate franchise, property,

and certain other governmental taxes (the "Taxes") that the Debtor, in its sole discretion, deems

necessary, as and when they become due in the ordinary course of the Debtor's business, and (ii)

authorizing financial institutions to receive, process, honor and pay all checks issued and

electronic payment requests made relating to the foregoing.  In support of this Motion, the

Debtor respectfully states as follows:

### Jurisdiction

1.       This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157

---

[1]  The last four digits of the Debtor's federal tax identification number are 2254.  The Debtor's mailing address is 138 Bartlett Street, Marlboro, MA 01752.

and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.     The statutory predicates for the relief requested herein are sections 105(a) and 363, 507(a) and 541 of the Bankruptcy Code and Bankruptcy Rule 6003.

## Background

3.     On the date hereof (the "Petition Date"), the Debtor commenced this case by filing a voluntary petition for relief under chapter 11 the Bankruptcy Code.

4.     The Debtor has continued in possession of its property and has continued to operate and manage its businesses as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner or committee has been appointed in the Debtor's chapter 11 case.

5.      The Debtor has historically developed and manufactured multi-crystalline silicon wafers (known as String Ribbon ™ wafers) utilizing its proprietary wafer manufacturing technology. Those String Ribbon wafers are then converted into photovoltaic solarcells, which are used to produce Evergreen-branded solar panels or solar modules. Evergreen's technology involves a unique process of producing multi-crystalline silicon wafers by growing thin strips of silicon that are then cut into wafers using lasers, substantially reducing the amount of silicon and other processing costs required to produce a wafer as compared to conventional wafer manufacturing methods.

6.     More recently, the Debtor has focused its efforts on developing technology for the production of an industry standard size wafer ("Wide Wafer Technology"),

which can be supplied to the world's leading solar cell and panel manufacturers. The Debtor plans to focus its operations solely on completing the development of the Wide Wafer Technology, which then may be used to manufacture wafers to be sold to other cell or panel manufacturers or licensed to other cell or panel manufacturers. Evergreen expects that its Wide Wafer Technology will permit the manufacturing of wafers at substantially lower cost than wafers manufactured by alternative methodologies and therefore expects significant demand for its Wide Wafer Technology.

7.     The factual background relating to the Debtor's commencement of this chapter 11 case is set forth in detail in the *Declaration of Michael El-Hillow, Chief Executive Officer of the Debtor, in Support of First Day Pleadings* (the "El-Hillow Declaration") filed contemporaneously with this Motion and incorporated herein by reference.[2]

## Relief Requested

8.     By this Motion, pursuant to sections 105(a), 363, 507(a) and 541 of the Bankruptcy Code, the Debtor seeks authority to pay, in accordance with the Cash Collateral Order, prepetition Taxes owed to the Taxing Authorities (as defined below), including, without limitation, Taxes subsequently determined upon audit to be owed for periods prior to the Petition Date. The Debtor requests authority to make such payments in an aggregate amount (excluding amounts paid prepetition by checks that have not yet cleared on the Petition Date) not to exceed $345,000.00, which is the aggregate maximum sum that the Debtor currently believes may be

---

[2]  Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the El-Hillow Declaration.

due on account of prepetition Taxes incurred in the period immediately preceding the Petition Date.[3]

9.      In addition, to the extent any check issued or electronic transfer initiated prior to the Petition Date to satisfy any prepetition obligation on account of Taxes has not cleared the applicable banks or financial institutions (the "Banks") as of the Petition Date, the Debtor requests the Court to authorize the applicable Banks, when requested by the Debtor in its sole discretion, to receive, process, honor, and pay such checks or electronic transfers initiated prior to the Petition Date, provided that there are sufficient funds available in the applicable accounts to make such payments.  The Debtor also seeks authorization to issue replacement checks, or to provide for other means of payment to the Taxing Authorities, to the extent necessary to pay such Taxes outstanding and owing for periods prior to the Petition Date.

10.      Pursuant to Bankruptcy Rule 6003(b), "a motion to pay all or part of a claim that arose before the filing of the petition" shall not be granted by the Court within 20 days of the Petition Date "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm . . . ."  Fed. R. Bankr. P. 6003(b).  For the reasons described herein and as supported by the El-Hillow Declaration, the Debtor submits that the requirements of Bankruptcy Rule 6003 have been met and that the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtor and its estate.  To implement the foregoing successfully and insure the Debtor's operations are not disrupted, the Debtor seeks a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the ten-day stay of an order

---

[3] Nothing in this Motion shall be deemed to constitute an admission to any asserted liability or obligation with respect to any Tax.  The Debtor reserves any and all rights to contest any Tax asserted against them by any Taxing Authority.

authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h), to the extent these rules are applicable.

## The Debtor's Taxes

11.     In connection with the normal operations of its business, the Debtor collects and incur various Taxes, which the Debtor remits to various federal, state, and local taxing authorities (collectively, the "Taxing Authorities").  The Debtor incurs certain corporate franchise taxes based on assessment from the appropriate state authority.  The Debtor incurs real property taxes in connection with certain properties of its business.  The Debtor also incurs certain self-assessed use taxes as part of its business.

12.     Because of the timing of these collections and the associated payments, the Debtor believes that it has not turned over the total amount of Taxes collected on behalf of the Taxing Authorities.  As of the Petition Date, the Debtor believes that it may owe up to approximately $345,000.00 in Taxes, broken down as $750.00 in unremitted prepetition use taxes, $36,000.00 in unremitted prepetition corporate franchise taxes, and $307,788.00 in unremitted prepetition real property taxes.

13.     The Debtor hereby requests the authority to pay, in accordance with the Cash Collateral Order, the prepetition Taxes that may have accrued during the prepetition period and become due and owing, in an aggregate amount not to exceed $345,000.00.  In addition, the Debtor requests authority to pay prepetition Taxes that are currently under review or that may be subject to review in the future, but for which no formal assessment has been made, subject to compliance with the Cash Collateral Order.  The Debtor reserves all rights to contest such

amounts.  Through this Motion, the Debtor seeks authority to negotiate, compromise and pay any

Taxes subsequently determined to be owed for prepetition periods, subject to compliance with

the Cash Collateral Order.  Any amounts that are actually due, but have not yet been paid to the

Taxing Authorities because of this case, represent a small fraction of the Debtor's total assets.

Further, some, if not all, of the Taxing Authorities may cause the Debtor to be audited if the

Taxes are not paid immediately or may attempt to take action against the Debtor's officers and

directors.  Such audits will unnecessarily divert the Debtor's attention away from its efforts in

this chapter 11 case.  If the Debtor does not pay such amounts in a timely manner, the Taxing

Authorities may attempt to suspend the Debtor's operations, file liens, and seek to lift the stay or

pursue other remedies that will harm the estate.

## Basis For Requested Relief

14.     Numerous grounds exist to authorize the payment of the prepetition Taxes,

which payments are critical to the Debtor's continued and uninterrupted operations.  The grounds

include the following: (i) amounts collected on account of certain Taxes are not property of the

estate under section 541(d) of the Bankruptcy Code; (ii) portions of the Taxes may be entitled to

priority status pursuant to section 507(a)(8) of the Bankruptcy Code; (iii) governmental entities

may sue the Debtor's directors and officers, which will distract them from the Debtor's sale

efforts; and (iv) sections 105(a) and 363(b) of the Bankruptcy Code permit the Court to grant the

relief sought.

## A.      Certain Taxes are Not Property of the Debtor's Estate

15.     To the extent that the Debtor has collected sales and use taxes from third

parties, the Debtor submits that such amounts are not part of the Debtor's estate under section

541(a) of the Bankruptcy Code; rather, such amounts constitute "trust fund" taxes that are held for the benefit of the Taxing Authorities. *See Begier v. Internal Revenue Service*, 496 U.S. 53 (1990) (taxes such as excise taxes, FICA taxes and withholding taxes are property held by a debtor in trust for another, and as such, do not constitute property of the estate); *City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95 (3d Cir. 1994); *In re Al Copeland Enterprises, Inc.*, 991 F.2d 233 (5th Cir. 1993) (debtor's prepetition collection of sales taxes and interest on the tax were held subject to trust for the state and were not property of the estate). Accordingly, because payment of the sales and use taxes contemplated herein does not implicate property of the estate, such payments will not otherwise be available to the Debtor's estate or its creditors.

16.     Moreover, many state statutes, including those of certain states in which the Debtor does business, hold officers and directors of collecting entities personally liable for sales and use taxes owed by those entities. To the extent that any sales and use taxes remain unpaid by the Debtor, the officers and directors of the Debtor may be subject to lawsuits during the pendency of this Chapter 11 case. *See, e.g.*, MASS. GEN. LAWS ch. 62C, § 31A (2010). Any such lawsuit (and the ensuing potential liability) would distract the Debtor and its officers and directors in their attempt to implement a successful reorganization strategy, to the detriment of all parties in interest in this chapter 11 case, and could result in indemnification claims.

**B.     Certain Taxes are Entitled to Priority Status under the Bankruptcy Code**

17.     In addition, it is likely that some of the Taxes are entitled to priority status pursuant to 11 U.S.C. § 507(a)(8). *See* 11 U.S.C. § 507(a)(8)(A) (taxes measured on gross

income); 11 U.S.C. § 507(a)(8)(C) ("trust fund" taxes); 11 U.S.C. § 507(a)(8)(E) (excise taxes).[4]

Under any plan of reorganization, these priority Taxes must be paid in full and in regular cash

installments over no more than a five-year period from the date of the order for relief. *See* 11

U.S.C. § 1129(a)(9)(C)(i)-(ii). Additionally, such priority Taxes must be paid in the order of

priority no less favorable than the treatment given to the most favored general unsecured claims.

*See* 11 U.S.C. § 1129(a)(9)(C)(iii). Finally, any plan of reorganization must provide the same

treatment of those Taxes that constitute secured claims that, were they unsecured, would have

been priority tax claims under 11 U.S.C. § 507(a)(8). *See* 11 U.S.C. § 1129(a)(9)(D). Thus, in

many cases, the payment of the Taxes that are entitled to such priority in the ordinary course of

the Debtor's business only affects the timing of the payment and does not prejudice the rights of

other creditors of the Debtor.

18.     Courts have also authorized debtors to pay the types of taxes described in

this Motion under section 363(b)(1) of the Bankruptcy Code, which provides that "the trustee,

after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business,

property of the estate." Under such section, a court may authorize a debtor to pay certain

prepetition claims. *See In re FV Steel & Wire Co.*, Case No. 04-22421 (Bankr. E.D. Wis. Feb.

26, 2004) (authorizing the continuation of customer programs and the payment of prepetition

claims under section 363 of the Bankruptcy Code); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174,

---

[4] For bankruptcy purposes, a tax is characterized as (1) an involuntary pecuniary burden, regardless of name, laid upon the individual or property; (2) imposed by, or under authority of the legislature; (3) for the public purposes, including the purposes of defraying expenses of government or undertakings authorized by it; and (4) under the police or taxing power of the state. *In re United Healthcare Systems Inc.*, 396 F.3d 247 (3d Cir. 2005) (*citing In re Lorber Indus. of Cal. Inc.*, 675 F.2d 1062 (9th Cir. 1982); *see also In re Chateaugay Corp.*, 53 F.3d 478, 498 (2d Cir. 1995) (citation omitted).

175 (Bankr. S.D.N.Y. 1989) (affirming lower court order authorizing payment of prepetition wages pursuant to section 363(b) of the Bankruptcy Code); *In re UAL Corp.*, Case No. 02-48191 (Bankr. N.D. Ill. Dec. 9, 2002) (authorizing payment of prepetition claims under section 363 of the Bankruptcy Code as an out-of-the-ordinary-course transaction). To do so, "the debtor must articulate some business justification, other than the mere appeasement of major creditors." *Ionosphere Clubs*, 98 B.R. at 175. As discussed herein, the Debtor's failure to pay the Taxes could have a material adverse impact on its ability to operate in the ordinary course of business.

19.     Nothing in this Motion should be construed as impairing the Debtor's rights to contest the amount or priority of any Taxes that may be asserted by any Taxing Authority, and the Debtor expressly reserves all its rights with respect thereto.

**C.      Non-Payment of Taxes
         Would be Detrimental to Debtor's Estate.**

20.     Payment of the Taxes is critical to the Debtor's continued, uninterrupted operations. Non-payment of the Taxes may cause the Taxing Authorities to take precipitous actions, including but not limited to, conducting audits, filing liens, seeking to impose liability against the Debtor and its directors and officers, and, if applicable, seeking to lift the automatic stay, all of which would disrupt the Debtor's day-to-day operations and could potentially impose significant costs on the Debtor's estate. Payment of the Taxes will avoid these unnecessary and potentially costly governmental actions.

**D.      Payment of the Taxes Is Authorized
         Under Sections 105, 362, 363, 1107 and the Necessity of Payment Doctrine**

21.     The relief requested in this Motion is supported by several provisions of the Bankruptcy Code that authorize a debtor to honor prepetition obligations in certain

circumstances. Courts have recognized each of these statutory provisions as valid authority for such payments. For instance, courts have found a basis for allowing debtors to make payments to creditors under section 363 of the Bankruptcy Code. *See, e.g., In re UAL Corp.*, Case No. 02-48 191 (ERW) (Bankr. N.D. Ill. Dec. 11, 2002). Authority for such payments also may be found in sections 1107(a) and 1108 of the Bankruptcy Code, which vest debtors in possession with authority to continue operating their business. Sometimes this duty and the concomitant fiduciary duty to maximize estate value may be fulfilled only through the pre-plan payment of certain unsecured claims. *See, e.g., In re Mirant Corp.*, 296 BR. 427 (Bankr. N.D. Tex. 2003); *In re CoServ. L.L.C.*, 273 BR. 487, 498 (Bankr. N.D. Tex. 2002).

22.     Further, section 105(a) of the Bankruptcy Code provides that "(t)he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." *See* 11 U.S.C. § 105(a). The purpose of section 105(a) is to assure the bankruptcy court's power "to take whatever action is appropriate or necessary in aid of the exercise of their jurisdiction." *See* 2 COLLIER ON BANKRUPTCY, ¶105.01, at 105-5 to 105-6 (15th ed. rev. 2001). Thus, section 105 essentially codifies the bankruptcy court's inherent equitable powers. *See Management Tech. Corp. v. Pardo*, 56 B.R. 337, 339 (Bankr. D.N.J. 1985) (noting that the court's equitable power is derived from section 105).

23.     Numerous courts have used section 105 equitable powers under the "necessity of payment doctrine" to authorize payment of a debtor's prepetition obligations where, as here, such payment is necessary to effectuate the "paramount purpose" of a chapter 11 reorganization. *See In re Lehigh & New England Rv. Co.*, 657 F.2d 570, 581 (3d Cir. 1981); *In*

*re Ionosphere Clubs, Inc.,* 98 B.R. at 176-77 (citing *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 528 (1984)). This doctrine, first articulated by the United States Supreme Court in *Miltenberger v. Logansport, C.& S.W.R. Co.*, 106 U.S. 286, 311-312 (1882), recognizes the existence of judicial power to authorize a debtor in a reorganization case to pay prepetition claims where such payment is essential to the continued operation of the debtor.

24.  In numerous chapter 11 cases, bankruptcy courts in this District have exercised their equitable powers under section 105(a) of the Bankruptcy Code to authorize debtors to pay their obligations for prepetition taxes. *See, e.g., In re Nebraska Book Co., Inc.*, Case No. 11-12005 (PJW) (Bankr. D. Del. June 28, 2011); *In re Consolidated Horticulture Group LLC.*, Case No. 10-13308 (CSS) (Bankr. D. Del. Oct. 14, 2010); *In re Point Blank Solutions, Inc., et al.*, Case No. 10-11255 (PJW) (Bankr. D. Del. Apr. 16, 2010); *In re Champion Enterprises, Inc., et al.*, Case No. 09-14019 (KG) (Bankr. D. Del. Nov. 17, 2009); *In re Tropicana Entm't, LLC*, Case No. 08-10856 (KJC) (Bankr. D. Del. May 6, 2008); *In re Aegis Mortgage Corp.* (BLS) (Bankr. D. Del. Aug. 15, 2007). The Debtor submits that the present circumstances warrant similar relief in this chapter 11 case to preserve the Debtor's assets and avoid business interruption.

## Notice

25.  Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known: (i) the Office of the United States Trustee; (ii) the Debtor's prepetition secured lenders; (iii) Maslon Edelman Borman & Brand, LLP, 3300 Wells Fargo Center, 90 South Seventh Street, Minneapolis, MN 55402-4140, Attn: Clark T. Whitmore, Esq.

(clark.whitmore@maslon.com), as counsel to the Indenture Trustee; (iv) Akin Gump Strauss

Hauer & Feld LLP, One Bryant Park, New York, New York 10036, Attn: Michael S. Stamer

(mstamer@akingump.com), as counsel to the Supporting Noteholders.  As the Motion is seeking

"first day" relief, within two business days of the hearing on the Motion, the Debtor will serve

copies of the Motion and any order entered respecting the Motion as required by Del. Bankr. LR

9013-1(m).  The Debtor submits that, in light of the nature of the relief requested, no other or

further notice need be given.

### No Prior Request

26.     No prior motion for the relief requested herein has been made to this or

any other court.

WHEREFORE, the Debtor respectfully requests that this Court enter an order,

substantially in the form attached hereto, granting the relief requested herein and such other or

further relief as this Court deems appropriate.


Dated:  August ___, 2011                     PACHULSKI STANG ZIEHL & JONES LLP


_____
Laura Davis Jones (Bar No. 2436)
Timothy P. Cairns (Bar No. 4228)
Peter J. Keane (Bar No. 5503)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile:  (302) 652-4400
E-mail:  ljones@pszjlaw.com
          tcairns@pszjlaw.com
          pkeane@pszjlaw.com

-and-

BINGHAM MCCUTCHEN LLP
Ronald J. Silverman (*pro hac vice* pending)
Scott K. Seamon (*pro hac vice* pending)
399 Park Avenue
New York, NY  10022-4689
Telephone: (212) 705-7868
Facsimile:  (212) 508-1407
E-mail:  ronald.silverman@bingham.com
         scott.seamon@bingham.com

[Proposed] Counsel to Debtor and
Debtor in Possession

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| EVERGREEN SOLAR, INC.[1] | ) | Case No. _____ (___) |
| | ) | |
| Debtor. | ) | **Related Docket No. ____** |

**ORDER (I) AUTHORIZING THE DEBTOR TO
PAY CERTAIN TAXES IN THE ORDINARY COURSE OF BUSINESS AND (II)
AUTHORIZING BANKS AND FINANCIAL INSTITUTIONS TO
HONOR AND PROCESS CHECKS AND TRANSFERS RELATED THERETO**

Upon consideration of the motion (the "Motion")[2] filed by the above captioned

debtor and debtor in possession (the "Debtor"), for an *Order (I) Authorizing the Debtor to Pay*

*Certain Taxes in the Ordinary Course of Business and (II) Authorizing Banks and Financial*

*Institutions to Honor and Process Checks and Transfers Related Thereto*; and it appearing that

the Court has jurisdiction over this matter; and it appearing that notice of the Motion as set forth

therein is sufficient under the circumstances, and that no other or further notice need be

provided; and it further appearing that the relief requested in the Motion is in the best interests of

the Debtor and its estate and creditors; and due and adequate notice of the Motion having been

given under the circumstances; and it appearing that the requirements of Rule 6003 of the

Federal Rules of Bankruptcy Procedure have been satisfied; and upon all of the proceedings had

before the Court; and after due deliberation and sufficient cause appearing therefore, it is hereby

ORDERED that the Motion is GRANTED; and it is further

---

[1] The last four digits of the Debtor's federal tax identification number are 2254. The Debtor's mailing address is 138 Bartlett Street, Marlboro, MA 01752.

[2] Capitalized terms not otherwise defined shall have the meaning ascribed to them in the Motion.

ORDERED that the Debtor is authorized, in its sole discretion, to pay, in the ordinary course of business, subject to compliance with the Cash Collateral Order, all prepetition Taxes to the applicable Taxing Authorities hereto, including, without limitation, all payments that remained un-cashed prior to the Petition Date or that are otherwise returned by a Taxing Authority, as well as all Taxes subsequently determined upon audit to be owed for periods prior to the Petition Date; and it is further

ORDERED that the Debtor's payment of prepetition Taxes owed to Taxing Authorities as authorized herein (excluding amounts paid prepetition that may not have cleared on the Petition Date) shall not exceed $345,000.00 in the aggregate unless otherwise ordered by the Court; and it is further

ORDERED the Debtor is authorized in its discretion, subject to compliance with the Cash Collateral Order, to pay Taxes that are currently under review or that may be subject to review in the future, but for which no formal assessment has been made, subject in all respects to the Debtor's rights to contest any such amounts. The Debtor is authorized in its discretion to negotiate, compromise and pay any Taxes subsequently determined to be owed for prepetition periods, subject to compliance with the Cash Collateral Order.

ORDERED that all applicable Banks shall be, and hereby are, authorized, when requested by the Debtor in its sole discretion, to receive, process, honor, and pay any and all checks or electronic transfers drawn on the Debtor's accounts to pay the Taxes, whether those checks were presented prior to or after the Petition Date, provided that sufficient funds are available in the applicable accounts to make the payments; and it is further

ORDERED that nothing in the Motion or this Order shall be construed as impairing the Debtor's rights to contest the validity, priority or amount of Taxes that may be due to any Taxing Authorities, as the case may be; and it is further

ORDERED that the requirements set forth in Bankruptcy Rule 6003(b) are satisfied by the contents of the Motion; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation of this Order.

Dated: _____, 2011

_____
United States Bankruptcy Judge

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| EVERGREEN SOLAR, INC.,[1] | ) | Case No. 11-_____ (___) |
| | ) | |
| Debtor. | ) | |

**DEBTOR'S MOTION FOR ORDER UNDER SECTION 366 OF THE
BANKRUPTCY CODE (A) PROHIBITING UTILITY PROVIDERS FROM
ALTERING, REFUSING OR DISCONTINUING SERVICE; (B) DEEMING UTILITIES
ADEQUATELY ASSURED OF FUTURE PERFORMANCE; AND (C) ESTABLISHING
PROCEDURES FOR DETERMINING ADEQUATE ASSURANCE OF PAYMENT**

The debtor and debtor in possession in the above captioned case (the "Debtor") as

and for its motion for entry of an order: (a) prohibiting the Utility Providers (defined below)

from altering, refusing or discontinuing service; (b) deeming the Utility Providers adequately

assured of future performance; and (c) establishing procedures for determining additional

adequate assurance of future payment (the "Motion") respectfully represents as follows:

**Jurisdiction**

1.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157

and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper before

this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for the relief requested herein are sections 105(a)

and 366 of title 11 of the United States Code (the "Bankruptcy Code").

---

[1]  The last four digits of the Debtor's federal tax identification number are 2254.  The Debtor's mailing address is
138 Bartlett Street, Marlboro, MA 01752.

## Background

3. On the date hereof (the "Petition Date"), the Debtor commenced this case by filing a voluntary petition for relief under chapter 11 the Bankruptcy Code.

4. The Debtor has continued in possession of its property and has continued to operate and manage its business as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner or committee has been appointed in the Debtor's chapter 11 case.

5. The Debtor has historically developed and manufactured multi-crystalline silicon wafers (known as String Ribbon ™ wafers) utilizing its proprietary wafer manufacturing technology. Those String Ribbon wafers are then converted into photovoltaic solarcells, which are used to produce Evergreen-branded solar panels or solar modules. Evergreen's technology involves a unique process of producing multi-crystalline silicon wafers by growing thin strips of silicon that are then cut into wafers using lasers, substantially reducing the amount of silicon and other processing costs required to produce a wafer as compared to conventional wafer manufacturing methods.

6. More recently, the Debtor has focused its efforts on developing technology for the production of an industry standard size wafer ("Wide Wafer Technology"), which can be supplied to the world's leading solar cell and panel manufacturers. The Debtor plans to focus its operations solely on completing the development of the Wide Wafer Technology, which then may be used to manufacture wafers to be sold to other cell or panel manufacturers or licensed to other cell or panel manufacturers. Evergreen expects that its Wide

Wafer Technology will permit the manufacturing of wafers at substantially lower cost than wafers manufactured by alternative methodologies and therefore expects significant demand for its Wide Wafer Technology.

7.     The factual background relating to the Debtor's commencement of this chapter 11 case is set forth in detail in the *Declaration of Michael El-Hillow, Chief Executive Officer of the Debtor, in Support of First Day Pleadings* (the "El-Hillow Declaration") filed contemporaneously with this Motion and incorporated herein by reference.[2]

## **Relief Requested**

8.     In the normal course of business, the Debtor has relationships with various utility companies and other providers (each a "Utility Provider" and, collectively, the "Utility Providers") for the provision of electricity, gas, water, and related services (the "Utility Services"). The Utility Providers include, without limitation, the entities set forth on Exhibit A hereto.[3] The Debtor estimates that its average monthly postpetition payments to the Utility Providers will aggregate approximately $353,894.00.

9.     Because uninterrupted Utility Services are critical to the Debtor's ongoing operations, the Debtor, by this Motion and pursuant to sections 105(a) and 366 of the Bankruptcy Code, seeks the entry of an order: (a) prohibiting the Utility Providers from altering, refusing or

---

[2]  Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the El-Hillow Declaration.

[3]  The listing of any entity on Exhibit A hereto is not an admission that any listed entity is a utility within the meaning of section 366 of the Bankruptcy Code. The Debtor reserves the right to assert at any time that any entity listed on Exhibit A is not entitled to adequate assurance pursuant to section 366 of the Bankruptcy Code. The Debtor further reserves the right to terminate the services of any Utility Provider at any time and to seek an immediate refund of any Utility Deposit without giving effect to any right of setoff or claim asserted by a Utility Provider against the Debtor.

discontinuing services; (b) deeming Utility Providers adequately assured of future performance; and (c) establishing procedures for determining additional adequate assurance of future payment.

10.     In order to provide adequate assurance of payment for future services to the Utility Providers, the Debtor proposes to make a deposit (a "Utility Deposit") equal to 50% of the Debtor's estimated cost of its monthly utility consumption for each Utility which the Debtor intends to continue to utilize during the course of this case.  The Debtor will place the aggregate amount of the Utility Deposits into escrow into a newly created, segregated, interest-bearing account (the "Utility Deposit Account") within twenty days after the Petition Date.[4]  The Debtor estimates that the Utility Deposits, in the aggregate, will total approximately $176,947.00.  This amount represents a sum equal to 50% of the Debtor's estimated aggregate monthly costs of Utility Services for all Utility Providers listed on Exhibit A.  Such Utility Deposits will be held in escrow, pending further order of the Court.

11.     In addition, the Debtor seeks to establish reasonable procedures (the "Procedures") by which a Utility Provider may request additional adequate assurance of future payment, in the event that such Utility Provider believes that its Utility Deposit does not provide it with satisfactory adequate assurance.  Such Procedures would provide that:

a.      If a Utility Provider is not satisfied with the assurance of future payment provided by the Debtor pursuant to the proposed Utility Deposit, the Utility Provider must serve a written request (the "Request") upon the Debtor setting forth the location(s) for which Utility Services are provided, the account number(s) for such location(s), the outstanding balance for each account, a summary of the Debtor's average utility usage over the past twelve months, and

---

[4]  The Utility Deposit Account will be maintained with a minimum balance equal to 50% of the Debtor's estimated aggregate monthly cost of utility services, which may be adjusted by the Debtors from time to time if the Debtor's estimated cost of utility services materially increases or decreases.

an explanation of why the Utility Deposit is inadequate assurance of payment;

b.  The Request must be actually received by the Debtor and Debtor's counsel, Bingham McCutchen LLP, 399 Park Avenue, New York, NY 10022 (Attn: Scott K. Seamon, Esq.) within forty-five days of the date of the interim order granting this Motion (the "Request Deadline");

c.  Without further order of the Court, the Debtor may enter into agreements granting additional adequate assurance to a Utility Provider serving a timely Request, if the Debtor, in its discretion, determine that the Request is reasonable;

d.  If the Debtor believes that a Request is unreasonable and is otherwise unable to come to agreement with the Utility making the Request, then the Debtor shall, within thirty days after the Request Deadline, file a motion pursuant to section 366(c)(2) of the Bankruptcy Code (a "Determination Motion"), seeking a determination from the Court that the Utility Deposit, plus any additional consideration offered by the Debtor, constitutes adequate assurance of payment. Pending notice and a hearing on the Determination Motion, the Utility Provider that is the subject of the unresolved Request may not alter, refuse, or discontinue services to the Debtor nor recover or setoff against a prepetition deposit; and

e.  Any Utility Provider that fails to make a timely Request shall be barred from contending that the Utility Deposit does not provide adequate assurance of payment.

12.  If the Debtor supplements the list in Exhibit A hereto subsequent to the filing of this Motion, the Debtor will serve a copy of this Motion and the signed order granting the Motion (the "Order") on any Utility Provider that is added to the list by such a supplement (the "Supplemental Service"). In addition, the Debtor will also add an amount equal to 50% of the estimated cost of monthly utility consumption for the added Utility Provider to the Utility Deposit Account. Concurrently with the Supplemental Service, the Debtor will file with the Court a supplement to Exhibit A adding the name of the Utility Provider so served. The added

Utility Provider shall have thirty days from the date of service of this Motion and the Order to make a Request.

13. The Debtor further requests that the Order provide that the Debtor may terminate the services of any Utility Provider by providing written notice (a "Termination Notice") to the Utility Provider. Upon receipt of a Termination Notice by a Utility Provider, pursuant to the relief requested by the Debtor herein, the Utility Provider shall immediately refund any Utility Deposit to the Debtor, without giving effect to any rights of setoff or any claims the Utility Provider may assert against the Debtor. The Debtor believes that the immediate refund of a Utility Deposit by a Utility Provider whose services are terminated is fair and appropriate under the circumstances because the Utility Provider would no longer require adequate assurance of future payment by the Debtor.

14. Pursuant to Rule 6003(b) of the Federal Rules of Bankruptcy Procedure, "a motion to pay all or part of a claim that arose before the filing of the petition" shall not be granted by the Court within 21 days of the Petition Date "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm . . . ." Fed. R. Bankr. P. 6003(b). Because the Utilities may attempt to terminate the Debtor's postpetition utility services within the period set forth in section 366(c)(2) of the Bankruptcy Code, and for the reasons set forth in the El-Hillow Declaration, the Debtor submits that the requirements of Rule 6003 have been met and that the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtor and its estate. To implement the foregoing successfully and insure the Debtor's utility service is not interrupted, the Debtor seeks a waiver of the notice requirements under

Bankruptcy Rule 6004(a) and the ten-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h), to the extent these rules are applicable.

### Basis For Relief

15.     Congress enacted section 366 of the Bankruptcy Code to protect a debtor from utility service cutoffs upon a bankruptcy filing while, at the same time, to provide utility companies with adequate assurance that the debtor will pay for postpetition services.  *See* H.R. Rep No. 95-595, at 350 (1978) *reprinted in* 1978 U.S.C.C.A.N. 5963, 6306.  Accordingly, section 366 protects a debtor by enjoining utilities from altering, refusing or discontinuing services solely on account of unpaid prepetition amounts for a period of thirty days after the bankruptcy filing.  Section 366 also protects utility providers by permitting them to alter, refuse or discontinue service after thirty days if the debtors have not furnished "adequate assurance" of payment.

16.     Section 366(c), which was enacted as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (the "BAPCPA"), significantly modified the existing statutory framework.  It has two primary purposes.  First, it permits a utility to alter, refuse, or discontinue utility service if a debtor has not provided "satisfactory" adequate assurance within thirty days of its bankruptcy filing, subject to the court's ability to modify the amount of adequate assurance.  Second, it also restricts the factors that a court can consider when determining whether an adequate assurance payment is, in fact, adequate.  Specifically, courts may no longer consider (i) the absence of a security deposit before the debtor's petition date, (ii) the debtor's history of timely payments, or (iii) the availability of an administrative expense

priority when determining the amount of a deposit. Notwithstanding these changes, it does not appear that Congress intended to -- or did -- abrogate the bankruptcy court's right to determine the amount of adequate assurance necessary or change the fundamental requirement that assurance of payment must simply be "adequate."

17. First, while section 366(c) does limit the factors a court can consider when determining whether a debtor has provided adequate assurance of payment, it does not limit the court's ability to determine the amount of payment necessary, if any, to provide such adequate assurance. Instead, section 366(c) gives courts the same discretion in determining the amount of payment necessary for adequate assurance as they previously had under section 366(b). *Compare* 11 U.S.C. § 366(b) (2005) ("On request of a party in interest and after notice and a hearing, the court may order reasonable modification of the amount of the deposit or other security necessary to provide adequate assurance") *with* 11 U.S.C. § 366(c)(3)(A) (2005) ("On request of a party in interest and after notice and a hearing, the court may order modification of the amount of an assurance payment under paragraph (2)"). It is well established that section 366(b) permits a court to find that no adequate assurance payment at all is necessary to provide a utility with adequate assurance of payment. *See Virginia Elec. and Power Co. v. Caldor, Inc.*, 117 F.3d 646, 650 (2d Cir. 1997) ("Even assuming that 'other security' should be interpreted narrowly,… a bankruptcy court's authority to 'modify' the level of the 'deposit or other security,' provided for under § 366(b), includes the power to require 'no deposit or other security' where none is necessary to provide a utility supplier with 'adequate assurance of payment'"). This may be particularly true in cases where debtors have made prepetition deposits

or prepayments for services that utilities will ultimately render postpetition.  11 U.S.C.

§ 366(c)(1)(A)(v) (recognizing a prepayment for postpetition services as adequate assurance).

Accordingly, courts continue to have discretion to determine the amount and form of adequate

assurance payments.

18.     Additionally, section 366(c), like section 366(b), simply requires that a

utility's assurance of payment be "adequate."  Courts have long recognized that adequate

assurance of performance does not constitute an absolute guarantee of a debtor's ability to pay.

*In re Caldor, Inc.*, 199 B.R. 1, 3 (S.D.N.Y. 1996) (section 366(b) "does not require an 'absolute

guarantee of payment'"); *In re Steinebach v. Tucson Elec. Power Co. (In re Steinebach)*, 303 B.R.

634, 641 (Bankr. D. Ariz. 2004) ("Adequate assurance of payment is not, however, absolute

assurance… all § 366(b) requires is that a utility receive only such assurance of payment as is

necessary to protect its interests given the facts of the debtor's financial circumstances").  Courts

have also recognized that in determining the amount of adequate assurance, bankruptcy courts

should "'focus upon the need of the utility for assurance, and to require that the debtor supply *no

more than that*, since the debtor almost perforce has a conflicting need to conserve scarce

financial resources.'"  *Virginia Elec. & Power Co.*, 117 F.3d at 650 (quoting *In re Penn Jersey

Corp.*, 72 B.R. 981, 985 (Bankr. E.D. Pa 1987) (emphasis by Second Circuit)).

19.     The essence of the Court's inquiry in determining whether a given

assurance of payment is in fact "adequate" is an examination of the totality of the circumstances

in making an informed judgment as to whether utilities will be subject to an unreasonable risk of

nonpayment.  *Adelphia*, 280 B.R. at 82-83; *see also In re Magnesium Corp. of Am.*, 278 B.R. 698, 714 (Bankr. S.D.N.Y. 2002) (quoting *Penn Jersey*).

20.     Here, the Debtor proposes to make Utility Deposits in order to provide adequate assurance to the Utility Providers.  Under the circumstances of this case, the Debtor believes that the proposed Utility Deposits constitute adequate assurance of payment under section 366(c) of the Bankruptcy Code.  Moreover, the Debtor proposes to protect the Utility Providers further by establishing the Procedures provided for herein, whereby any Utility Provider can request additional adequate assurance in the event that it believes there are facts and circumstances with respect to its providing postpetition services to the Debtor that would merit greater protection.

21.     The Debtor cannot continue to operate without continued Utility Services. If any of the Utility Providers alter, refuse or discontinue service, even for a brief period, the Debtor's business operations would be severely disrupted.  In contrast, the Utility Providers will not be prejudiced by the continuation of their services and will be paid all postpetition utility charges.  It is therefore critical that Utility Services continue uninterrupted.

22.     Additionally, this Court has the authority to grant the relief requested herein pursuant to section 105(a) of the Bankruptcy Code which provides that the Court "may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  The purpose of section 105(a) is to assure the bankruptcy court's power "to take whatever action is appropriate or necessary in aid of the exercise of their jurisdiction." 2 COLLIER ON BANKRUPTCY ¶ 105.01, at 105-5 to 105-6 (15th rev. ed. 2009).

Because the proposed Procedures protect the Debtor without materially prejudicing the Utility

Providers, they carry out section 366 in a manner fully consistent therewith and are an

appropriate exercise of this Court's authority under section 105(a) of the Bankruptcy Code.

23.     Similar relief has been granted in other cases in this District.  *See, e.g., In

re Nebraska Book Co., Inc.*, Case No. 11-12005 (PJW) (Bankr. D. Del. July 21, 2011); *In re

Consolidated Horticulture Group LLC.*, Case No. 10-13308 (CSS) (Bankr. D. Del. Nov. 1,

2010); *In re Filene's Basement, Inc.*, Case No. 09-11525 (MFW) (Bankr. D. Del. May 5, 2009);

*In re NetEffect, Inc.*, Case No. 08-12008 (KJC) (Bankr. D. Del. Aug. 28, 2008); *In re Aegis

Mortgage Corp.*, Case No. 07-11119 (BLS) (Bankr. D. Del. Aug. 15, 2007).  Moreover, the

rights of the Utility Providers will not be prejudiced should the relief requested herein be

granted, because the Utility Providers are permitted to come before this Court and seek relief

according to the Procedures established herein.

## **Notice**

24.     Notice of this Motion has been given to the following parties or, in lieu

thereof, to their counsel, if known: (i) the Office of the United States Trustee; (ii) the Debtor's

prepetition and postpetition secured lenders; (iii) Maslon Edelman Borman & Brand, LLP, 3300

Wells Fargo Center, 90 South Seventh Street, Minneapolis, MN 55402-4140, Attn: Clark T.

Whitmore, Esq. (clark.whitmore@maslon.com), as counsel to the Indenture Trustee; and (iv)

Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036, Attn:

Michael S. Stamer (mstamer@akingump.com), as counsel to the Supporting Noteholders.

Following the first day hearing in this case, this Motion will be served on (a) creditors holding

the twenty largest unsecured claims against the Debtor, or their legal counsel (if known) and (b) those persons who have requested notice pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure. The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

## No Prior Request

25. No prior motion for the relief requested herein has been made to this or any other Court.

*[Remainder of page intentionally left blank]*

WHEREFORE, the Debtor respectfully requests that this Court enter an interim and final Order, substantially in the form attached hereto, granting the relief requested herein and such other and further relief as this Court deems appropriate.

