IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| EVERGREEN SOLAR, INC.,[1] | ) | Case No. 11-12590 (MFW) |
| | ) | |
| Debtor. | ) | |

**DEBTOR'S MOTION FOR ORDERS (I)(A) AUTHORIZING DEBTOR'S
ENTRY INTO THE STALKING HORSE ASSET SALE AGREEMENT,
(B) AUTHORIZING AND APPROVING THE BIDDING PROCEDURES AND
TRANSACTION EXPENSE REIMBURSEMENT
(C) APPROVING THE NOTICE PROCEDURES
AND THE ASSUMPTION AND ASSIGNMENT PROCEDURES,
AND (D) SETTING A DATE FOR THE SALE HEARING, AND
(II) AUTHORIZING AND APPROVING (A) THE SALE OF SUBSTANTIALLY ALL OF
DEBTOR'S ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS AND
ENCUMBRANCES AND (B) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN
EXECUTORY CONTRACTS**

The Debtor in the above-captioned chapter 11 case, Evergreen Solar, Inc., as debtor and

debtor in possession (the "Debtor" or "Seller"), hereby moves this Court (the "Motion") for the

entry of orders pursuant to sections 105, 363 and 365 of title 11 of the United States Code (the

"Bankruptcy Code"), Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules"), and Rule 6004-1 of the Local Rules of Bankruptcy Practice

and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local

Rules"): (i) (a) authorizing the Debtor's entry into that certain asset sale agreement dated as of

August 15, 2011, among the Debtor and ES Purchaser LLC as purchaser ("NewCo" or the

"Proposed Purchaser") for the sale of substantially all of the assets of the Debtor (the "Purchased

Assets") as a "stalking-horse" sale agreement (as appended hereto as *Exhibit A*, the "Asset

---

[1] The last four digits of the Debtor's federal tax identification number are 2254. The Debtor's mailing
address is 138 Bartlett Street, Marlboro, MA 01752.

Purchase Agreement"), (b) authorizing and approving the bidding procedures (as summarized below and appended as *Schedule 1* to the Bidding Procedures Order (as defined herein), the "Bidding Procedures") and the Transaction Expense Reimbursement (as defined below), including granting administrative expense status to the Transaction Expense Reimbursement payable by the Debtor to the Proposed Purchaser, (c) approving the form and manner of sale notice (the "Notice Procedures") and the procedures as set forth herein for the assumption and assignment of the Assumed and Assigned Contracts (as defined below, and together with the Purchased Assets and such other assets and contracts as described in the Asset Purchase Agreement), and (d) setting the time, date and place for a hearing (the "Sale Hearing") to consider the sale of the Purchased Assets and the assumption and assignment of the Assumed and Assigned Contracts (the "Sale"); (ii) authorizing and approving (a) the sale of the Purchased Assets, free and clear of all liens, claims, and encumbrances, pursuant to section 363 of the Bankruptcy Code, except as set forth in the Asset Purchase Agreement and (b) the assumption and assignment of the Assumed and Assigned Contracts pursuant to section 365 of the Bankruptcy Code; and (iii) granting them such other and further relief as the Court deems just and proper. In support of this Motion, the Debtor respectfully represents as follows:

## JURISDICTION

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are sections 105, 363 and 365 of the Bankruptcy Code, Rules 2002, 6004, 6006, and 9014 of the Bankruptcy Rules, and Rule 6004-1 of the Local Rules.

## BACKGROUND

3.     On August 15, 2011 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

4.     The Debtor continues to operate its businesses and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made and no committees have been appointed or designated.

5.     A more detailed description of the Debtor's business, corporate structure and the reasons for filing this chapter 11 case is set forth in the *Declaration of Michael El-Hillow in Support of the First Day Pleadings* (the "First Day Declaration"), which was filed contemporaneously with the Motion and is incorporated herein by reference.

## DEBTOR'S DECISION TO SELL THE PURCHASED ASSETS

6.     As described in the First Day Declaration, the Debtor believes that the best way to maximize value for its stakeholders is through a sale of the Purchased Assets. Rapidly falling prices for solar panels have made it difficult for the Debtor to manufacture and sell its products at the desired level of profitability. This forced the Debtor to close its U.S. solar panel manufacturing facility in early 2011. The decline in solar panel prices is the result of increased competition from better capitalized Chinese companies with significantly lower operating costs than the Debtor and severe reductions in subsidies for solar power throughout Europe, which is the largest market for the Debtor's products.

7.     Nevertheless, the Debtor has developed a technology designed to produce wafers,

a key component of solar panels, at a substantially lower cost than conventional processes (the "Wide Wafer Technology"). The Debtor has made substantial progress in developing its technology to produce industry standard sized wafers ("Wide Wafers") that can be used throughout the solar industry. The Debtor expects to be able to offer Wide Wafers at a substantially lower cost than can be purchased from suppliers that use conventional technology and, as a result, expects significant demand for its wafers in the future. The Debtor plans to focus its operations solely on completing the development of the Wide Wafer Technology going forward and believes it can become a market leader in this space.

8.     Despite this progress, the Debtor is currently operating at a loss and, as a result, is unable to sustain its current capital structure of approximately $400 million in outstanding long term debt. The Debtor has been unable to attract additional financing to refinance its funded debt. In light of its inability to raise fresh capital and its continuing cash burn, the Debtor has determined that it is necessary to embark on the proposed sale process to preserve its value for the benefit of its creditors.

9.     Earlier this year, the Debtor began to discuss a possible transaction to restructure its 13% Secured Notes, commencing discussions with certain 13% Noteholders (the "Supporting Noteholders"), which Supporting Noteholders represent in excess of 70% of the outstanding principal amount of 13% Secured Notes, and their counsel and financial advisor. After extensive negotiations with the Supporting Noteholders, the Debtor ultimately reached a Restructuring Support Agreement with them in order to restructure its capital structure and organization, in this Chapter 11 case. The Restructuring Support Agreement represents the best chance to maximize value for stakeholders, while providing the opportunity to realize the potential of Wide Wafer Technology.

10. The proposed restructuring involves the marketing and sale of substantially all of the Debtor's assets pursuant to 11 U.S.C. § 363, which will allow for the development of the Wide Wafer Technology. The Supporting Noteholders have agreed to effect a stalking horse credit bid through Newco as acquisition vehicle for the Purchased Assets of the Debtor (the "13% NewCo Credit Bid") including, without limitation, the Wide Wafer Technology. In connection with the 13% NewCo Credit Bid, U.S. Bank National Association as indenture trustee (the "Indenture Trustee"), acting at the direction of holders of a majority of outstanding principal amount of the 13% Secured Notes (the "Majority Noteholders"), will credit bid some or all of the obligations owed in respect of the 13% Secured Notes for the benefit of all of the 13% Noteholders. To the extent the 13% NewCo Credit Bid is the winning bid, the equity of Newco will be distributed to all of the holders of 13% Secured Notes in accordance with the Indenture, and NewCo will have the opportunity to retain employees relevant to Wide Wafer Technology and continue the Wide Wafer Technology business for a period of time pursuant to the terms set forth in the 13% NewCo Credit Bid.

11. The contemplated restructuring would be consummated through a sale pursuant to this Motion and the Bidding Procedures summarized below -- namely a sale pursuant to section 363 of the Bankruptcy Code -- in which the Purchased Assets will be thoroughly marketed by the Debtor, with any sale or sales subject to higher and better offers and approval by the Bankruptcy Court.

12. The Debtor has negotiated an Asset Purchase Agreement with the Supporting Noteholders, which will be executed by the Debtor and NewCo, an acquisition vehicle for the 13% NewCo Credit Bid. The Asset Purchase Agreement provides for the sale of the Purchased Assets, free and clear of all liens, claims, encumbrances and other interests other than those

expressly assumed by the Proposed Purchaser. To obtain the maximum value for the Purchased Assets, the Debtor proposes to subject the sale of the Purchased Assets to an auction process to elicit higher or better bids. Interested parties may also bid for individual Lots (as defined below) of the Purchased Assets. If no other bids are received for the Purchased Assets that are higher or otherwise better than the transaction set forth in the Asset Purchase Agreement, the Debtor intends to sell the Purchased Assets to Newco pursuant to the terms of the Asset Purchase Agreement.

13.     The sale of the Purchased Assets is subject to this Court's approval and the auction process proposed in the Bidding Procedures. The Debtor does not have the wherewithal to operate in chapter 11 for an extended period without pursuing this sale transaction. The Debtor believes that the sale of the Purchased Assets is the best option for maximizing the recoveries for the parties in interest in this chapter 11 case.

## THE PURCHASED ASSETS

14.     The Debtor seeks this Court's approval to sell the LBIE Assets, the Devens Assets, the Core Assets and the Non-Core Assets, (each as defined and described in the Bidding Procedures, attached hereto as Exhibit B and summarized below) (each a "Lot" and collectively, the "Purchased Assets")). The Purchased Assets, taken together, includes substantially all of the Debtor's assets:

## PREPETITION AND POSTPETITION EFFORTS TO MARKET AND SELL THE LBIE ASSETS AND DEVENS ASSETS.

*LBIE Assets*

15.     The Debtor and its advisors have spoken to several parties about the sale of the

LBIE Assets, but the Debtor has not yet retained a broker to assist with the marketing of the LBIE Assets nor has it solicited firm offers. There has been significant trading in LBIE claims, with many financial institutions trading in such Lehman-related claims on a daily basis and, therefore, the Debtor believes that the LBIE Assets are highly-marketable Purchased Assets which should attract multiple bidders.

### Devens Assets

16.     The Debtor first started marketing the Devens Assets following its announcement of its shutdown of operations at Devens in January 2011. In February, it hired Hilco Industrial LLC ("Hilco") pursuant to that certain engagement letter dated February 25, 2011.

17.     The Debtor, in consultation with Hilco, approached a number of parties likely to be interested and able to acquire the Devens Assets, including mostly strategic buyers. The Debtor had serious discussions with multiple bidders who provided draft asset purchase agreements, however, the Debtor was unable to finalize and enter into an asset purchase agreement with one of these parties. While the Debtor and each of these parties were unable to reach an agreement prepetition, the Debtor knows of no reason why they would not participate in the sales process outlined in this Motion. The Debtor plans to continue to work with these parties (and others) and hopes that they will become a Qualifying Bidder (as defined in the Bidding Procedures). The Debtor will continue its efforts, and seeks to employ Hilco to assist (*see* the Debtor's Motion to Retain Hilco Trading Inc. filed on the Petition Date) to sell the Devens Assets by re-canvassing many of the entities originally contacted, plus additional parties. The Debtor hopes and expects to have a robust bidding and auction process for the Devens Assets.