Dated:  August ___, 2011          PACHULSKI STANG ZIEHL & JONES LLP

_____
Laura Davis Jones (Bar No. 2436)
Timothy P. Cairns (Bar No. 4228)
Peter J. Keane (Bar No. 5503)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile:  (302) 652-4400
E-mail:  ljones@pszjlaw.com
        tcairns@pszjlaw.com
        pkeane@pszjlaw.com

-and-

BINGHAM MCCUTCHEN LLP
Ronald J. Silverman (*pro hac vice* pending)
Scott K. Seamon (*pro hac vice* pending)
399 Park Avenue
New York, NY  10022-4689
Telephone: (212) 705-7868
Facsimile:  (212) 508-1407
E-mail:  ronald.silverman@bingham.com
        scott.seamon@bingham.com

[Proposed] Counsel to Debtor and
Debtor in Possession

# Exhibit A

## Utility Vendors

| Account Number | Provider | Type of Service | Address | Monthly Payment |
|---|---|---|---|---|
| 03809-35017 | National Grid | Electric | PO Box 1005 Woburn, MA 01817 | $814.00 |
| 78373-45013 | National Grid | Electric | PO Box 1005 Woburn, MA 01817 | $155.00 |
| 78374-66026 | National Grid | Electric | PO Box 1005 Woburn, MA 01817 | $26,197.00 |
| 28547-57012 | National Grid | Electric | PO Box 1005 Woburn, MA 01817 | $14,005.00 |
| 65917-59014 | National Grid | Electric | PO Box 1005 Woburn, MA 01817 | $1,006.00 |
| 90843-24013 | National Grid | Electric | PO Box 1005 Woburn, MA 01817 | $394.00 |
| 11393670051 | Nstar | Gas | 1 Nstar Way SW 200 Westwood, MA 02090 | $3,843.00 |
| 28209210013 | Nstar | Gas | PO Box 660369 Dallas, TX 75266-0369 | $1,689.00 |
| 27416070038 | Nstar | Gas | PO Box 660369 Dallas, TX 75266-0369 | $15.00 |

**Exhibit A**

**Utility Vendors**

| Account Number | Provider | Type of Service | Address | Monthly Payment |
|---|---|---|---|---|
| 16545790038 | Nstar | Gas | PO Box 660369 Dallas, TX 75266-0369 | $36.00 |
| 1000 4024 7783 | Consumers Energy   C4000 | Gas | Consumers Energy Lansing, MI 48937-0001 | $5,471.00 |
| 1000 4077 2400 | Consumers Energy   C4000 | Electric | Consumers Energy Lansing, MI 48937-0001 | $36,238.00 |
| 58053-11978 | City of Midland, Treasurer C4000 | Water/Sewer | PO Box 1647 Midland, MI 48641-1647 | $4,339.00 |
| 508-303-3198 | Verizon | Phone | PO Box 1100 Albany, NY 12250-0001 | $91.00 |
| 508-481-1384 | Verizon | Phone | PO Box 1100 Albany, NY 12250-0001 | $896.00 |
| 617-815-9381 | Verizon | Phone | PO Box 1100 Albany, NY 12250-0001 | $1,452.00 |
| 978-266-2200/01 | Verizon | Phone | PO Box 1100 Albany, NY 12250-0001 | $2,686.00 |
| 978-772-0231 | Verizon | Phone | PO Box 1100 Albany, NY 12250-0001 | $536.00 |

# Exhibit A

## Utility Vendors

| Account Number | Provider | Type of Service | Address | Monthly Payment |
|---|---|---|---|---|
| 000824704714 81Y | Verizon | Phone | PO Box 28003<br>Lehigh Valley, PA 18002-8003 | $128.00 |
| 7373337 | Premiere Global | Phone | PO Box 404351<br>Atlanta, GA 30384-4351 | $3,045.00 |
| EVERGR001 | Veroxity/Lightower | Internet | 80 Central Street<br>Boxborough, MA 01719 | $34,948.00 |
| 7020375 | Sprint Email Protection Services | Internet | PO Box 730087<br>Dallas, TX 75373-0087 | $918.00 |
| 13158006 | Sprint Data Services | Internet | PO Box 219623<br>Kansas City, MO 64121-9623 | $682.00 |
| 00100000103620 | XO Communications | Internet | 8851 Sandy Parkway<br>Sandy, UT 84070 | $1,391.00 |
| 672716,672953,675269 | Metropolitan Communications C4000 | Phone | PO Box 1056<br>New York, NY 10268-1056 | $2,026.00 |
| 734-0051784-1734-0 | Waste Management C4000 | Trash | 48797 Alpha Drive Ste 150<br>Wixom, MI 48393 | $147.00 |
| 824089012 | AT&T Mobility | Cell Phone | PO Box 6463<br>Carol Stream, IL 60197-6463 | $15,846.00 |

**Exhibit A**

**Utility Vendors**

| Account Number | Provider | Type of Service | Address | Monthly Payment |
|---|---|---|---|---|
| 805843 | Mass Development Finance Agency | Gas | PO Box 55073 Boston, MA 02205 | $74.00 |
| 406116 | Mass Development Finance Agency | Gas | PO Box 55073 Boston, MA 02205 | $22,300.00 |
| 156 | Mass Development Finance Agency | Water/Sewer | 33 Andrews Pkwy Devens, MA 01434 | $14,915.00 |
| 808000181 | Mass Development | Electric | PO Box 55073 Boston, MA 02205 | $66,841.00 |
| 4-132642 | City of Marlborough | Water/Sewer | 140 Main Street Marlboro, MA 01752 | $165.00 |
| 1118281 | ABM Janitorial | Sanitation | 59 Inner Belt Road Somerville, MA 02143 | $9,227.00 |
| 27449 | E.L. Harvey & Sons Inc. | Waste Removal | 68 Hopkington Road Westboro, MA 01581 | $839.00 |
| 458754 | AmSan New England | Sanitation | 804 East Gate Drive Ste 100 Mt. Laurel, NJ 08054 | $90.00 |
| 100057221 | Capgemini | Network hosting | 98836 Collection Drive Chicago, IL 60693 | $35,484.00 |

**Exhibit A**

**Utility Vendors**

| Account Number | Provider | Type of Service | Address | Monthly Payment |
|---|---|---|---|---|
| 100439 | Global Telecom & Tech Americas | Telecom | 8484 Westpark Drive STE 720 McLean, VA 22102 | $44,964.00 |
| | | | **TOTAL** | $353,894.00 |

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| EVERGREEN SOLAR, INC.,[1] | ) | Case No. 11-_____ (___) |
| | ) | |
| Debtor. | ) | **Related Docket No. _____** |

**INTERIM ORDER UNDER SECTION 366 OF THE BANKRUPTCY CODE
(A) PROHIBITING UTILITY PROVIDERS FROM ALTERING, REFUSING
OR DISCONTINUING SERVICE, (B) DEEMING UTILITIES ADEQUATELY
ASSURED OF FUTURE PERFORMANCE, AND (C) ESTABLISHING
PROCEDURES FOR DETERMINING ADEQUATE ASSURANCE OF PAYMENT**

This matter came before the Court on the *Motion of the Debtor for an Order*

*Under Section 366 of the Bankruptcy Code (a) Prohibiting Utility Providers From Altering,*

*Refusing or Discontinuing Service, (b) Deeming Utilities Adequately Assured of Future*

*Performance, and (c) Establishing Procedures for Determining Adequate Assurance of Payment*

(the "Motion").[2]  The Motion was filed by the debtor and debtor in possession in the above

captioned case (the "Debtor") and it shall be promptly served by the Debtor's counsel, together

with a copy of this Interim Order, no later than three (3) business days after entry of this Interim

Order by way of postage prepaid, first class regular mail upon each Utility Provider set forth on

Exhibit A to the Motion and other interested parties.  The Court finds that the relief requested in

the Motion is in the best interest of the Debtor, its estate and creditors and other parties in

---

[1]  The last four digits of the Debtor's federal tax identification number are 2254.  The Debtor's mailing address is 138 Bartlett Street, Marlboro, MA 01752.

interest and that, in light of the record of the hearing on the Motion, the proposed Utility

Deposits and the Procedures provided for by the Motion constitute adequate assurance of

payment to the Utility Providers for their postpetition services. After due deliberation thereon

and sufficient cause appearing therefore; and due and adequate notice of the Motion having been

given under the circumstances; and it appearing that the requirements of Rule 6003 of the

Federal Rules of Bankruptcy Procedure have been satisfied; it is hereby

ORDERED, ADJUDGED AND DECREED THAT:

1.     The Motion is GRANTED, as stated herein, on an interim basis pending a

final hearing thereon, which is hereby scheduled for _____:_____ ____.m. on

_____, 2011, with any objection to be filed and served so as to be received on

or before _____:_____ ____.m. on _____, 2011.

2.     Within twenty (20) days after the Petition Date, the Debtor shall make a

deposit (a "Utility Deposit") equal to 50% of the Debtor's estimated cost of its monthly utility

consumption for each Utility Provider which the Debtor intends to continue to utilize during the

course of this case. The Debtor shall place the Utility Deposits into escrow into a newly created,

segregated, interest-bearing account (the "Utility Deposit Account"). Such Utility Deposits will

be held in escrow, pending further order of the Court.

3.     Except in accordance with the procedures set forth below, absent further

order of the Court, each Utility Provider is prohibited from: (a) altering, refusing or

discontinuing service to, or discriminating against the Debtor solely on the basis of the

commencement of this case or on account of any unpaid invoice for services provided before the

Petition Date; and (b) requiring the payment of any additional deposit or other security in

connection with the Utility Providers' continued provision of utility services, including the

furnishing of electricity, water, and gas, or any other utility service of like kind to the Debtor.

4.     If a Utility Provider is not satisfied with the assurance of future payment

provided by the Debtor in the Motion, then the Utility Provider must serve a written request (the

"Request") upon the Debtor setting forth the location(s) for which Utility Services are provided,

the account number(s) for such location(s), the outstanding balance for each account, a summary

of the Debtor's average utility usage over the past twelve months, and an explanation of why the

Utility Deposit is inadequate assurance of payment.

5.     The Request must be actually received by the Debtor and Debtor's

counsel, Bingham McCutchen LLP, 399 Park Avenue, New York, NY 10022 (Attention: Scott

K. Seamon, Esq.), within forty-five (45) days of the date hereof (the "Request Deadline").

6.     Without further order of the Court, and with the consent of the Supporting

Noteholders (which consent may not be unreasonably withheld), the Debtor may enter into

agreements granting additional adequate assurance to a Utility Provider serving a timely

Request, if the Debtor, in its discretion, determine that the Request is reasonable.

7.     If the Debtor believes that a Request is unreasonable and is otherwise

unable to come to agreement with the Utility making the Request, within thirty (30) days after

the Request Deadline the Debtor shall file a motion pursuant to section 366(c)(2) of the

Bankruptcy Code (a "Determination Motion"), seeking a determination from the Court that the Utility Deposit placed into the Utility Deposit Account for the objecting Utility Provider, plus any additional consideration offered by the Debtor, constitutes adequate assurance of payment. Pending notice and a hearing on the Determination Motion, the Utility Provider that is the subject of the unresolved Request may not alter, refuse, or discontinue services to the Debtor, nor exercise any set off against the Utility Deposit.

8.      Any Utility Provider that fails to make a timely Request shall be deemed to be satisfied that the Utility Deposit constitutes adequate assurance of payment.

9.      The Debtor may supplement the list of Utility Providers on <u>Exhibit A</u> to the Motion.  If the Debtor supplements the list subsequent to the filing of the Motion, the Debtor will serve a copy of the Motion and this Order on any Utility Provider that is added to the list by such a supplement (the "Supplemental Service").  In addition, the Debtor shall place a Utility Deposit in the amount of 50% of the estimated cost of monthly utility consumption for the added Utility Provider into the Utility Deposit Account.  Any subsequently added Utility Provider set forth on a supplement to <u>Exhibit A</u> to the Motion shall fall within the scope of this Order from the date of the filling of the supplemental <u>Exhibit A</u>.  Such an added Utility Provider shall have thirty (30) days from the date of service of the Motion and the Order to make a Request.  If such Request is made, the Debtor and the Utility Provider making the Request shall be bound by the Procedures set forth herein, as applicable.

10.     The Debtor may terminate the services of any Utility Provider by providing written notice (a "Termination Notice") to the Utility Provider.  The Debtor's rights to oppose any setoff or claims of the Utility Providers are reserved.

11.     Payments pursuant to this Motion, if any, will be made pursuant to the Cash Collateral Order.

12.     Nothing in this order shall be deemed to vacate or modify any other restrictions on the termination of service by a Utility Provider as provided by sections 362 and 365 of the Bankruptcy Code or other applicable law.  Nothing herein or in the Motion shall constitute postpetition assumption or adoption of any agreement pursuant to section 365 of the Bankruptcy Code, nor shall anything herein be deemed a waiver by the Debtor or any other party of any rights with respect to the assumption or rejection of an executory contract.


Dated: _____, 2011          _____
                                                United States Bankruptcy Judge

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| EVERGREEN SOLAR, INC.,[1] | ) | Case No. 11-_____ (___) |
| | ) | |
| Debtor. | ) | **Related Docket No. _____** |

**FINAL ORDER (A) PROHIBITING UTILITY PROVIDERS FROM ALTERING, REFUSING OR DISCONTINUING SERVICE, (B) DEEMING UTILITIES ADEQUATELY ASSURED OF FUTURE PERFORMANCE, AND (C) ESTABLISHING PROCEDURES FOR DETERMINING ADEQUATE ASSURANCE OF PAYMENT**

This matter came before the Court on the *Motion of the Debtor for an Order Under Section 366 of the Bankruptcy Code (a) Prohibiting Utility Providers From Altering, Refusing or Discontinuing Service, (b) Deeming Utilities Adequately Assured of Future Performance, and (c) Establishing Procedures for Determining Adequate Assurance of Payment* (the "Motion") filed by the above-captioned debtor and debtor in possession (the "Debtor"). On August ___, 2011, the Court entered an order granting the Motion, on an interim basis (the "Interim Order") and scheduled a final hearing on the Motion for _____, 2011 at ____:____ ___.m. (the "Final Hearing"). A copy of the Interim Order is annexed hereto as Exhibit 1. The Court finds that the relief requested in the Motion is in the best interest of the Debtor, its estate and creditors and other parties in interest and that, in light of the record of the

---

[1] The last four digits of the Debtor's federal tax identification number are 2254. The Debtor's mailing address is 138 Bartlett Street, Marlboro, MA 01752.

hearing on the Motion, the Utility Deposits and the Procedures provided for by the Motion constitute adequate assurance of payment of the Utility Providers for their postpetition services. After due deliberation thereon and sufficient cause appearing therefor it is hereby ORDERED, ADJUDGED AND DECREED THAT:

13.     The Motion is GRANTED on a final basis, as provided herein.

14.     The procedures set forth in paragraphs 3 through 11 of the Interim Order are hereby approved on final basis.

15.     Payments pursuant to this Motion, if any, will be made pursuant to the Cash Collateral Order.

16.     Nothing in this order shall be deemed to vacate or modify any other restrictions on the termination of service by a Utility Provider as provided by sections 362 and 365 of the Bankruptcy Code or other applicable law.  Nothing herein or in the Motion shall constitute postpetition assumption or adoption of any agreement pursuant to section 365 of the Bankruptcy Code, nor shall anything herein be deemed a waiver by the Debtor or any other party of any rights with respect to the assumption or rejection of an executory contract.

Dated: _____, 2011      _____
                                          United States Bankruptcy Judge