## PREPETITION AND POSTPETITION EFFORTS TO MARKET AND SELL THE CORE ASSETS AND NON-CORE ASSETS

18.     Prepetition, the Debtor spent a considerable amount of time and effort trying to restructure its debt and/or raise sufficient financing so that it could continue operating as a going concern out of court.   As part of its restructuring efforts, the Debtor also commenced the marketing process with respect to the Core Assets and the Non-Core Assets.

### *Core Assets*

19.     The Debtor and its investment banker, UBS, have put together a list of more than 80 parties who may be interested in the Core Assets.  This includes both strategic and financial buyers who have operations, investments or interest in the solar sector.   UBS has started preparing marketing materials for potential purchasers, which will outline the Core Assets to be sold and describe the Wide Wafer Technology.  The Debtor also continues to negotiate with its China JV partner, HSTIC, to ascertain whether the two parties can resolve certain issues that exist between them.   The Debtor believes that this relationship could prove valuable to a potential purchaser.

20.     The Debtor has been working with UBS and its legal advisor, Bingham McCutchen LLP, to create a data room such that all relevant items that relate to the Purchased Assets will be immediately available to prospective bidders who execute a standard confidentiality agreement.

### *Non-Core Assets*

21.     Over the past few months the Debtor has tried to collect on its outstanding accounts receivable and sell its remaining solar panel inventory in an attempt to monetize Non-

Core Assets. As a result of these efforts, the Debtor has successfully increased its cash balance, while decreasing its accounts receivable and inventory. The Debtor believes value remains with the Non-Core Assets and that third parties, whom Hilco will seek to identify, are prepared to unlock this value and participate in the auction.

## SUMMARY OF RELIEF REQUESTED

22.     The Debtor seeks orders: (i)(a) authorizing the Debtor to enter into the Asset Purchase Agreement and take other such steps as are necessary to consummate the Sale, (b) authorizing and approving the Bidding Procedures and the Transaction Expense Reimbursement, (c) approving the Notice Procedures and the Assumption and Assignment Procedures (as defined below), and (d) setting the time, date, and place of the Sale Hearing (such order, substantially in the form attached hereto as *Exhibit C*, the "Bidding Procedures Order"); (ii) authorizing and approving (a) the sale of the Purchased Assets, free and clear of all liens, claims and encumbrances, and (b) the assumption and assignment of the Assumed and Assigned Contracts (such order, substantially in the form attached hereto as *Exhibit D*, the "Sale Order"); and (iii) granting it such other and further relief as the Court deems just and proper.

## THE ASSET PURCHASE AGREEMENT[2]

After extensive arm's-length, good faith negotiations between the Debtor and the Supporting Noteholders and their respective advisors, the Debtor has agreed to enter into an Asset Purchase Agreement (the "Asset Purchase Agreement") with the Proposed Purchaser, the acquisition vehicle formed by the Supporting Noteholders, pursuant to which the Debtor has agreed, among

---

[2]     Capitalized terms used but not defined herein have the meanings ascribed to them in the Asset Purchase Agreement. To the extent that there are inconsistencies between the summary description of the Asset Purchase Agreement contained herein and the terms and conditions of the Asset Purchase Agreement, the terms and conditions of the Asset Purchase Agreement control.

other things, to convey the Acquired Purchased Assets (as defined in the Asset Purchase Agreement) and assign the Designated Contracts to the Proposed Purchaser in accordance with the terms and conditions of the Asset Purchase Agreement. The Debtor has determined that the Asset Purchase Agreement represents the best opportunity for the Debtor to maximize the value of its Acquired Purchased Assets and serve as a basis for conducting an auction to seek higher and/or better offers.

23.     The Asset Purchase Agreement uses as its consideration a credit bid of some or all of the obligations owed in respect of the 13% Secured Notes for the benefit of all of the 13% Noteholders pursuant to 11 U.S.C.§ 363(k) by the Indenture Trustee acting at the direction of the Majority Noteholders[3]. This credit bid is intended to ensure that the auction for the sale of the Debtor's assets conducted under the rules and supervision of the Bankruptcy Court will not fail, as the Proposed Purchaser is required to purchase substantially all of the assets of the Debtor that are not acquired by third party bidders, subject to certain exceptions. To maximize value and facilitate the auction, the Debtor's assets have been separated into Lots of similar assets. The Asset Purchase Agreement contemplates the sale of the Acquired Purchased Assets, subject to higher and/or better bids, on the following significant terms:

- Acquired Purchased Assets. The Acquired Purchased Assets to be acquired by the Proposed Purchaser include the assets described in the Bidding Procedures.

- Assumed Liabilities. The liabilities to be assumed by the Proposed Purchaser include, among others, all liabilities arising after the Closing Date under the Designated Contracts (the Contracts the Proposed Purchaser chooses to assume).

---

[3] The Indenture Trustee is not acquiring the assets of the Debtors and, other than with respect to the obligation to credit bid the obligations of the 13% Secured Notes pursuant to Section 3.1 of the Asset Purchase Agreement, has no obligations under the Asset Purchase Agreement, except to reduce the secured obligations of the 13% Secured Notes to the extent that the credit bid is actually used to close a transaction pursuant to the Asset Purchase Agreement. The Supporting Noteholders have formed Proposed Purchaser to be an acquisition vehicle and have committed to the Trustee to distribute the equity of Proposed Purchaser to all Noteholders pro rata in accordance with the Indenture in the event that a credit bid is used to close a transaction pursuant to the Asset Purchase Agreement.

- **Purchase Price.** $60 million, which the Purchaser is entitled to allocate at the Auction as it determines, except that the purchase price allocated to Lot 3 may not be more than $30 million, if an offer containing cash of $30 million or more is received for Lot 3.

- **Sale Free and Clear.** The Purchased Assets to be transferred by the Debtor will be transferred free and clear of all liens, claims and encumbrances, other than those expressly assumed by the Proposed Purchaser or otherwise expressly permitted under the Asset Purchase Agreement.

- **Excluded Purchased Assets.** The Proposed Purchaser has the right to exclude certain assets in the acquisition, including the Midland Facility, the Devens Lease and the shares of capital stock of Evergreen (Wuhan) and Evergreen (Hong Kong). In addition, it is possible that all of the Purchased Assets in Lot 2 will be excluded.

- **Closing Conditions:** The obligation of the Proposed Purchaser to close the sale is subject to the satisfaction of certain customary closing conditions, including conditions relating to bankruptcy court approvals.

- **Status of Payments.** The portion of the Transaction Expenses to be paid or borne by the Debtor shall constitute administrative expenses under section 503(b) of the Bankruptcy Code.

## THE BIDDING PROCEDURES

24.     To ensure that the Debtor receives the maximum value for the Purchased Assets, the Asset Purchase Agreement is subject to higher or better offers, and, as such, the Asset Purchase Agreement will serve as the "stalking-horse" bid for the Purchased Assets. The Purchased Assets may be sold in a single sale to a single purchaser or in Lots to several purchasers. A list of the Purchased Assets will be posted in the virtual data room. As set forth below, bidders are invited to submit a bid for all of the Purchased Assets or, at the bidder's election, for specifically identified lots of Purchased Assets (the "*Lots*") or combinations of Lots that the bidder may desire. A list of the Lots that are available for individual bids or group bids is attached hereto as appended as Schedule 1 to the Bidding Procedures, which is Exhibit B. The Debtor shall retain all rights to any Purchased Assets that are not part of a bid accepted by the Debtor, subject to the liens with respect to the Secured Notes

25.     **ANY PARTY INTERESTED IN BIDDING ON ANY OF THE DEBTOR'S**

**ASSETS SHOULD CONTACT THE DEBTOR'S ADVISORS, AS FOLLOWS:**

> **FOR LOT 1 AND LOT 3:**
>
> **UBS INVESTMENT BANK**: Steve Smith (sd.smith@ubs.com, 212-821-5222) 299 Park Avenue, New York, NY 10171, or David Dolezal (david.dolezal@ubs.com, 415-352-6086), 555 California Street, San Francisco, CA 94104
>
> **FOR LOT 2 AND LOT 4 (INCLUDING ANY OF THE ASSETS IN LOT 2 OR 4):**
>
> **HILCO INDUSTRIAL, LLC**: Brian Lee (blee@hilcobid.com, 203-258-0927), 5 Revere Drive, Suite 206, Northbrook, IL 60062

26.     The key provisions of the Bidding Procedures to be employed with respect to the

proposed sale of the Purchased Assets and assumption of certain liabilities as set forth in the

Asset Purchase Agreement are as follows:

> a.      Participation Requirements

Any person that wishes to participate in the bidding process (each, a "Potential Bidder") must become a "Qualifying Bidder." As a prerequisite to becoming a Qualifying Bidder (and, thus, being able to conduct due diligence), a Potential Bidder:

> (i)     must deliver an executed confidentiality agreement in form and substance acceptable to the Debtor; and
>
> (ii)    must be able, as reasonably determined by the Debtor, to consummate a transaction if selected as the successful bidder for some or all of the Purchased Assets.

The Proposed Purchaser is deemed a Qualifying Bidder and the Asset Purchase Agreement constitutes a Qualifying Bid (as defined below) for all purposes.

> b.      Form of Agreement

The Asset Purchase Agreement is an offer to purchase all of the Purchased Assets. Bidders who intend to submit bids for all of the Purchased Assets should reference the Asset Purchase Agreement in connection with such bids. On or before September 16, 2011, for bidders who only intend to submit bids for one or more of the Lots representing the LBIE Assets, the

Devens Assets, the Core Assets or the Non-Core Assets (each as defined in the Bidding Procedures), the Debtor will post in the virtual data room one or more forms of asset purchase agreement (each a "Short Form APA") that will be substantially similar to the Asset Purchase Agreement, but with modifications appropriate for the purchase of such applicable Lots without the other Purchased Assets. As set forth in section 5 below, Bidders who intend to submit bids must include with their bids (i) one or more clean asset purchase agreement(s) that contains substantially the same or terms more favorable to the Debtor than those in the Asset Purchase Agreement or the Short Form APA, as applicable and (ii) marked modified asset purchase agreement(s) reflecting any variations from the Asset Purchase Agreement executed by the Proposed Purchaser or the Short Form APA, as applicable.

   c.   Due Diligence

        The Debtor must afford any Qualifying Bidder the time and opportunity to conduct reasonable due diligence. The due diligence period shall extend through and including the Bid Deadline (as defined below). The Debtor and its representatives shall not be obligated to furnish any due diligence information after the Bid Deadline.

        Due diligence access may include such management presentations as may be scheduled by the Debtor, access to the virtual data room, and such other matters which a Qualifying Bidder may reasonably request and as to which the Debtor may agree. The Debtor will designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access from Qualifying Bidders. The Debtor may, in its sole discretion, coordinate diligence efforts such that multiple Qualifying Bidders have simultaneous access to due diligence materials and/or simultaneous attendance at management presentations. Qualifying Bidders are advised to exercise their own discretion before relying on any information regarding the Purchased Assets provided by anyone other than the Debtor or its representatives.