**<u>Exhibit E:  Cash Collateral Order</u>**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------------------------x
                                          :
In re                                     :        Chapter 11
                                          :
EVERGREEN SOLAR, INC.,                    :        Case No. 11-_____ (___)
                                          :
                Debtor.                   :
                                          :
-------------------------------------------------------------------x
```

### INTERIM ORDER (I) AUTHORIZING USE OF CASH COLLATERAL PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE, (II) PROVIDING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES PURSUANT TO SECTIONS 105, 361, 362, 363 AND 507 OF THE BANKRUPTCY CODE, (III) MODIFYING THE AUTOMATIC STAY, AND (IV) SCHEDULING A FINAL HEARING

Upon the motion (the "Motion"), dated August 15, 2011, of Evergreen Solar, Inc. ("Evergreen"), as debtor and debtor in possession (the "Debtor"), for interim and final orders authorizing it to, among other things, (i) use Cash Collateral (as defined below) pursuant to section 363 of title 11 of the United States Code (the "Bankruptcy Code"), and (ii) provide adequate protection including modification of the automatic stay pursuant to Bankruptcy Code sections 105(a), 361, 362, 363, and 507; rules 2002, 4001, 6004(h), 7062, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); and local rules 4001-2 and 2002-1(b) of the Delaware Local Rules of Bankruptcy Procedure (the "Delaware Rules"), and having sought the following relief:

(a)      This Court's authorization, pursuant to Bankruptcy Code section 363, to use Cash Collateral (which Cash Collateral shall be used only in accordance with the budget, which budget shall be acceptable to the Requisite Supporting Noteholders (as defined herein) in their sole discretion and subject only to the Permitted Variances (as defined herein), annexed hereto as Exhibit 1 (as such budget may be extended, varied, supplemented, or otherwise modified in

accordance with the provisions of this Interim Order (defined below) or the Final Order (defined below), the "Approved Budget"), which Approved Budget shall be deemed increased, to the extent such amounts are not already reflected in the Approved Budget, by (i) the fees and expenses provided for in paragraph 7(a), (ii) the fees and expenses of the Committee up to the Committee Professional Fee Cap, and (iii) the amount of severance and employee benefits payable with respect to terminated employees, as contemplated by footnote 6 of the Term Sheet (as defined and incorporated in the RSA (as defined below)), provided that to the extent payments are made as set forth in subparagraph (iii), the Wind-Down Budget (as defined in the Noteholder APA (as defined in the RSA)) shall be reduced accordingly), and provide certain adequate protection to the Prepetition Secured Parties (as defined below) against the diminution in the value of their interest in the Prepetition Collateral, the use, sale or lease of the Prepetition Collateral and/or the imposition of the automatic stay pursuant to Bankruptcy Code section 362; and

(b)    This Court's approval pursuant to Bankruptcy Code sections 105, 361, 362, 363 and 507 of the form and manner of adequate protection being granted to the Prepetition Secured Parties who have been granted prepetition liens and security interests under the following documents (collectively, the "Prepetition Loan Documents"):

(i)    The Indenture dated as of April 26, 2010 (as amended, restated, supplemented or otherwise modified from time to time, the "Indenture"), among Evergreen as issuer, U.S. Bank National Association as trustee (the "Indenture Trustee"), and the guarantors from time to time party thereto, pursuant to which Evergreen incurred indebtedness to certain holders (the "Noteholders" and collectively with the Indenture Trustee, the "Prepetition Secured

Parties") for certain notes issued in an initial aggregate principal amount at maturity of $165 million (the "Notes");

(ii)     The Pledge and Security Agreement, dated as of April 26, 2010 (as the same may have been amended, supplemented, or modified from time to time, the "Security Agreement"), among Evergreen Solar, Inc., the other grantors party thereto as grantors, and the Indenture Trustee, in its capacity as collateral agent; and

(iii)     The Collateral Trust Agreement, dated as of April 26, 2010 (as the same may have been amended and supplemented, or modified from time to time), among Evergreen Solar, Inc., the guarantors from time to time party thereto, and the Indenture Trustee.

(c)     This Court's scheduling an interim hearing (the "Interim Hearing") pursuant to Bankruptcy Rule 4001(a), (b) and (d) and Delaware Rule 4001-2 to consider the entry of an interim order in the form hereof (this "Interim Order") which, among other things, authorizes the use of Cash Collateral and grants adequate protection to the Prepetition Secured Parties, as provided in this Interim Order;

(d)     This Court's modification of the automatic stay imposed by Bankruptcy Code section 362 to the extent necessary to implement and effectuate the terms of this Interim Order;

(e)     This Court's scheduling, pursuant to Bankruptcy Rule 4001(a), (b) and (d), a hearing (the "Final Hearing") to consider entry of a final order (the "Final Order") which, among other things, grants, on a final basis, authorization for the Debtor to use the Cash Collateral and adequate protection to the Prepetition Secured Parties as provided in the Final Order;

(f)     This Court's finding, pursuant to Bankruptcy Rules 2002 and 4001(b)(1), and the Delaware Rule 4001-2 and 2002-1(b) that notice of the Interim Hearing is sufficient having been given to (i) the Office of the United States Trustee (the "U.S. Trustee"), (ii) counsel to any

known secured creditors of record, (iii) counsel to the Indenture Trustee, (iv) the twenty (20) largest unsecured creditors of the Debtor, (v) counsel to the Supporting Noteholders, (vi) any known party asserting a Lien against any of the Debtor's assets, and (vii) the Internal Revenue Service (collectively, the "Notice Parties"); and such notice being sufficient and adequate, and no other or further notice being required; and

The Interim Hearing having been held on August [__], 2011; and based upon all of the pleadings filed with this Court, the evidence presented at the Interim Hearing and the entire record herein; and this Court having heard and resolved or overruled all objections to the interim relief requested in the Motion; and this Court having noted the appearances of all parties in interest; and it appearing that the relief requested in the Motion, as modified herein on an interim basis, is necessary to avoid immediate and irreparable harm to the Debtor's estate prior to a final hearing, and otherwise is fair and reasonable, and in the best interests of the Debtor, its estate, and its creditors; and after due deliberation and consideration, and sufficient cause appearing therefor:

**BASED ON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

A. Disposition. The Motion is granted on an interim basis in accordance with the terms of this Interim Order. Any objections to the Motion with respect to the entry of the Interim Order that have not been withdrawn, waived or settled, and all reservation of rights included therein, are hereby denied and overruled.

B. Petition Date. On August 15, 2011 (the "Petition Date"), the Debtor commenced its chapter 11 case (the "Chapter 11 Case") by filing a voluntary petition for relief

under chapter 11 of the Bankruptcy Code.  The Debtor is operating its business and managing its affairs as a debtor in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  No trustee, examiner or committee has been appointed in the Chapter 11 Case.

C.       <u>Jurisdiction; Venue</u>.  This Court has jurisdiction over the Chapter 11 Case, the parties, and the Debtor's property pursuant to 28 U.S.C. §§157(b)(2)(D) and 1334.  This is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(D).  Venue for the Chapter 11 Case and the Motion is proper under 28 U.S.C. §§ 1408 and 1409.

D.       <u>Statutory Committee</u>.  As of the date herein, the Office of the United States Trustee has not appointed an official committee of unsecured creditors (the "<u>Committee</u>") or any other official committee pursuant to Bankruptcy Code section 1102.

E.       <u>Prepetition Liens</u>.  To secure the Indenture Obligations (as defined below) under the Indenture, the Debtor granted the Indenture Trustee, on behalf of the Noteholders, valid first priority liens (the "<u>Prepetition Liens</u>") upon and in substantially all of the Debtor's assets, and all proceeds and products of such assets (the "<u>Prepetition Collateral</u>").

F.       <u>Debtor's Stipulations</u>.  Subject to paragraph 10(a) of this Interim Order, and after consultation with its attorneys and financial advisors, the Debtor acknowledges, admits, represents, stipulates, and agrees that:

(i)       ***Prepetition Indebtedness:***

(a)       As of the Petition Date, the Debtor was liable to the Prepetition Secured Parties in respect of obligations under the Indenture for (i) the aggregate principal amount of not less than $165 million on account of outstanding notes under the Indenture (plus accrued and unpaid interest thereon) and (ii) unpaid fees, expenses, disbursements, indemnifications, obligations, and charges or claims of whatever nature, whether or not

contingent, whenever arising, due or owing under the Prepetition Loan Documents or applicable law (collectively, the "Indenture Obligations").

    (b) As of the Petition Date, all of the Indenture Obligations are unconditionally due and owing by Evergreen to the Prepetition Secured Parties.

    (c) As of the Petition Date, all claims in respect of the Indenture Obligations (i) constitute legal, valid, binding and nonavoidable obligations of the Debtor and (ii) are not, and shall not be, subject to any avoidance, disallowance, disgorgement, reductions, setoff, offset, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses or any other challenges of any kind or nature under the Bankruptcy Code or any other applicable law or regulation.

    (ii) The Prepetition Liens (i) constitute valid, binding, enforceable, nonavoidable, and properly perfected liens on the Prepetition Collateral that, prior to the entry of this Interim Order, were senior in priority over any and all other liens on the Prepetition Collateral, subject only to those liens explicitly permitted by the Prepetition Loan Documents (to the extent any such Permitted Liens were valid, properly perfected, non-avoidable liens senior in priority to the Prepetition Liens on the Petition Date) (the "Permitted Priority Liens"), if any; (ii) shall not be subject to avoidance, reductions, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses or any other challenges under the Bankruptcy Code or any other applicable law or regulation; and (iii) are subject and subordinate only to (a) the Carve-Out (as defined below) and (b) Permitted Priority Liens, if any.

(iii)     None of the Prepetition Secured Parties are or shall be deemed to be control persons or insiders of the Debtor by virtue of any of the actions taken by such parties in respect of or in connection with the Indenture Obligations or the Prepetition Loan Documents.

(iv)     As of the Petition Date, the Debtor has not brought, is not aware of, and has no claims, objections, challenges, causes of action, including without limitation, avoidance claims under chapter 5 of the Bankruptcy Code against the Prepetition Secured Parties or the Released Parties (as defined below) arising out of or related to the Indenture Obligations or the Prepetition Loan Documents.

(v)     As of the Petition Date, there were no other perfected liens on or security interests in the Prepetition Collateral except for the Prepetition Liens and the Permitted Priority Liens.

G.     Cash Collateral.  For purposes of this Interim Order, the term "Cash Collateral" shall mean and include all "cash collateral," as defined in Bankruptcy Code section 363, in which the Prepetition Secured Parties have a lien, security interest or other interest (including, without limitation, any adequate protection liens or security interests), in each case whether existing on the Petition Date, arising pursuant to this Interim Order, or otherwise.  The Debtor represents and stipulates that all of the Debtor's cash, cash equivalents, negotiable instruments, investment property and securities, including the cash, cash equivalents, negotiable instruments, investment property and securities in its deposit accounts, wherever located constitute the Cash Collateral (or part of the Prepetition Collateral) of the Prepetition Secured Parties.

H.     Use of Cash Collateral.  The Debtor has an immediate and critical need to use the Cash Collateral to operate its businesses and effectuate a reorganization of its business,

which will be used in accordance with the terms of this Interim Order and subject to the Approved Budget. Without the use of Cash Collateral, the Debtor will not have sufficient liquidity to be able to continue to operate its business. The adequate protection provided herein and other benefits and privileges contained herein are consistent with and authorized by the Bankruptcy Code and are necessary in order to obtain such consent or nonobjection of certain parties and to adequately protect the consenting and non-consenting parties' interests in the Prepetition Collateral. Absent authorization to immediately use Cash Collateral, the Debtor's estate and its creditors would suffer immediate and irreparable harm.

        I.      Sections 506(c) and 552(b). In light of the Indenture Trustee's and the Noteholders' agreement to subordinate their liens and claims to the Carve-Out, to permit the use of the Prepetition Collateral and to permit the use of their Cash Collateral for payments made in accordance with the Approved Budget and the terms of this Interim Order, subject to entry of a Final Order, each of the Indenture Trustee and the Noteholders are entitled to (a) a waiver of any "equities of the case" claims under Bankruptcy Code section 552(b) and (b) a waiver of the provisions of Bankruptcy Code section 506(c).

        J.      Good Cause. Good cause has been shown for entry of this Interim Order. The Debtor has an immediate and critical need to use Cash Collateral in order to continue to operate its businesses in the ordinary course in accordance with the Approved Budget, cash collateralize issued and outstanding letters of credit, preserve the value of the Debtor's business, and effectuate a reorganization of its business. The Debtor's use of Cash Collateral has been deemed sufficient to meet the Debtor's immediate postpetition liquidity needs, subject to the terms of this Interim Order and the Approved Budget. Good, adequate and sufficient cause has,

therefore, been shown for the immediate grant of the relief sought in the Motion, as modified herein.

K. <u>Consent to Use of Cash Collateral</u>. The Indenture Trustee and the Noteholders represented by Akin Gump Strauss Hauer & Feld LLP (the "<u>Supporting Noteholders</u>") have consented to the Debtor's use of Cash Collateral solely on the terms and conditions set forth in this Interim Order, and in accordance with the Approved Budget.

L. <u>Restructuring Support Agreement</u>. The Debtor and the Supporting Noteholders have entered into that certain Restructuring Support Agreement (the "<u>RSA</u>"), which contains the parties' agreements and undertakings with respect to the Debtor's restructuring.

M. <u>Good Faith</u>. Based on the record before the Court, the terms of the use of the Cash Collateral as provided in this Interim Order are fair, reasonable, are the best available under the circumstances, have been fully disclosed, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties, have been negotiated at arms' length and in good faith and are in the best interests of the Debtor, its estate and its creditors.

N. <u>Immediate Entry of Interim Order</u>. The Debtor has requested immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(b)(2). The Motion and this Interim Order comply with Delaware Rule 4001-2. The permission granted herein to use Cash Collateral is necessary to avoid immediate and irreparable harm to the Debtor. This Court concludes that entry of this Interim Order is in the best interests of the Debtor's estate and creditors as its implementation will, among other things, allow for access to the liquidity necessary for the continued flow of supplies and services to the Debtor necessary to sustain the operation of the Debtor's existing business and further enhance the Debtor's prospects for a successful restructuring. Based upon the foregoing findings, acknowledgements, and

conclusions, and upon the record made before this Court at the Interim Hearing, and good and sufficient cause appearing therefor;

**IT IS HEREBY ORDERED:**

1.    <u>Motion Granted</u>.  The Motion is granted on an interim basis, subject to the terms set forth herein.  Any objections to the Motion that have not previously been withdrawn or resolved are hereby overruled on their merits.  This Interim Order shall be valid, binding on all parties in interest, and fully effective immediately upon entry notwithstanding the possible application of Bankruptcy Rules 6004(h), 7062, and 9014.

2.    <u>Authorization to Use Cash Collateral</u>.  Subject to the terms of this Interim Order, upon entry of this Interim Order, the Debtor is authorized to use Cash Collateral in which the Prepetition Secured Parties may have an interest, in accordance with the terms, conditions, and limitations set forth in this Interim Order and the Approved Budget (including any Permitted Variances), and amounts necessary to fund the Utility Deposit  Account (as such term is defined in the Debtor's Motion for Order Under Section 366 of the Bankruptcy Code (A) Prohibiting Utility Providers from Altering, Refusing or Discontinuing Service; (B) Deeming Utilities Adequately Assured of Future Performance; and (C) Establishing Procedures for Determining Adequate Assurance of Payment (the "<u>Utility Motion</u>")) not to exceed $200,000.  Any dispute in connection with the use of Cash Collateral shall be heard by this Court.

3.    <u>Supplemental Approved Budget</u>.

(a)    Not later than one month prior to the expiration of the Approved Budget, the Debtor shall provide counsel to the Indenture Trustee and counsel to the Supporting Noteholders an updated budget for an additional 13-week period in substantially the same format as Exhibit 1, which, upon acceptance by the Requisite Supporting Noteholders (as defined in the

RSA) in their sole discretion (provided that the Requisite Supporting Noteholders shall accept a reasonable updated budget solely to the extent and for the period contemplated by section 2(a)(ii) of the RSA), shall become the Approved Budget for such period for purposes of this Interim Order (each, a "Supplemental Approved Budget"); provided, however, that a Supplemental Approved Budget may otherwise be proposed and accepted in the sole discretion of the Requisite Supporting Noteholders at any time. In the event the Debtor and the Requisite Supporting Noteholders, , fail to agree on a Supplemental Approved Budget, the Debtor's right to use Cash Collateral shall terminate in accordance with paragraph 5(a)(ii) herein.

(b)     The Prepetition Secured Parties shall have no obligation with respect to the Debtor's use of the Collateral (as defined below), Prepetition Collateral or Cash Collateral, and shall not be obligated to ensure or monitor the Debtor's compliance with the Approved Budget or to pay (directly or indirectly from their Collateral or Prepetition Collateral) any expenses incurred or authorized to be incurred pursuant to the Approved Budget. Cash Collateral used under this Interim Order shall only be used by the Debtor in accordance with the Approved Budget and this Interim Order. Subject to the Carve-Out, the Prepetition Secured Parties' consent to the Approved Budget shall not be construed as consent to the use of any Cash Collateral beyond the Termination Date, regardless of whether the aggregate funds shown on the Approved Budget have been expended.

4.     Permitted Variance.  Notwithstanding the Approved Budget, so long as no Termination Event has occurred, the Debtors shall be authorized to use Cash Collateral with respect to any one line item in the Approved Budget, in an amount that would not cause the Debtor to use Cash Collateral in an amount greater than one-hundred ten percent (110%) of the Approved Budget with respect to such line item measured on a four-week rolling basis;

provided, however, that in no event shall the collective variances to the Approved Budget cause the Debtor to use Cash Collateral in an amount greater than one hundred percent (100%) of the Approved Budget for such applicable period (a "Permitted Variance").  If the aggregate amount of Cash Collateral actually used by the Debtors, measured on a four-week rolling basis, is less than the aggregate amount of Cash Collateral available for use by the Debtor in the Approved Budget during such period, then the Debtor may carry over any such unused amount to future periods in the Approved Budget and allocate such unused amounts to any line item in the Approved Budget; provided, however, that in no event shall the Debtor use Cash Collateral in an amount greater than one hundred percent (100%) of the Approved Budget for that period of time from the Petition Date through the Monday of the preceding week.[1]

     5.    <u>Termination of Cash Collateral Usage</u>.

     (a)    Notwithstanding anything in this Interim Order to the contrary, the use of Cash Collateral authorized herein shall terminate without prior notice or order of the Court or any further action by the Prepetition Secured Parties, upon the occurrence of the "<u>Termination Date</u>."  The Termination Date shall occur (notice of which shall be provided thereafter to the Debtor, the U.S. Trustee, and any official committee appointed in the case) on the earliest to occur of (each of the following, a "<u>Termination Event</u>"):

         i.    November 15, 2011, unless extended pursuant to the RSA;

         ii.    Upon the expiration of the Approved Budget unless a Supplemental Approved Budget has been agreed upon by the Debtor and the Requisite Supporting Noteholders, in their sole discretion, provided, however, that the Requisite Supporting Noteholders shall accept a reasonable updated budget solely to the extent and for the period contemplated by section 2(a)(ii) of the RSA;

---

[1] For the avoidance of doubt, the Debtor shall not be entitled to allocate such funds to Severance or Restructuring Professionals, as such terms are used on the attached Exhibit 1.

iii. The date of the Final Hearing (which date shall not be later than twenty-five (25) calendar days after the Petition Date) if a Final Order (provided that such Final Order has not been reversed, vacated, stayed, unless such stay has been vacated, or appealed, unless such appeal has been dismissed or otherwise finally resolved) authorizing the use of Cash Collateral, substantially in accordance with the terms of this Interim Order and otherwise reasonably acceptable to the Requisite Supporting Noteholders,[2] is not entered within twenty-five (25) calendar days of the Petition Date;

iv. Five (5) business days after the date the Requisite Supporting Noteholders or the Indenture Trustee, at the direction of the Noteholders, provides the Debtor with written notice of the Debtor's failure to comply with any of the terms or conditions of this Interim Order;

v. The date an application, motion or other pleading is filed by the Debtor seeking to amend, modify, supplement or extend this Interim Order without the prior written consent of the Requisite Supporting Noteholders; or the date of entry of any order reversing, amending, supplementing, staying, vacating or otherwise modifying this Interim Order without the prior written consent of the Requisite Supporting Noteholders;

vi. The date any material provision of this Interim Order shall for any reason cease to be valid and binding or the Debtor shall so assert in any pleading filed in any court;

vii. The date an application is filed by the Debtor for the approval of any superpriority claim or any lien in the Chapter 11 Case which is *pari passu* with or senior to the Adequate Protection Liens, Superpriority Claim, or Prepetition Liens without the prior written consent of the Indenture Trustee and the Requisite Supporting Noteholders;

viii. The effective date of any confirmed chapter 11 plan in the Chapter 11 Case;

ix. Unless otherwise agreed in writing by the Requisite Supporting Noteholders, the date of the consummation of a sale or other disposition of all or substantially all of the assets of the Debtor;

---

[2] The budget attached to the Final Order shall be the Approved Budget, unless the Requisite Supporting Noteholders, in their sole discretion, agree otherwise.

x.     Unless otherwise agreed in writing by the Requisite Supporting Noteholders five (5) business days after a notice of the termination of the RSA;

xi.    The date of the entry of an order granting relief from the automatic stay to the holder or holders of any security interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any asset of the Debtor with a value in excess of $1 million;

xii.   The date (a) the Chapter 11 Case shall be dismissed or converted to a case under chapter 7 of the Bankruptcy Code or the Debtor shall file a motion or other pleading seeking the dismissal or conversion of the Chapter 11 Case pursuant to Bankruptcy Code section 1112 or otherwise; or (b) a trustee or an examiner with expanded powers is appointed or elected in the Chapter 11 Case or the Debtor applies for, consents to, or acquiesces in, any such appointment without the prior written consent of the Requisite Supporting Noteholders;

xiii.  The date of the commencement of any action by the Debtor against the Indenture Trustee or any of the Noteholders with respect to the Indenture Obligations or the Prepetition Liens; or

xiv.  The withdrawal, amendment, modification of, or filing of a pleading by the Debtor seeking to withdraw, amend or modify the proposed sale process and bidding procedures (as described in the sale motion filed on the first day of the Chapter 11 Case), in a manner not reasonably acceptable to the Requisite Supporting Noteholders.

(b)     The Requisite Supporting Noteholders may waive the occurrence of the Termination Date.  The Debtor's authority to use Cash Collateral shall automatically terminate upon the occurrence of the Termination Date, unless waived in writing by the Requisite Supporting Noteholders, all without further order or relief from the Court.  Upon the occurrence of the Termination Date, all Adequate Protection Obligations (as defined below) shall be immediately due and payable, subject to prior provision for the Carve-Out, and the Prepetition Secured Parties shall have all rights and remedies provided in this Interim Order and under applicable law.  Notwithstanding anything herein or the occurrence of the Termination Date, all

of the rights, remedies, benefits, and protections provided to the Prepetition Secured Parties

under this Interim Order shall survive the Termination Date.

      6.    <u>Restriction on Use of Cash Collateral</u>.

      (a)    From and after the Petition Date, all proceeds of the Prepetition Collateral,

including, without limitation, all of the Debtor's existing or future Cash Collateral, shall not,

directly or indirectly, be used for any payments, expenses or disbursements of the Debtor except

for (i) those payments, expenses and/or disbursement that are expressly permitted under this

Interim Order or other order entered by this Court (entered pursuant to motions which are

reasonably acceptable to the Requisite Supporting Noteholders and which orders shall be

reasonably acceptable to the Requisite Supporting Noteholders) and in all cases which are

consistent with the Approved Budget and amounts necessary to fund the Utility Deposit Account

(as such term is defined in the Utility Motion) not to exceed $200,000; (ii) compensation and

reimbursement of fees and expenses payable pursuant to Bankruptcy Code sections 330 and 331

to professionals or professional firms retained by the Debtor pursuant to Bankruptcy Code

sections 327, 328, 330, 331, or 503 (the "<u>Debtor Professionals</u>") and permitted or awarded

pursuant to an order of this Court, subject to an aggregate cap of $8.2 million, (the "<u>Debtor</u>

<u>Professional Fee Cap</u>"); (iii) compensation and reimbursement of fees and expenses not to

exceed $50,000 (the "<u>Committee Professional Fee Cap</u>"),[3] which are payable pursuant to

Bankruptcy Code sections 330 and 331 and payable to any attorneys, advisors, investment

bankers and other professionals retained by the Committee (the "<u>Committee Professionals</u>") and

permitted or awarded pursuant to an order of this Court, provided that if the payment of the fees

and expenses of the Committee Professionals up to the Committee Professional Fee Cap causes

---

[3] For the avoidance of doubt, in no event shall the sum of fees and expenses paid to the Committee Professionals during the Chapter 11 Case before and, if applicable, after a Termination Date exceed the Committee Professional Fee Cap.

the Debtor's expenditures to exceed amounts permitted by the Approved Budget, such excess payments shall not constitute a Termination Event; and (iv) the payment of reasonable fees and expenses of the Indenture Trustee and the Supporting Noteholders, as provided for herein, including, but not limited to the reasonable fees and expenses of the Noteholder Professionals (as defined herein); provided, however, that the foregoing shall not be construed as consent to the allowance of any of the amounts referred to in the preceding clauses (ii) or (iii) and shall not affect the right of any party in interest to object to the allowance and payments of any such amounts.

(b)     Subject to the Carve-Out and entry of a Final Order, no administrative expense claims, including fees and expenses of professionals, shall be charged or assessed against or recovered from the Prepetition Collateral or Collateral or attributed to the Prepetition Secured Parties with respect to their respective interests in the Prepetition Collateral or Collateral pursuant to the provisions of Bankruptcy Code section 506(c) or otherwise by, through, or on behalf of the Debtor, without the prior written consent of the affected Prepetition Secured Parties, and no such consent shall be implied from any action, inaction or acquiescence by, either with or without notice to, the Prepetition Secured Parties.  Except as set forth herein, the Prepetition Secured Parties have not consented or agreed to the additional use of the Prepetition Collateral or the Collateral and nothing contained herein shall be deemed a consent by the Prepetition Secured Parties to any charge, lien, assessment or claim against the Prepetition Collateral or the Collateral.  The Prepetition Secured Parties shall not be subject in any way whatsoever to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral or the Prepetition Collateral.

(c)     Subject to paragraph 10(a) of this Interim Order, no Cash Collateral, Prepetition Collateral or proceeds thereof, or any portion of the Carve-Out may be used directly or indirectly by the Debtor, any official committee appointed in the case, including the Committee, and any trustee appointed in the Chapter 11 Case or any successor case, or any other person, party or entity to (i) investigate, object, contest, or raise any defense to the validity, perfection, priority, extent, or enforceability of the Indenture Obligations including the liens with respect thereto or any action purporting to do any of the foregoing; (ii) investigate, assert or prosecute any Claims and Defenses (as defined below) against the Prepetition Secured Parties or their respective predecessors-in-interest, agents, affiliates, representatives, attorneys, or advisors or any action purporting to do the foregoing; (iii) prevent, hinder, or otherwise delay the Prepetition Secured Parties' assertion, enforcement, or realization on the Indenture Obligations, Cash Collateral, the Prepetition Liens, the Adequate Protection Obligations, or the Adequate Protection Liens in accordance with the Interim Order; (iv) seek to modify any of the rights granted to the Prepetition Secured Parties hereunder; (v) apply to the Court for authority to approve superpriority claims or grant liens in the Collateral or any portion thereof that are senior to, or on parity with, the Adequate Protection Liens, Superpriority Claims or Prepetition Liens, unless all Indenture Obligations under the Prepetition Loan Documents, this Interim Order and the Final Order have been refinanced or paid in full in cash or otherwise agreed to in writing by the Requisite Supporting Noteholders in their sole discretion; or (vi) seek to pay any amount on account of any claims arising prior to the Petition Date unless such payments are agreed to in writing by the Requisite Supporting Noteholders or provided for by the Approved Budget; provided, however, that up to $25,000 of Cash Collateral in the aggregate may be used to pay the allowed fees and expenses of counsel retained by the Committee incurred directly in connection

with investigating, but not preparing, initiating or prosecuting, any Claims and Defenses against the Prepetition Secured Parties or with regard to the Indenture Obligations or Prepetition Liens.

7.    <u>Adequate Protection</u>.  The Prepetition Secured Parties are entitled, pursuant to Bankruptcy Code sections 361 and 363(c) and (e) to adequate protection of their interests in the respective Prepetition Collateral, including Cash Collateral, equal to the aggregate diminution in value of the Prepetition Secured Parties' interests in the Prepetition Collateral (the "<u>Adequate Protection Obligations</u>").  As such, the Indenture Trustee, for the benefit of itself and the Noteholders, is entitled to receive adequate protection to the extent of any diminution in value of their interest in the Prepetition Collateral (including the Cash Collateral) resulting from the use of Cash Collateral, the use, sale or lease of Prepetition Collateral, the subordination of the Prepetition Liens to the Carve-Out, as described herein, or the imposition of the automatic stay (collectively, the "<u>Diminution in Value</u>") pursuant to Bankruptcy Code sections 361, 362 and 363.  Accordingly, the Prepetition Secured Parties are hereby provided with the following forms of adequate protection:

(a)    <u>Fees and Expenses</u>.  The Debtor is authorized and directed to pay, when due and payable and without regard to whether such fees and expenses were incurred prepetition or postpetition, the reasonable fees and expenses incurred by:  (i) the Supporting Noteholders (with respect to expenses only, not including advisors unless otherwise set forth herein); (ii) Akin Gump Strauss Hauer & Feld LLP, as counsel to the Supporting Noteholders; (iii) Morris, Nichols, Arsht & Tunnell LLP, as local counsel to the Supporting Noteholders; (iv) Duff & Phelps Securities LLC, as financial advisor to the Supporting Noteholders; (v) the Indenture Trustee; (vi) Maslon Edelman Borman & Brand, LLP as counsel to the Indenture Trustee, (vii) such local counsel as the Indenture Trustee may retain; and (viii) such other professionals and/or

consultants retained by the Supporting Noteholders and the Indenture Trustee (each of the professionals in (ii) through (viii) being the "Noteholder Professionals"), in each case including, without limitation, in connection with protecting the rights and interests of the Supporting Noteholders and the Indenture Trustee in connection with the Chapter 11 Case and in connection with any and all actions related to the sales process, provided that if the payment of such aggregate reasonable fees and expenses of the Noteholder Professionals causes the Debtor's expenditures to exceed amounts permitted by the Approved Budget, such excess payments shall not constitute a Termination Event. After delivery of a statement of fees and expenses (redacted for privilege) the Debtor is authorized and directed to pay all fees, costs, and expenses in accordance with the terms of this Interim Order, without the Supporting Noteholders or the Indenture Trustee having to file any further application with this Court for approval or payment of such fees, costs or expenses. Any such fees, costs and expenses incurred by the Noteholder Professionals shall be paid within five (5) business days of delivery of an invoice to the Debtor. All amounts paid as adequate protection are deemed permitted uses of Cash Collateral.

      (b)    Cash Payment. Not later than two (2) business days following the entry of this Interim Order , the Debtor shall pay to the Indenture Trustee, for the benefit of the Noteholders, Cash Collateral in the amount of $12.5 million, which funds shall reduce the total allowed claim of the Indenture Trustee.

      (c)    Adequate Protection Liens and Adequate Protection Superpriority Claim for Prepetition Secured Parties. Subject to the Carve-Out, the Indenture Trustee, for the benefit of the Noteholders, is hereby granted: (i) valid, enforceable, nonavoidable and fully perfected, first-priority postpetition security interests in and liens (effective and perfected upon the date of entry of this Interim Order and without the necessity of execution by the Debtor of mortgages,

security agreements, pledge agreements, financing statements, and other agreements or instruments) (the "<u>Adequate Protection Liens</u>") on all of the Collateral; and (ii) first-priority superpriority administrative expense claims under Bankruptcy Code section 507(b) (the <u>Superpriority Claim</u>") with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c) (subject to entry of a Final Order), 507(a), 507(b), 546(c), 546(d), 552 (subject to entry of a Final Order), 726 (to the extent permitted by law), 1113 and 1114, whether or not such expenses or claims arise in the Chapter 11 Case or in any subsequent case or proceedings under the Bankruptcy Code that may result therefrom, to secure in each case an amount equal to the aggregate Diminution in Value (which shall be calculated in accordance with Bankruptcy Code section 506(a)) in the interests of the Indenture Trustee and the Noteholders in the Prepetition Collateral (including the Cash Collateral) including, without limitation, any such diminution in value resulting from (a) depreciation, physical deterioration, use, sale, loss or decline in market value of the Prepetition Collateral; (b) the Carve-Out; or (c) imposition of the automatic stay under section 362 of the Bankruptcy Code or otherwise. For purposes of this Interim Order, the term "Collateral" shall include, without limitation, any and all prepetition and postpetition property, assets and interests in property and assets of the Debtor (or any successor trustee or other estate representative in the Chapter 11 Case or successor case), and all "property of the estate" (within the meaning of the Bankruptcy Code) of the Debtor (or any successor trustee or other estate representative in the chapter 11 case or successor case), of any kind or nature whatsoever, real or personal, tangible or intangible or mixed now existing or hereafter acquired or created, whether existing prior to the

Petition Date or arising after the Petition Date, including, without limitation, all accounts, inventory, contracts, investment property, instruments, documents, chattel paper, patents, trademarks, copyrights, licenses, general intangibles, payment intangibles, machinery and equipment, real property (including all facilities), capital stock of each subsidiary of the Debtor, deposit accounts, commercial tort claims and other causes of action, Cash Collateral, proceeds of the Avoidance Actions (subject to the entry of a Final Order) and all proceeds of any of the collateral described above. The Adequate Protection Liens and Superpriority Claim shall be subject and subordinate only to: (i) the Permitted Priority Liens, and (ii) solely upon the occurrence of the Termination Date, payment of the Carve-Out in accordance with the terms and conditions set forth in this Interim Order. For the avoidance of doubt, the use of Cash Collateral, for any purpose, shall constitute a Diminution in Value of the Prepetition Secured Parties' Collateral, and shall entitle the Prepetition Secured Parties to dollar-for-dollar Adequate Protection Liens in accordance with the terms of this Interim Order. Nothing herein shall impair or modify the application Bankruptcy Code section 507(b) in the event that the adequate protection provided to the Indenture Trustee or the Noteholders hereunder is insufficient to compensate for any Diminution in Value of their interests in the Prepetition Collateral during the Chapter 11 Case or any successor case.

8.    <u>Additional Reporting Obligations</u>.  The Debtor shall prepare and furnish to counsel to the Indenture Trustee and counsel to the Supporting Noteholders, in form and substance reasonably acceptable to the Indenture Trustee and the Requisite Supporting Noteholders, a weekly report of receipts, disbursements, and a reconciliation of actual receipts and disbursements with those set forth in the Approved Budget, on a line-by-line basis showing any percentage variance to the proposed corresponding line item of the Approved Budget (i) for

such weekly period and (ii) on a cumulative basis for the period of the Approved Budget or such other budget period, as applicable, and showing a calculation of the covenants and the Debtor's compliance or noncompliance, which shall be certified by the chief financial officer or chief executive officer (the "Budget Reconciliation").  Beginning on August 24, 2011 and every week thereafter, the Debtor shall also provide counsel to the Indenture Trustee and counsel to the Supporting Noteholders with (a) a list of any and all prepetition claims paid during the preceding week, each with a notation regarding which order authorized such payments, and (b) the cumulative total of all prepetition claims paid, each with a notation regarding which order authorized such payments (the "Other Reporting Obligations").  Such Budget Reconciliation and Other Reporting shall be provided to counsel to the Indenture Trustee and counsel to the Supporting Noteholders so as actually to be received within three (3) business days following the end of the week.  The Debtor and its professionals shall make themselves available to discuss the Budget Reconciliation and any other weekly reports provided pursuant to this Interim Order with the professionals retained by the Supporting Noteholders on a weekly basis and/or on such other basis as may be reasonably requested by the Supporting Noteholders and its professionals.  The Debtor shall also provide such other financial and other reporting information as may be reasonably requested by the Indenture Trustee or the Supporting Noteholders.

9.    Carve-Out.

(a)    As used in this Interim Order, "Carve-Out" means: (i) the unpaid fees of the Clerk of the Bankruptcy Court and the U.S. Trustee pursuant to 28 U.S.C. §1930(a)(6); (ii) fees in an amount not to exceed the Debtor Professional Fee Cap and the Committee Professional Fee Cap less any amount already paid to the Debtor Professionals and the Committee Professionals, respectively, to the extent allowed at any time by the Bankruptcy Court, whether

by interim order, procedural order or otherwise, all unpaid fees, disbursements, costs and expenses incurred by the Debtor Professionals or Committee Professionals, which are incurred prior to the Termination Date; and (iii) fees and expenses of the Debtor Professionals in an aggregate amount not to exceed $500,000 (the "Termination Carve-Out"), which are incurred on and after the Termination Date, provided such fees and expenses (in the aggregate) are ultimately allowed by the Bankruptcy Court, each subject to the rights of any party in interest to object to the allowance of any such fees and expenses.[4] For the avoidance of doubt, and without limiting the foregoing, so long as the Termination Date shall not have occurred, (A) the Debtor is authorized, subject to applicable court orders, to pay any expense that falls within the Carve-Out; and (B) Cash Collateral may be used for (i) payment of fees and expenses of the Debtor Professionals and the Committee Professionals up to the Debtor Professional Fee Cap and the Committee Professional Fee Cap, respectively, each as allowed and payable under Bankruptcy Code sections 330 and 331 and (ii) payments contemplated to be made pursuant to "first day" orders pursuant to "first day" motions in form and substance reasonably acceptable to the Requisite Supporting Noteholders and payments otherwise agreed to by the Requisite Supporting Noteholders, provided, however, that in each case such payments shall be in accordance with the Approved Budget or otherwise in accordance with this Interim Order.

(b)     No liens, claims, interests or priority status, other than the Carve-Out and the Permitted Priority Liens, having a lien or administrative priority superior to or *pari passu* with that of the Prepetition Liens, the Superpriority Claims or Adequate Protection Liens granted

---

[4] For the avoidance of doubt, in no event shall the amount of fees, disbursements, costs and expenses paid (a) to the Professionals prior to a Termination Date, plus the amount paid pursuant to the Termination Carve-Out exceed the aggregate of the Debtor Professional Fee Cap and the Committee Professional Fee Cap; (b) to the Debtor Professionals prior to a Termination Date, plus the amount paid to Debtor Professionals pursuant to the Termination Carve-Out exceed the Debtor Professional Fee Cap; or (c) to the Committee Professionals prior to a Termination Date, plus the amount paid to Committee Professionals pursuant to the Termination Carve-Out exceed the Committee Professional Fee Cap.

by this Interim Order, shall be granted while any portion of the Indenture Obligations remain outstanding or in effect without the prior written consent of the Requisite Supporting Noteholders.

(c)     If (i) no Termination Event occurs (other than as described in subparagraph (ii) of this paragraph 9(c)), or (ii) there is a Termination Event pursuant to paragraph 5(a)(i), (ii), (viii) or (ix), then, notwithstanding anything else herein to the contrary, the liens and claims of the Noteholders (including, without limitation, the Adequate Protection Liens) shall be subordinated to the Wind-Down Budget (as defined in the Noteholder APA), and the Debtor shall be authorized and entitled to disburse the Wind-Down Budget for the purposes thereof from and after the closing of the asset sales as contemplated by the RSA.

10.     <u>Investigation Period</u>.

(a)     The Adequate Protection Liens, the Superpriority Claims, and the Prepetition Liens shall be senior to, and no Collateral or Prepetition Collateral may be used to pay, any claims for services rendered by any of the professionals retained by the Debtor (or any successor trustee or other estate representative in the Chapter 11 Case or any successor case), any creditor or party in interest, any Committee or any other party in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, investigation, objection, defense or other contested matter against the Prepetition Secured Parties in connection with (i) invalidating, setting aside, avoiding, subordinating, recharacterizing, or challenging, in whole or in part, any claims or liens arising under or with respect to the Prepetition Loan Documents, the Indenture Obligations, the Prepetition Liens, the Collateral, or the Prepetition Collateral, or (ii) preventing, hindering, or delaying, whether directly or indirectly, the Prepetition Secured Parties' assertions or enforcement of their liens, security interests, or

realization upon any of the Collateral or the Prepetition Collateral. Notwithstanding anything herein to the contrary, the Committee shall have sixty (60) days after formation of the Committee, and parties in interest shall have seventy-five (75) days after entry of this Interim Order (or any subsequent date that may be agreed to in writing by the Requisite Supporting Noteholders and the Indenture Trustee, each in its sole discretion) (the "Investigation Termination Date") to investigate the validity, perfection, enforceability, and extent of the Indenture Obligations and Prepetition Liens and any potential claims of the Debtor or its estate against the Prepetition Secured Parties in respect of the Indenture Obligations and Prepetition Lender Liens, "lender liability" claims and causes of action, any actions, claims or defenses under chapter 5 of the Bankruptcy Code or any other claims and causes of action (all such claims, defenses and other actions described in this paragraph are collectively defined as the "Claims and Defenses").

(b)     Any challenge to the Indenture Obligations or Prepetition Liens or the assertion of any other claims or causes of action of the Debtor or its estates against the Prepetition Secured Parties must be made by a party in interest with standing who timely and properly commences an adversary proceeding on or before the Investigation Termination Date. If no such action is properly filed on or before the Investigation Termination Date, all holders of claims and interests as well as other parties in interest shall be forever barred from bringing or taking any such action, and the Debtor's stipulations made herein and the release set forth in this Interim Order shall be binding on all parties in interest. If such an action is timely and properly brought, any claim or action that is not brought shall be forever barred. In the event of a timely and successful challenge by plaintiff in such an action, this Court shall fashion the appropriate remedy with respect to the Prepetition Secured Parties after hearing from all parties.

(c)     Nothing in this Interim Order vests or confers on any Committee or any other party standing or authority to bring, assert, commence, continue, prosecute, or litigate any cause of action belonging to the Debtor or its estate, including, without limitation, the Claims and Defenses with respect to the Prepetition Loan Documents, the Prepetition Liens or the Indenture Obligations.

11.     <u>Release</u>.  Subject to the rights set forth in paragraph 10(a) of this Interim Order, the Debtor, on behalf of itself and its estate (including any successor trustee or other estate representative in the Chapter 11 Case or successor case) and any party acting by, through, or under the Debtor or its estate, forever and irrevocably (i) release, discharge, waive, and acquit the Prepetition Secured Parties, their participants and each of their respective affiliates, and each of their respective former, current or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest (collectively, the "<u>Released Parties</u>") of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, and obligations existing as of the Petition Date, including, without limitation, any so-called "lender liability" or equitable subordination claims or defenses, with respect to or relating to the Indenture Obligations, the Prepetition Liens, the Prepetition Loan Documents, any and all claims and causes of action arising under title 11 of the United States Code, and any and all claims regarding the validity, priority, perfection or avoidability of the liens or secured claims of the Prepetition Secured Parties; and (ii) waive any and all defenses (including, without limitation, offsets and counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability and nonavoidability of the Indenture Obligations and the Prepetition Liens.