        Each bidder shall be deemed to acknowledge and represent that it has had an opportunity to conduct any and all due diligence regarding the Purchased Assets prior to submitting its bid, that it has relied solely upon its own independent review, investigation and/or inspection of any documents in making its bid, and that it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Purchased Assets, or the completeness of any information provided in connection with the bidding process outlined herein, except as expressly stated in the relevant purchase agreement of the Prevailing Bidder(s) (defined below) approved by the Bankruptcy Court.

   d.   Bid Requirements

        To be deemed a "Qualifying Bid," a bid must be received from a Qualifying Bidder by a date no later than the Bid Deadline (as defined below) that:

             (i)    sets forth the cash purchase price to be paid by such bidder (or in the case of the Proposed Purchaser, the credit bid amount);

(ii)     does not propose payment in any form other than cash (or in the case of the Proposed Purchaser, a credit bid), provided, however, that a bid for the Core Assets in a consideration other than cash may be deemed a Qualifying Bid with the consent of the Supporting Noteholders holding a majority in aggregate principal amount of the Secured Notes held collectively by the Supporting Noteholders (the "Requisite Supporting Noteholders");

(iii)    states the Lots proposed to be acquired and the liabilities proposed to be paid or assumed by such bidder, provided, however, that with respect to Lot 2 and Lot 4, the Debtor with the consent of the Requisite Supporting Noteholders (which consent will not be unreasonably withheld), may accept bids for the individual assets within Lot 2 and Lot 4;

(iv)     is accompanied by a clean and duly executed purchase agreement (the "Modified Asset Purchase Agreement") and a marked Modified Asset Purchase Agreement reflecting any variations from the Asset Purchase Agreement executed by the Proposed Purchaser or the Short Form APA, as applicable;

(v)      states such Qualifying Bidder is financially capable of consummating the transactions contemplated by the Modified Asset Purchase Agreement and provides written evidence in support thereof;

(vi)     states such Qualifying Bidder's offer is irrevocable until the closing of the Asset Sale if such Qualifying Bidder is the Prevailing Bidder (as defined below) or the Second-Highest Bidder (as defined below) for any or all Lots;

(vii)    contains such financial and other information to allow the Debtor to make a reasonable determination as to the Qualifying Bidder's financial and other capabilities to consummate the transactions contemplated by the Modified Asset Purchase Agreement, including, without limitation, such financial and other information setting forth adequate assurance of future performance under contracts and leases to be assumed pursuant to section 365 of title 11 of the United States Code (the "Bankruptcy Code") in a form requested by the Debtor to allow the Debtor to serve, within one (1) business day after such receipt, such information on counter-parties to any contracts or leases being assumed or assumed and assigned in connection with the proposed sale that have requested, in writing, such information;

(viii)   identifies with particularity each and every executory contract and unexpired lease, the assumption and, as applicable, assignment of which is a condition to closing;

(ix)   does not request or entitle such Qualifying Bidder to any break-up fee, expense reimbursement (other than the expense reimbursement that only the Proposed Purchaser is entitled to receive), or similar type of payment;

(x)   fully discloses the identity of each entity that will be bidding in the Asset Sale or otherwise participating in connection with such bid, and the complete terms of any such participation;

(xi)   with respect to bids for all of the Lots, is likely to result in a value to the Debtor's estate in the Debtor's reasonable judgment, that is more than the aggregate of the value of the sum of: (i) the credit bid amount set forth in the Asset Purchase Agreement; plus (ii) the assumed liabilities, as identified in the Asset Purchase Agreement; plus (iii) $500,000;

(xii)   (a) does not contain any financing contingencies of any kind; (b) provides for expiration of any due diligence contingency on or before the Auction Date; and (c) contains evidence that the Qualifying Bidder has received debt and/or equity funding commitments or has financial resources readily available sufficient in the aggregate to consummate the Asset Sale, which evidence is reasonably satisfactory to the Debtor;

(xiii)   sets forth each regulatory and third-party approval required for the bidder to consummate its purchase, and the time period within which the bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to take more than 15 days following execution and delivery of an asset purchase agreement, those actions the bidder will take to ensure receipt of such approval(s) as promptly as possible),

(xiv)   includes a commitment to close on or before November 18, 2011 (the "Projected Closing Date") subject to any regulatory approvals;

(xv)   provides for the Qualifying Bidder to serve as a back up bid (the "Second-Highest Bidder") if it is the next highest and best bid after the Prevailing Bid (the "Second-Highest Bid") in accordance with the terms of the Asset Purchase Agreement;

(xvi)   includes evidence of authorization and approval from the Qualifying Bidder's board of directors (or comparable governing

body) with respect to the submission, execution, and delivery of the Modified Asset Purchase Agreement;

(xvii)   provides for liquidated damages in the event of the bidder's breach of contract equal to the deposit; and

(xviii)   provides a cash purchase deposit equal to ten percent (10%) of the purchase price contained in the Modified Asset Purchase Agreement; provided, however, that the Proposed Purchaser is not required to make a cash deposit.

A competing bid satisfying all the above requirements, as determined by the Debtor, after consultation with the Requisite Supporting Noteholders, as described below, shall constitute a Qualifying Bid. Each Potential Bidder submitting bid shall be deemed to acknowledge and represent that it is bound by these Bidding Procedures.

e.   Combination Bids

The Debtor reserves the right to auction off the Lots individually or in such combinations of Lots as the Debtor may determine, in consultation with the Requisite Supporting Noteholders. Bidders are invited to bid on the individual Lots or in such combinations of Lots as the bidder may elect, provided that any bid for a combination of Lots, other than the bid by the Proposed Purchaser, must (x) allocate the purchase consideration among the Lots, (y) state whether the bid is conditioned upon the bidder being the Prevailing Bidder (as defined herein) on more than one Lot and, if so, which are the Lots that the bid is conditioned upon, and (z) state whether the bidder is willing to purchase any of the Lots included in the bid individually, and if so, the bid must state the price the bidder would pay for each such Lot.

f.   Bid Deadline

A Qualifying Bidder that desires to make a bid shall deliver a written or electronic copy of its bid to: (i) Evergreen Solar, Inc., 138 Bartlett Street, Marlboro, MA 01752, Attn: Christian Ehrbar, General Counsel (cehrbar@evergreensolar.com); (ii) Bingham McCutchen LLP, One Federal Street Boston, MA 02110, Attn. J.Q. Newton Davis, Esq. (newton.davis@bingham.com) and 399 Park Avenue, New York, NY 10022, Attn: Ronald. J. Silverman, Esq. (ronald.silverman@bingham.com), counsel to the Debtor; (iii) UBS Investment Bank, 299 Park Avenue, New York, NY 10171, Attn: Steve Smith (sd.smith@ubs.com) and 555 California Street, San Francisco, CA 94104, Attn: David Dolezal (david.dolezal@ubs.com), investment banker to the Debtor; (iv) Hilco Industrial, LLC, 5 Revere Drive, Suite 206, Northbrook, IL 60062, Attn: Brian Lee (blee@hilcobid.com, 203-258-0927), broker to the Debtor; (v) Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, NY 10036, Attn: Michael S. Stamer, Esq. (mstamer@akingump.com) and James Savin, Esq. (jsavin@akingump.com), counsel to the Supporting Noteholders; (vi) Duff & Phelps Securities, LLC; 11150 Santa Monica Blvd, Suite 600, Los Angeles, CA 90025 Attn: Brian Cullen (brian.cullen@duffandphelps.com) and Mark Catania (mark.catania@duffandphelps.com), financial advisor to the Supporting Noteholders and (vi) Maslon Edelman Borman & Brand, LLP, 3300 Wells Fargo Center, 90 South Seventh Street, Minneapolis, MN 55402-4140, Attn: Clark T. Whitmore, Esq.

(clark.whitmore@maslon.com), counsel to the Indenture Trustee[4] so as to be received by a date no later than October 26, 2011 (the "Bid Deadline").

g.    Evaluation of Qualifying Bids

The Debtor shall make a determination regarding whether a bid is a Qualifying Bid, after consultation with the Requisite Supporting Noteholders, and shall notify bidders whether their bids have been determined to be qualified by a date no later than two (2) days prior to the Auction Date (as defined below). In the event a bid is determined not to be a Qualifying Bid, the bidder shall be notified by the Debtor and shall have one (1) day from the date of such notification to modify its bid to render it a Qualifying Bid. Prior to the Auction (as defined below), the Debtor shall determine, in its reasonable judgment, after consultation with the Requisite Supporting Noteholders, which of the Qualifying Bids is likely to be the highest or best with respect to any particular Lot or group of Lots.

h.    No Qualifying Bids

If no timely, conforming Qualifying Bids other than the Qualifying Bid submitted by the Proposed Purchaser are submitted by the Bid Deadline, the Debtor shall not hold an Auction (as defined below) and instead shall request at the Sale Hearing (as defined below) that the Bankruptcy Court approve the Asset Purchase Agreement with the Proposed Purchaser.

i.    Auction

In the event that the Debtor timely receives one or more Qualifying Bids, other than the Asset Purchase Agreement, with respect to any of the Lots or individual assets within Lot 2 or Lot 4, as permitted herein, the Debtor shall conduct an auction (the "Auction") no later than the date that is four (4) business days after the Bid Deadline (the "Auction Date").

Following the Auction, the Debtor will determine, in consultation with its advisors, which individual bid or combination of bids is in the best interests of the Debtor and its estate.

The Auction shall be governed by the following procedures for each Lot to be sold individually and each group of Lots to be sold together:

(i)    The Auction shall be held at the law offices of Bingham McCutchen, LLP, 399 Park Avenue, New York, NY 10022 on November 1, 2011, beginning at 10:00 a.m. Provisions will also be made to allow Qualifying Bidders the opportunity to participate in the Auction by phone;

---

[4] The defined term "Indenture Trustee" means U.S. Bank National Association (i) as Trustee for the Secured Notes pursuant to that certain Indenture, dated as of April 26, 2010, by and among Evergreen Solar, Inc., the Guarantors and U.S. Bank National Association; (ii) as Collateral Agent for the Secured Notes pursuant to that certain Pledge and Security Agreement, dated as of April 26, 2010, by and among Evergreen Solar, Inc., the Guarantors and U.S. Bank National Association; and (iii) as Trustee and Collateral Agent for the Secured Notes pursuant to that certain Collateral Trust Agreement, dated as of April 26, 2010, by and among Evergreen Solar, Inc., the Guarantors and U.S. Bank National Association.