12. <u>Cash Management</u>. The Debtor shall not seek approval of any cash management system without the prior approval of the Requisite Supporting Noteholders, which consent shall not be unreasonably withheld, and any order approving such cash management system shall be reasonably acceptable to the Requisite Supporting Noteholders. The Requisite Supporting Noteholders acknowledge that they have consented to the Debtor's use of a cash management system that is consistent with the cash management system described in the Debtor's "first day" motion to approve its prepetition cash management system.

13. <u>Equities of the Case</u>. Subject to and effective upon entry of the Final Order and in light of the subordination of their liens to the Carve-Out, the Prepetition Secured Parties shall be entitled to all benefits of Bankruptcy Code section 552(b) and the "equities of the case" exception under Bankruptcy Code section 552(b) shall not apply to such parties with respect to the proceeds, product, offspring, or profits of any of their collateral.

14. <u>Additional Perfection Measures</u>.

(a) Pursuant to this Interim Order, the Adequate Protection Liens are, and are deemed to be, valid, enforceable, and perfected liens, effective as of the Petition Date, and (notwithstanding any provisions of any agreement, instrument, document, the Uniform Commercial Code, or any other relevant law or regulation of any jurisdiction) no further notice, filing, possession, control, or other act shall be required to effect such perfection, and all liens on any deposit accounts or securities shall, pursuant to this Interim Order be, and they hereby are deemed to confer "control" for purposes of sections 8-106, 9-104, and 9-106 of the New York Uniform Commercial Code as in effect as of the date hereof or similar applicable laws in favor of the Prepetition Secured Parties).

(b)     None of the Debtor, the Indenture Trustee, or the Noteholders shall be required to enter into or obtain landlord waivers, mortgagee waivers, bailee waivers, warehouseman waivers or other waiver or consent to enter into control agreements, or to file or record financing statements, mortgages, deeds of trust, leasehold mortgages, notices of lien or similar instruments in any jurisdiction (including, trademark, copyright, trade name or patent assignment filings with the United States Patent and Trademark Office, Copyright Office or any similar agency with respect to intellectual property, or filings with any other federal agencies/authorities), or obtain consents from any licensor or similarly situated party-in-interest, or take any other action in order to validate and to perfect the Adequate Protection Liens.

(c)     The Indenture Trustee may, but shall not be obligated to, obtain consents from any landlord, licensor or other party in interest, file mortgages, financing statements, notices of lien or similar instruments, or otherwise record or perfect such security interests and liens, in which case:

i.     all such documents shall be deemed to have been recorded and filed as of the time and on the date of entry of this Interim Order; and

ii.     no defect in any such act shall affect or impair the validity, perfection and enforceability of the liens granted hereunder.

(d)     In lieu of obtaining such consents or filing any such mortgages, financing statements, notices of lien or similar instruments, the Indenture Trustee may, but shall not be obligated to, file a true and complete copy of this Interim Order in any place at which any such instruments would or could be filed, together with a description of Collateral or Prepetition Collateral, as applicable, and such filings by the Indenture Trustee shall have the same effect as

if such mortgages, deeds of trust, financing statements, notices of lien or similar instruments had been filed or recorded at the time and on the date of entry of this Interim Order.

15. <u>Automatic Stay Modified</u>. The automatic stay provisions of Bankruptcy Code sections 362 are hereby vacated and modified to the extent necessary to permit the Indenture Trustee, to exercise, upon the occurrence of the Termination Date, all rights and remedies provided for hereunder, and to take any or all of the following actions without further order of or application to this Court: (i) terminate the Debtor's use of Cash Collateral; (ii) declare all Adequate Protection Obligations owed to the Prepetition Secured Parties to be immediately due and payable; (iii) set off and apply immediately any and all amounts in accounts maintained by the Debtor with the Indenture Trustee against the Adequate Protection Obligations and Indenture Obligations owed to the Prepetition Secured Parties and otherwise enforce rights against the Collateral for application towards the Adequate Protection Obligations and Indenture Obligations; (iv) take any and all actions necessary to take control of all Cash Collateral; and (v) upon five (5) business days' notice to the Debtor, the Committee and the U.S. Trustee, take any other actions or exercise any other rights or remedies permitted under this Interim Order or applicable law to effect the repayment and satisfaction of the Adequate Protection Obligations and Indenture Obligations owed to the Prepetition Secured Parties. The rights and remedies of the Prepetition Secured Parties specified herein are cumulative and not exclusive of any rights or remedies that they may otherwise have.

16. <u>Collateral Rights</u>.

(a) In the event that any party who has both received notice of the Interim Hearing and holds a lien or security interest in Collateral or Prepetition Collateral that is junior and/or subordinate to the Adequate Protection Liens or the Prepetition Liens in such Collateral or

Prepetition Collateral receives or is paid the proceeds of such Collateral or Prepetition Collateral, or receives any other payment with respect thereto from any other source, such junior or subordinate lienholder shall be deemed to have received, and shall hold, the proceeds of any such Collateral in trust for the Prepetition Secured Parties and shall immediately turn over such proceeds to the Indenture Trustee for the benefit of the Noteholders.

(b)  If the Indenture Trustee or the Noteholders shall at any time exercise any of their respective rights and remedies hereunder or under applicable law in order to effect payment or satisfaction of the Adequate Protection Obligations and Indenture Obligations owed to the Prepetition Secured Parties or to receive any amounts or remittances due hereunder, including, without limitation, foreclosing upon and selling all or a portion of the Collateral (all solely to the extent not inconsistent with the requirements of this Interim Order), the Indenture Trustee shall have the right without any further action or approval of this Court to exercise such rights and remedies as to all or such part of the Collateral as the Indenture Trustee may determine.  No holder of a lien shall be entitled to object on the basis of the existence of any such lien to the exercise by the Indenture Trustee of its respective rights and remedies under this Interim Order or other applicable law to effect satisfaction of the Indenture Obligations or Adequate Protection Obligations owed to the Prepetition Secured Parties or to receive any amounts or remittances due hereunder, provided that the Indenture Trustee has complied with paragraph 15 of this Interim Order.  All proceeds and payments delivered to the Indenture Trustee pursuant to this paragraph 16 may be applied to the Indenture Obligations or Adequate Protection Obligations owed to the Noteholders, as determined by the Indenture Trustee, in accordance with the Indenture, and in no event shall the Prepetition Secured Parties be subject to

the equitable doctrine of "marshaling" or any other similar doctrine with respect to any such collateral or otherwise.

(c)     The Debtor shall not sell, lease, transfer or otherwise dispose of its interest in the Collateral outside the ordinary course of business, or seek authority of this Court to do any of the foregoing, without the prior written consent of the Requisite Supporting Noteholders (which consent shall not be unreasonably withheld), except to the extent provided by the RSA. In the event of any such sale, lease, transfer, license, or other disposition of property of the Debtor that constitutes Collateral outside the ordinary course of business (to the extent permitted by this Interim Order) the Debtor is authorized and directed, without further notice or order of this Court, to promptly pay to the Indenture Trustee, for the benefit of the Noteholders, 100% of the net cash proceeds resulting therefrom no later than the second business day following receipt of such proceeds, solely to the extent that, after giving effect to such payment, there remains in the Debtor's estate cash in an amount equal to the sum of:  (a) any amounts that remain unspent pursuant to the Approved Budget; (b) the Carve-Out; and (c) any other amounts contemplated by the RSA as requiring payment (including, without limitation, amounts identified in the Term Sheet (as defined and incorporated in the RSA) or the Noteholder APA (as defined in the RSA)).

(d)     In the event of any casualty, condemnation, or similar event with respect to property that constitutes Collateral, the Debtor is authorized and directed to pay to the Indenture Trustee, for the benefit of the Noteholders, 100% of any insurance proceeds, condemnation award, or similar payment no later than the third business day following receipt of payment by the Debtor, solely to the extent that, after giving effect to such payment, there remains in the Debtor's estate cash in an amount equal to the sum of:  (a) any amounts that remain unspent pursuant to the Approved Budget; (b) the Carve-Out; and (c) any other amounts

contemplated by the RSA as requiring payment (including, without limitation, amounts identified in the Term Sheet or the Noteholder APA).

17.    Credit Bid Rights.  The Prepetition Secured Parties shall have the right to "credit bid" the Indenture Obligations under the Prepetition Loan Documents and the Adequate Protection Liens granted hereunder during any sale of any of the Collateral, including without limitation, in connection with sales occurring pursuant to Bankruptcy Code section 363 or included as part of any plan subject to confirmation under Bankruptcy Code section 1129.

18.    Successors and Assigns.  The provisions of this Interim Order shall be binding upon the Debtor, the Prepetition Secured Parties, and each of their respective successors and assigns, and shall inure to the benefit of the Debtor, the Prepetition Secured Parties and each of their respective successors and assigns including, without limitation, any trustee, responsible officer, estate administrator or representative, or similar person appointed in a case for the Debtor under any chapter of the Bankruptcy Code.  The provisions of this Interim Order shall also be binding on all of the Debtor's creditors, equity holders, and all other parties in interest including any official committee appointed in the Chapter 11 Case.

19.    Binding Nature of Agreement.  Except with respect to a sale of the Debtor's assets approved by the Prepetition Secured Parties, the rights, remedies, powers, privileges, liens, and priorities of the Prepetition Secured Parties under this Interim Order shall not be modified, altered or impaired in any manner by any subsequent order (including a confirmation order), by any plan of reorganization or liquidation in the Chapter 11 Case, by the dismissal or conversion of the Chapter 11 Case or in any subsequent case under the Bankruptcy Code unless and until the Indenture Obligations have first been indefeasibly paid in full in cash and completely satisfied in accordance with the Prepetition Loan Documents.

20.     No Modification of Interim Order.  The Debtor irrevocably waives any right to seek any amendment, modification or extension of this Interim Order without the prior written consent of the Requisite Supporting Noteholders and no such consent shall be implied by any action, inaction or acquiescence of the Indenture Trustee or the Noteholders.

21.     Priorities Among Prepetition Secured Parties.  Notwithstanding anything to the contrary herein or in any other order of this Court, in determining the relative priorities and rights of the Prepetition Secured Parties (including, without limitation, the relative priorities and rights of the Prepetition Secured Parties with respect to the adequate protection granted hereunder), such relative priorities and rights shall continue to be governed by the Prepetition Loan Documents, to the extent otherwise applicable.

22.     No Waiver.  This Interim Order shall not be construed in any way as a waiver or relinquishment of any rights that the Prepetition Secured Parties may have to bring or be heard on any matter brought before this Court.

23.     Rights Preserved.  Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly (i) the Indenture Trustee's or any Noteholder's right to seek any other or supplemental relief in respect of the Debtor, including the right to seek additional adequate protection, (ii) any of the rights of the Indenture Trustee or any of the Noteholders under the Bankruptcy Code or under applicable nonbankruptcy law.  Nothing contained herein shall be deemed a finding by the Court or an acknowledgement by the Indenture Trustee or the Noteholders that the adequate protection granted herein does in fact adequately protect the Indenture Trustee or the Noteholders against any Diminution in Value of their interests in the Prepetition Collateral.

24.     No Waiver by Failure to Seek Relief.  The delay or failure of the Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies under this Interim Order, the Prepetition Loan Documents, or applicable law, as the case may be, shall not constitute a waiver of any of the rights thereunder, or otherwise of the Prepetition Secured Parties.

25.     Priority of Terms.  To the extent of any conflict between or among (a) the Motion, any other order of this Court, or any other agreements, on the one hand, and (b) the terms and provisions of this Interim Order, on the other hand, unless such term or provision herein is phrased in terms of "as defined in" or "as more fully described in" the Prepetition Loan Documents, the terms and provisions of this Interim Order shall govern.

26.     No Third-Party Beneficiary.  Except as explicitly set forth herein, no rights are created hereunder for the benefit of any third party, any creditor or any direct, indirect or incidental beneficiary.

27.     Survival.  Except as otherwise provided herein, (a) the protections afforded to the Prepetition Secured Parties under this Interim Order, and any actions taken pursuant thereto, shall survive the entry of an order (i) dismissing the Chapter 11 Case or (ii) converting the Chapter 11 Case into a case under Chapter 7 of the Bankruptcy Code, and (b) the Adequate Protection Liens and the Superpriority Claims shall continue in the Chapter 11 Case, in any such successor case or after any such dismissal.  Except as otherwise provided herein, the Adequate Protection Liens and the Superpriority Claims shall maintain their priorities as provided in this Interim Order and the Final Order, and not be modified, altered or impaired in any way by any other financing, extension of credit, incurrence of indebtedness, or any conversion of the Chapter 11 Case into a case pursuant to Chapter 7 of the Bankruptcy Code or dismissal of the Chapter 11

Case, or by any other act or omission until the Indenture Obligations are indefeasibly paid in full in cash or receive treatment as otherwise agreed to by the Requisite Supporting Noteholders.

28.     <u>Final Hearing Date</u>.  The Final Hearing to consider the entry of the Final Order approving the relief sought in the Motion shall be held on _____, 2011 at __:__ _.m. (as the same may be adjourned or continued by this Court) before The Honorable _____, at the United States Bankruptcy Court for the District of Delaware.

29.     <u>Adequate Notice</u>.  The Debtor shall promptly mail copies of this Interim Order, proposed Final Order and notice of the Final Hearing to the Notice Parties, any known party affected by the terms of the Final Order, and any other party requesting notice after the entry of this Interim Order.  Any objection to the relief sought at the Final Hearing shall be made in writing setting forth with particularity the grounds thereof, and filed with this Court and served so as to be actually received no later than five business (5) days prior to the Final Hearing by the following:  (i) Bingham McCutchen LLP, 399 Park Avenue, New York NY, 10022, Attn: Ronald Silverman, Esq. (ronald.silverman@bingham.com) and Steven Wilamowsky, Esq. (steven.wilamowsky@bingham.com), and Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, P.O. Box 8705, Wilmington, DE 19899-8705 (Courier 19801), Attn: Laura Davis Jones (ljones@pszjlaw.com), counsel to the Debtor; (ii) Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, NY 10036, Attn: Michael S. Stamer, Esq. (mstamer@akingump.com) and 1333 New Hampshire Avenue, NW, Washington, DC 20036, Attn: James R. Savin, Esq. (jsavin@akingump.com), and Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, 18th Floor, P.O. Box 1347, Wilmington, DE 19899-1347, Attn: Robert J. Dehney, Esq. (rdehney@mnat.com), counsel to the Supporting Noteholders; (iii) counsel to any statutory committee appointed in the case, (iv) Maslon Edelman Borman &

Brand, LLP, 3300 Wells Fargo Center, 90 South Seventh Street, Minneapolis, MN 55402-4140,

Attn: Clark T. Whitmore, Esq. (clark.whitmore@maslon.com), as counsel to the Indenture

Trustee, and (iv) the Office of the United States Trustee, J. 844 King Street, Suite 2207, Lockbox

35, Wilmington, DE 19081 (Attn: _____ (_____@usdoj.gov)).

      30.   <u>Entry of Interim Order; Effect</u>.  This Interim Order shall take effect and be fully

enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof, notwithstanding

the possible application of Fed. R. Bankr. P. 6004(h), 7062, 9014, or otherwise, and the Clerk of

this Court is hereby directed to enter this Interim Order on this Court's docket in the Chapter 11

Case.

      31.   <u>Retention of Jurisdiction</u>.  This Court shall retain jurisdiction overall all matters

pertaining to the implementation, interpretation and enforcement of this Interim Order.

      32.   <u>Binding Effect of Interim Order</u>.   The terms of this Interim Order shall be binding

on any trustee appointed under Chapter 7 or Chapter 11 of the Bankruptcy Code.

      33.   <u>Waiver of Requirement to File Proofs of Claim</u>.  Neither the Indenture Trustee

nor the Noteholders shall be required to file proofs of claim with respect to any of the Indenture

Obligations.


Dated: _____, 2011
       Wilmington, Delaware

                                    _____
                                    UNITED STATES BANKRUPTCY JUDGE

# Exhibit 1

# Approved Budget

**Evergreen Solar**

**13 week Cash Flow Forecast**

| $000<br>Week ending | Wk 1<br>Aug-20 | Wk 2<br>Aug-27 | Wk 3<br>Sep-03 | Wk 4<br>Sep-10 | Wk 5<br>Sep-17 | Wk 6<br>Sep-24 | Wk 7<br>Oct-01 | Wk 8<br>Oct-08 | Wk 9<br>Oct-15 | Wk 10<br>Oct-22 | Wk 11<br>Oct-29 | Wk 12<br>Nov-05 | Wk 13<br>Nov-12 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Cash Balance | $ 63,500 | $ 63,109 | $ 62,458 | $ 61,554 | $ 60,432 | $ 58,518 | $ 57,436 | $ 56,055 | $ 55,066 | $ 53,670 | $ 52,711 | $ 51,604 | $ 50,372 | |
| **Receipts:** | | | | | | | | | | | | | | |
| Pre-petition receivables | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Post-petition Inventory Sales | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Receipts** | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Disbursements** | | | | | | | | | | | | | | |
| Operating Disbursements | | | | | | | | | | | | | | |
| Salaries & Benefits | 46 | 64 | 499 | 179 | 545 | 57 | 448 | 172 | 448 | 68 | 359 | 155 | 359 | 3,399 |
| Rent, utilities and taxes | 64 | - | 52 | - | 393 | - | 49 | - | 88 | - | - | 49 | 24 | 719 |
| Materials, fees and other | 141 | 200 | 188 | 147 | 266 | 200 | 188 | 147 | 266 | 200 | 188 | 147 | 266 | 2,544 |
| **Total Operating Disbursements** | 251 | 264 | 739 | 326 | 1,204 | 257 | 685 | 319 | 802 | 268 | 547 | 351 | 649 | 6,661 |
| Non-Operating Disbursements | | | | | | | | | | | | | | |
| Severance | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other transition costs (Mid,Dev,GmbH) | 139 | 253 | 41 | 136 | 49 | 165 | 40 | 130 | 54 | 151 | 19 | 92 | 16 | 1,146 |
| Ordinary Course Professionals - Non-op | 139 | 134 | 124 | 108 | 108 | 108 | 104 | 82 | 82 | 82 | 82 | 69 | 69 | 1,292 |
| Restructuring Professionals | - | - | - | 553 | 553 | 553 | 553 | 458 | 458 | 458 | 458 | 721 | 721 | 5,483 |
| **Total Non-Operating Disbursements** | 139 | 388 | 165 | 797 | 709 | 825 | 696 | 670 | 594 | 691 | 559 | 882 | 805 | 7,921 |
| **Total Disbursements** | 391 | 652 | 904 | 1,123 | 1,913 | 1,082 | 1,381 | 989 | 1,396 | 959 | 1,106 | 1,232 | 1,455 | 14,582 |
| Net Cash Flow | (391) | (652) | (904) | (1,123) | (1,913) | (1,082) | (1,381) | (989) | (1,396) | (959) | (1,106) | (1,232) | (1,455) | (14,582) |
| Cumulative Net Cash Flow | (391) | (1,042) | (1,946) | (3,068) | (4,982) | (6,064) | (7,445) | (8,434) | (9,830) | (10,789) | (11,896) | (13,128) | (14,582) | |
| **Ending Cash Balance** | $ 63,109 | $ 62,458 | $ 61,554 | $ 60,432 | $ 58,518 | $ 57,436 | $ 56,055 | $ 55,066 | $ 53,670 | $ 52,711 | $ 51,604 | $ 50,372 | $ 48,918 | |

**Exhibit F-1:  Noteholder Sale Bid Procedures**

## BIDDING PROCEDURES

Set forth below are the bid procedures (the "<u>Bidding Procedures</u>") to be employed by Evergreen Solar, Inc. (the "<u>Debtor</u>" or "<u>Seller</u>") in connection with that certain purchase agreement, dated August 15, 2011 between the Debtor and ES Purchaser, LLC, a Delaware limited liability company (the "<u>Proposed Purchaser</u>"), pursuant to which the Proposed Purchaser shall acquire all or substantially all of the Debtor's assets all on the terms and conditions specified therein (the "<u>Asset Purchase Agreement</u>").

**ANY PARTY INTERESTED IN BIDDING ON ANY OF THE DEBTOR'S ASSETS SHOULD CONTACT THE DEBTOR'S ADVISORS, AS FOLLOWS:**

**<u>FOR LOT 1 AND LOT 3</u>:**

**UBS INVESTMENT BANK:** Steve Smith (sd.smith@ubs.com, 212-821-5222) 299 Park Avenue, New York, NY 10171, or David Dolezal (david.dolezal@ubs.com, 415-352-6086), 555 California Street, San Francisco, CA 94104

**<u>FOR LOT 2 AND LOT 4 (INCLUDING ANY OF THE INDIVIDUAL ASSETS IN LOTS 2 OR 4)</u>:**

**HILCO INDUSTRIAL, LLC:** Brian Lee (blee@hilcobid.com, 203-258-0927), 5 Revere Drive, Suite 206, Northbrook, IL 60062

1.  Assets to be Sold

The Debtor shall offer for sale all or substantially all of the property and assets (the "<u>Asset Sale</u>") of the Debtor's business as identified in further detail in the Asset Purchase Agreement (collectively the "<u>Assets</u>"). A list of the Assets will be posted in the virtual data room. As set forth below, bidders are invited to submit a bid for all of the Assets or, at the bidder's election, for specifically identified lots of Assets (the "<u>Lots</u>") or combinations of Lots that the bidder may desire. A list of the Lots that are available for individual bids or group bids is attached hereto as Exhibit A. The Debtor shall retain all rights to any Assets that are not part of a bid accepted by the Debtor, subject to the liens with respect to the Secured Notes.

2.  Participation Requirements

Any person that wishes to participate in the bidding process (each, a "<u>Potential Bidder</u>") must become a "<u>Qualifying Bidder</u>." As a prerequisite to becoming a Qualifying Bidder (and, thus, being able to conduct due diligence), a Potential Bidder:

> must deliver an executed confidentiality agreement in form and substance acceptable to the Debtor; and

> must be able, as reasonably determined by the Debtor, to consummate a transaction if selected as the successful bidder for some or all of the Assets.

The Proposed Purchaser is deemed a Qualifying Bidder and the Asset Purchase Agreement constitutes a Qualifying Bid (as defined below) for all purposes.

3.    Form of Agreement

The Asset Purchase Agreement is an offer to purchase all of the Assets. Bidders who intend to submit bids for all of the Assets should reference the Asset Purchase Agreement in connection with such bids. On or before September 16, 2011, for bidders who only intend to submit bids for one or more of the Lots representing the LBIE Claim, the Devens Assets, the Core Assets or the Non-Core Assets (each as defined on Exhibit A), the Debtor will post in the virtual data room one or more forms of asset purchase agreement (each a "Short Form APA") that will be substantially similar to the Asset Purchase Agreement, but with modifications appropriate for the purchase of such applicable Lots without the other Assets. As set forth in section 5 below, Bidders who intend to submit bids must include with their bids (i) one or more clean asset purchase agreement(s) that contains substantially the same or terms more favorable to the Debtor than those in the Asset Purchase Agreement or the Short Form APA, as applicable and (ii) marked modified asset purchase agreement(s) reflecting any variations from the Asset Purchase Agreement executed by the Proposed Purchaser or the Short Form APA, as applicable.

4.    Due Diligence

The Debtor must afford any Qualifying Bidder the time and opportunity to conduct reasonable due diligence. The due diligence period shall extend through and including the Bid Deadline (as defined below). The Debtor and its representatives shall not be obligated to furnish any due diligence information after the Bid Deadline.

Due diligence access may include such management presentations as may be scheduled by the Debtor, access to the virtual data room, and such other matters which a Qualifying Bidder may reasonably request and as to which the Debtor may agree. The Debtor will designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access from Qualifying Bidders. The Debtor may, in its sole discretion, coordinate diligence efforts such that multiple Qualifying Bidders have simultaneous access to due diligence materials and/or simultaneous attendance at management presentations. Qualifying Bidders are advised to exercise their own discretion before relying on any information regarding the Assets provided by anyone other than the Debtor or its representatives.

Each bidder shall be deemed to acknowledge and represent that it has had an opportunity to conduct any and all due diligence regarding the Assets prior to submitting its bid, that it has relied solely upon its own independent review, investigation and/or inspection of any documents in making its bid, and that it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets, or the completeness of any information provided in connection with the bidding process outlined herein, except as expressly stated in the relevant purchase agreement of the Prevailing Bidder(s) (defined below) approved by the Bankruptcy Court.

2

5. <u>Bid Requirements</u>

To be deemed a "<u>Qualifying Bid</u>," a bid must be received from a Qualifying Bidder by a date no later than the Bid Deadline (as defined below) that:

(a)     sets forth the cash purchase price to be paid by such bidder (or in the case of the Proposed Purchaser, the credit bid amount);

(b)     does not propose payment in any form other than cash (or in the case of the Proposed Purchaser, a credit bid), <u>provided</u>, <u>however</u>, that a bid for the Core Assets in a consideration other than cash may be deemed a Qualifying Bid with the consent of the Supporting Noteholders (as defined in the Motion) holding a majority in aggregate principal amount of the Secured Notes held collectively by the Supporting Noteholders (the "<u>Requisite Supporting Noteholders</u>");

(c)     states the Lots proposed to be acquired and the liabilities proposed to be paid or assumed by such bidder, <u>provided</u>, <u>however</u>, that with respect to Lot 2 and Lot 4, the Debtor with the consent of the Requisite Supporting Noteholders (which consent will not be unreasonably withheld), may accept bids for the individual assets within Lot 2 and Lot 4;

(d)     is accompanied by a clean and duly executed purchase agreement (the "<u>Modified Asset Purchase Agreement</u>") and a marked Modified Asset Purchase Agreement reflecting any variations from the Asset Purchase Agreement executed by the Proposed Purchaser or the Short Form APA, as applicable;

(e)     states such Qualifying Bidder is financially capable of consummating the transactions contemplated by the Modified Asset Purchase Agreement and provides written evidence in support thereof;

(f)     states such Qualifying Bidder's offer is irrevocable until the closing of the Asset Sale if such Qualifying Bidder is the Prevailing Bidder (as defined below) or the Second-Highest Bidder (as defined below) for any or all Lots;

(g)     contains such financial and other information to allow the Debtor to make a reasonable determination as to the Qualifying Bidder's financial and other capabilities to consummate the transactions contemplated by the Modified Asset Purchase Agreement, including, without limitation, such financial and other information setting forth adequate assurance of future performance under contracts and leases to be assumed pursuant to section 365 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") in a form requested by the Debtor to allow the Debtor to serve, within one (1) business day after such receipt, such information on counter-parties to any contracts or leases being assumed or assumed and assigned in connection with the proposed sale that have requested, in writing, such information;

(h) identifies with particularity each and every executory contract and unexpired lease, the assumption and, as applicable, assignment of which is a condition to closing;

(i) does not request or entitle such Qualifying Bidder to any break-up fee, expense reimbursement (other than the expense reimbursement that only the Proposed Purchaser is entitled to receive), or similar type of payment;

(j) fully discloses the identity of each entity that will be bidding in the Asset Sale or otherwise participating in connection with such bid, and the complete terms of any such participation;

(k) with respect to bids for all of the Lots, is likely to result in a value to the Debtor's estate in the Debtor's reasonable judgment, that is more than the aggregate of the value of the sum of: (i) the credit bid amount set forth in the Asset Purchase Agreement; plus (ii) the assumed liabilities, as identified in the Asset Purchase Agreement; plus (iii) $500,000;

(l) (i) does not contain any financing contingencies of any kind; (ii) provides for expiration of any due diligence contingency on or before the Auction Date; and (iii) contains evidence that the Qualifying Bidder has received debt and/or equity funding commitments or has financial resources readily available sufficient in the aggregate to consummate the Asset Sale, which evidence is reasonably satisfactory to the Debtor;

(m) sets forth each regulatory and third-party approval required for the bidder to consummate its purchase, and the time period within which the bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to take more than 15 days following execution and delivery of an asset purchase agreement, those actions the bidder will take to ensure receipt of such approval(s) as promptly as possible),

(n) includes a commitment to close on or before November 18, 2011 (the "Projected Closing Date") subject to any regulatory approvals;

(o) provides for the Qualifying Bidder to serve as a back up bid (the "Second-Highest Bidder") if it is the next highest and best bid after the Prevailing Bid (the "Second-Highest Bid") in accordance with the terms of the Asset Purchase Agreement;

(p) includes evidence of authorization and approval from the Qualifying Bidder's board of directors (or comparable governing body) with respect to the submission, execution, and delivery of the Modified Asset Purchase Agreement;

(q) provides for liquidated damages in the event of the bidder's breach of contract equal to the deposit; and

(r)     provides a cash purchase deposit equal to ten percent (10%) of the purchase price contained in the Modified Asset Purchase Agreement; provided, however, that the Proposed Purchaser is not required to make a cash deposit.

A competing bid satisfying all the above requirements, as determined by the Debtor, after consultation with the Requisite Supporting Noteholders, as described below, shall constitute a Qualifying Bid. Each Potential Bidder submitting bid shall be deemed to acknowledge and represent that it is bound by these Bidding Procedures.

6.      Combination Bids

The Debtor reserves the right to auction off the Lots individually or in such combinations of Lots as the Debtor may determine, in consultation with the Requisite Supporting Noteholders. Bidders are invited to bid on the individual Lots or in such combinations of Lots as the bidder may elect, provided that any bid for a combination of Lots, other than the bid by the Proposed Purchaser, must (x) allocate the purchase consideration among the Lots, (y) state whether the bid is conditioned upon the bidder being the Prevailing Bidder (as defined herein) on more than one Lot and, if so, which are the Lots that the bid is conditioned upon, and (z) state whether the bidder is willing to purchase any of the Lots included in the bid individually, and if so, the bid must state the price the bidder would pay for each such Lot.

7.      Bid Deadline

A Qualifying Bidder that desires to make a bid shall deliver a written or electronic copy of its bid to: (i) Evergreen Solar, Inc., 138 Bartlett Street, Marlboro, MA 01752, Attn: Christian Ehrbar, General Counsel (cehrbar@evergreensolar.com); (ii) Bingham McCutchen LLP, One Federal Street Boston, MA 02110, Attn. J.Q. Newton Davis, Esq. (newton.davis@bingham.com) and 399 Park Avenue, New York, NY 10022, Attn: Ronald. J. Silverman, Esq. (ronald.silverman@bingham.com), counsel to the Debtor; (iii) UBS Investment Bank, 299 Park Avenue, New York, NY 10171, Attn: Steve Smith (sd.smith@ubs.com) and 555 California Street, San Francisco, CA 94104, Attn: David Dolezal (david.dolezal@ubs.com), investment banker to the Debtor; (iv) Hilco Industrial, LLC, 5 Revere Drive, Suite 206, Northbrook, IL 60062, Attn: Brian Lee (blee@hilcobid.com), broker to the Debtor; (v) Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, NY 10036, Attn: Michael S. Stamer, Esq. (mstamer@akingump.com) and James Savin, Esq. (jsavin@akingump.com), counsel to the Supporting Noteholders; (vi) Duff & Phelps Securities, LLC; 11150 Santa Monica Blvd, Suite 600, Los Angeles, CA 90025 Attn: Brian Cullen (brian.cullen@duffandphelps.com) and Mark Catania (mark.catania@duffandphelps.com), financial advisor to the Supporting Noteholders and (vi) Maslon Edelman Borman & Brand, LLP, 3300 Wells Fargo Center, 90 South Seventh Street, Minneapolis, MN 55402-4140, Attn: Clark T. Whitmore, Esq. (clark.whitmore@maslon.com), counsel to the Indenture Trustee[1] so as to be received by a date

---

[1] The defined term "Indenture Trustee" means U.S. Bank National Association (i) as Trustee for the Secured Notes pursuant to that certain Indenture, dated as of April 26, 2010, by and among Evergreen Solar, Inc., the Guarantors and U.S. Bank National Association; (ii) as Collateral Agent for the Secured Notes pursuant to that certain Pledge

(Continued…)

no later than October 26, 2011 (the "<u>Bid Deadline</u>").

8.       <u>Evaluation of Qualifying Bids</u>

The Debtor shall make a determination regarding whether a bid is a Qualifying Bid, after consultation with the Requisite Supporting Noteholders, and shall notify bidders whether their bids have been determined to be qualified by a date no later than two (2) days prior to the Auction Date (as defined below). In the event a bid is determined not to be a Qualifying Bid, the bidder shall be notified by the Debtor and shall have one (1) day from the date of such notification to modify its bid to render it a Qualifying Bid. Prior to the Auction (as defined below), the Debtor shall determine, in its reasonable judgment, after consultation with the Requisite Supporting Noteholders, which of the Qualifying Bids is likely to be the highest or best with respect to any particular Lot or group of Lots.

9.       <u>No Qualifying Bids</u>

If no timely, conforming Qualifying Bids other than the Qualifying Bid submitted by the Proposed Purchaser are submitted by the Bid Deadline, the Debtor shall not hold an Auction (as defined below) and instead shall request at the Sale Hearing (as defined below) that the Bankruptcy Court approve the Asset Purchase Agreement with the Proposed Purchaser.

10.       <u>Auction</u>

In the event that the Debtor timely receives one or more Qualifying Bids, other than the Asset Purchase Agreement, with respect to any of the Lots or individual assets within Lot 2 or Lot 4, as permitted herein, the Debtor shall conduct an auction (the "<u>Auction</u>") no later than the date that is four (4) business days after the Bid Deadline (the "<u>Auction Date</u>").

Following the Auction, the Debtor will determine, in consultation with its advisors, which individual bid or combination of bids is in the best interests of the Debtor and its estate.

The Auction shall be governed by the following procedures for each Lot to be sold individually and each group of Lots to be sold together:

(a)       The Auction shall be held at the law offices of Bingham McCutchen, LLP, 399 Park Avenue, New York, NY 10022 on November 1, 2011, beginning at 10:00 a.m. Provisions will also be made to allow Qualifying Bidders the opportunity to participate in the Auction by phone;

---

and Security Agreement, dated as of April 26, 2010, by and among Evergreen Solar, Inc., the Guarantors and U.S. Bank National Association; and (iii) as Trustee and Collateral Agent for the Secured Notes pursuant to that certain Collateral Trust Agreement, dated as of April 26, 2010, by and among Evergreen Solar, Inc., the Guarantors and U.S. Bank National Association

(b)     only the Proposed Purchaser and the other Qualifying Bidders shall be entitled to make any subsequent bids at the Auction;

(c)     the Proposed Purchaser and the other Qualifying Bidders shall appear in person at the Auction, or through a duly authorized representative;

(d)     only the Debtor, the Proposed Purchaser, the Qualifying Bidders, the Supporting Noteholders, the Indenture Trustee, and the Creditors Committee (if one has been appointed) and advisors to each of these parties, may attend the Auction;

(e)     the Debtor and its professional advisors shall direct and preside over the Auction and the Auction shall be transcribed;

(f)     bidding shall commence at the amount of the highest Qualifying Bid submitted by the Qualifying Bidders prior to the Auction;

(g)     With respect to any bids for all of the Lots, Qualifying Bidders may then submit successive bids in increments of at least $500,000 higher than the bid at which the Auction commenced and then continue in minimum increments of at least $500,000 higher than the previous bid; provided that the Debtor shall retain the right to modify the bid increment requirements at the Auction;

(h)     all material terms of the bid that is deemed to be the highest and best bid for each round of bidding shall be fully disclosed to all other Qualifying Bidders and the Proposed Purchaser;

(i)     all Qualifying Bidders, including the Proposed Purchaser, at the Auction shall be deemed to have consented to the core jurisdiction of the Bankruptcy Court and waive any right to a jury trial in connection with any disputes relating to the marketing process, the Auction, and the construction and enforcement of the Qualifying Bidder's contemplated Transaction documents, as applicable;

(j)     the Proposed Purchaser shall be entitled, upon direction given by holders of a majority of the principal amount of the Secured Notes, to cause the Indenture Trustee to (i) credit bid all or a portion of the aggregate principal amount of the Secured Notes, together with accrued interest and any other claims with respect to the Secured Notes, consistent with Bankruptcy Code section 363(k); (ii) allocate such credit bid among the Lots; (iii) reallocate such credit bid during the Auction; (iv) reduce the amount of the credit bid to the extent the Proposed Purchaser is not the Prevailing Bidder with respect to any Lot, and (v) submit additional bids and make modifications to the Asset Purchase Agreement at the Auction; provided, however, the Requisite Supporting Noteholders have consented in advance to the sale of Lot 3 to a third party bidder who bids cash in excess of $30 million (the "Reserve Price"), provided further, that the

Requisite Supporting Noteholders may determine in their sole discretion to reduce the Reserve Price or accept consideration other than cash.

(k)     all Qualifying Bidders, including the Proposed Purchaser, shall have the right to submit additional bids and make additional modifications to the Asset Purchase Agreement or Modified Asset Purchase Agreement at the Auction, provided that any such modifications to the Asset Purchase Agreement or Modified Asset Purchase Agreement on an aggregate basis and viewed in whole, shall not, in the Debtor's business judgment, be less favorable to the Debtor with respect to the particular Lots than the terms of the Asset Purchase Agreement;

(l)     the Debtor shall have the right to request any additional financial information that will allow the Debtor to make a reasonable determination as to the Qualifying Bidder's financial and other capabilities to consummate the transactions contemplated by the Modified Asset Purchase Agreement, as further amended during the Auction, and any further information that the Debtor may believe is reasonably necessary to clarify and evaluate the Qualifying Bidder's bid;

(m)     the Debtor shall have the right, with the consent of the Requisite Supporting Noteholders, to choose the order in which the Lots are put up for Auction;

(n)     the Auction shall continue until there is only one offer for all Assets or each of the Lots, as applicable, that the Debtor determines, subject to Bankruptcy Court approval, is the highest or best from among the Qualifying Bids submitted at the Auction (the "Prevailing Bid").   In making this decision, the Debtor shall consider, without limitation, the amount of the purchase price, the likelihood of the bidder's ability to close a transaction and the timing thereof, the number, type and nature of any changes to the Asset Purchase Agreement requested by each bidder, and the net benefit to the Debtor's estate.   The bidder submitting such Prevailing Bid with respect to any Lot shall become the "Prevailing Bidder," with respect to such Lot and shall have such rights and responsibilities of the purchaser, as set forth in the applicable Asset Purchase Agreement or Modified Asset Purchase Agreement; and

(o)     within one (1) business day after adjournment of the Auction, the Prevailing Bidder shall complete and execute all agreements, contracts, instruments and other documents evidencing and containing the terms and conditions upon which the Prevailing Bid was made.

11.     Consent

        For the avoidance of doubt, the Supporting Noteholders and the Indenture Trustee, at the direction of holders of a majority in aggregate principal amount of the Secured

Notes, have consented to the sale of the Assets in connection with the sales process governed by these Bidding Procedures. For the avoidance of doubt, the liens of the Secured Noteholders and the Indenture Trustee shall attach to the proceeds of the Asset Sale(s).

12.    Sale Hearing

The Prevailing Bid and the Second-Highest Bid (or the Asset Purchase Agreement if no Qualifying Bid other than that of the Proposed Purchaser is received) will be subject to approval by the Bankruptcy Court. The hearing to approve the Prevailing Bid and the Second-Highest Bid (or the Asset Purchase Agreement if no Qualifying Bid other than that of the Proposed Purchaser is received) (the "Sale Hearing") shall take place no later than three (3) business days following the conclusion of the Auction, subject to Bankruptcy Court availability.

13.    Return of Deposits

All deposits shall be returned to each bidder not selected by the Debtor as the Prevailing Bidder no later than five (5) business days following the substantial consummation of the sale to the Prevailing Bidder or the Second Highest Bidder (if such bidder is deemed the Prevailing Bidder).

14.    Reservation of Rights

Notwithstanding any of the foregoing, the Debtor reserves its right to modify these Bidding Procedures with the consent of the Requisite Supporting Noteholders at or prior to the Auction, including, without limitation, extending the deadlines set forth herein, modifying bidding increments, waiving terms and conditions set forth herein with respect to any or all potential bidders, imposing additional terms and conditions with respect to any or all potential bidders, adjourning or cancelling the Auction at or prior to the Auction and/or adjourning the Sale Hearing in open court without further notice.

15.    Backup Bidder.

(a)    Notwithstanding any of the foregoing, in the event that the Prevailing Bidder with respect to any of the Lots or individual assets within any of the Lots fails to consummate such sale prior to the Projected Closing Date (or such date as may be extended by the Debtor with the consent of the Requisite Supporting Noteholders), the Second Highest Bidder will be deemed to be the back-up bidder at the price of its last bid with respect to such Lot(s) or individual assets. The Second-Highest Bidder will be deemed to be the Prevailing Bidder and the Debtor will be authorized, but not directed, to effectuate a Sale of such Lot(s) or individual assets to the Second-Highest Bidder subject to the terms of the Second-Highest Bid without further order of the Bankruptcy Court. All Qualified Bids (other than the Prevailing Bid and the Second-Highest Bid) shall be deemed rejected by the Debtor on and as of the date of approval of the Prevailing Bid and the Second-Highest Bid by the Bankruptcy Court.

(b)    For the avoidance of doubt, in the event that there is a Prevailing Bidder (other than the Stalking Horse Bidder) with respect to any of the Lot(s) or individual assets, and the Stalking Horse is the Second-Highest Bidder, the Stalking Horse Bidder will be deemed to be the back-up bidder at the price of its last credit bid with respect to such Lot(s) or individual

assets and will be subject to the terms contained Section 15(a) herein.

| |
|---|
| Lot 1 – LBIE Assets:  Seller's claims against Lehman Brothers International Europe and Lehman Brothers Holdings Inc. arising out of (i) the Share Lending Agreement between Lehman Brothers International (Europe) and Seller, dated June 26, 2008, and (ii) Guarantee of Lehman Brothers Holdings Inc. of the Share Lending Agreement between Lehman Brothers International (Europe) and Seller, dated June 26, 2008. |
| Lot 2 – Devens Assets:  means, except to the extent included in the definition of Devens Excluded Assets, Seller's right, title and interest under the Devens Lease, (ii) the Devens Plant, (iii) the Devens Tangible Assets and (iv) the Devens Contracts. |
| Lot 3 – Core Assets:  means, except to the extent included in the definition of Wafer Excluded Assets, (i) all of Seller's Intellectual Property, (ii) the Wafer Tangible Assets, (iii) all right, title and interest of Seller in and to the Wafer Real Property, (iv) Seller's rights under all Wafer Contracts, (v) the name "Evergreen Solar" and any derivation thereof and (vi) sufficient cash to fund the Wafer Budget. |
| Lot 4 – Non-Core Assets:  All right, title and interest of Seller in any of the following, in each case as of the Closing Date:  (i) all Cash and Cash Equivalents (other than Cash and Cash Equivalents to the extent remaining as of the Closing Date in any of the Wafer Budget, the Transition Budget and the Wind-Down Budget); (ii) all Accounts Receivable; (iii) all Actions (including Avoidance Actions)[2]; (iv) all existing Inventory; and (v) all other assets of Seller, wherever held, but excluding the Devens Assets, the LBIE Assets, the Core Assets and the Retained Assets.  With respect to calculating the amount of Cash and Cash Equivalents to be included in Non-Core Assets, not less than five days prior to the Closing Date, Seller will provide to Purchaser a reconciliation of each of the Wafer Budget, the Transition Budget and the Wind-Down Budget, including a good faith estimate of expenses note yet incurred.  Prior to the Closing Date, Purchaser and Seller will negotiate in good faith the amount of Cash and Cash Equivalents to be included in Non-Core Assets based on the terms of this Agreement. |

**Certain Defined Terms:**

"Devens Contracts" means Seller's rights under all Contracts to which it is a party relating to the Devens Land, the Devens Plant or any Devens Tangible Assets.

"Devens Excluded Assets" means (i) those Devens Contracts that are not Designated Contracts pursuant to Section 2.5 and (ii) at Purchaser's election, which must be delivered in writing to Seller prior to the Designation Deadline, Seller's right, title and interest in

---

[2] This will be changed to "excluding Avoidance Actions" in the asset schedule provided to other bidders.

and to any of the Devens Lease, the Devens Plant or the Devens Contracts.

"Devens Land" means that certain parcel of land consisting of approximately 23.11 acres located at 114 Barnum Road, Devens, Massachusetts that is subject to the Devens Lease.

"Devens Lease" means that certain Ground Lease, dated as of November 20, 2007, between Seller and Mass Dev.

"Devens Plant" means: (i) the buildings and all other improvements owned by Seller located on the Devens Land, including manufacturing, warehouse and office space comprising approximately 458,000 square feet; and (ii) all fixtures owned by Seller that are attached or appurtenant to the Devens Plant, including all installed facility infrastructure equipment, all support, communication and operating systems, all wiring and server connections for supporting telephone and computer servers and networks and all external improvements including sound barriers, and roof-mounted solar PV equipment.

"Devens Tangible Assets" means the tangible personal property of the Seller located at the Devens Plant or on the Devens Land, including all manufacturing, laboratory, and test equipment, all furniture, vehicles, solar demonstration equipment, office equipment, cafeteria equipment, tables, and other equipment or tangible personal property of any kind, but excluding all Inventory on hand at the Devens Plant, including supplies, raw materials and work in process, spare parts, maintenance supplies, gases, fluids, and any demo panels and finished goods, if any, which shall be included in Non-Core Assets.

"Wafer Budget" an initial budget for the operation of the Wafer Business commencing on the Closing Date, substantially in the form of Exhibit A-1 to the Asset Purchase Agreement, subject to decrease to the extent contemplated by the definition of "Transition Budget".

"Wafer Business" means Seller's proposed business based on industry standard sized String Ribbon™ wafers for the photovoltaic solar industry, including completing the commercialization of the applicable technology to enable a commercialization plan (which may be in one or more forms such as licensing or manufacturing) that better positions the business enterprise for significant new financings or sales.

"Wafer Contracts" means Seller's rights under all Contracts to which it is a party relating to the Wafer Business or any Wafer Tangible Assets.

"Wafer Excluded Assets" means (i) any Wafer Contracts that are not Designated Contracts pursuant to Section 2.5 and (ii) at Purchaser's election, which must be delivered in writing to Seller prior to the Designation Deadline any of (x) Seller's right, title and interest in and to the Midland Facility, (y) the shares of capital stock held by Seller in Evergreen (Wuhan) and the Evergreen (Wuhan) Contracts, collectively, and (z) the shares of capital stock of Evergreen (Hong Kong) and, to the extent so excluded, all Contract primarily related thereto.