(ii)    only the Proposed Purchaser and the other Qualifying Bidders shall be entitled to make any subsequent bids at the Auction;

(iii)   the Proposed Purchaser and the other Qualifying Bidders shall appear in person at the Auction, or through a duly authorized representative;

(iv)   only the Debtor, the Proposed Purchaser, the Qualifying Bidders, the Supporting Noteholders, the Indenture Trustee, and the Creditors Committee (if one has been appointed) and advisors to each of these parties, may attend the Auction;

(v)    the Debtor and its professional advisors shall direct and preside over the Auction and the Auction shall be transcribed;

(vi)   bidding shall commence at the amount of the highest Qualifying Bid submitted by the Qualifying Bidders prior to the Auction;

(vii)  Qualifying Bidders may then submit successive bids in increments of at least $500,000 higher per Lot than the bid at which the Auction commenced and then continue in minimum increments of at least $500,000 higher per Lot than the previous bid; provided that the Debtor shall retain the right to modify the bid increment requirements at the Auction;

(viii) all material terms of the bid that is deemed to be the highest and best bid for each round of bidding shall be fully disclosed to all other Qualifying Bidders and the Proposed Purchaser;

(ix)   all Qualifying Bidders, including the Proposed Purchaser, at the Auction shall be deemed to have consented to the core jurisdiction of the Bankruptcy Court and waive any right to a jury trial in connection with any disputes relating to the marketing process, the Auction, and the construction and enforcement of the Qualifying Bidder's contemplated Transaction documents, as applicable;

(x)    the Proposed Purchaser shall be entitled, to upon direction given by holders of a majority of the principal amount of the Secured Notes, to cause the Indenture Trustee to (i) credit bid all or a portion of the aggregate principal amount of the Secured Notes, together with accrued interest and any other claims with respect to the Secured Notes, consistent with Bankruptcy Code section 363(k); (ii) allocate such credit bid among the Lots; (iii) reallocate such credit bid during the Auction; (iv) reduce the amount of the credit bid to the extent the Proposed Purchaser is not the Prevailing Bidder with respect to any Lot, and (v) submit additional bids and make modifications to the Asset Purchase Agreement at the Auction; provided, however, holders of a majority of the principal

amount of the Secured Notes have consented in advance to the sale of Lot 3 to a third party bidder who bids cash in excess of $30 million (the "<u>Reserve Price</u>"), provided further, that the Requisite Supporting Noteholders may determine, in their sole discretion, to reduce the Reserve Price or accept consideration other than cash.

(xi)     all Qualifying Bidders, including the Proposed Purchaser, shall have the right to submit additional bids and make additional modifications to the Asset Purchase Agreement or Modified Asset Purchase Agreement at the Auction, provided that any such modifications to the Asset Purchase Agreement or Modified Asset Purchase Agreement on an aggregate basis and viewed in whole, shall not, in the Debtor's business judgment, be less favorable to the Debtor with respect to the particular Lots than the terms of the Asset Purchase Agreement;

(xii)    the Debtor shall have the right to request any additional financial information that will allow the Debtor to make a reasonable determination as to the Qualifying Bidder's financial and other capabilities to consummate the transactions contemplated by the Modified Asset Purchase Agreement, as further amended during the Auction, and any further information that the Debtor may believe is reasonably necessary to clarify and evaluate the Qualifying Bidder's bid;

(xiii)   the Debtor shall have the right, with the consent of the Requisite Supporting Noteholders, to chose the order in which the Lots are put up for Auction;

(xiv)    the Auction shall continue until there is only one offer for all Purchased Assets or each of the Lots, as applicable, that the Debtor determines, subject to Bankruptcy Court approval, is the highest or best from among the Qualifying Bids submitted at the Auction (the "<u>Prevailing Bid</u>").  In making this decision, the Debtor shall consider, without limitation, the amount of the purchase price, the likelihood of the bidder's ability to close a transaction and the timing thereof, the number, type and nature of any changes to the Asset Purchase Agreement requested by each bidder, and the net benefit to the Debtor's estate.  The bidder submitting such Prevailing Bid with respect to any Lot shall become the "<u>Prevailing Bidder</u>," with respect to such Lot and shall have such rights and responsibilities of the purchaser, as set forth in the applicable Asset Purchase Agreement or Modified Asset Purchase Agreement; and

(xv)     within one (1) business day after adjournment of the Auction, the Prevailing Bidder shall complete and execute all agreements,

contracts, instruments and other documents evidencing and
containing the terms and conditions upon which the Prevailing Bid
was made.

j.    Consent

For the avoidance of doubt, the Supporting Noteholders and the Indenture
Trustee, at the direction of holders of a majority in aggregate principal amount of the Secured
Notes, have consented to the sale of the Purchased Assets in connection with the sales process
governed by these Bidding Procedures.  For the avoidance of doubt, the liens of the Secured
Noteholders and the Indenture Trustee shall attach to the proceeds of the Asset Sale(s).

k.    Sale Hearing

The Prevailing Bid and the Second-Highest Bid (or the Asset Purchase
Agreement if no Qualifying Bid other than that of the Proposed Purchaser is received) will be
subject to approval by the Bankruptcy Court.  The hearing to approve the Prevailing Bid and
the Second-Highest Bid (or the Asset Purchase Agreement if no Qualifying Bid other than
that of the Proposed Purchaser is received) (the "Sale Hearing") shall take place no later than
two (2) business days following the conclusion of the Auction, subject to Bankruptcy Court
availability.

l.    Return of Deposits

All deposits shall be returned to each bidder not selected by the Debtor as the
Prevailing Bidder no later than five (5) business days following the substantial consummation of
the sale to the Prevailing Bidder.

m.    Reservation of Rights

Notwithstanding any of the foregoing, the Debtor reserves its right to modify
these Bidding Procedures with the consent of the Requisite Supporting Noteholders at or prior to
the Auction, including, without limitation, extending the deadlines set forth herein, modifying
bidding increments, waiving terms and conditions set forth herein with respect to any or all
potential bidders, imposing additional terms and conditions with respect to any or all potential
bidders, adjourning or cancelling the Auction at or prior to the Auction and/or adjourning the
Sale Hearing in open court without further notice.

n.    Backup Bidder

Notwithstanding any of the foregoing, in the event that the Prevailing Bidder with
respect to any of the Lots or individual Purchased Assets within any of the Lots fails to
consummate such sale prior to the Projected Closing Date (or such date as may be extended by
the Debtor with the consent of the Requisite Supporting Noteholders), the Second Highest
Bidder will be deemed to be the back-up bidder at the price of its last bid with respect to such
Lot(s).  The Second-Highest Bidder will be deemed to be the Prevailing Bidder and the Debtor
will be authorized, but not directed, to effectuate a Sale of such Lot(s) to the Second-Highest
Bidder subject to the terms of the Second-Highest Bid without further order of the Bankruptcy

Court. All Qualified Bids (other than the Prevailing Bid and the Second-Highest Bid) shall be deemed rejected by the Debtor on and as of the date of approval of the Prevailing Bid and the Second-Highest Bid by the Bankruptcy Court.

For the avoidance of doubt, in the event that there is a Prevailing Bidder (other than the Stalking Horse Bidder) with respect to any of the Lot(s) or individual assets, and the Stalking Horse is the Second-Highest Bidder, the Stalking Horse Bidder will be deemed to be the back-up bidder at the price of its last credit bid with respect to such Lot(s) or individual assets and will be subject to the terms contained in this section n.

27.   Notwithstanding any of the foregoing, the Debtor reserves its right to modify these Bidding Procedures with the consent of the Requisite Supporting Noteholders at or prior to the Auction, including, without limitation, extending the deadlines set forth herein, modifying bidding increments, waiving terms and conditions set forth herein with respect to any or all potential bidders, imposing additional terms and conditions with respect to any or all potential bidders, adjourning or cancelling the Auction at or prior to the Auction and/or adjourning the Sale Hearing in open court without further notice.

## THE BID PROTECTIONS

28.     The Proposed Purchaser and its advisors have expended, and will continue to expend, considerable time, energy and resources pursuing the purchase of the Assets and the assumption and assignment of the Assumed and Assigned Contracts, and have engaged in extended, good faith negotiations.  The Asset Purchase Agreement is the culmination of these efforts.

29.     In recognition of this expenditure of time, energy, and resources, and consistent with its obligations under the Asset Purchase Agreement and the Cash Collateral Order, the Debtor has agreed to pay the Transaction Expenses (as defined in Asset Purchase Agreement)  as such amounts become due and payable in the ordinary course.

30.     The Debtor has further agreed that its obligation to pay the Transaction Expenses (the "Transaction Expense Reimbursement") shall survive termination of the Asset Purchase Agreement, shall constitute an administrative expense claim under section 503(b) of the Bankruptcy Code and shall be payable pursuant to the terms and conditions of the Asset Purchase Agreement and the Bidding Procedures Order, notwithstanding section 507(a) of the Bankruptcy Code.

## THE NOTICE PROCEDURES

31.     The Debtor proposes to give notice immediately after the entry of the Bidding Procedures Order (or as soon thereafter as reasonably practicable) of the Bidding Procedures, the time and place of the Auction, the time and place of the Sale Hearing, and the objection deadline for the Sale Hearing by sending a notice (the "Sale Notice"), substantially in the form attached

hereto as *Exhibit E* by first-class mail, postage prepaid, upon (i) all entities reasonably known to have expressed an interest in a transaction with respect to the Purchased Assets during the past nine (9) months, (ii) all entities reasonably known to have asserted any claim, lien interest or encumbrance against the Debtor's right, title and interest in the Purchased Assets, (iii) the attorneys general for all states in which Purchased Assets owned by the Debtor are located, all federal and state taxing authorities, including (without limitation) the Securities and Exchange Commission, the Environmental Protection Agency, state environmental protection agencies, the Internal Revenue Service, and the Department of Labor and similar state labor or employment agencies, (iv) all counterparties to the Assumed and Assigned Contracts, (v) counsel to the Supporting Noteholders (vi) counsel to the Indenture Trustee (vii) all known or potential creditors of the Debtor and (viii) the general service list established in this chapter 11 case pursuant to Bankruptcy Rule 2002 and Local Rule 2002-1.

32.    In addition, within three (3) business days of entry of the Bidding Procedures Order, or as soon thereafter as reasonably practicable, the Debtor shall publish notice of the Bidding Procedures, the time and place of the Auction, the time and place of the Sale Hearing, and the objection deadline for the Sale Hearing in Photon Magazine (a widely read trade publication for the solar industry) and The Boston Globe, substantially in the form attached hereto as *Exhibit F* (the "Publication Notice").

33.    In addition, electronic notification of the Motion, the Bidding Procedures Order and the Notice of Auction and Sale Hearing will also be posted on the Debtor's website which will be contained on Epiq's website as follows: http://dm.epiq11.com/Evergreen.

34.    The Debtor proposes to give notice of the Sale to the counterparties under all

Assumed and Assigned Contracts (individually the "<u>Counterparty</u>" and together the "<u>Counterparties</u>") in accordance with the provisions outlined below.