"Wafer Real Property" means (i) that certain parcel of real property consisting of approximately 11,185 square feet of office space located at 138 Bartlett Street, Marlborough,

Massachusetts that is subject to the Lease for 120 Bartlett Street, Marlborough, Massachusetts, dated as of January 26, 2006, as amended, (ii) those certain plots, pieces and parcels of land located at 257 Cedar Hill Road, Marlborough, Massachusetts that is subject to the Lease for 127 Cedar Hill Road, dated as of January 15, 2006, as amended, and (iii) the Midland Facility.

"Wafer Tangible Assets" means (i) the shares of capital stock of Evergreen (Hong Kong), (ii) the shares of capital stock of Evergreen Wuhan owned by Seller, (iv) all tangible assets necessary for the development and pursuit of Wafer Business, including the tangible personal property of the Seller located at (x) 138 Bartlett Street, Marlborough, Massachusetts, (y) 257 Cedar Hill Road, Marlborough, Massachusetts and (z) the Midland Facility, including all manufacturing, laboratory, and test equipment, all furniture, vehicles, solar demonstration equipment, office equipment, cafeteria equipment, tables, and other equipment or tangible personal property of any kind.

13

**Exhibit F-2:  Noteholder Sale APA**

**ASSET PURCHASE AGREEMENT**

**by and among**

**EVERGREEN SOLAR, INC.,**

**and**

**ES PURCHASER, LLC**

**dated as of August 15, 2011**

**TABLE OF CONTENTS**

Page

ARTICLE I. DEFINITIONS ..............................................................................2

ARTICLE II. PURCHASE AND SALE OF ASSETS ........................................2

     Sale and Transfer of Acquired Assets........................................2
     Retained Assets ..........................................................................2
     Assumption of Liabilities...........................................................3
     Retained Liabilities ....................................................................4
     Designation of Designated Contracts; Cure Costs......................4
     Non-Assignment of Designated Contracts..................................5
     "As Is" Transaction....................................................................5

ARTICLE III.  CONSIDERATION. ..................................................................5

     Purchase Price ............................................................................5
     Allocation of Purchase Price......................................................6
     Sale Free and Clear ....................................................................6

ARTICLE IV. CLOSING ..................................................................................7

     Closing .......................................................................................7
     Deliveries by Seller....................................................................7
     Deliveries by Purchaser .............................................................8

ARTICLE V. REPRESENTATIONS AND WARRANTIES OF SELLER .................8

     Organization...............................................................................8
     Subsidiaries................................................................................9
     Financial Statements ..................................................................9
     Real Property ............................................................................10
     Authorization; Enforceability ..................................................12
     No Conflicts..............................................................................12
     Consents and Approvals ...........................................................12
     Intellectual Property.................................................................13
     Material Contracts ....................................................................14
     Absence of Certain Developments............................................14
     Litigation; Product Warranties.................................................14
     Permits and Compliance with Laws .........................................15
     Taxes ........................................................................................15
     Employment Matters................................................................16
     Brokers .....................................................................................18
     Foreign Corrupt Practices Act Compliance .............................18

i

Environmental Matters........................................................................18
Title to Assets; Sufficiency of Assets ................................................19
Insurance ............................................................................................20
Inventory ............................................................................................20
Receivables ........................................................................................20

ARTICLE VI. REPRESENTATIONS AND WARRANTIES OF PURCHASER ......................20

Organization.......................................................................................20
Authorization; Enforceability ............................................................21
No Conflicts .......................................................................................21
Consents and Approvals ....................................................................21
Financial Capability ..........................................................................21
Broker's, Finder's or Similar Fees....................................................22
No Other Representations or Warranties ...........................................22

ARTICLE VII.  BANKRUPTCY COURT MATTERS........................................................22

Bankruptcy Actions ...........................................................................22
Bidding Procedures............................................................................22
Conduct of the Auction ......................................................................22
Sale Order ..........................................................................................23

ARTICLE VIII. COVENANTS.........................................................................................23

Interim Operations of the Wafer Business.........................................23
Access .................................................................................................24
Efforts and Actions to Cause Closing to Occur ................................25
Section 8.4        HSR Act.............................................................................................25
Notification of Certain Matters .........................................................27
Casualty Loss .....................................................................................27
Employee Matters ...............................................................................27
Subsequent Actions.............................................................................28
Publicity .............................................................................................28
Tax Matters ........................................................................................29
Rejection of Designated Contracts.....................................................30
Certain Purchaser Pre-Closing Covenants .......................................30
Certain Purchaser Post-Closing Covenants ......................................30
Books and Records .............................................................................30

ARTICLE IX. CONDITIONS ...........................................................................................30

Conditions Precedent to Performance by Seller and Purchaser.................30
Conditions to Obligations of Purchaser ............................................31
Conditions to Obligations of Seller....................................................33

ARTICLE X. TERMINATION ................................................................................................34

        Termination ................................................................................................34
        Effect of Termination ................................................................................35
        Expense Reimbursement ...........................................................................35

ARTICLE XI. MISCELLANEOUS ......................................................................................35

        Survival of Covenants, Representations and Warranties ..........................35
        Disclosure Schedule Supplements ............................................................36
        Amendment and Modification ...................................................................36
        Notices ......................................................................................................36
        Counterparts .............................................................................................37
        Mutual Drafting. .......................................................................................37
        Entire Agreement; No Third Party Beneficiaries ......................................37
        Severability ..............................................................................................38
        Governing Law .........................................................................................38
        Exclusive Jurisdiction ..............................................................................38
        Remedies ..................................................................................................38
        Specific Performance ...............................................................................38
        Assignment ...............................................................................................39
        Headings ...................................................................................................39
        No Consequential or Punitive Damages ...................................................39
        Definitions ................................................................................................39
        Bulk Transfer Notices ..............................................................................52
        Interpretation ............................................................................................52

EXHIBITS

| Exhibit A | Lots |
| Exhibit A-1 | Wafer Budget |
| Exhibit B | Form of Bill of Sale |
| Exhibit C | Form of Instrument of Assumption |
| Exhibit D | Form of Bidding Procedures Order |
| Exhibit E | Transition Budget |

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement, dated as of August 15, 2011 (the "Execution Date"), is made and entered into by and among Evergreen Solar, Inc., a Delaware corporation ("Seller") and ES Purchaser, LLC, a Delaware limited liability company ("Purchaser").

## RECITALS

WHEREAS, Seller is in the process of restructuring its operations to focus on the Wafer Business through the use of the Core Assets;

WHEREAS, it is anticipated that Seller will file a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the "Bankruptcy Code") in the Bankruptcy Court (the "Bankruptcy Case").

WHEREAS, Purchaser desires to purchase and acquire from Seller certain assets and rights and assume certain liabilities, and Seller desires to sell, convey, assign and transfer such assets and rights and such liabilities to Purchaser, in the manner and subject to the terms and conditions set forth herein and as authorized under sections 105, 363 and 365 of the Bankruptcy Code. The aggregate Purchase Price to be paid by Purchaser to Seller for the Acquired Assets will consist of a credit bid by Purchaser of the amount specified herein against certain amounts owed by Seller under or in connection with the Secured Notes, together with the assumption by Purchaser of the Assumed Liabilities.

WHEREAS, Seller has entered into a Restructuring Support Agreement, dated as of the Execution Date (as amended from time to time, the "Support Agreement"), with holders of the Secured Notes holding in excess of 70% of the aggregate principal amount of the Secured Notes (the "Supporting Noteholders"), pursuant to which such holders have agreed to provide certain support for the transactions contemplated hereby.

NOW, THEREFORE, in consideration of the foregoing premises and the representations, warranties, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

ARTICLE I.

DEFINITIONS

The terms defined or referenced in <u>Section 11.16</u>, whenever used herein, shall have the meanings set forth therein for all purposes of this Agreement.

ARTICLE II.

PURCHASE AND SALE OF ASSETS

Section 2.1    <u>Sale and Transfer of Acquired Assets</u>.

(a)    On the terms and subject to the conditions set forth in this Agreement, on the Closing Date, Seller shall unconditionally Transfer to Purchaser and/or one or more of Purchaser's Affiliates or Subsidiaries, as designated by Purchaser, and Purchaser and/or one or more of its Affiliates or Subsidiaries, as applicable, shall purchase, acquire, assume and accept from Seller, to the extent permitted by the Bankruptcy Code, free and clear of all Liabilities (except for any Permitted Liens and Assumed Liabilities), all of Seller's right, title and interest in and to the Acquired Assets.

(b)    For purposes of this Agreement, subject to Section 2.7, the term "<u>Acquired Assets</u>" means:  (i) the LBIE Assets, as described more fully as Lot 1 on <u>Exhibit A</u>; (ii) the Devens Assets, as described more fully as Lot 2 on <u>Exhibit A</u>; (iii) the Core Assets, as described more fully as Lot 3 on <u>Exhibit A</u>, and (iv) the Non-Core Assets, as described more fully as Lot 4 on <u>Exhibit A</u>, but in no event shall the term "<u>Acquired Assets</u>" include any Retained Assets.

Section 2.2    <u>Retained Assets</u>.  Notwithstanding anything in this Agreement to the contrary, the Acquired Assets shall not include the Assets which are to be retained by Seller and not sold or assigned to Purchaser (collectively, the "<u>Retained Assets</u>"), which shall be limited to the following:

(a)    Cash and Cash Equivalents in the aggregate amount equal to (i) the amount required to fund the Wind-Down Budget, (ii) the amount required to fund any remaining amounts under the Transition Budget, (iii) the amount required to fund any remaining amounts of the Seller's Professionals Carve-Out, and (iv) the amount required to fund any remaining amounts of the UCC Professionals Carve-out (if any);

(b)    all shares of capital stock or other equity interests in any Subsidiary, or securities convertible into or exchangeable or exerciseable for any such shares of capital stock or other equity interests, to the extent that any such shares of capital stock or other equity interest are excluded from the Acquired Assets;

(c)    all rights of Seller in and to all Contracts other than the Designated Contracts;

(d)    all deposits and all prepaid charges, Taxes and expenses of Seller solely related to any Retained Asset (including a non-Designated Contract) or Retained Liability, including,

without limitation, (i) security deposits with third party suppliers, vendors, service providers or landlords, and lease and rental payments, (ii) rebates, (iii) tenant reimbursements, (iv) prepaid Taxes (including ad valorem Taxes, personal property Taxes and real estate Taxes), and (v) pre-payments, in each case of clauses (i) through (v), solely related to any Retained Asset (including a non-Designated Contract) or Retained Liability.

(e)     all losses, loss carryforwards and rights to receive refunds, and credits with respect to any and all Taxes of Seller (and/or its Affiliates);

(f)     all Tax Returns of Seller;

(g)     all personnel files for Employees who are not Transferred Employees and personnel files of Transferred Employees that may not be Transferred under Applicable Laws;

(h)     books and records that Seller is required by Applicable Law to retain to the extent they relate exclusively to the Retained Assets or the Retained Liabilities;

(i)     customer relationships, goodwill and other intangible assets relating to, symbolized by or associated exclusively with the Retained Assets;

(j)     all claims that Seller may have against any Person solely with respect to any other Retained Assets;

(k)     any of Seller's director and officer insurance policies, fiduciary policies or employment practices policies (in each case of the foregoing, including any tail policies or coverage thereon), and any of Seller's rights, claims, demands, proceedings, causes of action or rights of set off thereunder;

(l)     the Devens Excluded Assets and the Wafer Excluded Assets; and

(m)     all right and claims of Seller arising under this Agreement and the Ancillary Agreements.

Section 2.3     Assumption of Liabilities.  Purchaser shall (or shall cause its designated Subsidiaries or Affiliates to) assume, and become solely and exclusively liable for, the following Liabilities of Seller and no others (collectively, the "Assumed Liabilities"):

(a)     all Liabilities and obligations of Seller under the Designated Contracts that arise exclusively after the Closing Date;

(b)     any other Liabilities and obligations that are specifically designated by Purchaser in writing on or prior to the Closing Date;

(c)     all Liabilities for Cure Costs for the Designated Contracts;

(d)     all Liabilities relating to, or arising in respect of the Acquired Assets accruing, arising out of or relating to events, occurrences, acts or omissions occurring or existing after the

Closing Date, or the operation of the Wafer Business or the Acquired Assets after the Closing Date,

(e)     all executory performance Liabilities (but not any Liabilities requiring or contemplating the payment of any money or other amounts or otherwise requiring the expenditure of any funds) of Seller under each Designated Contract that arise on or prior to the Closing Date solely to the extent requiring performance after the Closing Date.

Section 2.4     Retained Liabilities.  Notwithstanding anything in this Agreement to the contrary, Purchaser shall not assume, and shall be deemed not to have assumed, Liabilities, other than the Assumed Liabilities specified in Section 2.3 (collectively, the "Retained Liabilities"), including, without limitation, any direct or indirect Liability of any Seller or any ERISA Affiliate with respect to any Benefit Plan or Service Provider.  Specifically and without limiting the foregoing, Seller shall retain and Purchaser does not assume any severance, retention or sale bonus arrangements of Seller with any such Service Providers even if that Service Provider is a Transferred Employee.

Section 2.5     Designation of Designated Contracts; Cure Costs.

(a)     Not later than 15 days following the Execution Date, Seller will provide Purchaser with Section 2.5(a) to the Disclosure Letter (as such schedule may be amended, supplemented or otherwise modified from time to time in accordance with the terms of this Agreement, the "Contract & Cure Schedule"), which contains a list of each Devens Contract, Wafer Contract and each other Contract of Seller included in the Acquired Assets and Seller's good faith estimate of the amount of Cure Costs applicable to each such Contract (and if no Cure Cost is estimated to be applicable with respect to any particular Contract, the amount of such Cure Cost has been designated for such Contract as "$0.00").  From the date the Contract & Cure Schedule is provided through (and including) the Designation Deadline, promptly following any changes to the information set forth on such Schedule (including any new Contracts included in the Acquired Assets to which Seller becomes a party and any change in the Cure Amount of any such Contract), Seller shall provide Purchaser with a schedule that updates and corrects the Contract & Cure Schedule.  Purchaser may, at any time and from time to time through (and including) the Designation Deadline, include or exclude any Contract from the Contract & Cure Schedule (except with respect to Wafer Contracts, which may be excluded only with Seller's consent, not to be withheld unreasonably) and require Seller to give notice to the Third Parties to any such Contract of Seller's assumption and assignment thereof to the Purchaser and the amount of Cure Costs associated with such Contract or the rejection thereof.  If any Contract is added to (or excluded from) the Contract & Cure Schedule as permitted by this Section 2.5, then Purchaser and Seller shall make appropriate additions, deletions or other changes to any applicable Schedule to reflect such addition or exclusion.

(b)     Seller shall be responsible for the verification of all Cure Costs for each Designated Contract and shall use commercially reasonable efforts to establish the proper Cure Costs, if any, for each Designated Contract prior to the Closing Date.

(c)     To the extent that any Designated Contract requires the payment of Cure Costs in order to be assumed pursuant to section 365 of the Bankruptcy Code, at the Closing, the Cure

Costs related to such Designated Contract shall be paid by Seller.  Purchaser shall not be required to make any payment for Cure Costs for, or otherwise have any Liabilities with respect to, any Contract that is not a Designated Contract.

Section 2.6    Non-Assignment of Designated Contracts.  Anything contained herein to the contrary notwithstanding, (i) this Agreement shall not constitute an agreement to assign any Designated Contract if, after giving effect to the provisions of sections 363 and 365 of the Bankruptcy Code, an attempted assignment thereof, without obtaining a Consent, would constitute a breach thereof or in any way negatively affect the rights of Seller or Purchaser, as the assignee of such Designated Contract and (ii) no breach of this Agreement shall have occurred by virtue of such nonassignment. If, after giving effect to the provisions of sections 363 and 365 of the Bankruptcy Code, such Consent is required but not obtained, Seller shall, at Purchaser's sole cost and expense, cooperate with Purchaser in any reasonable arrangement, including Purchaser's provision of credit support, designed to provide for Purchaser the benefits and obligations of or under any such Designated Contract, including enforcement for the benefit of Purchaser of any and all rights of Seller against a third party thereto arising out of the breach or cancellation thereof by such third party; provided, that nothing in this Section 2.6 shall (x) require Seller to make any significant expenditure or incur any significant obligation on its own or on Purchaser's behalf or (y) prohibit Seller from ceasing operations or winding up its affairs following the Closing. Any assignment to Purchaser of any Designated Contract that shall, after giving effect to the provisions of sections 363 and 365 of the Bankruptcy Code, require the Consent of any third party for such assignment as aforesaid shall be made subject to such Consent being obtained.  Any contract that would be a Designated Contract but is not assigned in accordance with the terms of this Section 2.6 shall not be considered a "Designated Contract" for purposes hereof unless and until such contract is assigned to Purchaser following the Closing Date upon receipt of the requisite consents to assignment and Bankruptcy Court approval.

Section 2.7    "As Is" Transaction.  THE PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN ARTICLE V OF THIS AGREEMENT, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE ACQUIRED ASSETS OR THE WAFER BUSINESS.  WITHOUT IN ANY WAY LIMITING THE FOREGOING, SELLER HEREBY DISCLAIMS ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE ACQUIRED ASSETS.  ACCORDINGLY, THE PURCHASER WILL ACCEPT THE ACQUIRED ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS."

ARTICLE III.

CONSIDERATION.

Section 3.1    Purchase Price.  The aggregate consideration for the sale and transfer of the Acquired Assets shall be (the "Purchase Price") (a) $60,000,000 (sixty million dollars), which Purchaser will pay and deliver at the Closing in accordance with Section 4.3(a) and (b) Purchaser's assumption of the Assumed Liabilities at the Closing.  The Purchase Price shall be payable, at the Purchaser's option, in the form of (a) the exercise of credit bid rights under

Section 363(k) of the Bankruptcy Code with respect to all or a portion of the aggregate Obligations then outstanding under the Indenture relating to the 13% Convertible Senior Secured Notes of Evergreen due 2015 (the "Secured Notes"), dated as of April 26, 2010 among Seller, ESLR1, LLC, as Guarantor and U.S. Bank National Association, as Trustee (the "Indenture"), provided that any such credit bid of the Secured Notes shall be effected by the Indenture Trustee at the written direction of holders of a majority of the Obligations in accordance with the Indenture and be for the benefit of all holders of the Secured Notes; (b) cash and (c) any combination of (a) and (b).

Section 3.2    Allocation of Purchase Price.  Within sixty (60) days of the Closing Date, Purchaser shall prepare and deliver to Seller a statement allocating the sum of the Purchase Price, the Assumed Liabilities and other relevant items among the Acquired Assets in accordance with Section 1060 of the Code and the Treasury regulations promulgated thereunder (such statement, the "Allocation Statement") "), and the Allocation Statement shall be finalized upon reasonable consultation with Seller, and with Seller's consent, which consent shall not be unreasonably withheld or delayed.  The parties shall follow the Allocation Statement for purposes of filing IRS Form 8594 (and any supplements to such form) and all other Tax Returns, and shall not voluntarily take any position inconsistent therewith.  If the IRS or any other taxation authority proposes a different allocation, Seller or Purchaser, as the case may be, shall promptly notify the other party of such proposed allocation.  Seller or Purchaser, as the case may be, shall provide the other party with such information and shall take such actions (including executing documents and powers of attorney in connection with such proceedings) as may be reasonably requested by such other party to carry out the purposes of this section.  Except as otherwise required by Applicable Law or pursuant to a "determination" under Section 1313(a) of the Code (or any comparable provision of United States state, local, or non-United States law), (i) the transactions contemplated by Article II of this Agreement shall be reported for all Tax purposes in a manner consistent with the terms of this Section 3.2; and (ii) neither party (nor any of their Affiliates) will take any position inconsistent with this Section 3.2 in any Tax Return, in any refund claim, in any litigation or otherwise.  Notwithstanding the allocation of the Purchase Price set forth in the Allocation Statement, nothing in the foregoing shall be determinative of values ascribed to the Acquired Assets or the allocation of the value of the Acquired Assets in any plan or reorganization or liquidation that may be proposed.

Section 3.3    Sale Free and Clear.  Seller acknowledges and agrees and the Sale Order shall provide that, on the Closing Date and concurrently with the Closing, all then existing or thereafter arising Liabilities (other than those in favor of Purchaser created under this Agreement and/or any Ancillary Agreement, the Permitted Liens, if any, and Assumed Liabilities) of, against or created by Seller or its bankruptcy estate, to the fullest extent permitted by Section 363 of the Bankruptcy Code, shall be fully released from and with respect to the Acquired Assets. On the Closing Date, the Acquired Assets shall be Transferred to Purchaser and/or one or more of its Affiliates or Subsidiaries, as applicable free and clear of all Liabilities, other than the Permitted Liens, if any, and the Assumed Liabilities to the fullest extent permitted by Section 363 of the Bankruptcy Code.

ARTICLE IV.

CLOSING

Section 4.1    Closing.

(a)    Upon the terms and subject to the conditions of this Agreement, the Closing shall take place at the offices of Bingham McCutchen LLP, 399 Park Avenue, New York, NY, 10022-4689, at 10:00 a.m., New York City time, as specified below, unless another date, time and/or place is agreed in writing by each of the parties hereto.

(b)    The Closing shall occur on or before the date (the "Closing Date") that is not later than the fifth Business Day following the satisfaction and/or waiver of all conditions to the Closing as set forth in Article IX (other than conditions which by their nature can be satisfied only at the Closing).

Section 4.2    Deliveries by Seller.  At the Closing, Seller shall deliver or cause to be delivered to Purchaser (unless previously delivered) each of the following:

(a)    the officers' certificate referred to in Section 9.2(d);

(b)    a certified copy of the Sale Order and a copy of the docket of the Bankruptcy Court evidencing the entry of the Sale Order (updated through the date and time of the Closing); and

(c)    the duly executed Bill of Sale and duly executed counterparts of each Conveyance Document in respect of the Acquired Assets;

(d)    a duly executed Instrument of Assumption for the Designated Contracts and Assumed Liabilities;

(e)    a certification of non-foreign status for Seller in a form and manner which complies with the requirements of Section 1445 of the Code and the Treasury regulations promulgated thereunder;

(f)    if the Midland Facility has been included as a Core Asset hereunder, a special warranty deed to the Midland Facility conveying fee simple title to the Midland Facility to Purchaser subject to Permitted Liens;

(g)    at Purchaser's election and sole cost and expense, an owner's or leasehold title insurance policy (as applicable), in effect as of the Closing Date, issued by Fidelity National Title Insurance Company or one of its affiliates, on an ALTA 2006 form or other form reasonably satisfactory to Purchaser, insuring Purchaser's fee simple or leasehold title, as the case may be, to the Midland Facility, Devens Plant and Devens Land, subject to the Permitted Liens;

(h)    executed copies of the consents and approvals referred to in Section 9.2(e); and

(i)     all other documents required to be delivered by Seller to Purchaser at or prior to the Closing in connection with the Transactions.

Section 4.3     Deliveries by Purchaser.  At the Closing, Purchaser shall deliver or cause to be delivered to Seller (unless previously delivered) each of the following:

(a)     Purchaser shall (i) pay to or as directed by Seller the cash portion of the Purchase Price, if any, by wire transfer of immediately available funds to an account designated by Seller; and/or (ii) cause the Indenture Trustee to credit bid all or a portion of the aggregate Obligations then outstanding under the Secured Notes;

(b)     a duly executed Instrument of Assumption for the Designated Contracts and Assumed Liabilities;

(c)     the Secretary's certificate referred to in Section 9.3(e);

(d)     a release from the Indenture Trustee on behalf of the holders of the Secured Notes with respect to aggregate amount of the Secured Notes subject to Purchaser's credit bid and included in the Purchase Price for the Acquired Assets, in form and substance reasonably satisfactory to Seller; and

(e)     all other documents required to be delivered by Purchaser to Seller at or prior to the Closing in connection with the Transactions.

ARTICLE V.

REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Purchaser that the statements contained in this Article V are true and correct as of the date of this Agreement, except as otherwise stated in this Article V and except as set forth in the corresponding sections or subsections of the Disclosure Letter delivered by Seller to Purchaser concurrently with the execution and delivery hereof (it being agreed that disclosure of any information in a particular section or subsection of the Disclosure Letter shall be deemed disclosure with respect to any other section or subsection only to the extent that the relevance of such item is readily apparent).   Each representation and warranty made in this Article V as to "Seller" shall be deemed to include a representation and warranty as to each Foreign Subsidiary by applying each such representation and warranty *mutatis mutandis* (such that all changes and modifications to the defined terms and other terminology shall be made so that each such representation and warranty can be applied in a logical manner to the Foreign Subsidiaries).

Section 5.1     Organization.  Seller has been duly organized and is validly existing in good standing under the laws of its jurisdiction of incorporation, with the requisite corporate power and authority to own its properties and conduct its business as currently conducted.  Seller has been duly qualified as a foreign corporation or organization for the transaction of business and is in good standing under the laws of each other jurisdiction in which it owns or leases properties or conducts any business so as to require such qualification, except to the extent that

the failure to be so qualified or be in good standing has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 5.2    Subsidiaries.  All of the direct and indirect Subsidiaries of the Company are set forth on Section 5.2 of the Disclosure Letter.  The Company owns, directly or indirectly, all of the capital stock or other equity interests of each Foreign Subsidiary (other than Evergreen (Wuhan), of which the Company holds a 33% ownership interest in) free and clear of any Liens and all the issued and outstanding shares of capital stock of each Foreign Subsidiary are validly issued and are fully paid, non-assessable and free of preemptive and similar rights to subscribe for or purchase securities.  Each Foreign Subsidiary has been duly organized, is validly existing as a corporation, partnership or limited liability company in good standing under the laws of the jurisdiction of its incorporation or formation, has the corporate power, partnership or limited liability company and authority to own its property and to conduct its business and is duly qualified to transact business and is in good standing in each jurisdiction in which the conduct of its business or its ownership or leasing of property requires such qualification, except to the extent that the failure to be so qualified or be in good standing would not have, individually or in the aggregate, a Material Adverse Effect.

Section 5.3    Financial Statements.

(a)    Except as set forth on Section 5.3 of the Disclosure Letter, Seller has filed all forms, reports, statements, certifications and other documents (including all exhibits, amendments and supplements thereto) required to be filed by it with the SEC since January 1, 2009 (all such forms, reports, statements, certificates and other documents filed, since January 1, 2009 and prior to the date hereof, collectively, the "SEC Documents"), and Seller has furnished all reports and other documents (including all exhibits, amendments and supplements thereto) required to be furnished by it with the SEC since January 1, 2009 (all such reports and other documents furnished, since January 1, 2009 and prior to the date hereof, collectively, the "Furnished Reports").  As of the date hereof, there are no outstanding or unresolved comments in comment letters received from the SEC staff with respect to the SEC Documents or Furnished Reports.  No executive officer of Seller has failed to make the certifications required of him or her under Section 302 or 906 of the Sarbanes-Oxley Act with respect to any SEC Documents.  Neither Seller nor any of its executive officers has received notice from any Governmental Entity challenging or questioning the accuracy, completeness or manner of filing of the certifications required by the Sarbanes-Oxley Act and made by its principal executive officer and principal financial officer.

(b)    Each of the audited consolidated financial statements included in or incorporated by reference into the SEC Documents (including any related notes and schedules) have been prepared, or in the case of SEC Documents filed after the date of this Agreement, will be prepared, in accordance with United States generally accepted accounting principles ("GAAP") applied on a consistent basis throughout the periods involved (except as may be indicated in the notes thereto) and fairly present, or in the case of SEC Documents filed after the date of this Agreement, will fairly present, in all material respects the consolidated financial position of the Company and its Subsidiaries at the respective dates thereof and the results of operations, changes in equity and cash flows.  Each of the unaudited condensed consolidated financial statements included in or incorporated by reference into the SEC Documents (including any

related notes) have been prepared in accordance with GAAP applied on a consistent basis throughout the periods involved (except as may be indicated in the notes thereto or may be permitted by the SEC under the Exchange Act) and fairly present, or in the case of SEC Documents filed after the date of this Agreement, will fairly present, in all material respects the consolidated financial position of the Company and its Subsidiaries as of the respective dates thereof and the results of their operations, changes in equity and cash flows for the periods indicated (subject to notes and normal period-end adjustments that will not be material in amount or effect).

Section 5.4    Real Property.

(a)    Section 5.4(a) to the Disclosure Letter sets forth, to the extent constituting Acquired Assets, a true and correct legal description of all real property owned by Seller and used or held for use in connection with Seller's operations, together with all fixtures and improvements thereon (the "Owned Real Property"). Seller has good, marketable and insurable title to such Owned Real Property in fee simple, free and clear of all title defects and Liens (other than those that will be discharged at Closing) and Permitted Liens. At the Closing, Seller shall convey to Purchaser good, marketable and insurable title to the Owned Real Property, free and clear of all title defects and Liens (including, without limitation, all tenancies and occupancies), except for the Assumed Liabilities and Permitted Liens.

(b)    Section 5.4(b) of the Disclosure Letter sets forth a true and correct list of and legal description of all easements, rights-of-way, property use agreements, transmission line and pipeline rights and real property licenses (including rights-of-way Permits from Governmental Entities) for the benefit of Seller associated with the Owned Real Property (the "Easements"). Seller has (and, to the extent constituting Acquired Assets, shall convey to Purchaser at the Closing) Seller's interest in the Easements to the extent assignable, free and clear of all Liens arising by, through or under Seller other than the Assumed Liabilities and Permitted Liens.

(c)    Section 5.4(c) of the Disclosure Letter lists all leases, subleases, licenses, concessions, or other agreements (written and all amendments thereto) of Real Property to which Seller is a party relating to or used in connection with the Acquired Assets (the "Real Property Leases"); such real property is referred to as the "Leased Real Property" and together with the Owned Real Property, the "Real Property." Seller has a good and marketable leasehold interest in, and enjoys quiet and undisturbed possession of, the Leased Real Property, free and clear of all Liens arising by, through or under Seller, except: (i) as set forth on Section 5.4(b) of the Disclosure Letter and (ii) Permitted Liens. True and correct copies of the Real Property Leases have been made available to Purchaser. Except as set forth on Section 5.4(c) of the Disclosure Letter and the rights of the holders of Permitted Liens, Seller is in exclusive possession of the Real Property and the improvements thereon. No public warehouse facilities are utilized in the operation of the Wafer Business as currently conducted other than as described on Section 5.4(c) of the Disclosure Letter.

(d)    Except as otherwise set forth in Section 5.4(d) of the Disclosure Letter: (i) the Real Property Leases are in force and effect and none of the Real Property Leases have been modified, amended, terminated, renewed or extended; (ii) no renewal or extension options have been granted to Seller; (iii) Seller does not have an option to purchase any of the Real Property

or any portion thereof, except as set forth in the applicable Real Estate Lease; (iv) the rents thereunder are being paid on a current basis and there are no arrearages; (v) except for any default created by the bankruptcy filing contemplated hereby, Seller is not in default, and to Seller's Knowledge, none of the other parties to such Real Property Lease is in default of any of its obligations thereunder and, other than the Bankruptcy Case, no event has occurred that, with the giving of notice or passage of time, or both, would constitute a default thereunder; (vi) Seller has not paid any rent, fees, or other charges under such Real Property Leases for more than one month in advance (other than in respect of base rent under the Devens Lease, which was prepaid upon execution thereof); (vii) Seller is presently not contesting any tax, utility, operating cost or other escalation payments or occupancy charges, or any other amounts payable under such Real Property Leases; (viii) to Seller's Knowledge, (A) all material work, repairs, alterations and improvements required to be performed by any party as of the date hereof to any of such Real Property Leases has been completed and fully paid for, and (B) all material obligations of the landlord under such Real Property Leases have been performed; (x) there are no actions or proceedings pending or, to the Knowledge of Seller, threatened by any landlord under any Real Property Leases; (xi) true and complete copies of all assignments of Real Property Leases and subleases and consents thereto by landlords under such Real Property Leases, including all amendments, guarantees, side letters, subordination and non-disturbance agreements and other documents relating thereto, have been made available to Purchaser; (xii) there are no security deposits other than those set forth in the Disclosure Letter, such security deposits are held by the landlords under such Real Property Leases and have not, as of the date hereof, been applied to existing arrears in rents or otherwise in accordance with the terms of such Real Property Leases; and (xiii) such Real Property Leases do not prohibit the execution, delivery and performance of this Agreement and the transactions contemplated hereby.

(e)      All public utilities (including, without limitation, gas, electric, water, storm and sanitary sewerage and telephone utilities) required to operate the Wafer Business are installed at and available to the Real Property, and, Seller has no Knowledge of any proposed, planned or actual curtailment of service of any utility supplied to any portion of the Real Property.

(f)      With respect to the Real Property (i) no eminent domain, condemnation or similar proceedings are pending or, to the Knowledge of Seller, threatened, (ii) no proceeding is pending that to the Knowledge of the Seller would reasonably be expected to terminate the current access from the Real Property to any presently existing highways and roads adjoining or situated on the Real Property, (iii) to the Knowledge of the Seller, no structure on the Real Property is located within a flood hazard zone as defined by the Federal Insurance Administration, (iv) to the Knowledge of the Seller, no special assessments or tax abatements affect the Real Property, (v) there are no pending or, to the Knowledge of Seller, threatened zoning changes or zoning ordinance amendments which would affect the Real Property, and (vi) the Real Property, including, without limitation, each improvement thereon, is in good condition, normal wear and tear excepted, for the purpose for which used in the Wafer Business, has sufficient rights of access and egress for the purposes for which it is used and complies, in all material respects, with all municipal, state and federal statutes, ordinances, rules and regulations applicable thereto, and no material improvements or repairs are necessary or currently contemplated with respect thereto, except where the failure to be in such condition would not, individually or in the aggregate, reasonably be expected to be adverse in any material respect to the Seller's or the Purchaser's ability to conduct the Wafer Business in the ordinary course of business.

(g)    Seller has not leased, licensed or otherwise granted to any Person the right to use or occupy the Real Property or any portion thereof, and except as set forth in Section 5.4(g) of the Disclosure Letter, there are no outstanding options, rights or first offer or rights of first refusal to purchase any of the Real Property, the Easements or any portion of or any interest therein.

(h)    To Seller's Knowledge, Seller's use or occupancy of the Real Property and the operation of the Wafer Business as currently conducted thereon complies in all material respects with all applicable zoning and land use Laws and is not dependent on a "permitted non-conforming use" or "permitted non-conforming structure" or similar variance, exemption or approval from any Governmental Entity (other than as set forth in Seller's unified permit relating to the Devens Plant and the Devens Land).

Section 5.5    Authorization; Enforceability.  Subject to the entry of the Sale Order, Seller has all requisite corporate power and authority to enter into, execute and deliver this Agreement and the other Ancillary Agreements to which it is or is to be a party and to perform its obligations hereunder and thereunder.  The execution, delivery and performance by Seller of this Agreement and each of the other Ancillary Agreements to which it is or is to be a party, and the consummation by Seller of the Transactions, have been duly authorized by all necessary corporate action on the part of Seller.  This Agreement has been and, when executed and delivered, each other Ancillary Agreement to which each of them is to be a party, will be, duly and validly executed and delivered by Seller and, subject to the entry of the Sale Order, constitutes (in the case of this Agreement) and will constitute (in the case of each of the Ancillary Agreements) the valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, subject to laws of general application relating to bankruptcy, insolvency, and the relief of debtors and other laws of general application affecting enforcement of creditors' rights generally, rules of law governing specific performance, injunctive relief and other equitable remedies.

Section 5.6    No Conflicts.  Subject to the entry of the Sale Order, the execution, delivery and performance of this Agreement and each other Ancillary Agreement, and the consummation of the Transactions will not (a) result in a violation of the Organizational Documents of Seller, (b) assuming receipt of all required consents and approvals from Governmental Entities in accordance with Section 9.1(b) and Section 9.2(e), result in a material violation of any Applicable Law, or (c) result in the creation or imposition of any Lien upon or with respect to any Acquired Asset, other than in favor of Purchaser as specified in the Ancillary Agreements and Permitted Liens, except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  Seller is not in violation of its Organizational Documents.

Section 5.7    Consents and Approvals.  Except as set forth in Section 5.7 of the Disclosure Letter or otherwise in this Agreement, no consent, approval, authorization, order, registration or qualification of or with any Governmental Entity having jurisdiction over Seller or any of its properties is required for the execution and delivery by Seller of the Agreement and the Ancillary Agreements and performance of and compliance by Seller with all of the provisions hereof and thereof and the consummation of the Transactions, except (a) the entry of the Sale Order and the expiration, or waiver by the Bankruptcy Court, of the 14-day period set forth in

Bankruptcy Rules 6004(h) and 3020(e), as applicable, (b) filings with respect to and any consents, approvals or expiration or termination of any waiting period, required under any United States or foreign antitrust or investment laws which may include the HSR Act and any other Regulatory Approvals required, and (c) such other consents, approvals, authorizations, registrations or qualifications the absence of which would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 5.8    Intellectual Property.

(a)    Section 5.8(a) of the Disclosure Letter sets forth a complete and accurate list of all (i) United States and non-United States Patents and Patent applications owned by Seller; (ii) United States and non-United States Trademark registrations and Internet domain registrations, Trademark applications, and material unregistered Trademarks owned by Seller; (iii) United States and non-United States Copyright and mask work registrations, and material unregistered Copyrights owned by Seller; and (iv) Software (other than readily available commercial software programs having an acquisition price of less than $10,000) that is owned, licensed or leased by Seller, describing which Software is owned, licensed or leased, as the case may be, and the applicable owner, licensor or lessor.

(b)    Section 5.8(b) of the Disclosure Letter sets forth a complete and accurate list of all Contracts to which Seller is a party or otherwise bound, (i) granting or obtaining any right to use or practice any rights under any Intellectual Property (other than licenses for readily available commercial software programs having an acquisition price of less than $10,000), or (ii) restricting Seller's rights to use any Intellectual Property, including license agreements, development agreements, distribution agreements, settlement agreements, consent to use agreements, and covenants not to sue (collectively, the "License Agreements").  Seller has not licensed or sublicensed its rights in any Intellectual Property other than pursuant to the License Agreements.

(c)    Seller owns or possesses rights to use all Intellectual Property used in the conduct of the Wafer Business.  All registrations with and applications to Governmental Entities in respect of such Intellectual Property are in full force and effect, have not, except in accordance with the ordinary course practices of Seller, lapsed, expired or been abandoned, are not the subject of any opposition or other action filed with the United States Patent and Trademark Office or any other applicable Intellectual Property registry, court of law, or tribunal.  The consummation of the Transactions will not result in the loss or impairment of any rights to use such Intellectual Property or obligate Purchaser to pay any royalties or other amounts to any third party in excess of the amounts that would have been payable by Seller absent the consummation of the Transactions.

(d)    No present or former Employee, officer or director of Seller, or agent, outside contractor or consultant of Seller, holds any right, title or interest, directly or indirectly, in whole or in part, in or to any Intellectual Property.  Other than with respect to copyrightable works Seller hereby represents to be "works made for hire" within the meaning of Section 101 of the Copyright Act of 1976 owned by Seller, Seller has obtained from all individuals who participated in any respect in the invention or authorship of any Intellectual Property created by or for Seller (the "Owned Intellectual Property"), as consultants, as employees of consultants or