**<u>THE ASSUMPTION AND ASSIGNMENT PROCEDURES</u>**

35.     To facilitate and effect the sale of the Purchased Assets, the Debtor seeks authorization to assume certain pre-petition executory contracts of the Debtor related to the Purchased Assets (the "<u>Assumed and Assigned Contracts</u>"), and to assign such executory contracts to the Proposed Purchaser or the Prevailing Bidder.

36.     In light of the foregoing and the need to coordinate the sale of the Purchased Assets, the Debtor submits the following procedures (the "<u>Assumption and Assignment Procedures</u>") for the Court's approval:

*Purchasers' Designation*

37.     On or before the date not less than 15 days following the execution of the Asset Purchase Agreement, the Debtor will provide to the Proposed Purchaser a list or lists of all contracts of the Debtor related to the Purchased Assets entered into prior to the Petition Date that the Debtor has identified as executory pursuant to section 365 of the Bankruptcy Code and that the Debtor and the Proposed Purchaser believe potentially may be assumed and assigned in connection with the Sale (the "<u>Designated Contracts</u>").  The list of Designated Contracts will also include a good faith estimate of the amount of Cure Costs applicable to each such Designated Contract (and if no Cure Cost is estimated to be applicable with respect to any particular Designated Contract, the amount of such Cure Cost has been designated for such Designated Contract as "$0.00").

38.     On or before the date that is three (3) Business Days before the Closing Date, as further described in the Asset Purchase Agreement, the Proposed Purchaser will provide to the Debtor a list of those Designated Contracts that the Proposed Purchaser elects to have assumed and assigned to the Proposed Purchaser at Closing pursuant to section 365 (the "Designation Deadline").   Under the Asset Purchase Agreement, the Proposed Purchaser has the right to remove certain contracts from the list of Assumed and Assigned Contracts at any time prior to the Designation Deadline (except with respect to Wafer Contracts, which may be excluded only with Debtor's consent, not to be withheld unreasonably).   In the event that the Proposed Purchaser exercises this option, the Debtor will provide the relevant Counterparty written notice that their contract(s) are no longer designated as an Assumed and Assigned Contract.   For the avoidance of doubt, only those executory contracts that remain designated as Assumed and Assigned Contracts as of the Closing will constitute Assumed and Assigned Contracts and will be assumed by the Debtor and assigned to the Proposed Purchaser under the Sale Order.

### *Notices*

39.     The Debtor shall serve an individual notice substantially in the form attached hereto as *Exhibit G* (the "Assumption and Assignment Notice") by first class mail on each Counterparty under each Designated Contract (and its attorney, if known) at the last known address available to the Debtor no later than 30 days following the execution of the Asset Purchase Agreement.   Each Assumption and Assignment Notice shall set forth the following information:  (i) the name and address of the Counterparty; (ii) notice of the proposed effective date of the assignment (subject to the Debtor's and Proposed Purchaser's right to withdraw such request for assumption and assignment of the Designated Contracts prior to the Closing); (iii) identification of the Designated Contract; (iv) the amount, if any, determined by the Debtor to be

necessary to be paid to cure any existing default in accordance with sections 365(b) and 365(f)(2) of the Bankruptcy Code (the "Cure Amount"); (v) a description of the Proposed Purchaser and a statement as to the Proposed Purchaser's ability to perform the Debtor's obligations under the Designated Contracts; and (v) the deadline to object, for any reason including with respect to the Cure Amount and adequate assurance of future performance, to the assumption and assignment of the Designated Contract.

40.     For Assumed and Assigned Contracts, the Debtor shall file with the Court a master notice of assignment of contracts (a "Master Assumption Notice") that sets forth:  (i) the name and address of each Counterparty; (ii) notice of the proposed effective date of the assignment (subject to the Debtor's and Proposed Purchaser's right to withdraw such request for assumption and assignment of the Designated Contracts as contained herein); (iii) identification of the Designated Contract; and (iv) the Cure Amount, if any.

41.     Master Assumption Notices for Assumed and Assigned Contracts must be filed no later than three (3) Business Days prior to the Sale Hearing.

42.     Within five (5) business days following the Closing Date, the Debtor shall file with the Court the final list of Assumed and Assigned Contracts.

*Cure Amounts*

43.     To the extent necessary to consummate the Sale, the Cure Amounts shall be paid promptly by the Debtor in accordance with the Asset Purchase Agreement, but in no event later than the later of (a) twenty (20) days following the resolution of the Cure Amounts in accordance with these procedures and (b) ten (10) days following the Closing Date.

44. Any Counterparty will be deemed to have received adequate assurance of future performance as required by section 365 of the Bankruptcy Code if the Debtor, after payment of any Cure Amounts, would no longer have any payment or delivery obligations under the relevant Assumed and Assigned Contract.

### *Counterparty Objection Procedures*

45. To the extent that any Counterparty wishes to object to any matter pertaining to the proposed assumption and assignment of the Assumed and Assigned Contracts, including without limitation to the proposed Cure Amount and the adequate assurance of future performance by the Proposed Purchaser under the applicable Assumed and Assigned Contract, then such Counterparty must file a written objection with the Court so that such objection is received by the applicable objection deadline (as further discussed below).

### *Requests for Adequate Assurance*

46. Not later than October 28, 2011, the Debtor shall post on Epiq's website, http://dm.epiq11.com/Evergreen, any non-confidential information reasonably related to adequate assurance with respect to any bidders other than the Proposed Purchaser.

47. Any Counterparty to an Assumed and Assigned Contract that wishes to receive adequate assurance information regarding bidders other than the Proposed Purchaser that will or may participate at the Auction, and to which the Debtor may ultimately elect, at the conclusion of the Auction, to assume and assign the Assumed and Assigned Contracts, must provide written notice (a "Request for Adequate Assurance") to counsel to the Debtor by mail, email, facsimile or hand delivery at Bingham McCutchen LLP, 399 Park Avenue, New York, New York 10022, Fax: (212) 752-5378 (Attn: Scott K. Seamon, Esq., scott.seamon@Bingham.com) so as to be

received no later than the General Objection Deadline. All Requests for Adequate Assurance must include an email address and/or facsimile number to which a response to such request will be sent.

48.     If a Counterparty timely submits a Request for Adequate Assurance, the Debtor shall supply such Counterparty with any non-confidential information reasonably related to adequate assurance with respect to such other bidders by email or facsimile delivery by no later than one (1) Business Day prior to the Auction. If a bidder other than the Proposed Purchaser is the Prevailing Bidder with respect to any of the Purchased Assets at the end of the Auction, the Debtor shall immediately notify all Counterparties that submits a Request for Adequate Assurance of the name of the Prevailing Bidder with respect to the relevant Purchased Assets and shall post such information on Epiq's website, http://dm.epiq11.com/Evergreen.

49.     If the Proposed Purchaser is not the Prevailing Bidder at the Auction and if a Counterparty does not timely submit a Request for Adequate Assurance and does not timely object to adequate assurance of future performance by bidders other than the Proposed Purchaser on or before the General Objection Deadline, the Court may enter an order forever barring such Counterparty from objecting to adequate assurance of future performance. Any party that has submitted a Request for Adequate Assurance shall have until three (3) Business Days prior to the Sale Hearing at 4 p.m. (ET) (the "Supplemental Objection Deadline") to file an objection to adequate assurance of future performance by any Prevailing Bidder that is not the Proposed Purchaser.

### Service of Objections

50.     All objections by Counterparties to Assumed and Assigned Contracts other than

those filed pursuant to the above procedures regarding Requests for Adequate Assurance must be filed by the General Objection Deadline. Any objection filed with respect to Assumed and Assigned Contracts will be addressed at the Sale Hearing unless adjourned or withdrawn.

51. All Counterparty objections must be served in accordance with the General Objection Procedures (as defined below) and must specify the grounds for such objection, including stating the Counterparty's alleged Cure Amount (including, on a transaction by transaction basis, calculations and detail of specific charges and dates, and any other amounts receivable or payable supporting such alleged Cure Amount) if the Counterparty disagrees with the Debtor's proposed Cure Amount and any other defaults or termination events the Counterparty alleges must be cured to effect assignment of the Assumed and Assigned Contract.

52. To the extent that any Counterparty does not timely file and serve an objection as set forth above, such Counterparty will be (i) deemed to have consented to such Cure Amounts, if any, and to the assumption and assignment of the applicable Assumed and Assigned Contract; (ii) bound to such corresponding Cure Amount, if any; (iii) deemed to have agreed that the Proposed Purchaser or any Prevailing Bidder has provided adequate assurance of future performance within the meaning of section 365(b)(1)(C) of the Bankruptcy Code; (iv) deemed to have agreed that all defaults under the Assumed and Assigned Contracts arising or continuing prior to the effective date of the assignment have been cured as a result or precondition of the assignment, such that the Proposed Purchaser or any Prevailing Bidder or the Debtor shall have no liability or obligation with respect to any default occurring or continuing prior to the assignment, and from and after the date of the assignment the Assumed and Assigned Contract shall remain in full force and effect for the benefit of the Proposed Purchaser or any Prevailing Bidder and the Counterparty in accordance with its terms; (v) deemed to have waived any right

to terminate the Assumed and Assigned Contract or designate an early termination date under the applicable Assumed and Assigned Contract as a result of any default that occurred and/or was continuing prior to the assignment date; and (vi) deemed to have agreed that the terms of the Sale Order shall apply to the assumption and assignment of the applicable Assumed and Assigned Contract.

### *Reservation of Rights*

53.     The Debtor's assumption and assignment of the Assumed and Assigned Contracts is subject to Court approval and consummation of the sale of the Purchased Assets to the Proposed Purchaser or other Prevailing Bidder.  The Debtor shall be deemed to have assumed each of the Assumed and Assigned Contracts as of the date of and effective only upon the Closing Date of the Asset Purchase Agreement or a similar agreement entered into between the Sellers and any Prevailing Bidder.  Absent such closing, the Assumed and Assigned Contracts shall be deemed neither assumed nor assigned and shall in all respects be subject to subsequent assumption or rejection by the Debtor under the Bankruptcy Code.

54.     The Proposed Purchaser shall have no rights in and to a particular Assumed and Assigned Contract until such time as the particular Assumed and Assigned Contract is assumed and assigned in accordance with the procedures set forth herein.

55.     In the event that the Proposed Purchaser is not the Prevailing Bidder at the Auction, the Debtor reserves the right to modify the Assumption and Assignment Procedures, subject to approval of the Court.