otherwise, effective waivers of any and all ownership rights of such individuals in the Owned Intellectual Property and written assignments to Seller of all rights with respect thereto.

(e)     Seller has not received any notice that it is, or they are, in default (or with the giving of notice or lapse of time or both, would be in default) under any contract relating to such Intellectual Property.  To Seller's Knowledge, all Owned Intellectual Property is valid, and Seller has not received any notice of any claim of invalidity of any Owned Intellectual Property.  To Seller' Knowledge, no Intellectual Property rights of Seller are being infringed by any other Person, except to the extent that such infringement has not had and would not have, individually or in the aggregate, a Material Adverse Effect.  Seller has not received any notice of any claim of infringement or conflict with any Intellectual Property right of others which has had or would in any such case be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 5.9     Material Contracts.

(a)     Section 5.9(a) of the Disclosure Letter sets forth each Contract to which Seller is a party or is bound (i) involving aggregate expenses or payments of $50,000 or more during any 12-month period (other than purchase orders in the ordinary course of business of Seller and other than Contracts that by their terms may be terminated by Seller in the ordinary course of business upon 60 days' or less notice without penalty or premium), (ii) which is a Contract with a Governmental Entity or (iii) the breach or termination of which could reasonably be expected to have a Material Adverse Effect on Seller (the "Material Contracts")

(b)     Except as may have occurred solely as a result of the commencement of the Bankruptcy Case (or any other action taken by Seller during the Bankruptcy Case), each Material Contract, is valid, binding and full force and effect, enforceable in all material respects by the Seller in accordance with its terms, and there has not been any cancellation or, to the Knowledge of Seller, threatened cancellation of any such Material Contract, nor any pending or, to the Knowledge of Seller, threatened disputes thereunder.  Seller is not (with or without the lapse of time or the giving of notice, or both) in material breach or default under any Material Contract except for breaches or defaults (i) that would be remedied solely by the payment of Cure Costs, or (ii) caused solely by the filing of the Bankruptcy Case.  To the Knowledge of Seller, no other party to any of the Material Contracts is (with or without the lapse of time or the giving of notice, or both) in material breach or default thereunder.  No consents or approvals of any Person other than Seller is necessary to sell, assign, convey, transfer and deliver to Purchaser, on the terms of this Agreement, any and all rights and interests of Seller in the Material Contracts.  Seller has provided Purchaser with true and complete copies of each written Material Contract (including all amendments thereto).

Section 5.10     Absence of Certain Developments.  Since December 31, 2010, Seller has not Transferred ownership of any of its Assets to any of its Subsidiaries or Affiliates.

Section 5.11     Litigation; Product Warranties.

(a)     Except as set forth on Section 5.11(a) of the Disclosure Letter, there are no legal, governmental or regulatory actions, suits, proceedings or, to the Knowledge of Seller,

investigations pending or threatened to which Seller is or may be a party or to which any property of Seller, any director or officer of Seller in their capacities as such, or the Wafer Business, Assumed Liabilities or Acquired Assets is or may be the subject that, individually or in the aggregate, has had or, if determined adversely to Seller, would reasonably be expected to have a Material Adverse Effect.

(b)      Except as set forth on <u>Section 5.11(b)</u> of the Disclosure Letter, there are no product warranties, product defect or products liability claims pending against Seller or its Subsidiaries with respect to any Products manufactured or sold by Seller or its Subsidiaries during the past five (5) years and Seller does not know of any basis for, any such claim.  To the Knowledge of Seller, there are no defects in design, construction or manufacture of Products that would adversely affect performance or create a risk of injury to persons or property.  The Products that are designed and manufactured solely by Seller and its Subsidiaries and, to the Knowledge of Seller, the other Products have been designed and manufactured so as to meet and comply with all governmental standards and specifications currently in effect, and the Products have received all governmental approvals necessary to allow their sale and use.  As used in this <u>Section 5.11(b)</u>, the term "<u>Products</u>" means any and all products of Seller and its Subsidiaries distributed or sold by Seller and its Subsidiaries under any brand name or mark under which products are or have been manufactured, distributed or sold by Seller and its Subsidiaries.

Section 5.12    <u>Permits and Compliance with Laws</u>.

(a)      Except as set forth on Section 5.12(a) of the Disclosure Letter, Seller is, and has been since January 1, 2009, in compliance in all material respects with all Applicable Laws. Seller has not received written notification from any Governmental Entity (i) asserting a violation of any Applicable Law regarding the conduct of the Wafer Business; (ii) threatening to revoke any material Permit; or (iii) restricting or in any way limiting its operations as currently conducted, except for notices of violations, revocations or restrictions.

(b)      Seller possesses all material Permits issued by, and have made all declarations and filings with, the appropriate Governmental Entities that are necessary for the ownership, lease, use and operation of the Acquired Assets (collectively, the "<u>Seller Permits</u>").  Section 5.12(b) of the Disclosure Letter sets forth, as of the Execution Date, a true and correct list of all material Seller Permits in effect and a true and correct list of all material pending applications for Permits, that would be Seller Permits if issued or granted and all material pending applications by Seller for modification, extension or renewal of the Seller Permits.  Seller has operated the Wafer Business in compliance in all material respects with the terms and conditions of the Seller Permits, and Seller not has received any written notice alleging any such failure to comply. Seller has not received notice of any revocation or modification of any such Permit or has any reason to believe that any such Permit will not be renewed in the ordinary course.

Section 5.13    <u>Taxes</u>.

(a)      Seller has timely filed or caused to be filed all United States federal, state, local and non-United States Tax Returns required to have been filed that are material to the Acquired Assets, taken as a whole, and each such Tax Return is true, complete and correct in all material respects.

(b)    Seller has timely paid or caused to be timely paid all Taxes shown to be due and payable by it or them on the returns referred to in Section 5.13(a) and all other Taxes or assessments (or made adequate provision (in accordance with GAAP) for the payment of all Taxes due) with respect to all periods or portions thereof ending on or before the Closing Date (except Taxes or assessments that are being contested in good faith by appropriate proceedings and for which Seller has set aside on its books adequate reserves in accordance with GAAP), which Taxes, if not paid or adequately provided for, would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(c)    Except as set forth in Section 5.13(c) of the Disclosure Letter to Seller's Knowledge, there are no material United States federal, state, local or non-United States federal or provincial audits, examinations, investigations or other administrative proceedings or court proceedings have been commenced or are presently pending or threatened in writing with regard to any Taxes or Tax Returns with respect to the Acquired Assets.  There is no material unresolved dispute or claim concerning any Tax liability with respect to the Acquired Assets either claimed or raised by any Tax Authority in writing.  There are no outstanding agreements or waivers extending the applicable statutory periods of limitation for Taxes associated with the Acquired Assets that will be binding upon Purchaser after the Closing Date.

(d)    Except as set forth in Section 5.13(d) of the Disclosure Letter, there are no statutory Liens for Taxes upon any of the Acquired Assets or the Wafer Business.

Section 5.14    Employment Matters.

(a)    To Seller's Knowledge, Seller's relations with its Employees are good under the circumstances of Seller's financial condition and prospects.  Seller is in compliance in all material respects with all Applicable Laws respecting employment and employment practices, terms and conditions of employment and wages and hours.

(b)    Seller is not engaged in any unfair labor practice or other unlawful employment practice.  Except as disclosed on Section 5.14(b) of the Disclosure Letter, there are no unfair labor practice charges or other employee-related complaints or claims against Seller pending or, to Seller's Knowledge, threatened before the National Labor Relations Board, the Equal Employment Opportunity Commission, the Occupational Safety and Health Review Commission, the Department of Labor or any other Governmental Entity by or concerning the Employees, independent contractors or consultants of Seller, that if decided adversely would reasonably be expected to have a Material Adverse Effect.  Except as disclosed on Section 5.14(b) of the Disclosure Letter, for the three (3) year period prior to the date of this Agreement, Seller has not (i) been notified in writing by any Governmental Entity of any alleged violation by Seller of Applicable Law that remains unresolved respecting employment, employment practices or terms and conditions of employment, or (ii) received any written notice of the intent of any Governmental Entity to conduct an investigation of Seller and, to Seller's Knowledge, no such investigation is in progress.

(c)    Seller is not (i) party to any collective bargaining agreement, (ii) currently negotiating any collective bargaining agreement, or (iii) obligated to negotiate any collective bargaining agreement with its Employees.

(d)     All material levies, assessments and penalties made against Seller pursuant to all applicable workers compensation legislation as of the date hereof have been paid by Seller, and Seller has not been reassessed under any such legislation.

(e)     Section 5.14(e) of the Disclosure Letter lists, as of the date of this Agreement, a true and complete list of each (i) deferred compensation plan, (ii) incentive compensation plan, (iii) equity compensation plan, (iv) "employee benefit plan" (within the meaning of Section 3(3) of ERISA, (v) employment, termination, severance or "change in control" agreement, and (vi) other employee benefit plan, fund, program, agreement or arrangement, in each case, that is sponsored, maintained or contributed to or required to be contributed to by Seller or by any trade or business, whether or not incorporated (an "ERISA Affiliate"), that together with Seller would be deemed a "single employer" within the meaning of Section 4001(b) of ERISA, or to which Seller or any ERISA Affiliate have any Liability or is a party, for the benefit of any Employee, consultant or director or any former Employee, consultant or director of Seller (each such plan is referred to herein as a "Benefit Plan" and each such Person is referred to herein as a "Service Provider").  Each Benefit Plan is operated, funded and administered in all material respects in accordance with its terms and the terms of Applicable Law (including ERISA and the Code). True and complete copies of all Benefit Plans, including, but not limited to, any trust instruments and insurance contracts forming a part of any Benefit Plans, and all amendments thereto have been made available to Purchaser.  Each Benefit Plan which is an "employee pension benefit plan" within the meaning of Section 3(2) of ERISA ("Pension Plan") and which is intended to be qualified under Section 401(a) of the Internal Revenue Code of 1986, as amended (the "Code"), has received a favorable determination letter from the Internal Revenue Service.  All liabilities or expenses of the Seller in respect of any Benefit Plan (including workers compensation) which have not been paid, have been properly accrued on the Seller's most recent financial statements in compliance with GAAP.  All contributions (including all employer contributions and employee salary reduction contributions) or premium payments required to have been made under the terms of any Benefit Plan, or in accordance with applicable law, as of the date hereof have been timely made or reflected on the Seller's financial statements in accordance with GAAP.

(f)     Neither the Seller or any ERISA Affiliate has ever maintained, contributed to or had any liability with respect to any employee benefit plan subject to Title IV or Section 302 of ERISA or Sections 412 or 430 of the Code.

(g)     As of the date hereof, there are no pending or, to Seller's Knowledge, threatened or anticipated claims by or on behalf of any Benefit Plan, by any Service Provider or beneficiary covered under any such Benefit Plan, or otherwise involving any Benefit Plan (other than routine claims for benefits) that could reasonably result in the imposition of any Liability upon Purchaser.

(h)     Neither Seller nor any ERISA Affiliate has any obligation to provide or make available post-employment benefit under any Benefit Plan which is a "welfare plan" (as defined in Section 3(1) of ERISA) for any Service Provider (or their respective beneficiaries) of the Seller, except as may be required under the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended (otherwise referred to as "COBRA"), and at the sole expense of such individual.

(i)     Seller has not incurred any liability or obligation under the Worker Adjustment and Retraining Notification Act or any similar state or local Law ("WARN") within the last six months which remains unsatisfied.  No later than five business days prior to the Closing Date, the Seller shall provide Purchaser with a list setting forth the number of employees terminated from each site of employment of Seller during the 90-day period ending on the Closing Date (which list shall not include any employees which may be terminated on the Closing Date at the direction of Purchaser) for reasons qualifying the termination as "employment losses" under WARN  and the date of each such termination with respect to each termination; provided, that this sentence shall not apply with respect to any site of employment at which sufficient employees have not been employed at any time in such 90-day period for terminations of employment at such site to be subject to WARN.

(j)     Seller has no direct or indirect liability, whether absolute or contingent, with respect to any misclassification of any person as an independent contractor rather than as an employee, or with respect to any employee leased from another employer.

(k)     No Subsidiary maintains or sponsors any Benefit Plan that would remain a Benefit Plan of such Subsidiary following the Closing.

Section 5.15     Brokers.  Except as disclosed in Section 5.15 of the Disclosure Letter, Seller is not a party to any contract, agreement or understanding with any Person that would give rise to a valid claim against Purchaser for a brokerage commission, finder's fee or like payment in connection with the Transactions.

Section 5.16     Foreign Corrupt Practices Act Compliance.  Since January 1, 2009, neither Seller nor, to the Knowledge of Seller, any person or other entity acting on behalf of Seller, has directly or indirectly, on behalf of or with respect to the Wafer Business: (a) made any contributions, payments or gifts of its property to or for the private use of any governmental official, employee or agent where either the payment or the purpose of such contribution, payment or gift is illegal under the laws of the United States, any state thereof or any other jurisdiction (foreign or domestic); (b) either established or maintained any unrecorded fund or asset for any purpose, or made any intentionally false or artificial entries on its books or records for any reason; (c) made any payments to any Person with the intention or understanding that any part of such payment was to be used for any purpose other than that described in the documents supporting the payment; (d) either made any contribution, or reimbursed any political gift or contribution made by any other Person, to candidates for public office, whether federal, state or local, where such contribution or reimbursement would be in violation of applicable law in any material respect; (e) made or received any payment which was not legal in any material respect to make or receive; (f) engaged in any material transaction or made or received any material payment which was not properly recorded on the books of the Company; (g) created or used any "off-book" bank or cash account or "slush fund;" or (h) engaged in any conduct constituting a violation in any material respect of the Foreign Corrupt Practices Act of 1977.

Section 5.17     Environmental Matters.

(a)     Except as set forth on Section 5.17(a) of the Disclosure Letter, (i) the operations of Seller are and have been in compliance with all Environmental Laws; (ii) there has been no

Release at any of the properties owned or operated by Seller, or any predecessor in interest thereof, or at any disposal or treatment facility which received Hazardous Materials generated by Seller or any predecessor in interest thereof; (iii) no Environmental Claim has been asserted against Seller or any predecessor in interest thereof nor does Seller have knowledge or notice of any threatened or pending Environmental Claim against Seller or any predecessor in interest thereof; (iv) no Environmental Claims have been asserted against any facilities that may have received Hazardous Materials generated by Seller or any predecessor in interest thereof; (v) no property now or formerly owned or operated by Seller has been used as a treatment, storage, or disposal site for any Hazardous Material (and no such property or facility is contaminated by any such substance); (vi) Seller has not failed to report to the proper Governmental Entity any Release which is required to be so reported by any Environmental Laws; (vii) Seller holds all Permits required under any Environmental Laws in connection with the occupation of any of the properties owned or operated by Seller or the operation of the business carried on by it; and (viii) Seller has not received any notification pursuant to any Environmental Laws that (A) any work, repairs, construction or capital expenditures are required to be made as a condition of continued compliance with any Environmental Laws or any license, permit or approval issued pursuant thereto or (B) any license, permit or approval referred to above is about to be reviewed, made subject to limitations or conditions, revoked, withdrawn or terminated.

(b)     Except as described in Section 5.17(b) of the Disclosure Letter, to the Knowledge of Seller, the Real Property does not contain any: (i) under- or above-ground storage tanks, (ii) underground injection wells, (iii) septic tanks in which process wastewater or any Hazardous Materials have been disposed, (iv) asbestos, (v) equipment containing PCBs or (vi) drums buried in the ground, or other landfills, surface impoundments, or disposal areas.

(c)     Section 5.17(c) of the Disclosure Letter identifies all environmental, health and/or safety, including process safety management, loss and prevention, investigations, assessments, audits, studies, tests, reviews, reports or sampling results (including but not limited to Phase I or Phase II environmental assessments or environmental audits) relating to the Real Property commissioned by Seller and true and complete copies of such reports have been provided to Purchaser.

(d)     Section 5.17(d) of the Disclosure Letter identifies all material Environmental Permits, approvals or authorizations issued by any federal, state or local Government Entity to Seller in connection with the Wafer Business or the Real Property, each such Environmental Permit is valid and enforceable and in full force and effect, and Seller is in compliance, in all material respects, with the terms and conditions of all such Environmental Permits, approvals or authorizations and no other Environmental Permits, approvals or authorizations are necessary for operating the Wafer Business as currently conducted.

Section 5.18     Title to Assets; Sufficiency of Assets.

(a)     Seller holds, and subject to the entry of the Sale Order, at the Closing shall cause to be delivered to Purchaser, good and valid title to or, in the case of leased or licensed  Acquired Assets, a valid and binding leasehold interest in or license to or rights under (as the case may be), all of the Acquired Assets, free and clear of all Liens, other than Assumed Liabilities and Permitted Liens. All of the Acquired Assets are in good order and repair for assets of comparable

age and past use and are capable of being used in the ordinary course of business in the manner necessary to operate the Wafer Business, except where the failure to be in such condition would not, individually or in the aggregate, reasonably be expected to be adverse in any material respect to the Seller's or the Purchaser's ability to conduct the Wafer Business in the ordinary course of business.

(b)     The Acquired Assets, without giving effect to the exclusion of any Wafer Excluded Assets, include all tangible Assets, intangible Assets and Intellectual Property that are necessary for the conduct of the Wafer Business immediately following the Closing Date in substantially the same manner as conducted by Seller prior to the commencement of the Bankruptcy Case, except for Service Providers that are not Transferred Employees.

Section 5.19   Insurance.  Section 5.19 of the Disclosure Letter sets forth a true, complete and correct description of all material insurance maintained by or on behalf of Seller as of the date of this Agreement.  As of such date, such insurance is in full force and effect.

Section 5.20   Inventory.  All Inventory of Seller, whether or not reflected on the financial statements included in the SEC Documents, consists of items of a quality useable or saleable in the ordinary course of business, assuming sufficient market demand.  Seller does not hold any Inventory on consignment.  All Inventory of Seller is merchantable and fit for the purpose for which it was procured or manufactured and, except as has been written down on the face of the financial statements included in the SEC Documents, or, with respect to Inventory acquired since the date of such financial statements, none of such Inventory is obsolete, damaged or defective.

Section 5.21   Receivables.  The Accounts Receivable of Seller reflected on the financial statements included in the SEC Documents and all Accounts Receivable arising subsequent to the date thereof (i) arose from bona fide sales transactions in the ordinary course of business consistent with past practice and are payable on ordinary trade terms, (ii) are legal, valid and binding obligations of the respective debtors enforceable in accordance with their respective terms, (iii) except as set forth on Section 5.21 of the Disclosure Letter, are not subject to any valid material set-off or counterclaim, (iv) do not represent obligations for goods sold on consignment, on approval or on a sale-or-return basis or subject to any other repurchase or return arrangement, and (v) are not the subject of any Actions or order by a Governmental Entity brought by or on behalf of Seller.

ARTICLE VI.

REPRESENTATIONS AND WARRANTIES
OF PURCHASER

Purchaser hereby represents and warrants to Seller that the statements contained in this Article VI are true and correct as of the date of this Agreement.

Section 6.1     Organization.  Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware.

Section 6.2    Authorization; Enforceability.  Purchaser has all requisite power and authority to enter into this Agreement and the other Ancillary Agreements to which Purchaser is a party.  The execution, delivery and performance by Purchaser of this Agreement and each of the other Ancillary Agreements to which Purchaser is a party, and the consummation by Purchaser of the Transactions (including the authorization to credit bid for the Acquired Assets), have been duly authorized by all necessary action on the part of Purchaser.  Subject to the entry of the Sale Order, this Agreement and, when executed, each other Ancillary Agreement to which Purchaser is a party, have been duly and validly executed and delivered by Purchaser and, assuming due and valid execution and delivery by Seller, constitute the valid and binding obligation of Purchaser, enforceable against them in accordance with its terms, subject to laws of general application relating to bankruptcy, insolvency, and the relief of debtors and other laws of general application affecting enforcement of creditors' rights generally, rules of law governing specific performance, injunctive relief and other equitable remedies.

Section 6.3    No Conflicts.  Subject to the entry of the Sale Order, the execution, delivery and performance of this Agreement and each other Ancillary Agreement, and the consummation of the Transactions will not (a) result in a violation of the Organizational Documents of Purchaser or (b) assuming receipt of all required consents and approvals from Governmental Entities in accordance with Section 9.1(b) and Section 9.2(e), result in a violation of any law, statute, rule or regulation of any Governmental Entity or any applicable order of any court or any rule, regulation or order of any Governmental Entity applicable to Purchaser or by which any property or asset of Purchaser is bound, except for violations which, individually or in the aggregate, has not had and would not reasonably be likely to have a Purchaser Material Adverse Effect.

Section 6.4    Consents and Approvals.  Except as set forth in this Agreement, no consent, approval, authorization, order, registration or qualification of or with any Governmental Entity having jurisdiction over Purchaser or any of its properties is required for the execution and delivery by Purchaser of the Agreement and the Ancillary Agreements and performance of and compliance by Purchaser with all of the provisions hereof and thereof and the consummation of the Transactions, except (a) the entry of the Sale Order and the expiration, or waiver by the Bankruptcy Court, of the 14-day period set forth in Bankruptcy Rules 6004(h) and 3020(e), (b) filings with respect to and any consents, approvals or expiration or termination of any waiting period, required under any United States or foreign antitrust investment laws which may include the HSR Act and any other Regulatory Approvals required, and (c) such other consents, approvals, authorizations, registrations or qualifications the absence of which will not have or would not reasonably be expected to have, individually or in the aggregate, a Purchaser Material Adverse Effect.

Section 6.5    Financial Capability.  Purchaser (a) has as of the date of this Agreement and will have on the Closing Date sufficient funds available to pay the Purchase Price and any expenses incurred by Purchaser in connection with the Transactions, and (b) has as of the date of this Agreement and will have on the Closing Date the resources and capabilities (financial or otherwise) to perform its obligations hereunder.

Section 6.6     Broker's, Finder's or Similar Fees.  There are no brokerage commissions, finder's fees or similar fees or commissions payable by Purchaser in connection with the Transactions.

Section 6.7     No Other Representations or Warranties.  Notwithstanding anything contained in this Agreement to the contrary, Purchaser acknowledges and agrees that none of Seller, its Affiliates or any other Person is making any representations or warranties whatsoever, express or implied, beyond those expressly given by Seller in Article V (as modified by the Disclosure Letter), or with respect to any other information provided to the Purchaser in connection with the transaction contemplated hereby, including without limitation as to the probable success or profitability of the ownership, use or operation of the Wafer Business and the Acquired Assets after Closing.  Purchaser further represents that none of Seller, its Affiliates or any other Person has made any representation or warranty, express or implied as to the accuracy or completeness of any information regarding Seller, the Wafer Business or the transactions contemplated by this Agreement not expressly set forth in this Agreement, and none of Seller, its Affiliates or any other Person will have or be subject to liability to Purchaser or any other Person resulting from the distribution to Purchaser or its Representatives of Purchaser's use of, any such information, including data room information provided to Purchaser or its representatives, in connection with the sale of the Wafer Business and the Transactions. Purchaser acknowledges that it has conducted to its satisfaction its own independent investigation of the Wafer Business and, in making the determination to proceed with the Transactions, Purchaser has relied on the results of its own independent investigation.

ARTICLE VII.

BANKRUPTCY COURT MATTERS

Section 7.1     Bankruptcy Actions.  Seller shall use its commercially reasonable efforts to obtain the entry of the Bidding Procedures Order and the Sale Order on the Bankruptcy Court's docket.  Purchaser covenants and agrees that it shall cooperate with Seller in connection with furnishing information or documents to Seller to satisfy the requirements of adequate assurance of future performance under section 365(f)(2)(B) of the Bankruptcy Code.

Section 7.2     Bidding Procedures.  The bidding procedures (the "Bidding Procedures") to be employed with respect to the Auction process shall be those reflected in the Bidding Procedures Order substantially in the form of Exhibit D hereto, with only such changes as approved by the Purchaser in its reasonable discretion (the "Bidding Procedures Order").

Section 7.3     Conduct of the Auction.  At the Auction, in accordance with the Bidding Procedures Order and notwithstanding any other provision of this Agreement, Purchaser shall be permitted to bid on individual Lots, a combination of Lots or individual Assets within certain Lots as Purchaser may elect; provided, that, Purchaser shall submit a bid for the Core Assets. Purchaser shall be entitled to: (i) allocate the Purchase Price among the Lots in the discretion of the Purchaser, (ii) reallocate the Purchase Price during the Auction in the discretion of the Purchaser; (iii) reduce the Purchase Price to the extent that it is not the Prevailing Bidder with respect to any Lot, and (iv) submit additional bids and make additional modifications to this Agreement at the Auction; except that Purchaser may not exclude any assets from the Core

Assets other than the Wafer Excluded Assets and any purchase of the Core Assets shall be on terms consistent with this Agreement.

Section 7.4    Sale Order.  Seller shall use commercially reasonable efforts to obtain entry of the Sale Order approving the transactions contemplated by this Agreement and such Sale Order shall be in form and substance satisfactory to Purchaser in its reasonable discretion granting, among other things, that (i) such sale shall be, to the fullest extent permitted by the Bankruptcy Code, pursuant to Sections 105, 363(b) and 363(f) of the Bankruptcy Code, free and clear of all Liens other than Permitted Liens and Assumed Liabilities; (ii) all Contracts required to be assumed by Seller and assigned to Purchaser are so assumed and assigned free and clear of all Liens and Retained Liabilities other than Permitted Liens and Assumed Liabilities to the fullest extent permitted by Section 365 of the Bankruptcy Code, subject to Section 2.6; (iii) Purchaser is deemed to have purchased the Acquired Assets in good faith pursuant to Section 363(m) of the Bankruptcy Code; and (iv) Seller is authorized and directed to execute, upon request by Purchaser, one or more assignments in form, substance, and number reasonably acceptable to Purchaser, evidencing the conveyance of the Acquired Assets to Purchaser.

ARTICLE VIII.

COVENANTS

Section 8.1    Interim Operations of the Wafer Business.  From the Execution Date through the Closing Date, subject to any limitations imposed on Seller as a result of its status as debtor-in-possession in the Bankruptcy Case, Seller shall use its commercially reasonable efforts to ensure that, and Seller covenants and agrees that, except as expressly provided in this Agreement, contemplated by the Transition Budget or the Cash Collateral Order, required by Applicable Law or as may be agreed in writing by Purchaser:

(a)    the Wafer Business shall be conducted only in the ordinary course (including the sale of Inventory) in accordance with the Transition Budget and Seller shall use commercially reasonable efforts to preserve intact the business organization of the Wafer Business and maintain the existing relations with customers, suppliers, vendors, creditors, business partners and others having business dealings with the Wafer Business;

(b)    Seller shall use commercially reasonable efforts to, maintain, preserve and protect all of the Acquired Assets in the condition in which they exist on the date hereof, except for ordinary wear and tear and except for (i) replacements, modifications or maintenance in the ordinary course of business and (ii) any Acquired Assets not reasonably beneficial for operating the Wafer Business in accordance with the Wafer Budget if Seller determines that cost of maintenance is not justified;

(c)    Seller shall use commercially reasonable efforts not to (i) modify, amend, reject, waive any rights under or terminate any Designated Contract or (ii) waive, release, compromise, settle or assign any material rights or claims related to any Designated Contract;

(d)     Seller shall use commercially reasonable efforts to perform in all material respects the obligations required to be performed by Seller under the Designated Contracts, other than to cure pre-petition monetary defaults;

(e)     Except as permitted by the Bidding Procedures Order, Seller shall not (i) issue, sell, pledge, dispose of or encumber, or authorize the issuance, sale, pledge, disposition or encumbrance of, any equity interest of itself or any equity interest of, or similar interest in, a joint venture or similar arrangement to which Seller is a party which is an Acquired Asset hereunder, (ii) alter, whether through a complete or partial liquidation, dissolution, merger, consolidation, restructuring, reorganization or in any other manner, the legal structure or ownership of itself or any other Seller or any joint venture or similar arrangement to which Seller is a party which is an Acquired Asset hereunder, (iii) sell, lease, mortgage, pledge, grant a lien, mortgage, pledge, security interest, charge, claim or other encumbrance of any kind or nature on or otherwise encumber or dispose of any of the Acquired Assets, except for dispositions of inventory and obsolete equipment in the ordinary course of business or (iv) propose, adopt or approve a plan with respect to any of the foregoing;

(f)     Seller shall not institute any increase (including any increase in coverage) in any Benefit Plan with respect to directors or Service Providers of Seller;

(g)     Seller shall not increase the compensation (including salary, bonus or incentive compensation) of, or promote any of, the Service Providers to Seller, provided that Sellers may institute the key employee incentive plan contemplated by the Transition Budget to the extent approved by the Bankruptcy Court;

(h)     enter into any employment, deferred compensation, severance, consulting, independent contractor, nondisclosure, non-competition or similar agreement (or amend in any material manner that is adverse to the Wafer Business any such agreement) to which any Seller is a party or involving any of its directors, officers or employees in his or her capacity as a director, officer or employee of Seller; and

(i)     Seller shall not enter into any Contract, directly or indirectly, unilaterally or in concert, and whether orally, in writing, formally or informally, to do any of the foregoing or assist or cooperate with any other Person in doing any of the foregoing, or authorize, recommend, propose or announce an intention to do any of the foregoing.

During the period from the Execution Date and continuing until the earlier of the termination of this Agreement in accordance with Article X and the Closing Date, Seller shall cause the Foreign Subsidiaries constituting Acquired Assets to comply with the terms and provisions of Section 8.1 as if such terms and provisions were applicable to the Foreign Subsidiaries by applying such terms and provisions mutatis mutandis (such that all changes and modifications to the defined terms and other terminology used in such terms and provisions shall be made so that such terms and provisions can be applied in a logical manner to the Foreign Subsidiaries)

Section 8.2     Access.

(a)     Subject to the Confidentiality Agreement, from the Execution Date until the earlier of (i) termination of this Agreement and (ii) the Closing, Seller will, (w) upon reasonable

notice, give Purchaser and its employees, accountants, financial advisors, counsel and other representatives reasonable access during normal business hours to the offices, properties, books and records of Seller relating to the Acquired Assets, the Assumed Liabilities, and the Wafer Business; (x) furnish to Purchaser such financial and operating data and other information relating to the Acquired Assets, the Assumed Liabilities, and the Wafer Business as may be reasonably requested; and (y) instruct the executive officers and senior business managers, Employees, counsel, auditors and financial advisors of Seller to cooperate with Purchaser's employees, accountants, counsel and other representatives; provided, that (A) all activities covered by this Section 8.2(a) shall be at the sole cost and expense of Purchaser and (B) that any such activities pursuant to this provision shall be conducted in such manner as not to interfere unreasonably with the conduct of the business of Seller. Notwithstanding anything herein to the contrary, no such investigation or examination shall be permitted to the extent that it would require Seller to disclose information, (i) subject to attorney-client privilege or that conflicts with any confidentiality obligations to which Seller is bound, (ii) related to pricing or other matters that are highly competitively sensitive or (iii) that would otherwise in the exercise of Seller's good faith judgment, be inappropriate in light of the Bankruptcy Case.

(b)     Purchaser shall cooperate with Seller and make available to Seller such documents, books, records or information Transferred to Purchaser and relating to activities of the Acquired Assets, the Assumed Liabilities, and the Wafer Business prior to the Closing as Seller may reasonably require after the Closing in connection with any Tax determination or contractual obligations to Third Parties or to defend or prepare for the defense of any claim against Seller or to prosecute or prepare for the prosecution of claims against Third Parties by Seller relating to the conduct of the Wafer Business by Seller prior to the Closing or in connection with any governmental investigation of Seller or any of its Affiliates; provided that any such activities pursuant to this provision shall be conducted in such manner as not to interfere unreasonably with the conduct of the business of Purchaser.

(c)     No party shall destroy any files or records which are subject to this Section 8.2 without giving reasonable notice to the other parties, and within 15 days of receipt of such notice, any such other party may cause to be delivered to it the records intended to be destroyed, at such other party's expense.

Section 8.3     Efforts and Actions to Cause Closing to Occur.  At all times prior to the Closing, upon the terms and subject to the conditions of this Agreement, Seller and Purchaser shall use their commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done all things necessary, proper or advisable (subject to any Applicable Laws) to cause the Closing Date to occur and consummate the Closing and the other Transactions as promptly as practicable including, the preparation and filing of all forms, registrations and notices required to be filed to cause the Closing Date to occur and consummate the Closing and the other Transactions and the taking of such actions as are necessary to obtain any requisite approvals, authorizations, consents, releases, orders, licenses, Permits, qualifications, exemptions or waivers by any Third Party or Governmental Entity.

Section 8.4     HSR Act.

(a)     Subject to the terms and conditions of this Agreement, each party shall use its commercially reasonable efforts to (i) take, or cause to be taken, all actions and to do, or cause to be done, all things necessary under applicable Laws to consummate the transactions contemplated by this Agreement; (ii) if required, file a Notification and Report Form pursuant to the HSR Act with respect to the transactions contemplated hereby within five Business Days after entry of the Sale Order; (iii) supply as promptly as practicable any additional information and documentary material that may be requested or required pursuant to any Antitrust Law, including the HSR Act and (iv) if applicable, cause the expiration or termination of the applicable waiting periods under the HSR Act or any other Antitrust Law as soon as practicable.

(b)     Each of the parties shall use commercially reasonable efforts to (a) cooperate with each other in connection with any filing or submission and in connection with any investigation or other inquiry, including any proceeding initiated by a private party; (b) keep the other parties informed in all material respects of any material communication received by such party from, or given by such party to, any Governmental Entity and of any material communication received or given in connection with any proceeding by a private party, in each case regarding any of the transactions contemplated hereby and (c) permit the other party to review any material communication given to it by, and consult with each other in advance of any meeting or conference with any Governmental Entity, including in connection with any proceeding by a private party. The foregoing obligations in this Section 8.4 shall be subject to the Confidentiality Agreement and any attorney-client, work product or other privilege, and each of the parties hereto shall coordinate and cooperate fully with the other parties hereto in exchanging such information and providing such assistance as such other parties may reasonably request in connection with the foregoing and in seeking early termination of any applicable waiting periods under Antitrust Law. The parties will not take any action that will have the effect of delaying, impairing or impeding the receipt of any required authorizations, consents, Orders or approvals. "Antitrust Law" means the Sherman Act, as amended, the Clayton Act, as amended, the HSR Act, the Federal Trade Commission Act, as amended, and all other Applicable Laws that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or lessening of competition through merger or acquisition. Fees incurred in connection with complying with any Antitrust Law shall be borne solely by Seller.

(c)     If any objections are asserted with respect to the transactions contemplated hereby under any Antitrust Law or if any suit is instituted by any Governmental Entity or any private party challenging any of the transactions contemplated hereby as violative of any Antitrust Law or if the filing pursuant to Section 8.4 is reasonably likely to be rejected or conditioned by federal or a state Governmental Entity, each of the parties shall use commercially reasonable efforts to resolve such objections or challenge as such Governmental Entity or private party may have to such transactions, including to vacate, lift, reverse or overturn any Action, whether temporary, preliminary or permanent, so as to permit consummation of the transactions contemplated by this Agreement.

(d)     Seller shall provide commercially reasonable assistance to Purchaser to assist Purchaser in (i) obtaining or (ii) the transfer of Permits from Seller to Purchaser. Any and all fees required by any Governmental Entity or any Person to obtain or for the transfer of a Permit shall be the sole responsibility of Seller.

Section 8.5    Notification of Certain Matters.  Seller shall give written notice to Purchaser promptly after becoming aware of (i) the occurrence of any event, which would be likely to cause any condition set forth in Article IX to be unsatisfied in any material respect at any time from the date hereof to the Closing Date or (ii) any notice or other communication from (x) any Person alleging that the consent of such Person is or may be required in connection with any of the Transactions or (y) any Governmental Entity in connection with any of the Transactions; provided, however, that the delivery of any notice pursuant to this Section 8.5 shall not limit or otherwise affect the remedies available hereunder to Purchaser.

Section 8.6    Casualty Loss.  Notwithstanding any provision in this Agreement to the contrary, if, before the Closing, all or any portion of the Acquired Assets is (a) condemned or taken by eminent domain, or (b) a material portion is damaged or destroyed by fire or other casualty, Seller shall notify Purchaser promptly in writing of such fact, and (i) in the case of condemnation or taking, Seller shall assign or pay, as the case may be, any proceeds thereof to Purchaser at the Closing, and (ii) in the case of fire or other casualty, Seller shall, at its option, either restore such damage or assign the insurance proceeds therefrom to Purchaser at Closing. Notwithstanding the foregoing, the provisions of this Section 8.6 shall not in any way modify Purchaser's other rights under this Agreement, including any applicable right to terminate the Agreement if any condemnation, taking, damage or other destruction resulted in a Material Adverse Effect.

Section 8.7    Employee Matters.

(a)    Purchaser shall notify Seller prior to the Bid Deadline which Employees of Seller to whom Purchaser intends to make offers of employment, which Employees shall include at least the Employees required to implement the business plan embodied in the Wafer Budget (such Employees who accept such offer are hereinafter referred to as the "Transferred Employees").  Any such offers shall be on terms that include the same salary or hourly pay as currently being paid and with a severance program at least as favorable as the current program summarized in Section 5.14(e) of the Seller Disclosure Schedule and with other benefits that are comparable (in the aggregate) to the employee's current benefits as of the Execution Date, and on such other terms and conditions as Purchaser shall in its sole discretion deem appropriate. The employment offer will be timed with the intention of making the Transferred Employee's first day of employment effective as of the Closing Date.  Transferred Employees' employment with the Purchaser or any of its Affiliates will be "at will" and nothing contained in this Agreement or any other communication shall constitute a contract of employment and the Transferred Employees shall not be a third party beneficiary of this Agreement.  Seller will reasonably cooperate with the Purchaser in any offer of employment that Purchaser may extend and Seller shall terminate the employment of each Transferred Employee on the Closing Date.

(b)    All Liabilities to, or relating to, the Benefit Plans, and all Liabilities to, or relating to, any such Service Provider shall be Retained Liabilities, and Purchaser shall have no obligation or liability with respect to such Benefit Plans, arrangements or agreements.  Purchaser and Seller shall take all actions necessary to cause the retention by Seller of all such Benefit Plans with effect as of the Closing Date, any Subsidiary that has Service Providers that participate in any Benefit Plan of Seller shall cease to be a participating employer in any such Plans and Seller shall take all actions necessary to effectuate the foregoing.

(c)     All Liabilities in respect of each Transferred Employee have or shall have been paid by Seller prior to the date upon which the Transferred Employee commences employment with Purchaser, including premium contributions, remittance and assessments for unemployment insurance, employer health tax, income tax, workers' compensation and any other employment related legislation, accrued wages, taxes, salaries, commissions and employee benefit plan payments.  There are no outstanding, pending, threatened or anticipated assessments, actions, causes of action, claims, complaints, demands, orders, prosecutions or suits against Seller or its or their respective directors, officers or agents pursuant to or under any Applicable Laws, unemployment insurance, income tax, employer health tax, employment standards, labor relations, occupational health and safety, human rights, workers' compensation and pay equity.  Seller have no obligation to re-instate any Employees in connection with the Wafer Business.

(d)     To the extent that any obligations might arise under WARN or under any similar provision of any United States federal, state, regional, non-United States or local law, rule or regulation as a consequence of the Transactions, Seller shall be responsible for therefor to the extent arising as a result of any employment losses to Employees of Seller occurring prior to the Closing Date.

(e)     Seller shall reasonably cooperate, to the extent permitted by law, with the Purchaser's attempt to obtain information relating to the Transferred Employees, including making available to Purchaser Service Providers' personnel files and performance evaluations.  Any such information of the Transferred Employees shall be an Acquired Asset.

Section 8.8     Subsequent Actions.  If at any time after the Closing Date, Purchaser or Seller consider or are advised that any deeds, bills of sale, instruments of conveyance, assignments, assurances or any other actions or things are necessary or desirable to vest, perfect or confirm ownership (of record or otherwise) in Purchaser, its right, title or interest in, to or under any or all of the Acquired Assets or otherwise to carry out this Agreement, including the assumption of the Assumed Liabilities, Purchaser or Seller shall at Purchaser's expense, execute and deliver all deeds, bills of sale, instruments of conveyance, powers of attorney, assignments, assumptions and assurances and take and do all such other actions and things as may be requested by the other party in order to vest, perfect or confirm any and all right, title and interest in, to and under such rights, properties or assets in Purchaser or otherwise to carry out this Agreement.

Section 8.9     Publicity.  Prior to the Closing and without limiting or restricting any party from making any filing with the Bankruptcy Court with respect to this Agreement or the Transactions and upon 24 hours advance notice of such public announcement or press release, no party shall issue any press release or public announcement concerning this Agreement or the Transactions without obtaining the prior written approval of the other party, which approval will not be unreasonably withheld or delayed, unless, in the reasonable judgment of Purchaser or Seller, disclosure is otherwise required by Applicable Law, the Bankruptcy Code or the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement or by the applicable rules of the Securities Exchange Commission or any stock exchange on which Purchaser lists securities, provided that the party intending to make such release shall use its reasonable best efforts consistent with such Applicable Law, the