56.     Regardless of whether any objection with respect to adequate assurance has been received from a Counterparty, prior to the entry of the Sale Order, the Proposed Purchaser or any

bidder other than the Proposed Purchaser that is the Prevailing Bidder at the Auction shall provide such adequate assurance of its future performance under the Assumed and Assigned Contracts for the benefit of the parties thereto (other than the Debtor) as reasonably necessary to satisfy section 365(f)(2)(B) of the Bankruptcy Code. Except as set forth in the Asset Purchase Agreement, the Proposed Purchaser has not agreed to pay, shall not be required to assume, and shall have no liability or obligation with respect to, any liability or obligation, direct or indirect, absolute or contingent, of the Debtor, including any liabilities or obligations associated with the Assumed and Assigned Contracts arising on or before Closing under the Asset Purchase Agreement.

57. The same Assumption and Assignment Procedures will be used for each of the Assumed and Assigned Contracts. Bankruptcy Rule 6006(e) allows for the sale of multiple contracts in one motion upon authorization of the Court. The Debtor therefore requests that the Court grant authorization to seek approval of the assumption and assignment of the Assumed and Assigned Contracts through this Motion and the notice and procedures set forth in the Assumption and Assignment Procedures (which are consistent with the use of an omnibus motion pursuant to Bankruptcy Rule 6006(f)(6)).

58. To facilitate the assumption and assignment of the Assumed and Assigned Contracts, the Debtor further requests that the Court find the anti-assignment provisions of the Assumed and Assigned Contracts, if any, to be unenforceable under section 365(f) of the Bankruptcy Code.[5]

---

[5] Section 365(f)(1) provides in part that, "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease . . ." 11 U.S.C. § 365(f)(1). Section 365(f)(3) further provides that "Notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that

## REQUEST TO SET A DATE FOR THE SALE HEARING

59.     The Debtor intends to present the Prevailing Bid with respect to the individual Purchased Assets or all of the Purchased Assets, for approval by the Court pursuant to the provisions of sections 105, 363 and 365 of the Bankruptcy Code at the Sale Hearing to be scheduled by the Court and currently proposed as November 4, 2011 at 1:00 p.m. (ET).  The Debtor shall be deemed to have accepted a bid only when the Court has approved the bid at the Sale Hearing.

## OBJECTIONS TO SALE OF ASSETS

60.     All objections to the sale of any of the Purchased Assets, the assumption and assignment of the Assumed and Assigned Contracts, or any relief requested in the Motion other than the relief granted by this Court in the Bidding Procedures Order must be:  (a) in writing; (b) signed by counsel or attested to by the objecting party; (c) in conformity with the Bankruptcy Rules and the Local Rules; (d) filed with the Clerk of the Bankruptcy Court, 824 Market Street, Wilmington, Delaware 19801 by no later than 4 p.m. (ET) on October 20, 2011 (the "General Objection Deadline"), or other applicable deadline as indicated in this Motion; and (e) served in accordance with the Local Rules so as to be received on or before the relevant objection deadline by the following (collectively, the "Objection Notice Parties"):  (a) Bingham McCutchen LLP, 399 Park Avenue, New York, NY   10022, Attn:   Ronald. J. Silverman, Esq. (ronald.silverman@bingham.com), counsel to the Debtor; (b) Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, NY 10036, Attn:  Michael S. Stamer, Esq. (mstamer@akingump.com)

---

terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee."  11 U.S.C. § 365(f)(3).

and James Savin, Esq. (jsavin@akingump.com); and (c) Maslon Edelman Borman & Brand, LLP, 3300 Wells Fargo Center, 90 South Seventh Street, Minneapolis, MN 55402-4140, Attn: Clark T. Whitmore, Esq. (clark.whitmore@maslon.com), counsel to U.S. Bank National Association; (d) the Office of the United States Trustee, 844 King Street, Suite 2207, Wilmington, Delaware 19801, Fax: (302) 573-6497; and (e) counsel to the Committee (if one has been appointed) (these procedures collectively referred to as the "<u>General Objection Procedures</u>").

61.     Each objection shall state the legal and factual basis of such objection.

62.     If the Proposed Purchaser is not the Prevailing Bidder at the Auction, objections to issues arising from and in connection with the Auction and/or the Debtor's selection of a Successful Bid made by a Prevailing Bidder other than the Proposed Purchaser must be filed by the Supplemental Objection Deadline in accordance with the General Objection Procedures.

63.     Only those objections made in compliance with the General Objection Procedures will be considered by the Court at the relevant hearing. The failure of any objecting person or entity to file its objections by the relevant objection deadline and in accordance with the General Objection Procedures will be a bar to the assertion, at the Sale Hearing or thereafter, of any objection (including to the sale of the Purchased Assets and assumption and assignment of the Assumed and Assigned Contracts free and clear of liens, claims and encumbrances), and shall be deemed to be "consent" for purposes of section 363(f) of the Bankruptcy Code.

## SALE FREE AND CLEAR OF ALL LIENS, CLAIMS AND INTERESTS

64.     The Debtor has agreed to sell and transfer its right, title and interest in the Purchased Assets, free and clear of any and all Liens, Claims, and Interests (each as defined

herein) pursuant to section 363 of the Bankruptcy Code to the maximum extent allowed by section 363 of the Bankruptcy Code (other than with respect to Assumed Liabilities and Permitted Encumbrances[6]), including (without limitation) (i) any and all liens, including any lien (statutory or otherwise), mortgage, pledge, security interest, hypothecation, deed of trust, deemed trust, option, right of use, right of first offer or first refusal, servitude, encumbrance, easement, encroachment, right-of-way, restrictive covenant on real property, real property license, charge, prior claim, lease, conditional sale arrangement, or other similar restriction of any kind (collectively, including "Liens" as defined in the Asset Purchase Agreement, the "Liens"); (ii) any and all debts, liabilities and obligations, whether accrued or fixed, direct or indirect, liquidated or unliquidated, absolute or contingent, matured or unmatured, known or unknown or determined or undeterminable, including any tax liability (other than Assumed Liabilities and the Permitted Encumbrances) (collectively, the "Liabilities" and together with the Liens, the "Interests"), with such Interests to attach to the sale proceeds in the same validity, extent and priority as immediately prior to the Sale, subject to any rights, claims and defenses of the Debtor and other parties in interest; and (iii) any and all claims as defined in section 101(5) of the Bankruptcy Code, (collectively, the "Claims").

65.     The Debtor seeks a finding by the Court that upon the Closing, and except as otherwise expressly provided in the Asset Purchase Agreement, the Proposed Purchaser shall not be liable for any Claims against, and Interests in and obligations of, the Debtor or any of the Debtor's predecessors or affiliates or the assets of each of the respective entities. The Debtor further seeks a finding by the Court that as of the Closing, subject to the provisions of this Order, the Proposed Purchaser shall succeed to the entirety of the Debtor's rights and obligations in the

---

[6]     For purposes of this Motion, "Permitted Encumbrances" shall have the same meaning as set forth in the Asset Purchase Agreement.

Assumed and Assigned Contracts first arising and attributable to the time period occurring on or after the Closing and shall have all rights thereunder.

66.     The Debtor further requests that (i) all defaults (monetary and non-monetary) under the Assumed and Assigned Contracts through the Closing shall be deemed cured; (ii) no other amounts will be owed by the Debtor, its estate or the Proposed Purchaser with respect to amounts first arising or accruing during, or attributable or related to, the period prior to Closing; and (iii) any and all persons or entities shall be forever barred and estopped from asserting a claim against the Debtor, its estate, or the Proposed Purchaser that any additional amounts are due or defaults exist under the Assumed and Assigned Contracts that arose or accrued, or relate to or are attributable to the period prior to the Closing.

## ASSUMPTION AND ASSIGNMENT OF THE ASSUMED AND ASSIGNED CONTRACTS

67.     Pursuant to section 365(f) of the Bankruptcy Code, the Debtor seeks authorization and approval to assume and assign the Assumed and Assigned Contracts to the Proposed Purchaser notwithstanding any provision to the contrary in the Assumed and Assigned Contracts, or in applicable non-bankruptcy law, that prohibits, restricts, or conditions the assignment.

68.     Upon assumption of the Assumed and Assigned Contracts by the Debtor and assignment to the Proposed Purchaser, the Assumed and Assigned Contracts shall be deemed valid and binding, in full force and effect in accordance with their terms, subject to the provisions of the Sale Order.

## BASIS FOR RELIEF

### A. Sale of the Purchased Assets Is a Product of the Debtor's Reasonable Business Judgment

69.     Section 363(b)(1) of the Bankruptcy Code provides, in relevant part: "[t]he Trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." Section 105(a) of the Bankruptcy Code provides, in relevant part: "The Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

70.     A court may approve a proposed sale of a debtor's assets outside of the ordinary course of business and prior to the confirmation of a plan of reorganization if it finds that the transaction represents a reasonable business judgment on the part of the trustee or debtor-in-possession. *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 391 (6th Cir. 1986) (we "conclude that a bankruptcy court can authorize a sale of all a Chapter 11 debtor's assets under § 363(b)(1) when a sound business purpose dictates such action"); *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983) ("The rule we adopt requires that a judge determining a § 363(b) application expressly find . . . a good business reason to grant such an application")[2]; *see The Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999) ("In determining whether to authorize the use, sale or lease of property of the estate under [section 363], courts require the debtor to show that a sound business purpose justifies such actions."); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991) (existence of a "sound business reason" may justify pre-confirmation sale of

---

[2] *Lionel's* "sound business purpose test" replaced an older rule that restricted pre-confirmation sales of substantially all of a debtor's assets to "emergency" situations (i.e., when the assets to be sold were "wasting" or perishable). 722 F.2d at 1071.

estate assets); *In re Phoenix Steel Corp.*, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (stating that the elements necessary for approval of a section 363 sale in a chapter 11 case are "that the proposed sale is fair and equitable, that there is a good business reason for completing the sale and the transaction is in good faith"); *In re Stroud Ford, Inc.*, 163 B.R. 730, 732 (Bankr. M.D. Pa 1993) ("case law has strongly suggested that sales of virtually all of the assets of a Chapter Eleven Debtor other than pursuant to a Reorganization Plan should be approved only for a sound business purpose") (citation omitted); *Titusville Country Club v. Pennbank (In re Titusville Country Club)*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991) (the "sound business purpose" test is appropriate for determining whether to approve sale of estate assets); *In re Indus. Valley Refrigeration & Air Conditioning Supplies, Inc.*, 77 B.R. 15, 17 (Bankr. E.D. Pa. 1987) (holding that pre-confirmation sale of virtually all of Chapter 11 debtor's assets should be permitted 'only when a good business reason" is established); *see e.g., Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d. Cir. 1996) (a trustee is expected to represent the creditor body and the court will generally "defer to the trustee's judgment so long as there is a legitimate business justification" for the proposed action).