Bankruptcy Code or Bankruptcy Court requirement to consult with the other party with respect to the text thereof.

Section 8.10   Tax Matters.

(a)      The Purchaser and the Seller agree that the Purchase Price is exclusive of any Transfer Taxes.  Seller shall promptly pay directly to the appropriate Tax Authority all applicable Transfer Taxes that may be imposed upon or payable or collectible or incurred in connection with this Agreement or the transactions contemplated herein, or that may be imposed upon or payable or collectible or incurred in connection with the Transactions.

(b)      In the event that Seller elects to file a plan of reorganization or liquidation in conjunction with the Transactions, Purchaser and Seller covenant and agree that they will use their commercially reasonable efforts to obtain an order from the Bankruptcy Court pursuant to section 1146 of the Bankruptcy Code exempting, to the maximum extent possible, the Transfer of the Acquired Assets from Seller to Purchaser from any and all Transfer Taxes.  To the extent the Transactions or any portion of the Transactions are not exempt from Transfer Taxes under section 1146 of the Bankruptcy Code, Purchaser shall be responsible for and shall pay all Transfer Taxes in accordance with Section 8.10.  Purchaser and Seller shall cooperate in providing each other with any appropriate certification and other similar documentation relating to exemption from Transfer Taxes (including any appropriate resale exemption certifications), as provided under Applicable Law.

(c)      Purchaser and Seller agree to furnish, or cause their Affiliates to furnish, to each other, upon request, as promptly as practicable, such information and assistance relating to the Acquired Assets or the Wafer Business (including access to books and records) as is reasonably necessary for the filing of all Tax Returns, and making of any election related to Taxes, the preparation for any audit by any taxing authority, and the prosecution or defense of any claim, suit or proceeding relating to any Tax Return.  Purchaser and Seller shall cooperate, and cause their Affiliates to cooperate, with each other in the conduct of any audit or other proceeding related to Taxes and each shall execute and deliver such powers of attorney and other documents as are reasonably necessary to carry out the intent of this Section 8.10(c).  Purchaser and Seller shall provide, or cause their Affiliates to provide, timely notice to each other in writing of any pending or threatened tax audits, assessments or litigation with respect to the Acquired Assets or the Wafer Business for any taxable period for which the other party may have liability under this Agreement.  Purchaser and Seller shall furnish, or cause their respective Affiliates to furnish, to each other copies of all correspondence received from any taxing authority in connection with any tax audit or information request with respect to any taxable period for which the other party or its Affiliates may have liability under this Agreement.

(d)      Real and personal property Taxes and assessments, and all rents, utilities and other charges, on the Acquired Assets for any taxable period commencing on or prior to the Closing Date and ending after the Closing Date (the "Straddle Period Property Tax") shall be prorated on a per diem basis between Purchaser and Seller as of the Closing Date; provided, however, that Seller shall not be responsible for, or benefit from, any increased or decreased assessments on real or personal property resulting from the transactions contemplated hereby. All such prorations of Straddle Period Property Taxes shall be allocated so that items relating to

time periods ending on or prior to the Closing Date shall be allocated to Seller and items relating to time periods beginning after the Closing Date shall be allocated to Purchaser. The amount of all such prorations shall be settled and paid on the Closing Date. If any of the rates for the Straddle Period Property Taxes for any taxable period commencing on or prior to the Closing Date and ending after the Closing Date are not established by the Closing Date, the prorations shall be made on the basis of such rates in effect for the preceding taxable period. The apportioned obligations under this Section 8.10(d) shall be shall be timely paid and all applicable filings made in the same manner as set forth for the apportioned Transfer Taxes in Section 8.10(a) and (b).

Section 8.11    Rejection of Designated Contracts. Seller shall not reject any Designated Contracts pursuant to the Bankruptcy Case without the prior written consent of Purchaser.

Section 8.12    Certain Purchaser Pre-Closing Covenants. Subject in all respects to the requirements and restrictions of, or as may result from or relate to, the Bankruptcy Case and orders entered therein (including the Sale Order), from the Execution Date to the Closing Date, except as otherwise consented to in writing by Seller, Purchaser shall offer to each of Seller's Chief Financial Officer and General Counsel an opportunity to provide transition services on a full-time basis to Purchaser for a three-month period and an aggregate fee of $75,000 (each) for such period and such agreements will contain non-competition clauses for the duration of the transition contracts.

Section 8.13    Certain Purchaser Post-Closing Covenants. Following the Closing, Purchaser shall use commercially reasonable efforts to operate the Wafer Business in accordance with the Wafer Budget and the Side Letter, subject to the conditions in the Side Letter.

Section 8.14    Books and Records. At or promptly after the Closing, Seller shall deliver to Purchaser all books and records pertaining to the Acquired Assets that are in Seller's possession or control; provided, however, that Seller shall be entitled to make and retain a copy of any and all books and records delivered to Purchaser.

Section 8.15    Indenture Trustee. Other than with respect to the obligation to credit bid the obligations of the Secured Notes pursuant to Section 3.1, the Indenture Trustee is not responsible for the performance of the Purchaser's obligations under this Agreement, except to reduce the amount of the Secured Notes by the amount of the credit bid, as of the Closing Date.

ARTICLE IX.

CONDITIONS

Section 9.1    Conditions Precedent to Performance by Seller and Purchaser. The respective obligations of Seller and Purchaser to consummate the transactions contemplated by this Agreement are subject to the satisfaction or waiver, on or prior to the Closing Date, of the following conditions:

(a) <u>Bankruptcy Matters</u>.

    (i)    The Bankruptcy Court shall have entered the Sale Order in form and substance acceptable to Purchaser in Purchaser's reasonable discretion by November 9, 2011 (subject to extension as permitted by the Support Agreement). The Sale Order shall declare the Purchaser as the Prevailing Bidder and the Sale Order shall not be the subject of a pending appeal and shall not have been stayed, vacated, modified or supplemented without the prior written consent of Purchaser.

    (ii)    The Bankruptcy Court shall not have entered an order (x) appointing a trustee or an examiner with expanded powers, or (y) dismissing Seller's Bankruptcy Case or converting Seller's Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code.

(b) <u>Antitrust and Regulatory Approvals</u>. If applicable, the waiting periods for the transactions contemplated under this Agreement under the HSR Act, and any other Antitrust Law shall have expired or terminated any other Regulatory Approvals have been obtained.

(c) <u>No Order</u>. No order, statute, rule, regulation, executive order, injunction, stay, decree, directive, or restraining order shall have been enacted, entered, promulgated or enforced by any court of competent jurisdiction or Governmental Entity that would (i) prevent the consummation of any of the transactions contemplated by this Agreement or (ii) cause any of the transactions contemplated by this Agreement to be rescinded following consummation, nor shall any such order, statute, rule, regulation, executive order, injunction, stay, decree, directive, or restraining order be in effect. No Action shall be pending before any Governmental Entity or before any arbitral body wherein an unfavorable injunction, judgment, order, decree, ruling, directive or charge would (x) prevent consummation of any of the transactions contemplated by this Agreement or (y) cause any of the transactions contemplated by this Agreement to be rescinded following consummation.

Section 9.2    <u>Conditions to Obligations of Purchaser</u>. The obligations of Purchaser to consummate the Closing shall be subject to the satisfaction (or waiver by Purchaser) on or prior to the Closing Date, of the following conditions:

(a) <u>Material Adverse Effect</u>. Since the Petition Date, there shall not have occurred and be continuing any Material Adverse Effect.

(b) <u>Seller's Representations and Warranties</u>. The representations and warranties made by Seller in Article V of this Agreement shall be true and correct in all respects as of the Closing, in each case as though made at and as of such time (or, if made as of a specific date, at and as of such date), except to the extent such failures to be true and correct do not individually or in the aggregate constitute a Material Adverse Effect (except for representations and warranties which are qualified by "material" or "Material Adverse Effect", which such representations and warranties shall be true and correct in all respects).

(c) <u>Seller's Performance of Covenants</u>. Seller shall not have failed to perform in any material respect any material obligation or to comply in any material respect with any material

agreement or material covenant of Seller to be performed or complied with by them under this Agreement.

(d)     Certificate of Seller's Officers.  Purchaser shall have received from Seller a certificate, dated the Closing Date, duly executed by the Chief Executive Officer, and the Chief Financial Officers of Seller, reasonably satisfactory in form to Purchaser, to the effect of paragraph (a) through (c) above.

(e)     Consents, Approvals and Permits.

(i)     All consents and approvals of any Person (other than a Governmental Entity) set forth in Section 9.2(e) of the Disclosure Letter shall have been obtained, except to the extent that the requirement for a particular consent or approval is rendered inapplicable by the Sale Order or other order of the Bankruptcy Court, if applicable.  A copy of each such consent or approval referred to in this Section 9.2(e) shall have been provided to Purchaser at or prior to the Closing.

(ii)     All Permits necessary for the operation of the Wafer Business included in the Acquired Assets will be Transferred to Purchaser or have been obtained by Purchaser except where the failure to Transfer or obtain would not constitute a Material Adverse Effect.

(iii)     Without limiting the generality of Section 9.2(e)(i) and subject to Section 9.4, to the extent the Devens Lease is not a Devens Excluded Asset, with respect to Purchaser's obligation to acquire the Devens Assets, Purchaser shall have obtained the consent of Mass Dev to assign the Devens Lease in a manner and subject to such terms and conditions that are satisfactory to Purchaser in its sole and absolute discretion.

(f)     Bill of Sale; Conveyance Documents.  Seller shall have duly executed and delivered to Purchaser the documents set forth in Section 4.2.

(g)     HSTIC Waiver.  Only to the extent the shares of capital stock of Evergreen (Wuhan) and the Evergreen (Wuhan) Contracts are included in the Acquired Assets, HSTIC shall have waived its rights under the Evergreen (Wuhan) Contracts to cause Seller to purchase the shares of capital stock held by HSTIC as a result of the commencement of the Bankruptcy Case and the consummation of the Transactions.

(h)     Support Agreement.  No Requisite Supporting Noteholder Termination Event (as defined in the Support Agreement) shall have occurred under the Support Agreement which gives the noteholders thereunder a right to terminate the Support Agreement.

The foregoing conditions in this Section 9.2 are for the sole benefit of Purchaser and may be waived by Purchaser, in whole or in part, at any time and from time to time in its sole discretion.  The failure by Purchaser at any time to exercise any of the foregoing rights shall not be deemed a waiver of any such right and each such right shall be deemed an ongoing right which may be asserted at any time and from time to time.

Section 9.3    Conditions to Obligations of Seller.  The obligations of Seller to consummate the Closing shall be subject to the satisfaction (or waiver by Seller) on or prior to the Closing Date, of the following conditions:

(a)    Representations and Warranties.  All representations and warranties made by Purchaser in Article VI of this Agreement shall be true and correct in all respects on and as of the Closing Date as if again made by Purchaser on and as of such date (or, if made as of a specific date, at and as of such date) except to the extent such failures to be true and correct do not individually or in the aggregate constitute a Purchaser Material Adverse Effect (except for such representations and warranties which are qualified by "material" or "Purchaser Material Adverse Effect", which such representations and warranties shall be true and correct in all respects).

(b)    Consents, Approvals and Permits.  All consents and approvals of any Person other than a Governmental Entity set forth in Section 9.3(b) of the Disclosure Letter, shall have been obtained, except to the extent that the requirement for a particular consent or approval is rendered inapplicable by the Sale Order or other order of the Bankruptcy Court.  A copy of each such consent or approval shall have been provided to Purchaser at or prior to the Closing.

(c)    Performance of the Obligations of Purchaser.  Purchaser shall have performed in all material respects all material obligations required under this Agreement to be performed by it on or before the Closing Date (except with respect to the obligation to pay the Purchase Price in accordance with the terms of this Agreement, which obligation shall be performed in all respects as required under this Agreement), and Seller shall have received a certificate dated as of the Closing Date and signed by the President or a Vice President of Purchaser to that effect.

(d)    Purchaser's Deliveries.  Purchaser shall have delivered, and Seller shall have received, all of the items set forth in Section 4.3 of this Agreement.

(e)    Secretary's Certificate.  Purchaser shall have delivered to Seller a duly executed certificate by the Secretary or managing member of Purchaser, certifying as to Purchaser's Organizational Documents and certificate of good standing, resolutions electing the directors to the board of directors of Purchaser and other customary matters.

(f)    Transition Agreements.  Purchaser shall have offered to engage each of the current Chief Financial Officer and the General Counsel of Seller as full-time consultants on transition matters for a period of three months following the Closing, for an aggregate payment each for such period of $75,000 and such agreements will contain non-competition clauses for the duration of the transition contracts.

(g)    Side Letter.  Purchaser shall have delivered to Seller a duly executed copy of the Side Letter and Michael El-Hillow shall have been elected to serve as a director on the board of directors of Purchaser, effective immediately after the Closing.

The foregoing conditions in this Section 9.3 are for the sole benefit of Seller and may be waived by Seller, in whole or in part, at any time and from time to time in its sole discretion.  The failure by Seller at any time to exercise any of the foregoing rights shall not be deemed a waiver of any such right and each such right shall be deemed an ongoing right which may be asserted at any time and from time to time.

Section 9.4    Devens Assets. Notwithstanding anything herein to the contrary, to the extent that all closing conditions herein have been met but the consent of Mass Dev has not been obtained in accordance with Section 9.3(e)(iii), then at the option of Seller, the Closing of all Acquired Assets, other than the Devens Assets, shall be consummated and the Purchase Price shall be reduced by an amount equal to the portion of the Purchase Price allocable to the Devens Assets, which amount shall be determined by Purchaser in consultation with Seller.

ARTICLE X.

TERMINATION

Section 10.1    Termination.  This Agreement may be terminated or abandoned in its entirety or with respect to any individual Lots or combination of Lots, at any time prior to the Closing Date as follows:

(a)    By the mutual written consent of Purchaser and Seller;

(b)    By either Purchaser or Seller upon written notice given to the other, if the Bankruptcy Court or any other Governmental Entity shall have issued an order, decree or ruling or taken any other action (which order, decree, ruling or other action the parties hereto shall use their reasonable best efforts to prevent the entry of and remove), which permanently restrains, enjoins or otherwise prohibits the consummation of the Transactions and such order, decree, ruling or other action shall have become final and non-appealable;

(c)    By Seller upon written notice given to Purchaser, if Purchaser shall have breached or failed to perform in any material respect any of its representations, warranties, covenants or other agreements contained in this Agreement, which breach or failure to perform (i) would result in a failure of a condition set forth in Section 9.3 and (ii) cannot be cured within ten (10) Business Days after Seller provides written notice to Purchaser of such breach;

(d)    By Purchaser upon written notice given to Seller:

(i)    if Seller shall have breached or failed to perform in any material respect any of its representations, warranties, covenants or other agreements contained in this Agreement, which breach or failure to perform (i) would result in a failure of a condition set forth in Section 9.2 and (ii) cannot be cured within ten (10) Business Days after Purchaser provides written notice to Seller of such breach;

(ii)    if the Sale Order has been revoked, rescinded or modified in any material respect and the order revoking, rescinding or modifying such order(s) shall not be reversed or vacated within three days after the entry thereof; provided that Purchaser shall have the right to designate any later date for this purpose in its sole discretion;

(iii)    if for any reason Purchaser is unable, pursuant to Section 363(k) of the Bankruptcy Code, to credit bid its Obligations under the Senior Notes in payment of the Purchase Price as set forth in Section 3.1; or

(iv)     if the Support Agreement has been terminated.

(e)     Subject to Purchaser's rights under Section 7.3 and the Bidding Procedures Order to amend the terms of this Agreement at the Auction, with respect to any Lot being purchased by Purchaser, by either Purchaser or Seller, if, at the conclusion of the Sale Hearing, Purchaser is not determined by the Bankruptcy Court to be the Prevailing Bidder with respect to such Lot, unless Purchaser is the Second-Highest Bidder; provided, however, that the Purchaser shall have the right to terminate this Agreement pursuant to this Section 10.1(e) on or at any time after the forty-fifth (45th) day following the date of the entry of the Sale Order unless the Purchaser becomes the Prevailing Bidder on or prior to such date.

Notwithstanding the foregoing, in no event may Seller terminate this Agreement pursuant to Section 10.1(e) after entry of the Sale Order or when in violation of the Bidding Procedures Order. For the avoidance of doubt, if the Purchaser or Seller terminates this Agreement with respect to any individual or combination of Lots pursuant to Section 10.1(e), the Agreement, as amended as permitted by Section 7.3 and the Bidding Procedures Order, shall remain in full force and effect for any Lots for which Purchaser is the Prevailing Bidder. Any party seeking to invoke its rights to terminate this Agreement shall give written notice thereof to the other party or parties specifying the provision hereof pursuant to which such termination is made and the effective date of such termination being the date of such notice.

Section 10.2     Effect of Termination. If this Agreement is terminated by either party in accordance with and pursuant to Section 10.1, then, except as otherwise provided in Section 10.3, all rights and obligations of the parties under this Agreement shall terminate; provided, however, that nothing herein shall relieve any party from liability for any breach of this Agreement prior to such termination. In addition, any termination under Section 10.1(e) with respect to any Lot (or assets within a Lot, in the case of Non-Core Assets) shall not relieve the obligations of any party hereunder with respect to any other Lot.

Section 10.3     Expense Reimbursement.

(a)     Seller shall pay, or cause to be paid, to Purchaser or as Purchaser may direct, by wire transfer in immediately available funds, an amount equal to any unreimbursed Transaction Expenses, with such payments to be made so as to be received not later than five (5) Business Days following the date of receipt by Seller of an invoice documenting such Transaction Expenses.

(b)     The parties acknowledge that the agreements contained in this Section 10.3 are an integral part of the transactions contemplated by this Agreement and that without these agreements neither Seller nor Purchaser would enter into this Agreement.

ARTICLE XI.

MISCELLANEOUS

Section 11.1     Survival of Covenants, Representations and Warranties. The representations and warranties set forth in Article V and Article VI shall not survive the Closing

Date; <u>provided</u>, <u>however</u>, that all covenants and agreements in this Agreement shall survive the Closing Date and remain in full force and effect indefinitely, unless otherwise specified therein.

Section 11.2    <u>Disclosure Schedule Supplements</u>.  From time to time prior to the Closing, Seller shall supplement or amend the Disclosure Letter respect to any matter that, if existing, occurring or known at the date of this Agreement, would have been required to be set forth or described in the Disclosure Letter.  The Disclosure Letter shall be deemed amended by all such supplements and amendments for all purposes (except for purposes of determining whether the conditions set forth in <u>Section 9.2(b)</u> of the Agreement have been satisfied), unless within ten (10) days from the receipt of such supplement or amendment Purchaser provides notice in good faith that the facts described in such supplement or amendment would reasonably be expected to have a Material Adverse Effect on the Acquired Assets.

Section 11.3    <u>Amendment and Modification</u>.  This Agreement may be amended, modified and supplemented in any and all respects, but only by a written instrument signed by all of the parties hereto expressly stating that such instrument is intended to amend, modify or supplement this Agreement.

Section 11.4    <u>Notices</u>.  All notices and other communications hereunder shall be in writing and shall be deemed given when mailed, delivered personally, telecopied (which is confirmed) or sent by an overnight courier service, such as Federal Express, to the parties at the following addresses:

| | |
|---|---|
| If to Seller: | Evergreen Solar, Inc.<br>138 Bartlett Ave.<br>Marlborough, Massachusetts  01752<br>Attn:  Chief Executive Officer<br>Telephone:<br>Facsimile: |
| with a copy to: | Ronald J. Silverman, Esq.<br>Bingham Mccutchen, LLP<br>399 Park Avenue<br>New York, New York  10022-4689<br>Telephone:  212.705.7000<br>Facsimile:  212.752.5378 |
| and to: | Laura Davis Jones, Esq.<br>Pachulski Stang Ziehl & Jones LLP<br>919 North Market Street, 17th Floor<br>Wilmington, DE 19899-8705 (courier 19801)<br>Telephone:  302.778.6401<br>Facsimile:  302.652.4400 |
| If to Purchaser: | ES Purchaser, LLC |

c/o Akin Gump Hauer & Feld LLP
                                    One Bryant Park
                                    New York, NY 10036
                                    Attn: Michael S. Stamer, Esq. & Stephen B. Kuhn, Esq.
                                    Telephone:  212.872.1000
                                    Facsimile: 212.872.1002

        with a copy to:             Michael S. Stamer, Esq.
                                    Stephen B. Kuhn, Esq.
                                    Akin Gump Hauer & Feld LLP
                                    One Bryant Park
                                    New York, NY 10036
                                    Telephone:  212.872.1000
                                    Facsimile: 212.872.1002

        or to such other address as a party may from time to time designate in writing in accordance with this Section 11.4.  Each notice or other communication given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been received (i) on the Business Day it is sent, if sent by personal delivery or telecopy, or (ii) on the first Business Day after sending, if sent by overnight delivery, properly addressed and prepaid or (iii) upon receipt, if sent by mail (regular, certified or registered); provided, however, that notice of change of address shall be effective only upon receipt.  The parties agree that delivery of process or other papers in connection with any such action or proceeding in the manner provided in this Section 11.4, or in such other manner as may be permitted by law, shall be valid and sufficient service thereof.

        Section 11.5    Counterparts.  This Agreement may be executed by facsimile or PDF signature and in one or more counterparts, all of which shall be considered one and the same agreement and shall become effective when two or more counterparts have been signed by each of the parties and delivered to the other party.

        Section 11.6    Mutual Drafting.  This Agreement is the result of the joint efforts of Purchaser and Seller, and each provision hereof has been subject to the mutual consultation, negotiation and agreement of the parties and there is to be no construction against either party based on any presumption of that party's involvement in the drafting thereof.

        Section 11.7    Entire Agreement; No Third Party Beneficiaries.  This Agreement, the Disclosure Letter and other schedules, annexes, and exhibits hereto, the Ancillary Agreements, and the Confidentiality Agreement (i) constitute the entire agreement and supersede all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof and thereof and supersede and cancel all prior agreements, negotiations, correspondence, undertakings, understandings and communications of the parties, oral and written, with respect to the subject matter hereof, and (ii) are not intended to confer upon any Person other than the parties hereto and thereto any rights, obligations or remedies hereunder; provided further that Affiliates and representatives of each party are express third-party beneficiaries of Section 11.15 and this Section 11.7.

Section 11.8  Severability.  Any term or provision of this Agreement that is held by a court of competent jurisdiction or other authority to be invalid, void or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.  If the final judgment of a court of competent jurisdiction or other authority declares that any term or provision hereof is invalid, void or unenforceable, the parties agree that the court making such determination shall have the power to reduce the scope, duration, area or applicability of the term or provision, to delete specific words or phrases, or to replace any invalid, void or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision.

Section 11.9  Governing Law.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK AND THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE.

Section 11.10  Exclusive Jurisdiction.  All actions and proceedings arising out of or relating to this Agreement, including the resolution of any and all disputes hereunder, shall be heard and determined in the Bankruptcy Court, and the Parties to this Agreement hereby irrevocably submit to the exclusive jurisdiction of such courts in any such action or proceeding and irrevocably waive the defense of an inconvenient forum to the maintenance of any such action or proceeding.  If the Bankruptcy Court does not have or declines to exercise subject matter jurisdiction over any action or proceeding arising out of or relating to this Agreement, then each party (i) agrees that all such actions or proceedings shall be heard and determined in federal court of the United States for the Southern District of New York, (ii) irrevocably submits to the jurisdiction of such courts in any such action or proceeding, (iii) consents that any such action or proceeding may be brought in such courts and waives any objection that such party may now or hereafter have to the venue or jurisdiction or that such action or proceeding was brought in an inconvenient court, and (iv) agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such party at its address as provided in Section 11.4 (provided that nothing herein shall affect the right to effect service of process in any other manner permitted by New York law).

Section 11.11  Remedies.  Neither the exercise of nor the failure to exercise a right of set-off or to give notice of a claim under this Agreement will constitute an election of remedies or limit Seller or Purchaser in any manner in the enforcement of any other remedies that may be available to any of them, whether at law or in equity.

Section 11.12  Specific Performance.

(a)  Purchaser acknowledges and agrees that any breach of the terms of this Agreement by Purchaser would give rise to irreparable harm for which money damages would not be an adequate remedy, and, accordingly agrees that, in addition to any other remedies, Seller shall be entitled to enforce the terms of this Agreement, including, for the avoidance of doubt, Purchaser's obligation to fund the Purchase Price, by a decree of specific performance without

the necessity of proving the inadequacy of money damages as a remedy and without the necessity of posting a bond.

(b)      Purchaser agrees that it will not oppose the granting of an injunction, specific performance and other equitable relief when expressly available pursuant to the terms of this Agreement on the basis that (i) there is adequate remedy at law or (ii) an award of specific performance is not an appropriate remedy for any reason at law or equity. In the event Seller seek an injunction or injunctions to prevent breaches of this Agreement when expressly available pursuant to the terms of this Agreement and to enforce specifically the terms and provisions of this Agreement when expressly available pursuant to the terms of this Agreement, they shall not be required to provide any bond or other security in connection with any such order or injunction.

(c)      Nothing in this Section 11.12 shall limit the rights of Purchaser to seek or obtain enforcement of the Bidding Procedures Order or the Sale Order after the entry of such orders or of this Agreement.

Section 11.13  Assignment.  Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto (whether by operation of law or otherwise) without the prior written content of the other party; provided that no such prior written consent shall be required for (a) an assignment by the Purchaser to any of its Affiliates, so long as the Purchaser remains liable hereunder, (b) an assignment by the Purchaser of its rights and interests hereunder after the Closing to any lender to the Purchaser for purposes of collateral security, or (c) an assignment by the Purchaser of its rights and interests hereunder after the Closing to any purchaser of all or any portion of its assets or businesses.  Subject to the first sentence of this Section 11.13, this Agreement shall be binding upon, inure to the benefit of and be enforceable by the parties and their respective successors and permitted assigns.

Section 11.14  Headings.  The article, section, paragraph and other headings contained in this Agreement are inserted for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 11.15  No Consequential or Punitive Damages. WITHOUT LIMITING ANY RIGHTS OF ANY PARTY TO RECEIVE EXPENSE REIMBURSEMENT IN ACCORDANCE WITH Section 10.3 OF THIS AGREEMENT, NO PARTY (OR ITS AFFILIATES OR REPRESENTATIVES) SHALL, UNDER ANY CIRCUMSTANCE, BE LIABLE TO THE OTHER PARTY (OR ITS AFFILIATES OR REPRESENTATIVES) FOR ANY CONSEQUENTIAL, EXEMPLARY, SPECIAL, INCIDENTAL OR PUNITIVE DAMAGES CLAIMED BY SUCH OTHER PARTY UNDER THE TERMS OF OR DUE TO ANY BREACH OF THIS AGREEMENT, INCLUDING LOSS OF REVENUE OR INCOME, DAMAGES BASED ON ANY MULTIPLIER OF PROFITS OR OTHER VALUATION METRIC, COST OF CAPITAL, DIMINUTION OF VALUE OR LOSS OF BUSINESS REPUTATION OR OPPORTUNITY.

Section 11.16  Definitions.  For all purposes of this Agreement, except as otherwise expressly provided or unless the context clearly requires otherwise:

"Accounts Receivable" means any and all trade accounts, notes and other receivables and indebtedness for borrowed money or overdue accounts receivable, in each case owing to Seller and all claims relating thereto or arising therefrom.

"Acquired Assets" has the meaning set forth in Section 2.1 and Exhibit A.

"Actions" means all rights, privileges, claims, demands, choses in action, prepayments, deposits, refunds, indemnification rights, warranty claims, offsets and other claims of Seller against Third Parties.

"Affiliate" has the meaning set forth in Rule 12b-2 of the Exchange Act.

"Agreement" or "this Agreement" means this Asset Purchase Agreement, together with the Exhibits hereto and the exhibits and schedules thereto and the Disclosure Letter.

"Allocation Statement" has the meaning set forth in Section 3.2.

"Ancillary Agreements" means the Support Agreement, Conveyance Documents, Sale Order, and, in the case of each of the foregoing, all exhibits and appendices thereto.

"Antitrust Law" has the meaning set forth in Section 8.4(b).

"Applicable Law" means any law, regulation, rule, order, judgment, guideline or decree to which the Wafer Business, any Acquired Asset, or Seller, is subject.

"Assets" means assets, properties, rights, interests, claims, contracts, and businesses of every kind, type, character and description, whether tangible or intangible, whether real, personal or mixed, whether accrued, contingent, liquidated or unliquidated, whether owned, leased or licensed and wherever located, and all rents, issues, profits, royalties, entitlements, products and proceeds of any of the foregoing.

"Assumed Liabilities" has the meaning set forth in Section 2.3.

"Auction" has the meaning ascribed to such term in the Bidding Procedures Order.

"Avoidance Action" means any claim, right or cause of action of Seller arising under sections 544 through 553 of the Bankruptcy Code, except for any such actions (i) against Purchaser (all such claims to be released at Closing); (ii) related to Designated Contracts; or (iii) in connection with any setoffs related to Acquired Assets.

"Bankruptcy Case" has the meaning set forth in the recitals hereof.

"Bankruptcy Code" has the meaning set forth in the recitals hereof.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure.

"Benefit Plans" has the meaning set forth in Section 5.14(e).

"Bid Deadline" has the meaning set forth in the Bidding Procedures.

"Bidding Procedures" has the meaning set forth in Section 7.2.

"Bidding Procedures Order" has the meaning set forth in Section 7.2.

"Bill of Sale" means the bill of sale substantially in the form attached as Exhibit B hereto.

"Business Day" means any day other than a Saturday, Sunday or a day on which banks in New York are authorized or obligated by Applicable Law or executive order to close or are otherwise generally closed.

"Cash and Cash Equivalents" means (a) cash; (b) marketable direct obligations issued by, or unconditionally guaranteed by, the United States government or issued by any agency thereof, maturing within one (1) year from the date of issuance; (c) certificates of deposit, time deposits, eurodollar time deposits, deposit accounts or overnight bank deposits having maturities of six months or less from the date of acquisition issued by any commercial bank; (d) commercial paper of an issuer and maturing within six (6) months from the date of acquisition; (e) securities with maturities of one (1) year or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, by any political subdivision or taxing authority of any such state, commonwealth or territory or by any non-United States government, the securities of which state, commonwealth, territory, political subdivision, taxing authority or non-United States government (as the case may be); (f) eurodollar time deposits having a maturity not in excess of 180 days to final maturity; (g) any other investment in United States Dollars which has no more than 180 days to final maturity; or (h) shares of money market mutual or similar funds which invest exclusively in assets satisfying the requirements of clauses (a) through (g) of this definition.

"Cash Collateral Order" has the meaning ascribed to such term in the Support Agreement.

"Closing" means the consummation of all transactions contemplated in this Agreement.

"Closing Date" has the meaning set forth in Section 4.1(b).

"Code" means the Internal Revenue Code of 1986, as amended.

"Committee Professionals Fee Cap" has the meaning set forth in the Cash Collateral Order.

"Confidentiality Agreement" means the confidentiality agreement executed between the Seller and the Purchaser on or before the date of this Agreement.

"Contract" means any written agreement, contract, lease, license, consensual obligation, promise or undertaking.

"Contract & Cure Schedule" has the meaning set forth in Section 2.5(a).

"Conveyance Documents" means (a) the Bill of Sale; (b) the Intellectual Property Instruments; (c) all documents of title and instruments of conveyance necessary to Transfer record and/or beneficial ownership to Purchaser of Acquired Assets composed of automobiles, trucks, or other vehicles, trailers, and any other property owned by Seller which requires execution, endorsement and/or delivery of a certificate of title or other document in order to vest record or beneficial ownership thereof in Purchaser; and (d) all such other documents of title, customary title insurance affidavits, deeds, endorsements, assignments and other instruments of conveyance or Transfer as, in the reasonable opinion of Purchaser's counsel, are necessary or appropriate to vest in Purchaser good and marketable title to any Acquired Assets.

"Copyrights" means any non-United States or United States copyright registrations and applications for registration thereof, and any nonregistered copyrights, all content and information contained on any website, "mask works" (as defined under 17 U.S.C. § 901) and any registrations and applications for "mask works."

"Cure Costs" means the amounts that must be paid, if any, in connection with the assumption and assignment of each Designated Contract pursuant to section 365(b)(1)(A) and section 365(b)(1)(B) of the Bankruptcy Code.

"Debtors" has the meaning set forth in the recitals hereof.

"Debtor's Professionals Fee Cap" has the meaning set forth in the Cash Collateral Order.

"Designated Contracts" means all Contracts set forth on the final Contract & Cure Schedule.

"Designation Deadline" means three Business Days prior to the Closing Date.

"Devens Contracts" has the meaning set forth in Exhibit A.

"Devens Excluded Assets" has the meaning set forth in Exhibit A.

"Devens Land" has the meaning set forth in Exhibit A.

"Devens Lease" has the meaning set forth in Exhibit A.

"Devens Plant" has the meaning set forth in Exhibit A.

"Devens Tangible Assets" has the meaning set forth in Exhibit A.

"Disclosure Letter" means the disclosure letter of even date herewith prepared and signed by Seller and delivered to Purchaser simultaneously with the execution hereof, as updated from time to time to the extent permitted herein.

"Easements" has the meaning set forth in Section 5.4(b).

"Employee" means any employee of the Seller as of the Closing Date.

"Environmental Claim" shall mean all Liabilities, including those for investigatory, remedial, or corrective actions, imposed, incurred or arising from or under any Environmental Law or resulting from the presence of any Hazardous Material.

"Environmental Laws" means any federal, state, local or foreign statute, law, ordinance or promulgated rule, regulation, code or directive, any duties imposed under common law, any judicial or administrative decree, order or judgment (whether or not by consent), any request or demand from a Governmental Entity which request or demand is currently uncontested by Seller, or any provision or condition of any permit, license or other operating authorization relating to (i) the protection of the environment or human, worker or public health and welfare, or the protection of the health and safety of any workers, employees, and the public or (ii) the manufacture, processing, distribution, use, treatment, storage, disposal, transport, handling or actual or potential release, discharge or emission of any Hazardous Material, including but not limited to the Clean Water Act, the Toxic Substances Control Act, the Clean Air Act, the Comprehensive Environmental Response, Compensation and Liability Act, the Resource Conservation and Recovery Act, the River and Harbor Act, the Federal Insecticide, Fungicide and Rodenticide Act, the Toxic Substances Control Act, the Federal Mine Safety and Health Act, the Occupational Safety and Health Act, and any state or local law, ordinance, rule, regulation, code or directive regulating the same or similar matters.

"Environmental Permits" shall mean any and all Permits issued in accordance with or pursuant to any Environmental Law.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" has the meaning set forth in Section 5.14(g).

"Evergreen (Hong Kong)" means Evergreen Solar (HK) China Limited, a limited company organized under the laws of Hong Kong.

"Evergreen (Wuhan)" means Evergreen Solar (China) Co., Ltd., a company with limited liability organized under the laws of the Peoples Republic of China.

"Evergreen (Wuhan) Contracts" means the following Contracts between Seller and HSTIC with respect to Evergreen (Wuhan): (i) the Increase Registered Capital and Enlarge Shares Agreement, dated as of July 24, 2009, as amended, on Evergreen (Wuhan); (ii) Joint Venture Agreement, dated as of July 2009, as amended, on Evergreen (Wuhan); and (iii) the Equity Transfer Agreement, dated as of July 24, 2009, as amended, and the other agreements

contemplated thereby or with respect thereto between or among HSTIC, Seller and Evergreen (Wuhan).

"Execution Date" has the meaning set forth in the preamble hereof.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Foreign Subsidiaries" means, collectively, Evergreen (Hong Kong) and Evergreen (Wuhan).

"Furnished Reports" has the meaning set forth in Section 5.3(a).

"GAAP" has the meaning set forth in Section 5.3(b).

"Governmental Entity" means any foreign, national, federal, state, municipal, local, provincial, territorial, government or any department, commission, board, bureau, agency, regulatory authority or instrumentality thereof, or any court, judicial, administrative or arbitral body or public or private tribunal, including any United States or other such entity anywhere in the world.

"Hazardous Material" means all substances or materials regulated as hazardous, toxic, explosive, dangerous, flammable or radioactive under any Environmental Law including, but not limited to: (i) petroleum, asbestos, or polychlorinated biphenyls; and (ii) all substances defined as Hazardous Substances, Oils, Pollutants or Contaminants in the National Oil and Hazardous Substances Pollution Contingency Plan.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvement Act of 1976, as amended.

"HSTIC" means Hubei Science and Technology Investment Co., Ltd., a company with limited liability organized under the laws of the Peoples Republic of China.

"Indebtedness" means, at any time and with respect to any Person: (a) all indebtedness of such Person for borrowed money; (b) all indebtedness of such Person for the deferred purchase price of property or services (other than trade payables, other expense accruals and deferred compensation items arising in the ordinary course of business, consistent with past practice); (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments (other than performance, surety and appeal bonds arising in the ordinary course of business in respect of which such Person's liability remains contingent); (d) all indebtedness of such Person created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property); (e) all obligations of such Person under leases which have been or should be, in accordance with GAAP, recorded as capital leases, to the extent required to be so recorded; (f) all reimbursement, payment or similar obligations of such Person, contingent or otherwise, under acceptance, letter of credit or similar facilities; (g) all Indebtedness of others referred to in clauses (a) through (f) above guaranteed directly or indirectly by such Person, or in effect guaranteed directly or indirectly by such Person through an agreement (i) to pay or

purchase such Indebtedness or to advance or supply funds for the payment or purchase of such Indebtedness, (ii) to purchase, sell or lease (as lessee or lessor) property, or to purchase or sell services, primarily for the purpose of enabling the debtor to make payment of such Indebtedness, (iii) to supply funds to or in any other manner invest in the debtor (including any agreement to pay for property or services irrespective of whether such property is received or such services are rendered) or (iv) otherwise to assure a creditor against loss in respect of such Indebtedness; and (h) all Indebtedness referred to in clauses (a) through (g) above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien upon or in property (including accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness.

"Indenture" has the meaning set forth in Section 3.1.

"Indenture Trustee" means U.S. Bank National Association in its capacity as Trustee under the Indenture and Collateral Agent under the Security Agreement.

"Instrument of Assumption" means the instrument of assumption substantially in the form attached as Exhibit C.

"Intellectual Property" means Trademarks; Patents; Copyrights; Software; rights of publicity and privacy relating to the use of the names, likenesses, voices, signatures and biographical information of real persons; inventions (whether or not patentable), discoveries, improvements, ideas, know-how, formulae, methodologies, research and development, business methods, processes, technology, interpretive code or source code, object or executable code, libraries, development documentation, compilers (other than commercially available compilers), programming tools, drawings, specifications and data, and applications or grants in any jurisdiction pertaining to the foregoing, including re-issues, continuations, divisions, continuations-in-part, reexaminations, renewals and extensions; trade secrets, including confidential information and the right in any jurisdiction to limit the use or disclosure thereof; database rights; Internet websites, web pages, domain names and applications and registrations pertaining thereto and all intellectual property used in connection with or contained in websites; all rights under agreements relating to the foregoing; all books and records pertaining to the foregoing, and claims or causes of action arising out of or related to past, present or future infringement or misappropriation of the foregoing; in each case used in or necessary for the conduct of Seller's Wafer Business as currently conducted or contemplated to be conducted.

"Intellectual Property Instruments" instruments of Transfer, in form suitable for recording in the appropriate office or bureau, effecting the Transfer of the Copyrights, Trademarks and Patents owned or held by Seller.

"Inventory" means all inventory, supplies, finished goods, works in process, goods-in-transit, packaging materials and other consumables of Seller.

"IRS" means the United States Internal Revenue Service.

"Knowledge" as applied to Seller, means a person listed on Section 11.16 of the Disclosure Letter hereto is actually aware of a particular fact; and "knowledge" as applied to

Purchaser, means any officer of Purchaser or any other person listed in Section 11.16 of the Disclosure Letter hereto is actually aware of a particular fact.

"Leased Real Property" has the meaning set forth in Section 5.4(a).

"LBIE" has the meaning set forth in Exhibit A.

"LBHI" has the meaning set forth in Exhibit A.

"Liabilities" means all Indebtedness, Claims, Liens, demands, expenses, commitments and obligations (whether accrued or not, known or unknown, disclosed or undisclosed, matured or unmatured, fixed or contingent, asserted or unasserted, liquidated or unliquidated, arising prior to, at or after the commencement of the Bankruptcy Case) of or against Seller, its Subsidiaries or any of the Acquired Assets.

"License Agreements" has the meaning set forth in Section 5.8(b).

"Lien" means, with respect to any asset, any mortgage or deed of trust, pledge, hypothecation, assignment, deposit arrangement, lien, charge, claim, security interest, easement or encumbrance, or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any lease or title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement perfecting a security interest under the Uniform Commercial Code as in effect from time to time in the State of New York or comparable law of any jurisdiction) and, in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"Lots" means the specifically identified groups of Assets listed on Exhibit A.

"Material Adverse Effect" means any change, effect, event or condition that has had or would reasonably be expected to have (i) a material adverse effect on the value of the Acquired Assets taken as a whole or (ii) to the extent that the Acquired Assets include the Core Assets, a material adverse effect on the prospects of the Wafer Business or (iii) a material adverse effect on the ability of Seller to consummate the Transactions; provided that the following shall not constitute a Material Adverse Effect and shall not be taken into account in determining whether or not there has been or would reasonably be expected to be a Material Adverse Effect: (A) changes in general economic conditions or securities or financial markets in general that do not have a disproportionate effect on the Wafer Business (relative to the effect on other Persons operating in the same industry as Seller), (B) changes in the industry in which Seller operates and that do not specifically relate to, or have a disproportionate effect on, the Wafer Business (relative to the effect on other Persons operating in the same industry as Seller), (C) changes in Applicable Law or interpretations thereof by any Governmental Entity that do not have a disproportionate effect on the Wafer Business (relative to the effect on other Persons operating in the same industry as Seller), (D) any outbreak or escalation of hostilities or war (whether declared or not declared) or any act of terrorism that does not have a disproportionate effect on the Wafer Business (relative to the effect on other Persons operating in the same industry as Seller), (E) changes to the extent resulting from the announcement or the existence of, or compliance with, this Agreement and the Transactions (including without limitation any