71.     The Third Circuit's decision in *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143 (3d Cir. 1986) is generally considered an adoption of the "sound business judgment" test. *See Titusville Country Club*, 128 B.R. at 399 (the *Abbotts Dairies* decision "has led other courts to the conclusion that the Third Circuit follows the 'sound business purpose' test rather than the 'emergency' rule."); *Delaware & Hudson Ry.*, 124 B.R. at 176 (same); *Indus. Valley Refrigeration*, 77 B.R. at 20 ("we believe that, in *Abbotts Dairies*, the Court of Appeals effectively overruled [the 'emergency' rule]").

72.     The "sound business judgment" test requires a trustee or debtor-in-possession to

establish four elements: (1) that a sound business purpose justifies the sale of assets outside the ordinary course of business; (2) that accurate and reasonable notice has been provided to interested persons; (3) that the trustee or the debtor-in-possession has obtained a fair and reasonable price; and (4) good faith. *Titusville Country Club*, 128 B.R. at 399; *Delaware & Hudson Ry.*, 124 B.R. at 176; *In re Sovereign Estate, Ltd.*, 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989); *Indus. Valley Refrigeration*, 77 B.R. at 21.

73.     Additionally, prior to and after enactment of the Bankruptcy Code, courts have permitted a proposed sale of all or substantially all assets of a trustee outside the ordinary course of business if such a sale is necessary to preserve the value of assets for the estate, its creditors or interest holders. *See In re Abbotts Dairies of Pa., Inc.*, 788 F.2d at 143; *Lionel*, 722 F.2d 1063 *passim*.

74.     The proposed sale of the Debtor's Purchased Assets meets the "sound business judgment" test. First, sound business purposes justify the sale. A prompt sale of the Purchased Assets, conducted pursuant to the Bidding Procedures, represents the best opportunity for maximizing distribution of assets to the Debtor's estate and its creditors. The value of the Purchased Assets will be adversely affected absent an immediate sale. *See Lionel*, 722 F.2d at 1071 (of factors for court to evaluate on motion under section 363(b), "most important perhaps, [is] whether the asset is increasing or decreasing in value").

75.     The Debtor has sought to establish procedures for providing accurate and reasonable notice to creditors and other prospective bidders. The notice period proposed satisfies the requirements of the Bankruptcy Rules, *see* Bankruptcy Rule 2002, and provides sufficient time for parties in interest to submit objections to the proposed sale and for bidders to formulate

and submit competing proposals.

76.     The terms of the Asset Purchase Agreement represent a fair and reasonable price for the Purchased Assets. The proposed procedures for the sale of the Purchased Assets satisfy the good faith requirement of *Abbotts Dairies*. 788 F.2d 143, 149-50 ("we hold that when a bankruptcy court authorizes a sale of assets pursuant to section 363(b)(1), it is required to make a finding with respect to the 'good faith' of the purchaser"). The results of the Auction will be the product of good faith, arm's-length negotiations with respect to the price and other terms of the sale of the Purchased Assets between the Debtor and highest and best bidder at the conclusion of the Auction.

77.     The Debtor has demonstrated sound business justifications for authorizing the sale of the Purchased Assets, entry into the Asset Purchase Agreement as a "stalking horse" sale agreement and the payment of the Transaction Expenses under the circumstances, timing, and procedures set forth herein and in the Bidding Procedures. The sale of the Purchased Assets pursuant to the Bidding Procedures will afford the Debtor's estate an opportunity to maximize the recovery to creditors. Accordingly, the Debtor requests that the Court approve the proposed procedures for the sale of the Purchased Assets to the highest or otherwise best bidder at the Auction, approve the Sale presented to the Court at the Sale Hearing and authorize the Debtor to take such other steps as are necessary to consummate the Sale.

**B.      The Bidding Procedures Are Appropriate Under the Circumstances**

78.     A debtor may sell its assets outside the ordinary course of business after notice and a hearing. 11 U.S.C. § 363. To obtain approval of a proposed sale of assets, a debtor must demonstrate that the "proffered purchase price is the highest and best offer" under the

circumstances of the case. *See, e.g., Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *In re Integrated Res.*, 147 B.R. 650, 659 (S.D.N.Y. 1992) ("It is a well-established principle of bankruptcy law that the . . . Debtor's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting *Cello Bay Co. v. Champion Int'l Corn. (In re Atlanta Packaging Prods., Inc.)*, 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988)).

79.     Bankruptcy courts routinely approve competitive bidding procedures as a means of facilitating the sale of a debtor's assets outside of the ordinary course of business and ensuring the highest and best return for a debtor's estate. The opportunity for competitive bidding embodied in the Bidding Procedures will generate the highest or otherwise best offer for the Purchased Assets and is designed to maximize the value of the Debtor's Purchased Assets. The Debtor is subjecting the value of the Purchased Assets to market testing and will permit perspective purchasers to bid on the Purchased Assets as a whole, or individually, thereby subjecting the proposed sale to a market check through solicitation of competing bids in a court-supervised auction process.

80.     A prompt sale process is the best way to maximize the value of the Debtor's Purchased Assets for the benefit of its estate, creditors and other stakeholders in light of the need to manage and transition the Purchased Assets to a Purchaser. Every day spent in chapter 11 increases the risk of business loss and value deterioration. Absent a prompt sale pursuant to the procedures and timelines proposed, the Debtor believes that the going concern value of the Purchased Assets could be compromised. Cash burn is a major factor in this case and has been a major concern to the Supporting Noteholders throughout the negotiation process.

81.     The Debtor has concluded that:  (a) a prompt sale of the Purchased Assets is the best way to maximize value for the estate, and (b) the proposed Bidding Procedures described herein are fair, reasonable, and appropriate and are designed to maximize recovery with respect to the sale of the Purchased Assets.

## C.     Provision for Bid Protections in the Form of a Transaction Expense Reimbursement Has Become a Recognized and Necessary Practice

82.     The Debtor has formulated a bidding process that the Debtor believes will induce prospective competing bidders to expend the time, energy and resources necessary to submit a bid, and which the Debtor believes is fair and reasonable and will provide a benefit to the Debtor's estate and creditors.  The proposed Transaction Expense Reimbursement is reasonable and supported by applicable case law.

83.     The use of bid protections has become an established practice in chapter 11 asset sales involving the sale of significant assets.  Bid protections enable a debtor to ensure a sale to a contractually committed bidder at a price the debtor believes is fair, while providing the debtor with the potential of obtaining an enhanced recovery through an auction process.  Historically, bankruptcy courts have approved bidding incentives (including bid protections) solely by reference to the "business judgment rule," which proscribes judicial second-guessing of the actions of a corporation's board of directors taken in good faith and in the exercise of honest judgment.  See, e.g., In re *995 Fifth Ave. Assocs.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1992) (bidding incentives may "be legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking") (citation omitted); *In re Marrose Corp.*, 1992 WL 33848, at *5 (Bankr. S.D.N.Y. 1992) (bidding incentives "are meant to compensate the potential acquirer who serves as a catalyst or 'stalking

horse' which attracts more favorable offers"); *In re Integrated Res.*, 147 B.R. 650, 657-58 (S.D.N.Y. 1992).

84.     The Third Circuit has established standards for determining the appropriateness of bidding incentives in the bankruptcy context. In *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527 (3d Cir. 1999). O'Brien held that while bidding incentives are measured against a business judgment standard in non-bankruptcy transactions, the administrative expense provisions in section 503(b) of the Bankruptcy Code govern in the bankruptcy context. To be approved, bidding incentives such as the Transaction Expense Reimbursement must provide benefit to a debtor's estate. Id. at 533.

85.     O'Brien identified at least two instances in which bidding incentives may provide benefit to the estate. First, benefit may be found if "assurance of a break-up fee promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would [be] limited." Id. at 537. Second, where the availability of bidding incentives induce a bidder to research the value of the debtor and submit a bid that serves as a minimum or floor bid on which other bidders can rely, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." Id.

86.     The Transaction Expense Reimbursement proposed by the Debtor is consistent with both the "business judgment rule" and the O'Brien standard, and should be approved as fair and reasonable. Potential purchasers will receive a copy of the Asset Purchase Agreement and will have an opportunity to submit their own adaptation of that agreement, marked to show changes necessary to consummate a sale which must be acceptable to the Debtor. The Debtor's

payment of the Transaction Expense Reimbursement payable by the Debtor under the conditions set forth in this Motion is (a) an actual and necessary cost of preserving the Debtor's estate, within the meaning of section 503(b) of the Bankruptcy Code, (b) of substantial benefit to the Debtor's estate and creditors and all parties in interest herein, (c) reasonable and appropriate and (d) necessary to ensure that the Proposed Purchaser will continue to pursue the proposed Asset Purchase Agreement to undertake the sale of the Purchased Assets, and therefore constitute administrative expenses with priority pursuant to Bankruptcy Code sections 503(b).

**D.      The Proposed Purchaser and Potential Bidders Should Receive the Protection of Section 363(m) of the Bankruptcy Code**

87.      As will be set forth in further detail at the Sale Hearing, the Debtor also maintains that the Proposed Purchaser is entitled to the protections afforded by section 363(m) of the Bankruptcy Code.

88.      Specifically, section 363(m) provides that:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

89.      While the Bankruptcy Code does not define "good faith," the Third Circuit has held that:

> [t]he requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

*Abbotts Dairies*, 788 F.2d at 147 (citations omitted); *see generally Marin v. Coated Sales, Inc., (In re Coated Sales, Inc.)*, 1990 WL 212899, at *2 (S.D.N.Y. Dec. 13, 1990) (holding that party, to show lack of good faith, must demonstrate "fraud, collusion, or an attempt to take grossly unfair advantage of other bidders"); *see also In re Sasson Jeans, Inc.*, 90 B.R. 608, 610 (S.D.N.Y. 1988) ("The misconduct which would destroy a buyers 'good faith purchaser' status at a judicial sale ordinarily involves fraud, collusion between the purchaser and the other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.") (quoting *In re Bel Air Assocs., Ltd.*, 706 F.2d 301, 305 (10th Cir. 1983)); *In re Pisces Leasing Corp.*, 66 B.R. 671, 673 (E.D.N.Y. 1986) (examining facts of each case, concentrating on "integrity of [an actor's] conduct during the sale proceedings" (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)).

90.     Over the last weeks, the Debtor has spent a considerable amount of time and resources negotiating the Asset Purchase Agreement at arm's length, with give and take on both sides. This Court should find that the Proposed Purchaser is entitled to all of the protections of section 363(m).

91.     The Bidding Procedures are designed to ensure that no party is able to exert undue influence over the process. The Proposed Purchaser or Prevailing Bidder should be afforded the protections that section 363(m) of the Bankruptcy Code provides to a good faith purchaser.