lawsuit related thereto), and the impact on relationships with suppliers, customers, employees or others, as a result of this Agreement and/or the Transactions, (F) any changes in accounting regulations or principles that does not have a disproportionate effect on the Wafer Business (relative to the effect on other Persons operating in the same industry as Seller), (G) any change in the market price or trading volumes of securities of Seller (it being understood for the purposes of this subclause (G) that any facts underlying such change that are not otherwise covered by the immediately preceding clauses (A) through (F) may be taken into account in determining whether or not there has been a Material Adverse Effect), and (H) any changes resulting from actions of Seller expressly agreed to or requested in writing by Purchaser or as a result of initiating the Bankruptcy Case and any action taken by the Bankruptcy Court.

"Material Contracts" has the meaning set forth in Section 5.9(a).

"Mass Dev" means Massachusetts Development Finance Agency, a Massachusetts body politic and corporate established under Chapter 23G of the Massachusetts General Laws.

"Midland Facility" means the real property located at 2820 Schuette Road, Midland, Michigan and the plant manufacturing String Ribbon and other improvements located thereon owned by Seller.

"Obligations" has the meaning set forth in the Security Agreement.

"Organizational Documents" means with respect to any Person, its certificate of incorporation, formation or organization (or comparable) document, its by-laws, partnership agreement or any certificate of formation, limited liability company agreement or operating agreement, or any other similar organizational instrument or document governing such Person or applicable to ownership.

"Owned Intellectual Property" has the meaning set forth in Section 5.8(d).

"Owned Real Property" has the meaning set forth in Section 5.4(a).

"Patents" means all patents, patent applications and non-United States counterparts thereof, and industrial designs (including any continuations, divisionals, continuations-in-part, renewals, reissues, and applications for any of the foregoing).

"Permits" means permits, certificates, licenses, filings, approvals and other authorizations of any Governmental Entity.

"Permitted Liens" means (i) Liens for utilities and current Taxes not yet due and payable or the amount or validity of which is being contested in good faith or that are due but may not be paid as a result of the commencement of the Bankruptcy Case; (ii) easements, rights of way, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments against any of the Acquired Assets which do not, individually or in the aggregate, adversely affect in any material respect the operation of the Wafer Business and, in the case of the Leased Real Property, which do not, individually or in the aggregate, adversely affect in any material respect the use or occupancy of such Leased Real Property as it relates to

the operation of the Wafer Business or materially detract from the value of the leased Real Property, (iii) zoning laws, building codes, land use restrictions and other similar restrictions imposed by Applicable Law (but not restrictions arising from a violation by Seller of any such Applicable Law), (iv) materialmans', mechanics', artisans', shippers', warehousemans' or other similar common law or statutory liens incurred in the ordinary course of business for sums not yet due and payable or that are due but may not be paid as a result of the commencement of the Bankruptcy Case and that do not result from a breach, default or violation by Seller of any Contract or Applicable Law, (v) such other title exceptions or imperfections of title as Purchaser may approve in writing in its sole discretion or which do not, individually or in the aggregate, adversely affect the operation of the Wafer Business, (vi) any Liabilities created by this Agreement or any of the Ancillary Agreements, (vii) the Real Property Leases and any memoranda or notices thereof; and (viii) in addition to clauses (i) through (vii) above, in respect of the Devens Assets, the "Permitted Encumbrances", "Reserved Easements" and other matters set forth in Section 1.1 of the Devens Lease and, in the event the Devens Land is acquired pursuant to the exercise of the purchase option therefor under the Devens Lease, the "Permitted Encumbrances" as defined in Exhibit G to the Devens Lease.

"Person" means any individual, sole proprietorship, partnership, limited liability company, joint venture, trust, incorporated organization, association, corporation, institution, public benefit corporation, Governmental Entity or other entity.

"Prevailing Bidder" has the meaning set forth in the Bidding Procedures.

"Products" has the meaning set forth in Section 5.11(b).

"Purchase Price" has the meaning set forth in Section 3.1.

"Purchaser" has the meaning set forth in the preamble hereof.

"Purchaser Material Adverse Effect" means a material adverse effect on the business, assets, operations, results of operations or financial condition of Purchaser or on Purchaser's ability to consummate the Transactions or delay the same in any material respect.

"Real Property" has the meaning set forth in Section 5.4(c).

"Real Property Leases" means the real property leases to which Seller is a party as described in Section 5.4(b).

"Regulatory Approvals" means those sanctions, rulings, consents, orders, exemptions, permits and other approvals (including the lapse, without objection, of a prescribed time under a statute or regulation that states that a transaction may be implemented if a prescribed time lapses following the giving of notice without an objection being made), waivers, early termination authorizations, clearances or written confirmation of no intention to initiate legal proceedings from Governmental Entities as required and as set out in Section 5.7 of the Disclosure Letter.

"Release" shall mean any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, seeping, migrating, dumping or disposing of any

Hazardous Material (including the abandonment or discarding of barrels, containers and other closed receptacles containing any Hazardous Materials) into the indoor or outdoor environment, including, without limitation, the movement of Hazardous Materials through or in the ambient air, soil, surface or ground water, or property.

"Retained Assets" has the meaning set forth in Section 2.2.

"Retained Liabilities" has the meaning set forth in Section 2.3(a).

"Sale Order" means an order of the Bankruptcy Court approving the Agreement and consummation of the Transactions under sections 105, 363 and 365 of the Bankruptcy Code.

"SEC Documents" has the meaning set forth in Section 5.3(a).

"Second-Highest Bidder" has the meaning set forth in the Bidding Procedures.

"Secured Notes" has the meaning set forth in Section 3.1.

"Securities Act" means the Securities Act of 1933, as amended.

"Security Agreement" means the Pledge and Security Agreement dated as of April 26, 2010 (as the same may have been amended, supplemented, or modified from time to time) entered into by and among Seller and ESLR1, LLC, as grantors, and U.S. Bank National Association, in its capacity as collateral agent.

"Seller" each has the meaning set forth in the preamble hereof.

"Seller Permits" has the meaning set forth in Section 5.12(b).

"Service Provider" has the meaning set forth in Section 5.14(e).

"Side Letter" means that certain side letter agreement to be executed between the Purchaser and the Seller with respect to certain governance provisions, as described in the Support Agreement.

"Software" means any and all (a) computer programs, including any and all software implementation of algorithms, models and methodologies, whether in source code or object code form, (b) computerized databases and compilations, including any and all data and collections of data, and (c) all documentation, including user manuals and training materials, relating to any of the foregoing.

"Straddle Period Property Tax" has the meaning set forth in Section 8.10(d).

"Subsidiary" means, with respect to any Person, any corporation, association trust, limited liability company, partnership, joint venture or other business association or entity (i) at least 50% of the outstanding voting securities of which are at the time owned or controlled directly or indirectly by such Person or (ii) with respect to which such Person possesses, directly or indirectly, the power to direct or cause the direction of the affairs or management.

"Support Agreement" has the meaning set forth in the recitals.

"Supporting Noteholders" has the meaning set forth in the recitals.

"Tax" or "Taxes" means any and all United States federal, state, local or non-United States taxes, fees, levies, duties, tariffs, imposts, and other similar charges on or with respect to net income, alternative or add-on minimum, gross income, gross receipts, sales, use, *ad valorem*, franchise, capital, paid-up capital, profits, license, withholding, payroll, employment, excise, severance, stamp, occupation, premium, property, environmental, or windfall profit tax, customs duties, value added or other tax, governmental fee or other like assessment or charge of any kind whatsoever, together with any interest or any penalty, addition to tax or additional amount imposed by any Governmental Entity responsible for the imposition of any such tax.

"Tax Authority" means any Governmental Entity with responsibility for, and competent to impose, collect or administer, any form of Tax.

"Tax Return" means any return, claim, election, information return, declaration, report, statement, schedule, or other document required to be filed in respect of Taxes and amended Tax Returns and claims for refund.

"Third Party" means any Person other than Seller, Purchaser or any of their respective Affiliates.

"Trademarks" means any trademarks, service marks, trade names, corporate names, Internet domain names, designs, trade dress, product configurations, logos, slogans, and general intangibles of like nature, together with all translations, adaptations, derivations and combinations thereof, all goodwill, registrations and applications in any jurisdiction pertaining to the foregoing.

"Transaction Expenses" means the reasonable, actual, and documented out-of-pocket costs and expenses incurred by the Purchaser Parties, including reasonable, actual and documented fees, costs and expenses of counsel and of any other professionals retained by the Purchaser Parties, in connection with the transactions contemplated hereby and including the invoiced fees of Akin Gump Strauss Hauer & Feld LLP.

"Transactions" means all the transactions provided for or contemplated by this Agreement and/or the Ancillary Agreements.

"Transfer" means sell, convey, assign, transfer and deliver, and "Transferable" shall have a corollary meaning.

"Transfer Taxes" means all goods and services, harmonized sales, excise, sales, use, transfer, stamp, stamp duty, recording, value added, gross receipts, documentary, filing, and all other similar Taxes or duties, fees or other like charges, however denominated (including any real property transfer taxes and conveyance and recording fees and notarial fees), in each case including interest, penalties or additions attributable thereto whether or not disputed, arising out

of or in connection with the Transactions, regardless of whether the Governmental Entity seeks to collect the Transfer Tax from Seller or Purchasers.

"Transferred Employee" has the meaning set forth in Section 8.7(a).

"Transition Budget" means a budget, substantially in the form of Exhibit E containing the line item expenses of Seller's bankruptcy estate appropriate to operate and maintain the assets of Seller and the Wafer Business and to conduct the Bankruptcy Case from the Execution Date through the Closing Date in accordance with the terms of the Support Agreement.

"Wafer Budget" has the meaning set forth in Exhibit A.

"Wafer Business" has the meaning set forth in Exhibit A.

"Wafer Contracts" has the meaning set forth in Exhibit A.

"Wafer Excluded Assets" has the meaning set forth in Exhibit A.

"Wafer Real Property" has the meaning set forth in Exhibit A.

"Wafer Tangible Assets" has the meaning set forth in Exhibit A.

"Wafer Business" has the meaning set forth in the recitals hereof.

"WARN" has the meaning set forth in Section 8.7(d).

"Wind-Down Budget" means a budget consisting of Cash and Cash Equivalents equal to:  (i) $2,500,000 for the wind-down of Seller's bankruptcy estate, plus (ii) an amount reasonably necessary to dispose of each Asset remaining with Seller following the Closing, up to an aggregate amount of $7,500,000, after giving effect to the receipt of net proceeds from the sale of any such Asset, plus (iii) the aggregate amount of all expenses incurred by Seller pursuant to this Agreement, plus (iv) the amount of the Debtor's Professional Fee Cap, plus (v) the Committee Professionals Fee Cap, plus (vi) the fees for the advisors to the Supporting Noteholders and the Indenture Trustee; and plus (vii) the amounts agreed under the Support Agreement (and the term sheet incorporated therein) relating to any of Seller's obligations under its key employee incentive program, severance, paid time off, and other employee benefits, and other obligations to Employees contemplated by the Support Agreement, less amounts previously paid by Seller in furtherance of the foregoing.

Section 11.17  <u>Bulk Transfer Notices</u>.  Seller and Purchaser hereby waive compliance with any bulk transfer provisions of the Uniform Commercial Code (or any similar Applicable Law), to the extent not repealed in any applicable jurisdiction, in connection with this Agreement and the Transactions.

Section 11.18  <u>Interpretation</u>.

(a)     When a reference is made in this Agreement to a Section, Article, subsection, paragraph, item or Exhibit, such reference shall be to a Section, Article, subsection, paragraph, item or Exhibit of this Agreement unless clearly indicated to the contrary.

(b)     Whenever the words "include," "includes" or "including" are used in this Agreement they shall be deemed to be followed by the words "without limitation."

(c)     The words "hereof," "herein" and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement as a whole and not to any particular provision of this Agreement.

(d)     The meaning assigned to each term defined herein shall be equally applicable to both the singular and the plural forms of such term, and words denoting any gender shall include all genders.  Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.

(e)     A reference to any party to this Agreement or any other agreement or document shall include such party's predecessors, successors and permitted assigns.

(f)     A reference to any legislation or to any provision of any legislation shall include any amendment to, and any modification or re-enactment thereof, any legislative provision substituted therefore and all regulations and statutory instruments issued thereunder or pursuant thereto.

(g)     References to $ are to United States Dollars.

(h)     The parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

[Remainder of page intentionally left blank]

IN WITNESS WHEREOF, Purchaser and Seller have executed this Agreement or caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first written above.

**SELLER:**

EVERGREEN SOLAR, INC.


By: _____
    Name:
    Title:




**PURCHASER:**

ES PURCHASER, LLC


By: _____
    Name:
    Title:  Authorized Signatory

## Exhibit A

## Lots

| Lots |
|------|
| **Lot 1 – LBIE Assets**:  Seller's claims against Lehman Brothers International Europe and Lehman Brothers Holdings Inc. arising out of (i) the Share Lending Agreement between Lehman Brothers International (Europe) and Seller, dated June 26, 2008, and (ii) Guarantee of Lehman Brothers Holdings Inc. of the Share Lending Agreement between Lehman Brothers International (Europe) and Seller, dated June 26, 2008. |
| **Lot 2 – Devens Assets**:  means, except to the extent included in the definition of Devens Excluded Assets, Seller's right, title and interest under the Devens Lease, (ii) the Devens Plant, (iii) the Devens Tangible Assets and (iv) the Devens Contracts. |
| **Lot 3 – Core Assets**:  means, except to the extent included in the definition of Wafer Excluded Assets, (i) all of Seller's Intellectual Property, (ii) the Wafer Tangible Assets, (iii) all right, title and interest of Seller in and to the Wafer Real Property, (iv) Seller's rights under all Wafer Contracts, (v) the name "Evergreen Solar" and any derivation thereof and (vi) sufficient cash to fund the Wafer Budget. |
| **Lot 4 – Non-Core Assets**:  All right, title and interest of Seller in any of the following, in each case as of the Closing Date:  (i) all Cash and Cash Equivalents (other than Cash and Cash Equivalents to the extent remaining as of the Closing Date in any of the Wafer Budget, the Transition Budget and the Wind-Down Budget); (ii) all Accounts Receivable; (iii) all Actions (including Avoidance Actions)[1]; (iv) all existing Inventory; and (v) all other assets of Seller, wherever held, but excluding the Devens Assets, the LBIE Assets, the Core Assets and the Retained Assets.  With respect to calculating the amount of Cash and Cash Equivalents to be included in Non-Core Assets, not less than five days prior to the Closing Date, Seller will provide to Purchaser a reconciliation of each of the Wafer Budget, the Transition Budget and the Wind-Down Budget, including a good faith estimate of expenses note yet incurred.  Prior to the Closing Date, Purchaser and Seller will negotiate in good faith the amount of Cash and Cash Equivalents to be included in Non-Core Assets based on the terms of this Agreement. |

**Certain Defined Terms:**

> "Devens Contracts" means Seller's rights under all Contracts to which it is a party relating to the Devens Land, the Devens Plant or any Devens Tangible Assets.

---

[1] This will be changed to "excluding Avoidance Actions" in the asset schedule provided to other bidders.

"Devens Excluded Assets" means (i) those Devens Contracts that are not Designated Contracts pursuant to Section 2.5 and (ii) at Purchaser's election, which must be delivered in writing to Seller prior to the Designation Deadline, Seller's right, title and interest in and to any of the Devens Lease, the Devens Plant or the Devens Contracts.

"Devens Land" means that certain parcel of land consisting of approximately 23.11 acres located at 114 Barnum Road, Devens, Massachusetts that is subject to the Devens Lease.

"Devens Lease" means that certain Ground Lease, dated as of November 20, 2007, between Seller and Mass Dev.

"Devens Plant" means: (i) the buildings and all other improvements owned by Seller located on the Devens Land, including manufacturing, warehouse and office space comprising approximately 458,000 square feet; and (ii) all fixtures owned by Seller that are attached or appurtenant to the Devens Plant, including all installed facility infrastructure equipment, all support, communication and operating systems, all wiring and server connections for supporting telephone and computer servers and networks and all external improvements including sound barriers, and roof-mounted solar PV equipment.

"Devens Tangible Assets" means the tangible personal property of the Seller located at the Devens Plant or on the Devens Land, including all manufacturing, laboratory, and test equipment, all furniture, vehicles, solar demonstration equipment, office equipment, cafeteria equipment, tables, and other equipment or tangible personal property of any kind, but excluding all Inventory on hand at the Devens Plant, including supplies, raw materials and work in process, spare parts, maintenance supplies, gases, fluids, and any demo panels and finished goods, if any, which shall be included in Non-Core Assets.

"Wafer Budget" an initial budget for the operation of the Wafer Business commencing on the Closing Date, substantially in the form of Exhibit A-1, subject to decrease to the extent contemplated by the definition of "Transition Budget".

"Wafer Business" means Seller's proposed business based on industry standard sized String Ribbon™ wafers for the photovoltaic solar industry, including completing the commercialization of the applicable technology to enable a commercialization plan (which may be in one or more forms such as licensing or manufacturing) that better positions the business enterprise for significant new financings or sales.

"Wafer Contracts" means Seller's rights under all Contracts to which it is a party relating to the Wafer Business or any Wafer Tangible Assets.

"Wafer Excluded Assets" means (i) any Wafer Contracts that are not Designated Contracts pursuant to Section 2.5 and (ii) at Purchaser's election, which must be

delivered in writing to Seller prior to the Designation Deadline any of (x) Seller's right, title and interest in and to the Midland Facility, (y) the shares of capital stock held by Seller in Evergreen (Wuhan) and the Evergreen (Wuhan) Contracts, collectively, and (z) the shares of capital stock of Evergreen (Hong Kong) and, to the extent so excluded, all Contract primarily related thereto.

"Wafer Real Property" means (i) that certain parcel of real property consisting of approximately 11,185 square feet of office space located at 138 Bartlett Street, Marlborough, Massachusetts that is subject to the Lease for 120 Bartlett Street, Marlborough, Massachusetts, dated as of January 26, 2006, as amended, (ii) those certain plots, pieces and parcels of land located at 257 Cedar Hill Road, Marlborough, Massachusetts that is subject to the Lease for 127 Cedar Hill Road, dated as of January 15, 2006, as amended, and (iii) the Midland Facility.

"Wafer Tangible Assets" means (i) the shares of capital stock of Evergreen (Hong Kong), (ii) the shares of capital stock of Evergreen Wuhan owned by Seller, (iv) all tangible assets necessary for the development and pursuit of Wafer Business, including the tangible personal property of the Seller located at (x) 138 Bartlett Street, Marlborough, Massachusetts, (y) 257 Cedar Hill Road, Marlborough, Massachusetts and (z) the Midland Facility, including all manufacturing, laboratory, and test equipment, all furniture, vehicles, solar demonstration equipment, office equipment, cafeteria equipment, tables, and other equipment or tangible personal property of any kind.

**Exhibit A-1**

**<u>Wafer Budget</u>**

**Exhibits**

Wafer Business Working Capital (in $000s)

| | |
|---|---|
| Operating Activities | $9,884 |
| Capex for Wide Wafer Development | 3,000 |
| **Total** | **$12,884** |

Note:  Budget items are defined as presented in the June 2011 Presentation.  The budget for Operating Activities will be increased by an amount equal to (i) 25% of the sum of the following items in excess of $4.5 million (as included in Working Capital and Other in the June 2011 Presentation) collected post-petition: (a) Accounts Receivable, (b) Inventory, and (c) Sovello royalty payments, plus (ii) the $2.2 million budgeted for Severance/PTO/Benefits payments in the Transition Budget on Exhibit E for those people expected to be terminated prior to Closing minus the amount of actual Severance/PTO/Benefits payments actually paid to those persons; provided, however, that the budget will be increased by the amounts referred to in clause (i) above only to the extent that the Company receives at least $4 million in proceeds of avoidance (including turnover) actions in the Bankruptcy Case and such proceeds are subject to the liens of the Secured Notes.

**Exhibit B**

**<u>Bill of Sale</u>**

**BILL OF SALE**, dated as of [_____], 2011 (this "***Bill of Sale***") is executed and delivered by Evergreen Solar, Inc. (the "***Seller***") in favor of ES Purchaser, LLC, a Delaware limited liability company (the "***Purchaser***"), pursuant to the Asset Purchase Agreement, dated as of August 15, 2011, by and among the Purchaser and the Seller (the "***Purchase Agreement***"). Capitalized terms used herein but not otherwise defined shall have the meanings set forth in the Purchase Agreement.

## WITNESSETH:

WHEREAS, pursuant to the Purchase Agreement, the Purchaser agreed to purchase from the Seller, and the Seller agreed to sell to the Purchaser, upon the terms specified in the Purchase Agreement and pursuant to sections 105, 363 and 365 of the Bankruptcy Code, all of the Seller's right, title and interest in and to the Acquired Assets.

NOW, THEREFORE, in consideration of the mutual covenants and obligations set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Purchaser and Seller hereby agree as follows:

Section 1.    Interpretation.

The Seller and the Purchaser each acknowledge and agree that this Bill of Sale is an "***Ancillary Agreement***" pursuant to the Purchase Agreement, subject to the terms set forth therein. Notwithstanding anything to the contrary contained herein, nothing contained in this Bill of Sale shall be deemed to grant the Purchaser or the Seller any rights, or to cause the Purchaser or the Seller to incur any obligations or liabilities, greater than or otherwise in excess of their respective rights, obligations and liabilities set forth in the Purchase Agreement. The Purchase Agreement is incorporated herein by reference, shall continue in full force and effect as though set forth herein at length to the extent provided in the Purchase Agreement, and shall control in the event of any conflict with the terms of this Bill of Sale.

Section 2.    Purchase and Sale of Acquired Assets.

On the terms and conditions set forth in the Purchase Agreement, the Seller hereby sells, assigns, conveys, transfers and delivers to or causes to be sold, assigned, conveyed, transferred and delivered to the Purchaser, and the Purchaser hereby purchases from the Seller all of the Seller's right, title and interest in the Acquired Assets (other than the Designated Contracts, the Assumed Liabilities and the Real Property), free and clear of all Liens other than the Permitted Liens. Notwithstanding the previous sentence, Seller does not sell, assign, convey, transfer or deliver to Purchaser any of the Retained Assets.

Section 3.     Governing Law; Jurisdiction.

THIS BILL OF SALE SHALL BE GOVERNED BY AND
CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW
YORK AND THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE. All
actions and proceedings arising out of or relating to this Bill of Sale, including the
resolution of any and all disputes hereunder, shall be heard and determined in the
Bankruptcy Court, and the Purchaser and Seller hereby irrevocably submit to the
exclusive jurisdiction of such courts in any such action or proceeding and irrevocably
waive the defense of an inconvenient forum to the maintenance of any such action or
proceeding. If the Bankruptcy Court does not have or declines to exercise subject matter
jurisdiction over any action or proceeding arising out of or relating to this Bill of Sale,
then the Purchaser and Seller each (i) agree that all such actions or proceedings shall be
heard and determined in federal court of the United States for the Southern District of
New York, (ii) irrevocably submit to the jurisdiction of such courts in any such action or
proceeding, (iii) consent that any such action or proceeding may be brought in such
courts and waives any objection that such party may now or hereafter have to the venue
or jurisdiction or that such action or proceeding was brought in an inconvenient court,
and (iv) agree that service of process in any such action or proceeding may be effected by
mailing a copy thereof by registered or certified mail (or any substantially similar form of
mail), postage prepaid, to such party at its address as provided in Section 11.4 of the
Purchase Agreement (provided that nothing herein shall affect the right to effect service
of process in any other manner permitted by New York law).

Section 4.     Waiver.

This Bill of Sale can be waived only by written instrument making
specific reference to this Bill of Sale signed by the party against whom enforcement of
such waiver is sought. The waiver by the Purchaser or the Seller of a breach of any
provision of this Bill of Sale shall not operate or be construed as a waiver of any other or
subsequent breach. No failure on the part of any party to exercise, and no delay in
exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor
shall any single or partial exercise of such right, power or remedy by such party preclude
any other or further exercise thereof or the exercise of any other right, power or remedy.

Section 5.     Facsimile Signatures.

Signed PDF copies exchanged via electronic mail or facsimile copies of
this Bill of Sale shall legally bind the parties to the same extent as original documents.

*[Remainder of Page Intentionally Left Blank]*

2

IN WITNESS WHEREOF, Seller has caused this Bill of Sale to be executed on its behalf as of the date first above written.

**<u>SELLER</u>:**

**EVERGREEN SOLAR, INC.**

By: _____
    Name:
    Title:

**Exhibit C**

**<u>Form of Instrument of Assumption</u>**

**EXHIBIT C**

**ASSIGNMENT AND ASSUMPTION AGREEMENT**, dated as of [____], 2011 (this "***Agreement***"), by and Evergreen Solar, Inc. (the "***Seller***"), and ES Purchaser, LLC, a Delaware limited liability company (the "***Purchaser***"), pursuant to the Asset Purchase Agreement, dated as of August 15, 2011, by and among the Purchaser and the Seller (the "***Purchase Agreement***"). Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Purchase Agreement.

## WITNESSETH:

WHEREAS, pursuant to the Purchase Agreement, the Purchaser agreed to purchase from the Seller, and the Seller agreed to sell to the Purchaser, upon the terms specified in the Purchase Agreement and pursuant to sections 105, 363 and 365 of the Bankruptcy Code, all of the Seller's right, title and interest in and to the Acquired Assets and to assume the Assumed Liabilities.

NOW, THEREFORE, in consideration of the mutual covenants and obligations set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Purchaser and Seller hereby agree as follows:

Section 1.    Interpretation.

The parties hereto acknowledge and agree that this Agreement is an "***Ancillary Agreement***" pursuant to the Purchase Agreement, subject to the terms set forth therein. Notwithstanding anything to the contrary contained herein, nothing contained in this Agreement shall be deemed to grant the Purchaser or the Seller any rights, or to cause the Purchaser or the Seller to incur any obligations or liabilities, greater than or otherwise in excess of their respective rights, obligations and liabilities set forth in the Purchase Agreement. The Purchase Agreement is incorporated herein by reference, shall continue in full force and effect as though set forth herein at length to the extent provided in the Purchase Agreement, and shall control in the event of any conflict with the terms of this Agreement.

Section 2.    Assignment.

The Seller hereby sells, assigns, conveys, transfers and delivers to or cause to be sold, assigned, conveyed, transferred and delivered to the Purchaser (collectively, the "***Assignment***") all of Seller's legal, beneficial, and other right, title, benefit, privilege, obligation and interest in and to (a) the Assumed Liabilities in accordance with the terms and conditions of the Purchase Agreement and (b) the Designated Contracts in accordance with the terms and conditions of the Purchase Agreement.

Section 3.     <u>Assumption</u>.

In connection with the purchase and sale of the Acquired Assets pursuant to the Purchase Agreement, the Purchaser hereby accepts the Assignment, and assumes and agrees to observe, perform, pay or otherwise discharge when due (a) the Assumed Liabilities in accordance with the terms and conditions of the Purchase Agreement and (b) the Designated Contracts in accordance with the terms and conditions of the Purchase Agreement.

Section 4.     <u>Governing Law; Jurisdiction</u>.

THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK AND THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE.  All actions and proceedings arising out of or relating to this Agreement, including the resolution of any and all disputes hereunder, shall be heard and determined in the Bankruptcy Court, and the Parties to this Agreement hereby irrevocably submit to the exclusive jurisdiction of such courts in any such action or proceeding and irrevocably waive the defense of an inconvenient forum to the maintenance of any such action or proceeding.  If the Bankruptcy Court does not have or declines to exercise subject matter jurisdiction over any action or proceeding arising out of or relating to this Agreement, then each party (i) agrees that all such actions or proceedings shall be heard and determined in federal court of the United States for the Southern District of New York, (ii) irrevocably submits to the jurisdiction of such courts in any such action or proceeding, (iii) consents that any such action or proceeding may be brought in such courts and waives any objection that such party may now or hereafter have to the venue or jurisdiction or that such action or proceeding was brought in an inconvenient court, and (iv) agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such party at its address as provided in Section 11.4 of the Purchase Agreement (provided that nothing herein shall affect the right to effect service of process in any other manner permitted by New York law).

Section 5.     <u>Waiver</u>.

This Agreement can be waived only by written instrument making specific reference to this Agreement signed by the party against whom enforcement of such waiver is sought.  The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any other or subsequent breach.  No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

Section 6.     <u>Counterparts; Facsimile Signatures</u>.

This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Signed PDFs exchanged via electronic mail or facsimile copies of this Agreement shall legally bind the parties to the same extent as original documents.

*[Remainder of Page Intentionally Left Blank]*

IN WITNESS WHEREOF, each of the undersigned has caused this Assignment and Assumption Agreement to be executed on its behalf as of the date first above written.

**SELLER:**

**EVERGREEN SOLAR, INC.**

By: _____
     Name:
     Title:

**PURCHASER:**

**ES PURCHASER, LLC**

By: _____
     Name:
     Title:

## Exhibit D

## Bidding Procedures Order

**Exhibit E**

<u>**Transition Budget**</u>

Transition Budget (in $000s)

| | |
|---|---|
| Operating Activities | $5,841 |
| Other Transition Charges | 2,120 |
| Severance/PTO/Benefits Payments | 2,200[1] |
| **Total Budget** | **$10,161** |

Note: Budget items are defined as presented in the June 2011 Presentation. The Severance/PTO/Benefits Payments are based on a defined list of personnel that the Company expects it will terminate prior to Closing. When the employment of all of these people has terminated, if the Company's total commitments for Severance/PTO/Benefits Payments for these people are less than the $2.2 million budgeted, the difference between the budgeted amount and the actual amount spent will be added to the Operating Activities included in the Wafer Budget. For purposes of clarity, employees that are offered employment with Purchaser or the third party purchaser of the Core Assets on Comparable Terms (as defined in the Support Agreement) and who do not accept these employment terms will not be entitled to severance from the estate and (ii) any employee who accepts an offer of employment from Purchaser or a third party purchaser (whether or not on Comparable Terms) would not be entitled to severance from the estate.

This Transition Budget contemplates a sales process commencing August 15, 2011 and consummating on or prior to November 15, 2011. To the extent that such period is extended with the consent of the Supporting Noteholders, which consent shall be in their sole discretion, this Transition Budget shall be increased and extended in an amount to be reasonably agreed and shall not reduce amounts for the Wafer Budget. In addition, to the extent that the Closing has not occurred (without the consent of the Supporting Noteholders) prior to November 15, 2011, the term of the Transition Budget will be extended, but not past November 30, 2011 except such term may be extended until December 31, 2011 solely to the extent required for the purchaser to obtain necessary regulatory approvals. In the event of such an extension without the consent of the Supporting Noteholders, the budget set forth above for Operating Activities will be increased by an amount to fund Seller's operating activities during such period, and such amount shall be deducted on a dollar for dollar basis from the Operating Activities of the Wafer Budget set forth on Exhibit A-1 and the amount of cash to be transferred to Purchaser or third parties as part of the sale of the Core Assets.

---

[1] This represents all Severance/PTO/Benefits payments required through Closing, based on the employees Seller intends to terminate prior to Closing. If Seller decides to terminate additional employees prior to Closing, these employees would be entitled to severance to be paid out of the additional $1.9 million reserved for potential additional severance and the Transition Budget will be increased by this amount. If every employee is terminated as a result of the Transactions (for example, Purchaser or the third party purchaser of the Core Assets does not offer comparable employment terms to any current employee of Seller), Seller would pay a total of an additional $1.9 million in additional severance and the Transition Budget will be increased by this amount.

**<u>Exhibit G: Wages Order</u>**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| EVERGREEN SOLAR, INC.,[1] | ) | Case No. 11-_____ (___) |
| | ) | |
| | ) | Debtor. |

**ORDER: (I) AUTHORIZING THE DEBTOR TO PAY
PREPETITION (A) WAGES, SALARIES, AND OTHER
COMPENSATION, (B) EMPLOYEE MEDICAL AND SIMILAR
BENEFITS, (C) SEVERANCE AND CERTAIN RELATED
OBLIGATIONS, AND (D) REIMBURSABLE EMPLOYEE
EXPENSES; AND (II) AUTHORIZING AND DIRECTING
BANKS AND OTHER FINANCIAL INSTITUTIONS TO PAY
ALL CHECKS AND ELECTRONIC PAYMENT REQUESTS
MADE BY THE DEBTOR RELATING TO THE FOREGOING**

Upon the motion (the "Motion")[2] of the debtor and debtor in possession in the

above-captioned chapter 11 case (the "Debtor") for entry of an order: (i) authorizing, but not

requiring, the Debtor to all the relief requested in the Motion, including to pay prepetition (a)

wages, salaries, and other compensation, (b) employee benefits and arrangements; (c) severance

and certain related obligations; and (d) reimbursable employee expenses; and (ii) authorizing and

directing banks and other financial institutions to receive, process, honor, and pay all checks

presented for payment and electronic payment requests relating to the foregoing; and the Court

having found that jurisdiction is proper pursuant to 28 U.S.C. §§ 157 and 1334 as is venue

pursuant to 28 U.S.C. §§ 1408 and 1409; this is a core proceeding pursuant to 28 U.S.C. §

157(b)(2); the relief requested is proper under 11 U.S.C. §§ 105(a), 507(a)(4) and (5), and

---

[1] The last four digits of the Debtor's federal tax identification number are 2254. The Debtor's mailing address is
138 Bartlett Street, Marlboro, MA 01752.

[2] Capitalized terms used but not defined herein shall have the same meanings ascribed to them in the Motion.

541(d); the relief requested is in the best interests of the Debtor's estate, its creditors, and other

parties-in-interest; such relief is necessary to avoid immediate and irreparable harm meaning that

the requirements of Rule 6003 of the Federal Rules of Bankruptcy Procedure have been satisfied;

proper and adequate notice of the Motion has been given and that no other or further notice is

necessary; and after due deliberation thereon; and good and sufficient cause appearing therefore

IT IS HEREBY

ORDERED that the Motion is GRANTED; and it is further

ORDERED that, pursuant to sections 507(a), 363(b) and 105(a) of the Bankruptcy

Code, the Debtor are authorized, but not directed, to pay and/or honor the Prepetition Employee

Obligations, the Employee Programs, all costs and/or expenses related thereto as set forth in the

Motion, in accordance with the Debtor's policies in the ordinary course of business and as

provided in the Motion, subject to the following caps and in accordance with the Cash Collateral

Order:

| Unpaid Wages | $10,000 |
|---|---|
| Employer Tax Obligations | $2,500 |
| General Reimbursement Obligations | $75,000 |
| Medical Plan Contributions | $100,000 |
| Vision Plan Contributions | $1,000 |
| Dental Plan Contributions | $25,000 |
| Life and AD&D Insurance, Disability Insurance and Voluntary Life Insurance Programs | $10,000 |

A/74479315.9

| Paychex Payments (Payroll Administrator) | $1,000 |
|---|---|
| EAP Administrator (Sobel) | $2,500 |
| FSA Administrator (Benefit Concepts) | $5,000 |
| Reward Plan Administrator (Terryberry) | $500 |
| Relocation Benefits (Cartus) | $5,000 |
| Travel Insurance | $5,000 |

and it is further

ORDERED that no payments to any Employee on account of that Employee's Unpaid Wages and prepetition PTO shall exceed the $11,725 cap per Employee provided under section 507(a)(4) of the Bankruptcy Code; it is further

ORDERED, that the Debtors is authorized to pay all severance obligations arising under the Severance Program to Employees (as and when they become due) and to Former Employees; *provided, however,* that: (i) with respect to Employees, the maximum amount paid pursuant to this Order under the Severance Program shall be limited to the sum of: (a) eight weeks' salary; (b) any additional severance earned during the postpetition period based on length of service; *plus* (c) in an amount not to exceed $11,725 (less any amounts already paid to each Employee for Unpaid Wages and prepetition PTO), any length-of-service based severance earned during the 180 days preceding the Petition Date; (ii) with respect to former Employees, the maximum amount paid pursuant to this Order under the Severance Program shall be limited to $11,725; *provided further, however,* that no severance payments to insiders (as defined by section 101(31)(B) of the Bankruptcy Code) are approved at this time; and it is further

3

ORDERED, that a hearing to consider the approval of payments under the Severance Program with respect to such insiders shall be held on September [__], 2011 at __:__ (EDT), with objections due no later than September [__], 2011 at __:__ (EDT); and it is further

ORDERED that the Debtor and any other third parties administering withholding obligations on behalf of the Debtor, are authorized, but not directed, to make payments to applicable third parties with respect to the Withholding Obligations, and the Employer Tax Obligation, as set forth in the Motion, and the costs associated therewith, in accordance with the Debtor's ordinary course of business and stated policies, as set forth in the Motion; and it is further

ORDERED that in accordance with this Order and any other order of this Court, the banks and financial institutions at which the Debtor maintain their accounts are authorized to honor all fund transfer requests made by the Debtor related hereto, to the extent that sufficient funds are on deposit in such accounts; and it is further

ORDERED, that all payments pursuant to this Order shall be made in accordance with the Cash Collateral Order and the Approved Budget; and it is further

ORDERED, that the Debtor is authorized to pay all processing and administrative fees associated with the Prepetition Employee Obligations, Employee Programs, and other benefits as set forth in the Motion; and it is further

ORDERED, that nothing in this Order shall be construed as a directive to the Debtor to make any payment authorized herein; and it is further

4

ORDERED that the Debtor are authorized to pay all processing and administrative fees associated with the Prepetition Employee Obligations, Employee Programs, and other benefits as set forth in the Motion; and it is further

ORDERED that nothing in the Motion or this Order shall be construed as impairing the Debtor's rights to contest the validity or amount of any Prepetition Employee Obligations and/or benefits under the Employee Programs; and it is further

ORDERED that nothing in the Motion shall be deemed a request by the Debtor for authority to assume, and nothing in this Order shall be deemed authorization to assume, any executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code or create an administrative obligation for any prepetition wages or benefits; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Order.

Dated:  August __, 2011

_____
UNITED STATES BANKRUPTCY JUDGE

**Exhibit H:  KEIP Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| EVERGREEN SOLAR, INC.,[1] | ) | Case No. 11-_____ (___) |
| | ) | |
| Debtor. | ) | |

### ORDER AUTHORIZING AND APPROVING IMPLEMENTATION OF A KEY EMPLOYEE INCENTIVE PROGRAM PURSUANT TO SECTIONS 105(a), 363(b), 503(b)(1) AND 503(c)(3) OF THE BANKRUPTCY CODE

Upon consideration of the motion (the "Motion")[2] filed by the debtor and debtor in possession (the "Debtor") in the above-captioned chapter 11 case, seeking entry of an Order under 11 U.S.C. §§ 105, 363(b), 503(b)(1) and 503(c)(3), authorizing and approving the implementation of a Key Employee Incentive Program (the "KEIP"); and it appearing that the relief requested is in the best interests of the Debtor's estate, its creditors and other parties in interest; and it appearing that this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (M) and (O); and due and adequate notice of the Motion having been given under the circumstances; and after due deliberation and cause appearing therefor; it is hereby

ORDERED that the Motion is granted and the KEIP is approved; and it is further

ORDERED that if the Wide Wafer Assets are sold to a party other than the Stalking Horse Bidder or pursuant to a credit bid, then the KEIP Participants shall, upon the closing of such sale (or sales) be entitled to their respective KEIP allocations, all as set forth in Exhibit "A" to the Motion; and it is further

---

[1] The last four digits of the Debtor's federal tax identification number are 2254. The Debtor's mailing address is 138 Bartlett Street, Marlboro, MA 01752.

[2] Unless otherwise noted, capitalized terms used herein shall have the meanings ascribed to them in the Motion.

A/74486282.1

ORDERED that any KEIP amounts earned pursuant to this Order shall be entitled to administrative expense priority pursuant to sections 503(b)(1) and 503(c)(3) of the Bankruptcy Code; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all matters arising from the interpretation and implementation of this Order.

Dated: _____, 2011

_____
UNITED STATES BANKRUPTCY JUDGE

A/74486282.1

**Exhibit I:  Form of Joinder**

A/74486196.2

**<u>Exhibit I:  Form of Joinder</u>**

JOINDER TO RESTRUCTURING SUPPORT AGREEMENT

This Joinder to the Restructuring Support Agreement, dated as of August [      ], 2011 (the "<u>Agreement</u>"), by and among Evergreen Solar, Inc. (the "<u>Company</u>") and the noteholders identified on the signature pages thereto (each a "<u>Supporting Noteholder</u>" and collectively, the "<u>Supporting Noteholders</u>"), is executed and delivered by [                  ] (the "<u>Joining Party</u>") as of [                  ]. Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Agreement.

1. <u>Agreement to be Bound</u>.  As a condition precedent to becoming the beneficial holder or owner of [_____] dollars ($_____) in principal amount of obligations under the Indenture dated as of April 26, 2010, by and among Evergreen Solar, Inc., the Guarantors and U.S. Bank National Association, the undersigned Joining Party hereby agrees to become bound by all of the terms, conditions and obligations of the undersigned transferor (the "<u>Transferor</u>") set forth in or contemplated by the Agreement and the Term Sheet (each attached to this Joinder as Annex 1 and as each may be hereafter amended, restated or otherwise modified from time to time), including those provisions that may be read to require such Joining Party to restrict Secured Notes owned prior to the purchase of Secured Notes from the Transferor.  The Joining Party shall hereafter be deemed to be a "Supporting Noteholder" and a "Party" for all purposes under the Agreement.

2. <u>Representations and Warranties</u>. The Joining Party acknowledges and agrees that (i) it has reviewed, or has had the opportunity to review, with the assistance of professional and legal advisors of its choosing, the Agreement and (ii) all representations and warranties of the Supporting Noteholders set forth in the Agreement are true and correct in all material respects as of the date hereof with respect to such Joining Party.  This Joinder shall take effect and shall become an integral part of the Agreement immediately upon its execution.

3. <u>Notices</u>. The Joining Party hereby acknowledges and agrees that all notices and other communications to be delivered to the Joining Party shall be made to the addresses, email or facsimile numbers set forth in the Agreement, as applicable.

4. <u>Governing Law</u>. This Joinder shall be governed by and construed in accordance with the internal laws of the State of New York.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, this Joinder has been duly executed by each of the undersigned as of the date first written above.

**[NAME OF SUPPORTING NOTEHOLDER]**

By: /s/_____
    Name:
    Title:
    Address:

    Fax:
    Email:


DTC Participant: _____

**[NAME OF JOINING PARTY]**

By: /s/_____
    Name:
    Title:
    Address:

    Fax:
    Email:


DTC Participant: _____


Total Secured Notes Owned by Joining Party: _____

A/74486215.1

<u>Annex 1</u>
Restructuring Support Agreement and Term Sheet

3

**Exhibit K: Governance Provisions**

Evergreen Solar, Inc.

Summary of Corporate Governance

Provisions on Runway

| Noteholder APA: | The Noteholder APA will contain a brief covenant to the effect that Purchaser will agree to support the commercial development of the Wafer Business, subject to the Wafer Budget and the terms of the charter and by-laws and side letter referred to below. |
|---|---|
| Election of Directors: | During the period after the acquisition of the Wafer Business by Purchaser while Purchaser is supporting the commercial development of the Wafer Business (the "Wafer Build-Out Period"), Mr. El-Hillow or, if Mr. El-Hillow is no longer CEO of the Company because he has left the Company voluntarily or been terminated for "Cause", the next CEO of the Company, will be on the Board and will constitute the "Designated Director". |
| Side Letter: | A side letter between the Purchaser, the Seller and Mr. El-Hillow will provide that during the Wafer Build-Out Period, (i) any significant deviation from the Wafer Budget will require the approval of the Designated Director and (ii) the consent of the Designated Director will be required to deviate in any significant respect from the Wafer Budget during the Wafer Build-Out Period. The side letter agreement will also provide that specific performance shall be available as remedy for the parties thereto. |
| Offramp: | However, in the event that the Board of Directors determines in good faith, at a meeting duly called in accordance with the Bylaws (and which shall be at least 48 hours notice), held any time 120 days after Purchaser acquires the Wafer Business, that the Wafer Business is not commercially viable and a sale to a third party providing proceeds to the stockholders in excess of the current cash balances (net of estimated wind-down costs) is not imminent, then Purchaser may cease pursuing the commercial development of the Wafer Business and the Wafer Build-Out Period will terminate, subject to the payment of wind down costs, including employee severance to the extent monies for such costs remain in the Wafer Budget. |