### E.     The Asset Purchase Agreement is Not the Subject of Collusive Bidding Under Section 363(n) of the Bankruptcy Code

92.     The Debtor has been negotiating with the Proposed Purchaser at arm's length and in good faith regarding the sale of the Purchased Assets. Any resulting sale will not stem from collusion or other bad faith between bidders, nor will the sale price under the Asset Purchase

Agreement be controlled by an agreement between potential or actual bidders within the meaning of section 363(n) of the Bankruptcy Code.

93. The Asset Purchase Agreement with the Proposed Purchaser has been negotiated, proposed, and entered into by the Debtor and the Proposed Purchaser without collusion, in good faith, and from arm's-length bargaining positions. Neither the Debtor nor the Proposed Purchaser have engaged in any conduct that would cause or permit the Asset Purchase Agreement to be avoided under section 363(n) of the Bankruptcy Code.

**F.      Sale of the Purchased Assets Should Be Free and Clear of Liens, Claims and Interests**

94. Pursuant to section 363(f) of the Bankruptcy Code, the Debtor seeks authority to sell and transfer the Debtor's right, interest and title in the Purchased Assets to the Proposed Purchaser or Prevailing Bidder free and clear of all Claims and Interests, except as set forth in the Asset Purchase Agreement, with such Claims and Interests to attach to the proceeds of the sale of the Purchased Assets, subject to any rights and defenses of the Debtor and other parties in interest with respect thereto. Section 363(f) of the Bankruptcy Code provides, in pertinent part:

> The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if –
>
> (1)      applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2)      such entity consents;
>
> (3)      such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4)      such interest is in bona fide dispute; or

> (5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  *See also In re Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988) (as section 363(f) is written in the disjunctive a court may approve sale "free and clear" provided at least one of the requirements is met).

95.     With respect to each creditor asserting an Interest, one or more of the standards set forth in Bankruptcy Code § 363(f)(1)-(5) has been satisfied.  Those holders of Claims and Interests who did not object or who withdrew their objections to the Sale or the Motion are deemed to have consented to the Motion and Sale pursuant to Bankruptcy Code § 363(f)(2).  Those holders of Claims and Interests who did object fall within one or more of the other subsections of Bankruptcy Code section 363(f).

96.     A sale free and clear of Claims and Interests is necessary to maximize the value of the Purchased Assets.  The Proposed Purchaser would not have entered into the Asset Purchase Agreement and would not consummate the Sale if the sale of the Purchased Assets to the Proposed Purchaser were not free and clear of all Claims and Interests, or if the Proposed Purchaser would, or in the future could, be liable for any of such Claims or Interest.  A sale of the Purchased Assets other than one free and clear of all Claims and Interests would yield substantially less value for the Debtor's estate, with less certainty than the proposed Sale.  The Sale contemplated by the Asset Purchase Agreement is in the best interests of the Debtor, its estate and creditors, and all other parties in interest.  A sale free and clear of Claims and Interests is particularly appropriate under the circumstances because any lien or claim in, to or against the Debtor's right, interest and title in the Purchased Assets that exists immediately prior to the closing of any sales will attach to the sale proceeds allocated to the Debtor with the same

validity, priority, force and effect as it had at such time, subject to the rights and defenses of the Debtor or any party in interest.

**G.    Notice of the Proposed Sale Is Reasonable Under the Circumstances**

97.    The Debtor submits that the Sale Notice as set forth above, along with the Publication Notice in <u>Photon Magazine</u> (a widely read trade publication for the solar industry) and <u>The Boston Globe</u> is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Bidding Procedures, the Auction (if necessary) and the Sale Hearing.

**H.    The Assumption and Assignment of the Assumed and Assigned Contracts Should Be Authorized**

98.    Under section 365(a) of the Bankruptcy, a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).   Section 365(b)(1) of the Bankruptcy Code, in turn, codifies the requirements for assuming an executory contract of a debtor.  This subsection provides:

> (b) (1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee -
>
> (A)    cures, or provides adequate assurance that the trustee will promptly cure, such default . . . ;
>
> (B)    compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C)    provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).  Section 365(f)(2) of the Bankruptcy Code provides, in pertinent part, that:

The trustee may assign an executory contract or unexpired lease of the debtor only if --

(A)     the trustee assumes such contract or lease in accordance with the provisions of this section; and

(B)     adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

99.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *EBG Midtown S. Corp. v. McLaren/Hart Envtl. Eng'g Corp. (In re Sanshoe Worldwide Corp.)*, 139 B.R. 585, 593 (S.D.N.Y. 1992); *In re Prime Motor Inns Inc.*, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994); *Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988).

100.     A demonstration of the assignee's financial health and experience in managing the type of enterprise or property assigned may constitute adequate assurance. *See, e.g., In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding adequate assurance of future performance present when prospective assignee of lease from debtor has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

101.     To the extent any defaults exist under any Assumed and Assigned Contracts, any such default will be promptly cured or adequate assurance that such default will be cured will be provided prior to the assumption and assignment. If necessary, the Debtor will submit facts prior to or at the Sale Hearing to show the financial credibility of the Proposed Purchaser or Prevailing Bidder and willingness and ability to perform under the Assumed and Assigned Contracts. The

Sale Hearing will therefore provide the Court and other interested parties the opportunity to evaluate and, if necessary, challenge the ability of the Proposed Purchaser to provide adequate assurance of future performance under the Assumed and Assigned Contracts, as required under section 365(b)(1)(C) of the Bankruptcy Code.

102.    It is an exercise of its sound business judgment to assume and assign the Assumed and Assigned Contracts to the Proposed Purchaser in connection with the consummation of the Sale, and the assumption, assignment and sale of Assumed and Assigned Contracts is in the best interests of the Debtor, its estate, its creditors and all parties in interest.  The Assumed and Assigned Contracts being assigned to the Proposed Purchaser are an integral part of the Purchased Assets being purchased by the Proposed Purchaser, and accordingly, such assumption, assignment and sale of Assumed and Assigned Contracts are reasonable and enhance the value of the Debtor's estate.  The Court should therefore authorize the Debtor to assume and assign the Assumed and Assigned Contracts as set forth herein.

103.    In connection with the negotiation of the Cash Collateral Order, the Debtor have sought approval of an order that will provide that upon the sale of the Assets to "promptly pay to the Indenture Trustee, for the benefit of the holders of the 13% Notes, 100% of the net cash resulting therefrom (the "Net Proceeds") no later than the second business day following receipt of such proceeds, solely to the extent that, after giving effect to such payment, there remains in the Debtor's estate cash in an amount equal to the sum of:  (a) any amounts that remain unspent pursuant to the Approved Budget; (b) the Carve-Out; and (c) any other amounts contemplated by the RSA as requiring payment (including, without limitation, amounts identified in the Term Sheet (as defined in the RSA) or the Noteholder APA (as defined in the RSA))."  Proposed Cash Collateral Order 16(c).  Although the Debtor and the Supporting Noteholders believe that the

Court will approve this request in the Cash Collateral Order, out of an abundance of caution, the

Debtor has the authority under the Restructuring Support Agreement to turn over the Net

Proceeds to the Indenture Trustee. In order to comply with such obligations under the

Restructuring Support Agreement, the Debtor seeks the authority to turn over the Net Proceeds.

## I.      Waiver of Bankruptcy Rule 6006(f)(6) with Respect to the Assumed and Assigned Contracts

104.    Bankruptcy Rule 6006(f)(6) requires that an omnibus motion to reject, assume or

assign multiple executory contracts or unexpired leases "be limited to no more than 100

executory contracts or unexpired leases." With regards to the Assumed and Assigned Contracts,

the Debtor requests that the Court waive the provision in Bankruptcy Rule 6006(f)(6) limiting

the number of executory contracts and unexpired leases that may be incorporated into one

omnibus motion. Rule 6006(f)(6) seeks "to help the other parties to the contracts locate their

information in the midst of the omnibus motion." 10 Collier on Bankruptcy ¶ 6006.05 (15th ed.

1999). Because the Debtor proposes to send an individual notice to each Counterparty, the

purpose of the rule will be satisfied without needlessly filing multiple motions with the Court.

## J.      Waiver of Automatic Fourteen-Day Stay Under Bankruptcy Rules 6004(h) and 6006(d)

105.    Pursuant to Bankruptcy Rule 6004(h), unless the Court orders otherwise, all

orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are

automatically stayed for fourteen days after entry of the order. Under Bankruptcy Rule 6006(d),

unless the Court orders otherwise, all orders authorizing the assignment of contracts or unexpired

leases are automatically stayed for fourteen days after entry of the order. The purpose of

Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to

request a stay pending appeal before the order can be implemented. *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h); Advisory Committee Notes to Fed. R. Bankr. P. 6006(d).

106. Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day stay period, commentators agree that the 14-day stay period should be eliminated to allow a sale or other transaction to close immediately where there has been no objection to the procedure. *See generally* 10 Collier on Bankruptcy ¶ 6004.09 (15th ed. 1999). Furthermore, if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time necessary to file such appeal. *Id.*

107. Pursuant to the Asset Purchase Agreement, and because of the potentially diminishing value of the Purchased Assets, the Debtor must close this sale promptly after all closing conditions have been met or waived. Thus, waiver of any applicable stays is appropriate in this circumstance.

## NOTICE

108. Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known: (i) the Office of the United States Trustee; (ii) the Debtor's prepetition secured lenders; (iii) Maslon Edelman Borman & Brand, LLP, 3300 Wells Fargo Center, 90 South Seventh Street, Minneapolis, MN 55402-4140, Attn: Clark T. Whitmore, Esq. (clark.whitmore@maslon.com), as counsel to the Indenture Trustee; and (iv) Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036, Attn: Michael S. Stamer (mstamer@akingump.com), as counsel to the Supporting Noteholders and as counsel to the Proposed Purchaser. The Debtor submits that under the circumstances no other or further notice

is necessary.

## NO PRIOR REQUEST

109.    No prior request for the relief sought herein has been made to this or any other

court.

WHEREFORE, the Debtor respectfully requests that this Court (i) grant this Motion and

the relief requested herein; (ii) enter the proposed orders attached hereto; and (iii) grant such

other and further relief as it deems just and proper.

Dated:    August 15, 2011

BINGHAM MCCUTCHEN LLP

Ronald J. Silverman (*pro hac vice pending*)
Steven Wilamowsky (*pro hac vice pending*)
Scott K. Seamon (*pro hac vice pending*)
399 Park Avenue
New York, New York 10022
Telephone:  (212) 705-7000
Facsimile:  (212) 752-5378
ronald.silverman@bingham.com
steven.wilamowsky@bingham.com
scott.seamon@bingham.com

PACHULSKI STANG ZIEHL & JONES LLP

Laura Davis Jones (Bar No. 2436)
Timothy P. Cairns (Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile:  (302) 652-4400
E-mail:  ljones@pszjlaw.com
tcairns@pszjlaw.com

*[Proposed] Attorneys for Debtor and Debtor in
Possession*